## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **GALLIT FISCHMAN,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:26-CV-0770-D** |
| | § | |
| **EPIC SYSTEMS CORPORATION,** | § | |
| | § | |
| **Defendant.** | § | |

## EPIC SYSTEMS CORPORATION'S MOTION TO DISMISS

**TABLE OF CONTENTS**

TABLE OF CONTENTS................................................................................................i

TABLE OF AUTHORITIES .......................................................................................iii

INTRODUCTION ....................................................................................................... 1

STANDARD OF REVIEW .......................................................................................... 2

ARGUMENT............................................................................................................... 3

    A.    The Amended Complaint Fails to Plead a Plausible Causal Connection Between Any Alleged Defect and Mr. Fischman's Death.................................... 3

        1.    The Amended Complaint does not identify the customer organization, prescribing physician, the treatment decision, or the mechanism of harm..................................................................... 3

        2.    The Amended Complaint Confuses What the Patient's Daughter Saw After Death with What the Physicians Saw During Treatment. ........................................................................................ 4

        3.    The Amended Complaint necessarily depends on physician judgment. ................................................................................... 5

        4.    Texas products liability law requires specificity the Amended Complaint lacks. .................................................................... 8

    B.    Epic Owes No Cognizable Tort Duty to Individual Patients Under Texas Law.................................................................................... 9

        1.    *Mendez* controls: third-party vendors owe no duty to their clients' end users..................................................................... 9

        2.    The MyChart patient portal does not create a direct relationship sufficient to impose a duty..................................................... 12

        3.    ONC certification does not create a private duty.................................... 12

    C.    The EHR Platform Is Not a "Product" Under the Texas Products Liability Act............................................................................ 14

        1.    Chapter 82 does not reach software, and the most authoritative sources on products liability expressly exclude it..................................... 15

        2.    The Amended Complaint's own allegations undermine its "fixed product" theory, and its attempt to neutralize the contradiction fails..................................................................... 17

3.      The Amended Complaint's "Architectural Control as a
        Dispositive Distinction" theory does not support the products
        liability claim. ...................................................................................... 18

D.  The Negligent Misrepresentation Claim Fails Because Epic's Alleged
    Representations Were Not Directed to Patients and No Patient
    Justifiably Relied on Them. ...................................................................... 18

    1.      Texas follows the strict § 552 framework, which limits liability
            to a "known party for a known purpose." ................................................. 19

    2.      Epic's alleged representations were not directed to individual
            patients. ............................................................................................ 19

    3.      The Amended Complaint does not allege justifiable reliance by
            Mr. Fischman on any specific Epic representation. ................................. 21

E.  The Gross Negligence Allegations Are Conclusory and Should Be
    Dismissed. ................................................................................................ 21

F.  Plaintiff Lacks Capacity to Pursue Non-Wrongful-Death Damages. ................... 23

CONCLUSION AND PRAYER FOR RELIEF ............................................................ 24

## TABLE OF AUTHORITIES

**Cases**

*Ackermann v. Wyeth Pharmaceuticals*, 526 F.3d 203 (5th Cir. 2008) ........................................ 12

*Amrhein v. eClinicalWorks, LLC,* 954 F.3d 328 (1st Cir. 2020) ................................................. 17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................... 9, 10, 14, 23

*Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845 (Tex. 2005) ........................................ 29, 30

*Borg-Warner Corp. v. Flores,* 232 S.W.3d 765 (Tex. 2007)........................................................ 14

*Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001)............................................ 19

*Burghart v. South Correctional Entity*, No. 2:21-CV-01578, 2023 WL 1766258
    (W.D. Wash. Feb. 3, 2023) ...................................................................................... 22

*Butler v. Juno Therapeutics, Inc.*, 541 F. Supp.3d 774 (S.D. Tex. May 27, 2021) ...................... 12

*Caterpillar, Inc. v. Shears*, 911 S.W.2d 379 (Tex. 1995)........................................................ 22, 24

*Centocor, Inc. v. Hamilton*, 372 S.W.3d 140 (Tex. 2012)........................................................ 12, 20

*Davis v. Dallas County*, 541 F. Supp.2d 844 (N.D. Tex. Mar. 6, 2008) .................................... 16

*Diamond Shamrock Refining Co. v. Hall*, 168 S.W.3d 164 (Tex. 2005)..................................... 28

*Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137 (Tex. 2022).............................. 15, 17, 19, 20

*Fresh Coat, Inc. v. K-2, Inc.,* 318 S.W.3d 893, (Tex. 2010).......................................................... 21

*Gen. Elec. Cap. Corp. v. Posey*, 415 F.3d 391 (5th Cir. 2005) .................................................... 25

*Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913 (Tex. 2010) ............. 25, 27

*Graves v. CAS Medical Systems, Inc.*, 735 S.E.2d 650 (S.C. 2012)............................................ 10

*Guidry v. Bank of LaPace*, 954 F.2d 278 (5th Cir. 1992)............................................................. 11

*Guzman v. Synthes (USA)*, 20 S.W.3d 717 (Tex. App.—San Antonio 1999, pet.
    denied).................................................................................................................... 20

Houston Area Safety Council, Inc. v. Mendez, 671 S.W.3d 580 (Tex. 2023) ...................... *passim*

*IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794 (Tex. 2004) .......................................... 10

*Longoria v. GEO Reentry, Inc.*, No. 1:23-CV-104, 2025 WL 1688104 (S.D. Tex. May 23, 2025) .................................................................................................. 28

*McCall v. Genetech, Inc.*, No. 3:10-CV-1747, 2011 WL 2312283 (N.D. Tex. Jun. 9, 2011) ....................................................................................................................... 17

*McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787 (Tex. 1999).............................................................................................. 25, 26, 27

*Mobile Oil v. Ellender, 968 S.W.2d 917 (Tex. 1998)*.................................................. 28

*Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499 (Tex. 2017)................................ 15, 17

*Rodgers v. Christie*, 795 F. App'x 878 (3d Cir. 2020) .................................................. 21

*Shepherd v. Ledford*, 962 S.W.2d 28 (Tex. 1998) ........................................................ 30

*Steen v. Medtronic, Inc.*, No. 3:10-CV-936, 2010 WL 2573455 (N.D. Tex. June 25, 2010) ....................................................................................................................... 10

*Suday v. Suday*, 716 S.W.3d 586 (Tex. 2025) .............................................................. 30

*Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10 (Tex. 1994) ................................... 28

*White v. Ford Motor Co.*, No. 3:24-CV-2139-D, 2024 WL 4895726 (N.D. Tex. Nov. 26, 2024) ........................................................................................................... 29

*Winter v. G.P. Putnam's Sons*, 938 F.2d 1033 (9th Cir. 1991)..................................... 21

**Statutes**

21 U.S.C. § 360j(o)(1)(B)–(E)....................................................................................... 23

21 U.S.C. § 360j(o)(1)(C) ............................................................................................. 13

Tex. Civ. Prac. & Rem. Code § 41.001(11)............................................................. 27, 28

Tex. Civ. Prac. & Rem. Code § 41.003(a).................................................................... 27

Tex. Civ. Prac. & Rem. Code § 71.002(b)...................................................................... 9

Tex. Civ. Prac. & Rem. Code § 71.004 ........................................................................ 29

Tex. Civ. Prac. & Rem. Code § 82.001 .................................................................. 20, 21

**Other Authorities**

Restatement (Second) of Torts § 552 (1977)................................................... 8, 24, 25, 27

Restatement (Second) of Torts § 552(1) (1977) ............................................................. 25

Restatement (Second) of Torts § 552(2)(a) (1977) ........................................................ 25

Restatement (Third) of Torts: Prods. Liab. § 19 (1998) ........................................... 21, 24

Restatement (Third) of Torts: Prods. Liab. § 19(a) (1998) ........................................... 21

**Rules**

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 8, 30

**Regulations**

45 C.F.R. § 170.315 ....................................................................................................... 19

45 C.F.R. § 170.580 ....................................................................................................... 19

ONC Health IT Certification Program, 45 C.F.R. pt. 170 ............................................. 18

**<u>INTRODUCTION</u>**

This is a wrongful-death case about electronic health record design—but Plaintiff never connects any specific alleged software defect to anyone's death. Plaintiff Gallit Fischman, proceeding pro se, alleges that architectural deficiencies in Epic Systems Corporation's EHR platform caused the death of her father, Dov Fischman. The Amended Complaint asserts five causes of action: wrongful death, negligence, products liability (design defect), negligent misrepresentation, and gross negligence. Each fails as a matter of law.

The Amended Complaint names the medication Everolimus and alleges it was prescribed off label for a heart transplant but that allegation does not cure the fundamental deficiency. It sharpens it. The more specific the medication allegation, the more apparent it is that causation necessarily runs through the prescribing physician's clinical judgment: a judgment the Amended Complaint never identifies, never addresses, and cannot avoid. The Amended Complaint does not identify the customer healthcare provider organization, the prescribing physician, or any treatment decision, does not allege that any physician would have acted differently but for any software feature, and does not plead a clinical mechanism connecting any alleged defect to Mr. Fischman's death. The Court should dismiss the Amended Complaint for the following independent reasons:

*First*, the Amended Complaint fails to plead a plausible causal connection between any alleged software defect and Mr. Fischman's death. Its prevention theories—approval workflows, off-label alerts, clinical decision support—depend on what a physician would have done with different information, a causal link the Amended Complaint never makes. Causation here requires proof that the alleged deficiency was a producing and substantial cause of the physician's decision, and the Amended Complaint provides none.

*Second*, Epic owes no cognizable tort duty to individual patients under Texas law. The Texas Supreme Court's framework in *Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580 (Tex. 2023), forecloses each of the Amended Complaint's duty theories.

*Third*, Epic's EHR platform is not a "product" within the meaning of the Texas Products Liability Act. No Texas court has ever subjected enterprise software to Chapter 82 liability, and the Act's text, structure, and purpose foreclose that extension.

*Fourth*, the negligent misrepresentation claim fails because the Amended Complaint does not allege that any member of the Fischman family ever saw, read, or relied on any Epic representation. There are no allegations that ONC certification and the platform capabilities were made to individual patients, and the Amended Complaint does not plead the justifiable reliance that Texas law and the Restatement (Second) of Torts § 552 (1977) requires.

*Fifth*, the gross negligence claim fails because the Amended Complaint does not allege the actual, subjective awareness of a specific extreme risk that Texas law demands—and identifies no corporate vice principal who possessed such awareness.

*Finally*, Plaintiff lacks capacity to pursue the survival and estate-level damages because she has not alleged that she has been appointed personal representative of Mr. Fischman's estate.

The Amended Complaint should be dismissed in its entirety under Rule 12(b)(6). No amount of liberal construction can supply the factual allegations it omits.

## STANDARD OF REVIEW

Under Rule 12(b)(6), the Court accepts well-pleaded factual allegations as true but is "not bound to accept as true a legal conclusion couched as a factual allegation." *Ashcroft v. Iqbal*, 556

2

U.S. 662, 678 (2009). The Court must set aside conclusory allegations and determine whether the remaining factual matter "state[s] a claim to relief that is plausible on its face." *Id.*[1]

## **ARGUMENT**

**A.    The Amended Complaint Fails to Plead a Plausible Causal Connection Between Any Alleged Defect and Mr. Fischman's Death.**

The Amended Complaint fails at the threshold because it does not plead a plausible causal connection between any alleged defect in Epic's software and Mr. Fischman's death. This deficiency is fatal regardless of how the Court resolves the duty and product-classification questions addressed below. *See* Tex. Civ. Prac. & Rem. Code § 71.002(b).

### **1.    The Amended Complaint does not identify the customer organization, prescribing physician, the treatment decision, or the mechanism of harm.**

The Amended Complaint identifies a medication—Everolimus—and alleges it was prescribed off-label for a heart transplant patient. Am. Compl. ¶¶ 54–55. It alleges EHR system-level failures: the system permitted initiation of Everolimus without documented justification, approval, or monitoring (¶¶ 54–56), lacked escalation mechanisms for high-risk decisions (¶ 56), and failed to aggregate adverse findings or generate alerts (¶ 59). But naming the medication and alleging the absence of system-level safeguards does not plead causation.

The Amended Complaint does not identify the provider organization (to establish whether it even uses Epic software) or the prescribing physician, does not allege what information was available to treating physicians through the clinical-facing interface at the time of prescribing, does not allege that any physician would have acted differently had the system generated an alert or required approval, and does not allege the clinical mechanism by which the absence of any specific

---

[1] Epic assumes as true, as it must, that the allegations in the Amended Complaint are true for the purposes of this Motion. *See Campbell v. Wells Fargo Bank*, 781 F.2d 440, 442 (5th Cir. 1986).

feature purportedly caused or contributed to Mr. Fischman's death. *See Iqbal*, 556 U.S. at 678; *see also Steen v. Medtronic, Inc.*, No. 3:10-CV-936, 2010 WL 2573455 (N.D. Tex. June 25, 2010) (requiring plaintiff in medical products liability case to plead specific defect and "sufficient facts demonstrating that his injury would not have occurred but for the pacemaker's design").[2] The Amended Complaint suffers the same infirmity: its causal theory rests on conclusory steps and identifies no specific fault, no specific warning deficiency, and no specific mechanism of harm. *See IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798-99 (Tex. 2004) (proximate cause "cannot be established through conjecture, guess, or speculation").[3]

### 2.    The Amended Complaint Confuses What the Patient's Daughter Saw After Death with What the Physicians Saw During Treatment.

The Amended Complaint's factual anchor is Plaintiff's alleged post-mortem review of her father's medical record through the patient-facing portal. The Amended Complaint also alleges system-level failures during treatment: the system permitted initiation of Everolimus without approval or monitoring (¶ 54), failed to surface risk information (¶ 55), lacked escalation mechanisms (¶ 56), failed to reconcile conflicting diagnostic information (¶ 57), and failed to aggregate adverse findings (¶ 59). But these allegations describe what Plaintiff believes the system

---

[2] The Amended Complaint's most specific causation allegations—its five-step causal chain (Am. Compl. ¶ 65)—confirm this deficiency. The chain posits that (1) Epic's architecture allowed medication information to go unrecorded or appear inconsistently; (2) clinicians relied on the Epic record; (3) the record did not accurately reflect the medication status; (4) the missing information was not corrected; and (5) the uncorrected status caused Mr. Fischman's death. But each step is conclusory. Step (1) does not allege any specific instance in Mr. Fischman's record as it appeared to treating physicians. Step (3) does not identify how the record diverged from reality in the clinical-facing interface. Step (4) does not name who, if anyone, failed to act. And step (5) leaps to causation without alleging what a physician would have done differently.

[3] The only reported decision squarely addressing alleged software design defect claims against a medical monitor manufacturer confirms this point. In *Graves v. CAS Medical Systems, Inc.*, 735 S.E.2d 650, 659 (S.C. 2012), the court held that such claims require "expert testimony" because the claim "involves complex issues of computer science" beyond lay understanding. Although *Graves* arose at summary judgment, its recognition that software-defect causation involves specialized complexity beyond lay understanding underscores the inadequacy of the conclusory allegations here. The Amended Complaint does not even identify a specific software feature that malfunctioned, let alone provide the factual specificity that would make its causal theory plausible under *Iqbal*.

allegedly should have done—not what any treating physician experienced. The Amended Complaint does *not* allege that any treating physician was unable to access accurate medication information through the clinical-facing interface, that any physician relied on inaccurate information displayed by Epic's system, or that the alleged deficiencies Plaintiff identifies existed in the clinical record as viewed by physicians during treatment.

This distinction is legally significant: the Amended Complaint's entire theory depends on the assumption that alleged deficiencies visible in the patient portal existed in the clinical record physicians used, yet the Amended Complaint never makes that allegation. The patient-facing portal displays a subset of the clinical record formatted for patients as configured by the healthcare organization; it is not the clinical-facing interface physicians use to make treatment decisions.

The Amended Complaint assumes—without alleging—that the system-level deficiencies it describes in the abstract manifested in the clinical record during Mr. Fischman's treatment and that treating physicians lacked access to information that would have changed their decisions. Those are "unwarranted deductions of fact" that do not survive a motion to dismiss. *Guidry v. Bank of LaPace*, 954 F.2d 278, 281 (5th Cir. 1992). Without allegations establishing what the clinical-facing interface displayed to treating physicians during the relevant treatment period, Plaintiff's observations from the patient portal cannot support the conclusory inference that physicians lacked access to the same information.

### 3. The Amended Complaint necessarily depends on physician judgment.

The Amended Complaint contains a fatal internal contradiction. It insists that "[t]his action does not challenge physician treatment decisions" and that "[r]esolution of these claims concerns software architecture . . . independent of physician judgment." Am. Compl. ¶¶ 6, 8. Yet it alleges the system should have generated off-label prescribing alerts, required approval workflows,

surfaced safer alternatives, and aggregated adverse findings to generate clinical alerts. Am. Compl. ¶¶ 54–56, 59, 61. These allegations are irreconcilable: proving that a system-generated alert would have prevented death necessarily requires proving what a treating physician would have done with different information. The Amended Complaint cannot disclaim physician-judgment questions while advancing a causal theory that depends entirely on them. Nor does the Amended Complaint allege that the treating physicians lacked any independent source of clinical information, an omission that further undermines its theory that the EHR was the but-for cause of harm.

Causation requires proof that the deficiency was "a producing cause of [the] physicians' decisions." *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 143 (Tex. 2012). This requirement cannot be avoided by casting what is essentially a failure to warn claim under a different cause of action. *Id.* at 168-69. Although *Centocor* arose in the pharmaceutical context, its reasoning applies here: the Texas Supreme Court grounded its holding in the structural role of the physician as the decision-maker between the product and the patient, holding that "the duty to warn a patient . . . rests with the prescribing physician." *Id*. at 166. The plaintiff must show the physician would have acted differently with different information. *See Ackermann v. Wyeth Pharmaceuticals*, 526 F.3d 203, 208 (5th Cir. 2008). The Amended Complaint's causal chain runs through the physician regardless of its label—precisely the maneuver *Centocor* forbids.[4]

The absence of a causal connection is further confirmed by the Amended Complaint's own proposed safer alternatives. The Amended Complaint contends that Epic's software should have included off-label prescribing alerts, mandatory approval workflows, and clinical decision-support features. Am. Compl. ¶¶ 55–56, 100. But the 21st Century Cures Act draws a sharp distinction

---

[4] Texas law does not limit the learned intermediary doctrine to FDA-approved prescription drugs. In *Butler v. Juno Therapeutics, Inc.*, 541 F. Supp.3d 774, 786-87 (S.D. Tex. May 27, 2021), the court held that the doctrine applies wherever a product could not reach its end users except through treating medical professionals. An EHR system fits that description: it is a clinical platform used by licensed clinicians to assist in making treatment decisions.

between EHR software and clinical decision-support software, excluding the former from the definition of "device" while preserving FDA authority over the latter. 21 U.S.C. § 360j(o)(1)(C) (excluding "electronic patient records, including patient-provided information…so long as (i) such records were created, stored, transferred, or reviewed by health care professionals, or by individuals working under supervision of such professionals."). The Amended Complaint's causal theory thus depends on features that Congress has placed in an entirely different regulatory category—further attenuating the already speculative causal chain. Moreover, Epic does not generate, enter, or verify the clinical information contained in any patient's record; the hospital's clinicians do. This independent human judgment at every step of the information chain further undermines any plausible theory of but-for or proximate causation between Epic's software design and Mr. Fischman's death.

The Amended Complaint's own allegations confirm this dependency on physician judgment. Throughout, the purported system "deficiencies" are defined by adjectives—"incomplete," "inconsistent," "inaccurate," "outdated"—that can only be evaluated through clinical knowledge. For example, the Amended Complaint alleges "incomplete medication timelines" and "inconsistent information" (Am. Compl. ¶ 33), but whether a medication timeline is "complete" or information is "consistent" is a clinical determination that depends on the treating physician's knowledge of the patient's condition, not something an EHR vendor could independently assess.

The same is true of allegations that the system failed to maintain an "accurate medication status" or "reliably reconstruct[]" medication history (¶ 35): accuracy and reliability in this context are measured against clinical reality known only to the treating providers. The complaint further

7

alleges that the system lacked an "automated mechanism to expire or reclassify" medication entries (¶ 39), but expiring or reclassifying a medication entry is itself a clinical determination.

Similarly, the allegation that "outdated and incorrect medication entries" persisted across encounters (¶ 39) presupposes a duty on the EHR vendor to independently verify the accuracy of information entered by clinicians, a duty that would require the software to exercise medical judgment. Critically, the complaint does not allege that any of these supposed deficiencies actually manifested in Mr. Fischman's care, because doing so would necessarily call into question the adequacy of his treating physicians' actions. In substance, the Amended Complaint asks this Court to hold that Epic's system should have compelled the treating providers to make different clinical decisions—the very physician-judgment inquiry the complaint disclaims.

**4.       Texas products liability law requires specificity the Amended Complaint lacks.**

Even apart from the general plausibility standard, Texas products liability law requires that a defendant's product be a substantial factor in causing the harm. *Borg-Warner Corp. v. Flores,* 232 S.W.3d 765, 770 (Tex. 2007). The Amended Complaint alleges that "Epic is not alleged to be the sole cause, but its system was a substantial factor." Am. Compl. ¶ 70. But this is a legal conclusion, not a factual allegation satisfying *Iqbal*. The substantial factor test requires identification of the specific product feature and the specific mechanism by which it contributed to the harm. The Amended Complaint does not explain how any particular feature of a specific Epic customer's system—as opposed to the clinical decisions of the prescribing physicians—was a substantial factor in the chain of events leading to Mr. Fischman's death. Indeed, the Amended Complaint does not even allege a medical cause of death for Mr. Fischman. Without identifying the alleged clinical mechanism by which the patient died, the Amended Complaint cannot establish that any software feature, as opposed to the natural progression of the patient's underlying

8

condition or the clinical decisions of treating physicians, was a "substantial factor" in producing the harm.

**B.      Epic Owes No Cognizable Tort Duty to Individual Patients Under Texas Law**

Even if the Amended Complaint had pleaded a plausible causal connection, Counts One, Two, and Five would still fail because Epic owes no tort duty to individual patients whose records are managed on its platform. The existence of a legal duty is a threshold question of law for the court. *Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 503 (Tex. 2017) (stating the existence of a duty is a legal question for the court). The question is not whether this particular plaintiff was foreseeably harmed, but whether the law should impose a duty on this *category* of defendant for this *category* of risk. And no court, to Epic's knowledge, has imposed a tort duty on an EHR vendor to the individual patients of its hospital clients in any jurisdiction.

The Amended Complaint advances three theories of duty: (1) foreseeability of harm to patients; (2) a direct relationship through the MyChart patient portal; and (3) voluntary ONC certification. It also alleges that Epic "maintains ongoing control through system updates" (Am. Compl. ¶ 22) and "derives commercial benefit" from patient use (¶ 25). None of these theories is supported by Texas law. The Texas Supreme Court's decisions in *Mendez*, *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137 (Tex. 2022), and *Pagayon* confirm that foreseeability alone does not create a duty, that voluntary undertakings for institutional clients do not create duties to end users, and that imposing new categories of tort duty is for the Legislature, not the courts.

**1.      *Mendez* controls: third-party vendors owe no duty to their clients' end users.**

The Texas Supreme Court's most recent and most directly applicable pronouncement is *Mendez*. There, the Court held that a third-party drug-testing laboratory hired by an employer owed no common-law negligence duty to the employer's employee who was the subject of the test, even

9

though the lab knew its results would be used to make employment decisions affecting identifiable individuals. 671 S.W.3d at 590.

The Court's reasoning applies directly onto this case. In *Mendez*, the lab's contractual relationship was with the employer, not the employee; here, Epic's relationship is with the *hospital organization*, not the patient. In *Mendez*, the employee was a foreseeable beneficiary but not a party to whom the lab had undertaken any obligation; here, the patient is a foreseeable beneficiary but not a party to whom Epic has assumed any direct obligation. The Court noted the incongruity of imposing a duty on the vendor when the employer itself owed no such duty, *id.* at 588 n. 52; the same incongruity would arise from imposing a duty on Epic when the hospital stands between Epic and the patient.

The Amended Complaint's theory that Epic "maintains ongoing control through system updates" (¶ 22) does not distinguish *Mendez*. Software updates distributed to institutional licensees do not transform a B2B vendor into a party with a direct relationship to patients; the hospital decides whether and when to deploy updates. The Amended Complaint alleges the system "incorporates patient interaction" (¶ 16), but the *Mendez* Court rejected this in substance: the lab's services directly affected identifiable individuals, yet no duty ran to them. 671 S.W.3d at 588–89.[5]

---

[5] This Court's decision in *Davis v. Dallas County*, 541 F. Supp.2d 844 (N.D. Tex. Mar. 6, 2008) (Fitzwater, J.) is not to the contrary. In *Davis*, this Court declined to dismiss negligence claims against a technology contractor (Atos Origin) that built a jail management system for Dallas County, where software defects caused inmates to be wrongfully over-detained. That case is distinguishable in at least four respects. *First*, in *Davis*, no learned intermediary exercised independent professional judgment between the software and the injured parties. Here, a licensed physician would have necessarily added, verified, and reviewed the EHR data and made independent clinical treatment decisions, including based on observations of the patient outside of the EHR data. *Second*, the class of affected inmates in *Davis* was small and identifiable. Recognizing a duty from Epic to all patients would expose every EHR vendor to claims from the millions of patients whose records are managed on these platforms. *Third*, Atos Origin exercised direct control over installing and programming the jail management system. Epic sells software that hospitals configure, implement, and operate according to their own workflows and clinical protocols. *Fourth*, and most fundamentally, *Davis* was decided in 2008—fifteen years before the Texas Supreme Court's decision in *Mendez*, 671 S.W.3d at 580, which squarely rejected vendor duty to a client's end users in an analogous B2B context. *Mendez* controls.

*Mendez* also rejected the voluntary-undertaking theory, holding that performance of services "for the benefit of" an institutional client does not create a duty to the affected individual. *Id.* at 590. The Amended Complaint's argument that Epic's voluntary ONC certification created a patient-directed duty is thus foreclosed.

The Texas Supreme Court in *Mendez* concluded that "[w]hether such a duty is desirable is a separate policy question for the Legislature." *Id.* at 590. That admonition applies here. The Legislature's awareness of health information technology (and its choice not to impose the duty the Amended Complaint seeks) weighs heavily against judicial creation of that duty.

The Texas Supreme Court's multi-factor duty analysis reinforces this conclusion. Courts must weigh "the risk, foreseeability, and likelihood of injury" against "the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Elephant Ins.,* 644 S.W.3d at 145. The same analysis compels the same result here: the social utility of EHR systems, the magnitude of the burden a patient-directed duty would impose, and the indeterminate scope of such a duty all weigh against judicial recognition. Recognizing a duty to each of those patients would expose every EHR vendor to claims from an effectively limitless class, and that weighs against creation of new duties. *Pagayon*, 536 S.W.3d at 503; *see also McCall v. Genetech, Inc.*, No. 3:10-CV-1747, 2011 WL 2312283, at *5 (N.D. Tex. Jun. 9, 2011) ("Both state and federal courts applying Texas law admonish against the judicial creation of legal duties.").[6]

---

[6] The First Circuit's decision in *Amrhein v. eClinicalWorks, LLC,* 954 F.3d 328 (1st Cir. 2020), underscores the point. There, estates of deceased patients sued a different EHR vendor, alleging that the software showed providers false and incomplete data about patients' conditions. Both the district court and the First Circuit dismissed the case, finding that patients identified no common-law claim giving them a cognizable legal interest in the accuracy of a vendor's software. Although the dismissal rested on Article III standing, the reasoning directly supports the absence of any recognized legal duty from EHR vendors to patients: the court could identify no basis on which individual patients could claim a legally protected interest in the internal accuracy of a vendor's platform licensed to their healthcare providers.

11

**2.    The MyChart patient portal does not create a direct relationship sufficient to impose a duty.**

The Amended Complaint argues that Epic "maintains a direct, independent relationship with patients through its proprietary patient-portal product, MyChart" and "derives commercial benefit from [patients'] use." Am. Compl. ¶ 25. These characterizations misapprehend how MyChart operates. MyChart is not an independent product that patients purchase—it is a module within the hospital's deployment of Epic's EHR software. Plaintiff would have accessed her father's MyChart through the treating hospital's instance of Epic software, authenticated through the hospital's credentialing process, and viewed data that the hospital's clinicians have entered and that the hospital organization configured in its system to share with patients via MyChart. Epic provides the software; the hospital provides the patient record contents and the clinical relationship.[7] Under *Mendez*, the inquiry is whether the defendant undertook a direct obligation to the plaintiff—not whether the defendant benefits economically from the plaintiff's use of its product.

**3.    ONC certification does not create a private duty.**

The Amended Complaint's third theory rests on Epic's certification under the ONC Health IT Certification Program, 45 C.F.R. Part 170, arguing that by obtaining certification, Epic represented to the public—including patients—that the platform met federal standards for medication management and patient safety. The Amended Complaint identifies specific certified products and the § 170.315 certification criteria, including computerized provider order entry, drug interaction checks, and medication-list maintenance. Am. Compl. ¶ 47. These allegations do not

---

[7] Even assuming that Epic's operation of the MyChart patient portal could give rise to some duty to patients who access it, any such duty would be limited to the portal's patient-facing functions. The Amended Complaint's injury theory, however, depends on alleged deficiencies in the core clinical EHR software used by treating physicians at the point of care, a system patients do not access. A duty arising from MyChart would not extend to the design of Epic's clinical-facing platform, and the Court need not reach the MyChart question to resolve this motion.

establish a basis for duty for two reasons. Notably, the Amended Complaint does not allege that Epic *violated* any ONC certification criterion or that the platform failed to meet the technical specifications for which it was certified.

*First*, ONC certification is a federal regulatory compliance program directed at health information technology vendors and users (including healthcare institutions), not at individual patients. The program certifies that EHR software meets specified technical criteria for interoperability and functionality. 45 C.F.R. § 170.315. The § 170.315 criteria are technical specifications, not representations to individual patients about their personal care. That certification is voluntary and modular, as the Amended Complaint concedes (¶ 47), which further underscores that it operates as a market-participation mechanism, not a patient-directed undertaking.

*Second*, the Amended Complaint's theory would convert every federal certification into a private duty. If ONC certification creates a tort duty to patients, then FDA clearance would create a duty to device users, FAA certification to passengers, and SEC registration to investors—each time bypassing the regulatory framework's own enforcement mechanisms and creating the indeterminate liability Texas law prohibits. *See Elephant Ins.,* 644 S.W.3d at 144–45. The Supreme Court's decision in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 349 (2001), reinforces this conclusion: *Buckman* held that state-law fraud-on-the-agency claims were impliedly preempted because they would "exert an extraneous pull on the scheme established by Congress*." Id.* at 353. The ONC program has its own enforcement mechanisms, including decertification under 45 C.F.R. § 170.580. Permitting state-law tort claims based on a duty arising from participation in a federal certification program would circumvent those mechanisms.

13

Additionally, as discussed in Section A.3, the treating physician's independent clinical judgment intervenes between Epic's software and the patient. Under the learned intermediary doctrine, a manufacturer satisfies its duty to warn end users by "providing adequate warnings to the intermediaries" who prescribe or administer the product. *Centocor*, 372 S.W.3d at 157. Although adopted in the prescription-drug context, the doctrine extends to any situation in which "the physician is integrally involved in deciding" how to use the product. *Guzman v. Synthes (USA)*, 20 S.W.3d 717, 720 n. 2 (Tex. App.—San Antonio 1999, pet. denied). The structural relationship here is analogous: a healthcare provider stands between the platform and the patient, exercising independent judgment. Any arguable duty runs to the physician, not through the physician to the patient.

Epic is a software vendor that licenses its configurable EHR software to hospitals and other health care organizations; its relationship with patients is mediated through the hospital at every level. *Mendez*, *Pagayon*, and *Elephant Insurance* confirm that foreseeability alone does not create a duty, voluntary undertakings for institutional clients do not create duties to end users, and imposing new categories of tort duty is for the Legislature. Counts One, Two, and Five should be dismissed for these reasons.

## C.      The EHR Platform Is Not a "Product" Under the Texas Products Liability Act.

Count Three alleges that Epic's EHR platform is a defective "product" within the meaning of the Texas Products Liability Act, Tex. Civ. Prac. & Rem. Code § 82.001 *et seq*. Am. Compl. ¶ 98. The theory has no precedent: across reported federal and state court decisions, every products liability claim against an EHR vendor fully adjudicated has been dismissed. No court has ever held that an EHR platform is a "product" subject to strict liability.

No Texas court and no court in the Fifth Circuit has held that enterprise software constitutes a "product" subject to strict liability. This absence of precedent is itself a powerful reason for

restraint—particularly where the Legislature has addressed health information technology without imposing products liability on EHR vendors. The Amended Complaint attempts to overcome this gap by arguing that the platform satisfies the statutory definition because its "core architecture" is "fixed by Epic prior to distribution." Am. Compl. ¶ 17. But the Amended Complaint's own allegations undermine that characterization: it acknowledges that "the system must be implemented and configured to function, including the establishment of workflows and system rules governing how information is processed and presented." Am. Compl. ¶ 29.

1.    **Chapter 82 does not reach software, and the most authoritative sources on products liability expressly exclude it.**

Chapter 82 defines "claimant," "products liability action," "seller," and "manufacturer." Tex. Civ. Prac. & Rem. Code § 82.001. Absent is any definition of "product." The most authoritative secondary source—the Restatement (Third) of Torts: Products Liability—draws the line precisely where the Amended Complaint asks this Court to cross it.

The Restatement defines "product" as "tangible personal property distributed commercially for use or consumption." Restatement (Third) of Torts: Products Liability § 19(a) (1998). Comment *d* addresses the distinction directly: courts "have, appropriately, refused to impose strict products liability" in connection in cases involving the dissemination of false or defective information where the complaint is directed at "the information, not the tangible medium." *Id.* cmt. *d; see Fresh Coat, Inc. v. K-2, Inc.,* 318 S.W.3d 893, (Tex. 2010) (citing Restatement (Third) of Torts: Products Liability § 19.

Federal appellate authority confirms this conclusion. In *Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1035 (9th Cir. 1991), the Ninth Circuit held that "products liability law is geared to the tangible world." In *Rodgers v. Christie*, 795 F. App'x 878, 880 (3d Cir. 2020), the Third Circuit

15

held that AI risk-assessment software "is neither 'tangible personal property' nor remotely 'analogous to' it." No contrary authority, to Epic's knowledge, exists in any circuit.

The only reported decision squarely addressing whether EHR software is a "product" confirms the same conclusion. In *Burghart v. South Correctional Entity*, No. 2:21-CV-01578, 2023 WL 1766258 (W.D. Wash. Feb. 3, 2023), the court dismissed a products liability claim against an EHR developer, holding that "courts in this District have held that the WPLA does not apply to software services as a matter of law." *Id*. at *4. Although *Burghart* arose under Washington law, its reasoning is directly applicable: it analyzed the same product-versus-service question dispositive under Chapter 82 and reached the conclusion the Restatement (Third) compels.[8]

The novelty of treating enterprise software as a "product" under strict liability is itself a reason for judicial *restraint*. If products liability doctrine was not designed for "modern software systems," as Plaintiff alleges (Am. Compl. ¶ 79), the appropriate response is for the Legislature to address the gap, not for this Court to stretch Chapter 82 to reach a category of defendant Congress itself excluded from the regulatory framework for medical devices.

The Amended Complaint's proposed safer alternative designs—off-label prescribing alerts, mandatory approval workflows, and clinical decision-support features (Am. Compl. ¶¶ 55–56, 100)—confirm this categorical error. Under *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995), the safer alternative design must be a design of the same product, not a different product entirely. This distinction is drawn by federal law: the 21st Century Cures Act excludes

---

[8] The Amended Complaint's analogies to electricity and embedded device software are unavailing. Electricity is a physical force the Restatement treats as a product because "its distribution and use is sufficiently analogous to" tangible property. Restatement (Third) of Torts: Products Liability § 19(a). Embedded device software is subject to products liability because it is an integrated component of a *physical device* directly affecting its operation. Epic's EHR software system does not interact physically with anyone and is not embedded in any device. Congress drew this line in the 21st Century Cures Act, expressly excluding EHR software from the definition of "device." 21 U.S.C. § 360j(o)(1)(A)–(D).

EHR software from the definition of "device" while preserving FDA authority over non-exempt clinical decision-support software. 21 U.S.C. § 360j(o)(1)(B)–(E). Because the proposed alternatives would require incorporating functions that Congress has placed in a different regulatory category, they do not represent a safer design of the same product.[9]

### 2. The Amended Complaint's own allegations undermine its "fixed product" theory, and its attempt to neutralize the contradiction fails.

The Amended Complaint's products liability theory depends on characterizing the software as a standardized product in the stream of commerce. But the Amended Complaint's own allegations undermine this: it acknowledges that "the system must be implemented and configured to function, including the establishment of workflows and system rules governing how information is processed and presented." Am. Compl. ¶ 29. It then asserts that "those configuration-dependent elements are part of the system's design"—a legal conclusion this Court need not accept. *Iqbal*, 556 U.S. at 678. If hospital configuration determines whether medication reconciliation is enforced, alerts generated, and approval workflows activated, then the platform as deployed is a configurable system whose operation depends on institutional choices—precisely the kind of client-configured system that falls outside the stream-of-commerce framework on which products liability depends.

---

[9] The Amended Complaint's citations to *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897 (Cal. 1963) and *University of Texas Medical Branch v. York,* 871 S.W.2d 175 (Tex.1994) undercut its theory. *Greenman* established strict liability for tangible goods and has never been extended to enterprise software; *York* held that claims arising from the accuracy of medical record (precisely what Plaintiff alleges) do not fall within Section 101.021 of the Texas Tort Claims Act and therefore do not waive sovereign immunity. 871 S.W.2d at 178–79; *see also id.* at 176 ("While paper [medical records] can be touched, handled, and seen, medical information recorded on paper is not tangible personal property.").

**3.    The Amended Complaint's "Architectural Control as a Dispositive Distinction" theory does not support the products liability claim.**

The Amended Complaint's "Architectural Control" theory argues that "the causal chain runs from Epic's design defect to the absence of accurate information to the inability to act." Am. Compl. ¶ 90. Whether information is organized by a software platform or disseminated by a publisher, the complaint is directed at "the information, not the tangible medium," and the Restatement's exclusion applies. Restatement (Third) § 19 cmt. d. Indeed, the Amended Complaint's core grievance is not with how information is technically stored or displayed, but with the *substance* of the information itself—its accuracy, completeness, and clinical reliability. Those are judgments about the content of clinical information, not about the design of a tangible product, and they fall squarely within the Restatement's exclusion. As the Texas Supreme Court recognized, "it is not rational . . . to impose liability in such a way as to eliminate whole categories of useful products from the market." *Caterpillar*, 911 S.W.2d at 384.

Count Three should be dismissed. The Restatement (Third) excludes information from the definition of "product." The Amended Complaint's own allegations undermine its "fixed product" characterization, and its proposed alternatives describe a different system rather than a safer design of the same one under *Caterpillar*. The harm alleged—that clinical information was organized in a way that made interpretation difficult—is not the kind of harm that product liability law was designed to address.

**D.    The Negligent Misrepresentation Claim Fails Because Epic's Alleged Representations Were Not Directed to Patients and No Patient Justifiably Relied on Them.**

Count Four alleges negligent misrepresentation under Restatement (Second) of Torts § 552 based on Epic's ONC certification. The Amended Complaint alleges that Epic "obtained federal certification representing compliance with medication management and patient safety

18

standards…while the system's architecture lacked the ability to reliably perform those functions" (Am. Compl. ¶¶ 47, 103) and that "Plaintiff and her father relied on the system as an accurate reflection of medication status" (¶ 104). The claim fails because § 552 was designed to prevent "liability in an indeterminate amount for an indeterminate time to an indeterminate class," *Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 918 (Tex. 2010), and Epic's supposed representations were not directed to individual patients.

To state a § 552 claim, a plaintiff must allege that the defendant supplied false information for the guidance of others in their business, did not exercise reasonable care, and the plaintiff suffered pecuniary loss by justifiably relying on the representation. *Gen. Elec. Cap. Corp. v. Posey*, 415 F.3d 391, 395–96 (5th Cir. 2005). Count Four fails on elements two and four: any Epic representations were not directed to patients, and no patient justifiably relied on them.

### 1.   Texas follows the strict § 552 framework, which limits liability to a "known party for a known purpose."

Texas adopted § 552 in *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991). Section 552 imposes liability only when the defendant supplies false information "for the guidance of others in their business transactions" and the plaintiff is within the "limited group of persons for whose benefit and guidance [the defendant] intends to supply the information." Restatement (Second) of Torts §§ 552(1) and (2)(a) . In *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999), the Court held that a claim is available "only when information is transferred by [the defendant] to a known party for a known purpose."

### 2.   Epic's alleged representations were not directed to individual patients.

The Amended Complaint does not allege that Epic directed any specific representation to any member of the Fischman family. As discussed in Section B.3, the ONC certification is not a

19

representation to patients. And Epic's marketing materials are likewise directed to institutional clients. *See* ¶ 104 ("*Hospitals* relied on these representations in selecting and deploying the system…") (emphasis added). Moreover, Epic could not have "represented" the accuracy of individual patient records, because the clinical information displayed in any patient's record is entered by hospital clinicians and determined by hospital-specific configurations, data which Epic does not control. The Amended Complaint's allegation of reliance "on the system as an accurate reflection of medication status" (¶ 104) describes reliance on a record generated through a hospital's deployment of software, not reliance on the vendor's certification or marketing. Section 552 requires that reliance be directed at the defendant's *specific* representation, not at a downstream product of a tool the defendant supplied to a third party. *McCamish*, 991 S.W.2d at 794. That gap is fatal.

Moreover, Epic is not an "information supplier" within § 552's meaning with respect to the EHR platform at issue. Section 552 reaches professionals whose stock in trade is information itself—accountants, appraisers, surveyors—who supply opinions used as a direct basis for decisions. Epic's EHR software is a *tool* that healthcare institutions use to generate, store, and organize their *own* clinical information. The hospital's clinicians enter data; the hospital's configuration determines how it is organized; and the resulting record is the hospital's, not Epic's. Under *McCamish*, liability attaches only when the defendant "transfer[s]" information "to a known party for a known purpose." 991 S.W.2d at 794. With respect to the platform at issue here, Epic provides software to *hospitals*—it does not supply clinical opinions or patient-specific information to patients.

20

**3.      The Amended Complaint does not allege justifiable reliance by Mr. Fischman on any specific Epic representation.**

The Amended Complaint does not identify any specific marketing representation. Nor does the Amended Complaint allege that Mr. Fischman knew what EHR system his hospital used, reviewed any Epic certification, read any Epic marketing material, or chose his hospital based on any Epic representation. Under *McCamish* and *Grant Thornton*, Epic was not "aware of" individual patients like Mr. Fischman and did not intend that they rely on any of the unspecified representations alleged in the Amended Complaint. 991 S.W.2d at 794; 314 S.W.3d at 921.

Count Four fails at every step of the § 552 analysis and should be dismissed. Any alleged Epic representations were directed to institutional clients and the federal government. No member of the Fischman family relied on any specific Epic representation. And extending § 552 liability to the millions of patients who use EHR systems would impose precisely the indeterminate liability Texas law prohibits.

**E.      The Gross Negligence Allegations Are Conclusory and Should Be Dismissed.**

Count Five alleges gross negligence under Texas Civil Practice & Remedies Code § 41.001(11). As a threshold matter, if the Court dismisses the underlying negligence claims for failure to plead causation or duty, the gross negligence claim necessarily fails because it is derivative. *See* Tex. Civ. Prac. & Rem. Code § 41.003(a). Even independently, the claim fails because the Amended Complaint does not identify any corporate vice principal with actual, subjective awareness of an extreme risk, and alleges only generalized industry awareness.

The Amended Complaint does not identify any specific "vice principal" at Epic who possessed actual, subjective awareness of the alleged risk. Texas law requires that gross negligence be attributed through a corporate vice principal, *i.e.,* an officer, director, or manager authorized to exercise supervisory authority. *See Longoria v. GEO Reentry, Inc.*, No. 1:23-CV-104, 2025 WL

21

1688104, *6 (S.D. Tex. May 23, 2025) ("Corporations act through agents, so liability attaches only if the corporation: (1) authorized or ratified an agent's gross negligence, (2) was grossly negligent in hiring an unfit agent, or (3) committed gross negligence through a vice principal") citing *Mobile Oil v. Ellender,* 968 S.W.2d 917, 921 (Tex. 1998). The Amended Complaint attributes awareness to "Defendant" as an undifferentiated corporate entity without naming any officer, director, or decision-maker (or any other factual basis to attribute gross negligence to Epic). Am. Compl. ¶ 106. A corporation does not "know" things in the abstract; knowledge must reside in an identifiable person satisfying the statutory definition.

The Amended Complaint also alleges only generalized industry awareness, not the actual, subjective awareness of a specific extreme risk that Texas law requires. To recover exemplary damages, a plaintiff must prove by clear and convincing evidence that the defendant had "actual, subjective awareness of the risk involved, but nevertheless proceeded with conscious indifference." Tex. Civ. Prac. & Rem. Code § 41.001(11); *Transportation Ins. Co. v. Moriel*, 879 S.W.2d 10, 22 (Tex. 1994); *Diamond Shamrock Refining Co. v. Hall*, 168 S.W.3d 164, 172-73 (Tex. 2005). The Amended Complaint's allegations—that AHRQ links medication-list inaccuracies to adverse drug events (¶ 46), that Epic obtained ONC certifications (¶ 47), and that Epic "had access to and participated in" federal patient-safety efforts (¶ 106)—describe generalized industry awareness that *Moriel* and *Diamond Shamrock* distinguish from the "actually knew" standard.[10] Participating in industry working groups establishes awareness that a risk

---

[10] To illustrate the distinction: awareness that medication errors are a recognized category of healthcare risk—something known to the entire health information technology industry—is not the same as subjective awareness that a specific feature of Epic's EHR platform poses an extreme degree of risk to specific patients. *Moriel* and *Diamond Shamrock* draw this line: generalized awareness of an industry-wide risk category does not satisfy the "actually knew" standard. The Amended Complaint identifies no Epic officer, director, or manager who knew that the specific software features at issue created an extreme risk and consciously disregarded that risk.

category exists; it does not establish subjective awareness that a specific product feature poses an extreme degree of risk.[11]

### F.        Plaintiff Lacks Capacity to Pursue Non-Wrongful-Death Damages.

The Amended Complaint brings five causes of action and requests "all damages recoverable under applicable law," including wrongful death damages, compensatory damages, exemplary damages, and interest. Am. Compl. ¶ 108. But Plaintiff sues only "in her individual capacity as the adult daughter of Dov Fischman" and "as a statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004." Am. Compl. ¶¶ 4, 11. She does not allege that she is the personal representative of Mr. Fischman's estate.

Texas law creates two distinct vehicles for recovery when a person dies from another's alleged wrongful conduct. A wrongful-death claim under § 71.002 is brought by statutory beneficiaries for *their own* injuries. A survival claim under § 71.021 is brought by the *personal representative of the decedent's estate* for damages the decedent could have recovered. These are separate and distinct causes of action, and a party who is not the personal representative cannot bring a survival claim. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 850 (Tex. 2005).

Plaintiff brings this action solely as a wrongful-death beneficiary. Am. Compl. ¶¶ 4, 11, 92. She does not allege appointment as personal representative of the estate or that letters testamentary have been issued. To the extent the Amended Complaint's causes of action seek compensatory damages for injuries suffered by the *decedent*—rather than damages suffered by Plaintiff *herself* as a consequence of her father's death—those claims can only be brought by the

---

[11] Federal courts in this district have consistently dismissed gross negligence claims at the pleading stage where, as here, the allegations rest on conclusory statements. *See White v. Ford Motor Co.*, No. 3:24-CV-2139-D, 2024 WL 4895726, at *2 (N.D. Tex. Nov. 26, 2024) (Fitzwater, J).

estate's representative.[12] Counts Two through Five, to the extent they seek such damages, should be dismissed for lack of capacity.

Because the deficiency is one of legal capacity rather than pleading insufficiency, Counts Two through Five should be dismissed to the extent they seek damages recoverable only by the estate's personal representative. *See Lovato*, 171 S.W.3d at 850; *Shepherd v. Ledford*, 962 S.W.2d 28, 31 (Tex. 1998). Such dismissal should be without prejudice to a properly appointed personal representative bringing those claims, but the claims as currently pled cannot proceed in Plaintiff's individual capacity.

<u>**CONCLUSION AND PRAYER FOR RELIEF**</u>

All five causes of action in the Amended Complaint fail to state a claim upon which relief can be granted. Accordingly, Epic respectfully requests that the Court dismiss the Amended Complaint in its entirety with prejudice under Rule 12(b)(6) and grant such other relief as the Court deems just and proper.

DATE: April 14, 2026                          Respectfully submitted,

*/s/Christopher J. Schwegmann*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 – Telephone
214-981-3839 – Facsimile

**ATTORNEYS FOR DEFENDANT
EPIC SYSTEMS CORPORATION**

---

[12] The Amended Complaint does not allege that Plaintiff is the sole statutory beneficiary of Mr. Fischman's estate. To the extent other beneficiaries exist, a wrongful-death action affecting their interests cannot be maintained pro se; it must be brought through an attorney. *See Suday v. Suday*, 716 S.W.3d 586 (Tex. 2025).

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct foregoing document was served by ECF electronic filing on all known parties on this April 14, 2026.

*/s/Christopher J. Schwegmann*

Christopher J. Schwegmann
