# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| GALLIT FISCHMAN, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | § Civil Action No. 3:26-CV-0770-D |
| | § |
| EPIC SYSTEMS CORPORATION, | § |
| | § |
| Defendant. | § |

---

## EPIC SYSTEMS CORPORATION'S REPLY IN SUPPORT OF
## MOTION TO DISMISS

---

Plaintiff's Opposition shows the inadequacy of the Amended Complaint. Where Epic identifies a causation defect, Plaintiff responds that "[t]hose are merits issues, not pleading issues," Opp. at 2. Where Epic identifies a product-classification defect, Plaintiff says the question is "a fact-dependent inquiry not suitable for resolution on a motion to dismiss." *Id.* at 16. Where Epic identifies the absence of vice-principal awareness, Plaintiff responds that "Rule 8 does not require identification of specific individuals at this stage." *Id*. at 21–22. In sum, Plaintiff asks the Court to suspend the Rule 12(b)(6) plausibility inquiry completely. These arguments concede the Amended Complaint is defective under *Twombly* and *Iqbal*. In *Wright v. City of Garland*, this Court rejected the argument that "once fair notice is given, discovery can be used to 'root out' and dispose of meritless claims." No. 3:10-CV-1852-D, 2014 WL 1492356, at *3 n. 8 (N.D. Tex. Apr. 16, 2014) (Fitzwater, C.J.). *Twombly* and *Iqbal* require plausibility at the *pleading* stage, not after discovery. Plaintiff's asks this Court to do precisely what this Court in *Wright* refused to permit.[1]

### A.  The Amended Complaint Does Not Plausibly Allege Causation.

Plaintiff now alleges that causation by Epic operates "upstream" of clinical judgment, "independent of" any treating physician's decisions, at the level of "system architecture" that determined what information existed for care. Opp. at 5–9. But every "prevention" theory—off-label alerts, approval workflows, escalation requirements, decision-support prompts, reconciliation features (Am. Compl. ¶¶ 54–59; Opp. at 5)—describes an input to or from a

---

[1] *See Iqbal,* 556 U.S. at 678–79 (Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions"); *accord Twombly,* 550 U.S. at 559, 563 n. 8 (stating that "[i]t is no answer to say that a claim just shy of a plausible entitlement to relief can, if groundless, be weeded out early in the discovery process" and recognizing that "before proceeding to discovery, a complaint must allege facts suggestive of illegal conduct"). Limited or "cabined" discovery is not an available fallback: a Rule 8–deficient plaintiff is "not entitled to discovery, cabined or otherwise." *Jackson v. City of Hearne*, 959 F.3d 194, 201 (5th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 686). Plaintiff compounds this defect by attempting to amend her pleading through the Opposition. Factual allegations advanced for the first time in opposition to a motion to dismiss are not part of the pleading and may not be considered. *See Leal v. McHugh*, 731 F.3d 405, 407 n.2 (5th Cir. 2013) (declining to consider facts asserted in briefing on a Rule 12(b)(6) motion that were not contained in the operative pleading).

prescribing physician. Each presupposes that, with different information, a physician would have made a different decision. Yet Plaintiff expressly disclaims that allegation. Her Opposition states that "the issue is not how a physician would have responded." Opp. at 8. That disclaimer is dispositive. A plaintiff who alleges that an information input would have altered a clinical outcome must plead what the prescribing physician would have done with the different information. *See Centocor, Inc. v. Hamilton*, 372 S.W.3d 140, 170-71 (Tex. 2012).

The Amended Complaint's causal chain refutes the "upstream" characterization. The chain alleges that "clinicians relied on the Epic record" (Am. Compl. ¶ 65(2)); that physicians use the system "as the primary mechanism of coordination" (¶ 21); and—central to her theory—that the alleged failure of the system prevented "recognition" of Mr. Fischman's condition and timely "intervention" by his providers (Opp. at 5). "Recognition" and "intervention" are what physicians do. Plaintiff's own description of the causal chain illustrates the gap. The Opposition recites: "the system did not generate an accurate and reconciled record; the condition was not recognized in time; intervention was not undertaken; and death resulted." Opp. At 5. Plaintiff's passive voice is intentional. *Recognized* by whom? *Undertaken* by whom? Each verb identifies an act of clinical judgment, exactly the link in the causal chain Plaintiff insists is absent from her theory. Plaintiff cannot maintain that her claim sits "upstream" of clinical judgment while alleging that the same clinical judgment was the mechanism through which the alleged software defect operated.[2]

Recognizing the problem, Plaintiff attempts to carve out an exception to the learned-intermediary doctrine, arguing that the doctrine "presumes the intermediary receives accurate information" and is suspended where the system "failed to generate" any reliable information at

---

[2] *See Steen v. Medtronic, Inc.*, 2010 WL 2573455, at *2–3 (N.D. Tex. June 25, 2010) (Lindsay, J.) (dismissing medical-device product-liability claims where the complaint's allegations went to the implanting physician's conduct rather than to any design defect and failed to state "more than labels and conclusions").

all. Opp. at 11. Even accepting Plaintiff's assertion that the provider's Epic system "failed to generate" certain reconciled medication information, the Amended Complaint does not allege that the prescribing physician had no information or how a physician would have acted differently in treating Mr. Fischman, *see id.* at 8 ("the issue is not how a physician would have responded"). The prescribing physician necessarily exercised clinical judgment in prescribing Everolimus based on whatever information was available, including the physician's own clinical observations, patient history, and independent medical knowledge. That is the classic learned-intermediary scenario, not an exception to it. *See Centocor*, 372 S.W.3d at 154, 157 (plaintiff must show the physician would have acted differently with different information); *Butler v. Juno Therapeutics, Inc.*, 541 F. Supp. 3d 774, 786–87 (S.D. Tex. 2021).

The carve-out also contradicts Plaintiff's pleading: the Amended Complaint itself acknowledges that "the system must be implemented and configured to function, including the establishment of workflows and system rules governing how information is processed and presented." Am. Compl. ¶ 29; *see* Mot. at 7. A system whose informational outputs are determined by information provided by the institution and its clinicians is not a system that operates "upstream" of clinical judgment.[3] Indeed, Plaintiff's complaint is that the system "permitted

---

[3] Plaintiff's causation theory also rests on a second, independently fatal defect. Plaintiff's entire factual anchor is her *own* review of MyChart—Epic's patient-facing portal. Plaintiff does not allege what the *clinical*-facing interface displayed to any treating physician at any time during Mr. Fischman's care. The Opposition manufactures an assumption to bridge the gap, asserting that "the same underlying data structures and system logic determine what information exists in both contexts," and that "[a] defect in that architecture necessarily affects both." Opp. at 12. That proposition appears nowhere in the Amended Complaint and may not be considered under *Leal*. And the leap from one assumption to the other is precisely the kind of "unwarranted deduction[] of fact" this Circuit forbids. *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). The publicly available description of MyChart published by Mr. Fischman's treatment provider, UT Southwestern, confirms the gap. UTSW informs patients that MyChart "allow[s] you to access *portions* of your UT Southwestern electronic medical record." UTSW MyChart Frequently Asked Questions, https://mychart.utsouthwestern.edu/mchart/Authentication/Login/StandardFile?option=Faq#EQ (emphasis added). The Court may take judicial notice of UTSW's public description of its own patient portal. Fed. R. Evid. 201(b)(2); *see Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011).

complete clinician discretion in data entry." Opp. at 6.[4] Plaintiff concedes this causation gap and her refusal to address the intervening role of the learned intermediary provider is dispositive.

### B. The Amended Complaint Fails to Plead a Legal Duty.

Plaintiff acknowledges that the Texas Supreme Court's most recent decision on the duty question is *Houston Area Safety Council, Inc. v. Mendez*, 671 S.W.3d 580 (Tex. 2023), but argues that the laboratory defendant in *Mendez* "involved a third party with no role in generating or controlling clinical information." Opp. at 10. The premise is factually incorrect and the conclusion collapses with it. The *Mendez* defendant collected, processed, and tested biological samples then generated and transmitted a test result that an employer used to make an employment decision. 671 S.W.3d at 582, 585–86. "Generating and controlling clinical information" *was* its role. Yet the Texas Supreme Court held that no common-law duty ran from the lab to the affected employee. *Id.* at 588–90. If anything, Plaintiff's framing puts Epic *further* from the patient than the *Mendez* defendant, not closer. The lab in *Mendez generated* the content for the test result. Epic, by Plaintiff's own admission, does not generate the clinical information in any patient's medical record; the hospital's clinicians do, exercising "complete clinician discretion in data entry." Opp. at 6.

Plaintiff's remaining duty theories—that foreseeability of harm to identifiable patients suffices, that Epic's voluntary ONC certification creates a patient-directed duty, and that the MyChart relationship creates a direct vendor-patient nexus—are foreclosed by *Mendez* for the

---

[4] Plaintiff's architectural theory is also missing the most basic premise: she never alleges that the system's outputs were inaccurate given the inputs the system received. The Amended Complaint does not allege that data correctly entered into Mr. Fischman's medical record was incorrectly displayed; that medication information was reconciled in a manner contrary to the inputs; or that the architecture generated any output that contradicted the underlying data. Plaintiff's actual complaint—that the system "permitted complete clinician discretion in data entry," Opp. At 6— describes who supplied (or omitted) data, not how the architecture processed it.

reasons set forth in Epic's Motion at pp. 15–18. *Mendez* rejected foreseeability and direct effects on identifiable individuals as a sufficient basis for imposing a duty, 671 S.W.3d at 587–89, and the proposition that performance of services "for the benefit of" an institutional client creates a duty to the affected individual, *id.* at 590. Plaintiff does not engage with either holding. She argues only that *Mendez* does not apply, which fails for the reasons set forth above.[5]

Plaintiff's Opposition does not just fail to distinguish *Mendez*; it concedes the very feature of her duty theory that *Mendez* was structured to prevent. Plaintiff describes the class to which her proposed duty would run as "patients whose information the system generates and manages." Opp. at 12. That formulation describes *every* patient whose records reside on *any* EHR system— precisely the "indeterminate class" the Texas Supreme Court has repeatedly held cannot form the basis of tort liability. *See Grant Thornton LLP v. Prospect High Income Fund*, 314 S.W.3d 913, 918 (Tex. 2010); *Elephant Ins. Co., LLC v. Kenyon*, 644 S.W.3d 137, 144–45 (Tex. 2022).

The *Kenyon* duty factors do not alter that conclusion. Opp. at 12. Under the Texas Supreme Court's multi-factor analysis, courts must weigh "the risk, foreseeability, and likelihood of injury" against "the social utility of the actor's conduct, the magnitude of the burden of guarding against the injury, and the consequences of placing the burden on the defendant." *Kenyon*, 644 S.W.3d at 145. Each cuts against Plaintiff's proposed duty. The social utility of EHR systems to manage clinical information for millions of patients is enormous. The burden of imposing a patient-directed tort duty on EHR vendors would expose every EHR vendor to claims from the millions of patients whose records are stored through these systems—precisely the indeterminate liability Texas law prohibits. *See Pagayon v. Exxon Mobil Corp.*, 536 S.W.3d 499, 504 (Tex. 2017). And the

---

[5] Plaintiff's reliance on *Davis v. Dallas County*, 541 F. Supp. 2d 844 (N.D. Tex. 2008), does not change the analysis. Plaintiff argues that *Davis* supports the proposition that "a software vendor may owe a duty where system defects plausibly result in direct harm" and that *Mendez* "does not alter that principle." Opp. at 10–11. But *Davis* is not applicable here for the multiple, uncontroverted reasons stated in Epic's Motion to Dismiss. *See* Mot. at 10 n. 5.

consequences of placing that burden on Epic would not improve patient safety; it would instead shift liability away from the hospitals and physicians who control clinical workflows and make treatment decisions. The Legislature's choice to address health information technology without imposing products liability on EHR vendors underscores that judicial creation of such a duty is unwarranted. *See Mendez*, 671 S.W.3d at 590 ("Whether such a duty is desirable is a separate policy question for the Legislature.").

### C. The Epic EHR Software is Not a "Product."

Enterprise EHR software is not a "product" under Chapter 82. The Amended Complaint pleads that Epic's system qualifies as a "product" because its "core architecture" is "fixed by Epic prior to distribution." Am. Compl. ¶ 17. Plaintiff's Opposition abandons that theory by advancing two *new* theories—that Epic's deployment within hospital physical infrastructure converts the system into a tangible product, and that the "medical record" the system generates is itself the product. Neither is alleged in the Amended Complaint and both fail on the merits.

Plaintiff's first new theory—that Epic's software qualifies as a "product" because it is "deployed within physical infrastructure" at hospital sites—appears for the first time in the Opposition. Opp. at 16. This argument is foreclosed by *Leal*. The Amended Complaint contains no allegation that Epic's system is integrated into physical infrastructure in any manner that would render it a tangible article.[6]

Plaintiff's second new theory—that Epic's "system functions as a product" because it "generates and presents a concrete medical record," Opp. at 15—fares no better. It recharacterizes the alleged "product" as the purported *output* of the software—the medical-record information

---

[6] The fact that software runs on hospital servers no more makes the software a tangible product than the fact that a book is printed on paper makes its ideas tangible. *See Winter v. G.P. Putnam's Sons*, 938 F.2d 1033, 1034 (9th Cir. 1991). The Restatement § 19 distinction does not turn on whether information is delivered via physical media; it turns on what the alleged defect is. *See* Mot. at 21–23. Plaintiff's allegations are not about physical hardware Epic supplies.

itself—rather than the software itself. Like the physical-infrastructure theory, the outputs theory appears nowhere in the Amended Complaint. And Restatement § 19 Comment d expressly excludes information from its definition of "product" as tangible personal property. Restatement (Third) of Torts: Prods. Liab. § 19(a) & cmt. d; *see* Mot. at 21. Federal appellate courts have uniformly rejected attempts to treat informational outputs as "products" subject to strict liability. *See* Mot. 15-16 (collecting cases). Plaintiff identifies no contrary authority and concedes that "Texas courts have not squarely resolved whether such a system may be treated as a product." Opp. at 17.[7] Count Three should thus be dismissed.

### D.  The Court Should Dismiss the Section 552 Negligent Misrepresentation Claim.

Section 552 claims are confined to a "limited group of persons for whose benefit and guidance" the information is supplied—a confinement designed to prevent "liability in an indeterminate amount for an indeterminate time to an indeterminate class." *McCamish, Martin, Brown & Loeffler v. F.E. Appling Interests*, 991 S.W.2d 787, 794 (Tex. 1999). Liability attaches only when information is transferred "to a known party for a known purpose." *Id.*

The Amended Complaint pleads a single § 552 theory: that Epic made representations through its ONC certification and related marketing. Am. Compl. ¶¶ 47, 103–04. Confronted with *McCamish*, Plaintiff pivots in a different direction entirely, arguing that the "system-generated outputs" displayed by the provider's Epic software—the contents of the medical record itself—are actionable "representations" by Epic. Opp. at 18–19. This outputs theory appears nowhere in the

---

[7] Plaintiff gestures at a "safer alternative design" theory, alleging what "[a] feasible alternative architecture" would have included. Opp. at 15–16. That theory fails because an Epic EHR system is not a "product" under Chapter 82, and no safer-alternative-design analysis is triggered absent a cognizable product. Even if the system were a product, Plaintiff's proposed "alternative" is not a different design of the *same* product; it is a categorically different one. The Amended Complaint does not allege deficiencies in any specific clinical decision support feature configured at the hospital. It instead demands a different architecture that would autonomously override physician prescribing decisions and eliminate the "complete clinician discretion in data entry" Plaintiff acknowledges. *See id.* at 6. That is not a safer alternative design under *Caterpillar, Inc. v. Shears*, 911 S.W.2d 379, 384 (Tex. 1995).

Amended Complaint and is foreclosed by *Leal*. It also fails on the merits. The specific clinical data appearing in any patient's record is entered by hospital clinicians, *see* Opp. at 6, and shaped by institution-specific configuration. The "representations" in any given patient record are made—if at all—by the hospital and its clinicians, not by Epic.[8]

Plaintiff cites *Correct RX Pharmacy Services, Inc. v. Cornerstone Automation Systems, L.L.C.*, 945 F.3d 423 (5th Cir. 2019), but that case confirms Epic's position. *Correct RX* involved a commercial-software dispute where the plaintiff was the direct contractual counterparty to the defendant and directly received the representations at issue—precisely the "known party for a known purpose" relationship *McCamish* requires. A patient further removed from a direct contractual or customer relationship with Epic bears no resemblance to the plaintiff in *Correct RX*.

### E.  The Court Should Dismiss the Gross Negligence Claim.

Count Five fails twice over. It fails derivatively, because gross negligence cannot exist without an underlying tort, and Counts One and Two cannot survive the duty and causation deficiencies set forth above. *See Wilson v. Korth Direct Mortg., Inc.*, No. 3:23-CV-2158-D, 2023 WL 8569084, at *4 (N.D. Tex. 2023) (Fitzwater, J.). Even if those Counts survived, the Amended Complaint does not allege facts plausibly attributing to any identifiable Epic vice principal actual, subjective awareness of an extreme risk. *See* Mot. at 27–29.

Plaintiff argues that "Rule 8 does not require identification of specific individuals at this stage" and that the identities of Epic's decision-makers are "within Defendant's control." Opp. at

---

[8] Plaintiff also attempts to bridge the *McCamish* gap by recasting herself as a "caretaker responsible for administering medications" to Mr. Fischman. Opp. at 19. No such allegation appears in the Amended Complaint. *Leal*, 731 F.3d at 407 n.2. And for good reason, since Plaintiff concedes she brings only a wrongful death action standing in the shoes of her father; thus, any representations to Plaintiff directly are irrelevant to the cause of action alleged. The allegation also would not save Count Four if accepted: nothing in the Amended Complaint connects Epic's certification statements—the only representations actually pleaded—to Plaintiff in any caretaker capacity, and Plaintiff identifies no authority supporting the proposition that an end-user "caretaker" qualifies as a "known party" with respect to representations directed to institutional clients and federal regulators.

5, 21–22. That is the same merits-deflection move *Wright* rejected. The vice-principal requirement is a substantive element of corporate gross-negligence liability under Texas law, *see* Mot. at 27–28, not a procedural formality discovery may later supply. A complaint that alleges only that an undifferentiated "Defendant" was aware of certain risks—without identifying any officer, director, or managerial agent who possessed that awareness—alleges nothing more than the kind of "naked assertion[] devoid of further factual enhancement" that *Iqbal* forecloses. 556 U.S. at 678.

Plaintiff's remaining awareness theory—the "certification gap"—fares no better. Plaintiff argues that Epic obtained ONC certification "representing compliance with standards requiring" medication reconciliation "while its own system could not reliably perform that function," and that this gap "supports a reasonable inference" of subjective awareness. Opp. at 20–21. But the allegation of Epic obtaining and maintaining ONC certification under 45 C.F.R. Part 170 shows regulatory engagement. Plaintiff's own complaint demonstrates that Epic invested in meeting those standards, which is the opposite of conscious indifference. *See Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 173 (Tex. 2005) ("[T]he plaintiff must show that the defendant knew about the peril, but his acts or omissions demonstrate that he did not care.").[9] A defendant that voluntarily subjects its product to a compliance program is not a defendant that "did not care."

Plaintiff's remaining awareness allegations—AHRQ publications on EHR safety and Epic's participation in industry groups (Am. Compl. ¶¶ 46–47, 106)—describe general industry awareness of a risk category, not actual, subjective awareness that a specific feature of Epic's

---

[9] Plaintiff's Opposition now states Epic's development of its specialized "Phoenix" application—a transplant-focused module—demonstrates that Epic's leadership "recognized that transplant care requires longitudinal, reconciled, and reliable clinical information." Opp. at 20. Although not pleaded in the Amended Complaint, that allegation defeats Count Five. Texas law equates "conscious indifference" with knowing about a peril and not caring. *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d at 173. The development and deployment of a transplant-specific module is, by its nature, evidence that Epic *addressed* the purported risk—not that Epic disregarded it. *See Louisiana-Pacific Corp. v. Andrade*, 19 S.W.3d 245, 247–48 (Tex. 1999).

system posed an extreme risk Epic then disregarded. *See Moriel*, 879 S.W.2d at 22 (the subjective prong requires "actual awareness of the extreme risk created by [the defendant's] conduct").

### F. The Court Should Deny Leave to Amend.

The Court should deny leave to amend again because the Opposition shows further amendment would be futile. *Stripling v. Jordan Prod. Co.*, 234 F.3d 863, 872–73 (5th Cir. 2000). After twenty-four pages devoted to defending her existing pleading and adding new allegations, Plaintiff offers no concrete proposal for what an amended pleading would say differently and presents no plausible allegations that, if included in an amended complaint, would support the claims she brings.[10]

---

[10] Plaintiff's Opposition also makes two binding capacity admissions: *First*, Plaintiff confirms that she sues solely in her individual capacity as a wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004 and "does not assert a survival claim or seek recovery on behalf of the estate." Opp. at 22. *Second*, she concedes that she is "one of three statutory beneficiaries." Opp. at 23. The Texas Wrongful Death Act creates a single, unitary cause of action that runs for the benefit of all statutory beneficiaries collectively, *see* Tex. Civ. Prac. & Rem. Code § 71.004(b), and prosecution by a non-attorney pro se litigant of an action that adjudicates the rights of additional, non-appearing beneficiaries raises questions the Texas Supreme Court addressed in *Suday v. Suday*, 716 S.W.3d 586 (Tex. 2025). Epic did not seek dismissal under Rule 12(b)(7) because it lacked the benefit of these new facts, but respectfully requests the Court preserve this issue for appropriate later attention, if necessary. Fed Rule Civ. Pro. 12(h)(2).

DATED: May 7, 2026                    Respectfully submitted,


                                      */s/ Christopher J. Schwegmann*
                                      Christopher J. Schwegmann
                                      Texas Bar No. 24051315
                                      cschwegmann@lynnllp.com
                                      **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                      2100 Ross Avenue, Suite 2700
                                      Dallas, Texas 75201
                                      214-981-3800 – Telephone
                                      214-981-3839 – Facsimile


                                      **ATTORNEYS FOR DEFENDANT**
                                      **EPIC SYSTEMS CORPORATION**


### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 7, 2026, a true and correct copy of the foregoing was served

on all counsel of record via the Court's ECF system.

                                      */s/ Christopher J. Schwegmann*
                                      Christopher J. Schwegmann