IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GALLIT FISCHMAN, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:26-CV-0770-D |
| | § | |
| EPIC SYSTEMS CORPORATION, | § | |
| | § | |
| Defendant. | § | |

**PLAINTIFF'S SECOND AMENDED CIVIL COMPLAINT**

**JURY TRIAL DEMANDED**

(Wrongful Death; Negligence; Products Liability—Design Defect; Gross Negligence)

**I. INTRODUCTION**

1. This action arises from the design and control of a safety-critical electronic health record ("EHR") system used by hospitals to manage medication information, clinical documentation, and patient records.

2. It arises in part from a defective product placed into the stream of commerce, the design of which created an unreasonably dangerous condition.

3. Defendant Epic Systems Corporation ("Epic") develops and licenses an EHR platform used by major hospital systems throughout the United States. The platform functions as the primary repository of patient medication histories, prescribing information, and clinical reporting relied upon by physicians, hospitals, and patients.

Page 1

4. Plaintiff brings this action in her individual capacity as the adult daughter of Dov Fischman, who died on January 6, 2025, as a wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004.

5. Dov Fischman's Epic-generated medical record did not permit generation of a coherent medication timeline, identification of active versus discontinued medications, or reliable differentiation between current and historical clinical information. The record was fragmented across discrete encounters and did not provide a unified, longitudinal view of the patient's condition, requiring reconstruction from isolated entries rather than presenting an integrated clinical history.

6. These deficiencies arise from Epic's architectural design of its electronic record system. This action does not challenge physician treatment decisions or medical standards of care. The harm alleged did not result from a physician choosing the wrong course of treatment.

7. Instead, the harm resulted from an information system so structurally deficient that the information necessary to identify the problem, a current, accurate, and reconciled medication record, did not exist in the record at all. This is an engineering failure, not a clinical one.

8. Resolution of these claims concerns software architecture, safety engineering, and information system design, which are independent of physician judgment.

9. Plaintiff alleges that Epic's system contained structural defects that prevented the creation of an accurate and coherent medication record and allowed dangerous conditions to go unflagged, untracked, and unenforced.

10. These defects existed independent of user conduct and were present when the system was placed into the stream of commerce.

## II. PARTIES

11. Plaintiff Gallit Fischman is a resident of Dallas County, Texas. She is the adult daughter of Dov Fischman, deceased, and brings this action individually in her own right as a statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004.

12. Defendant Epic Systems Corporation is headquartered in Verona, Wisconsin and designs, licenses, and maintains electronic health record software used by healthcare institutions across the United States, including Texas. Epic may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

## III. JURISDICTION AND VENUE

13. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is a citizen of Texas. Defendant Epic Systems Corporation is a corporation incorporated under the laws of the State of Wisconsin with its principal place of business in Verona, Wisconsin, and is therefore a citizen of Wisconsin for purposes of diversity jurisdiction. The amount in controversy, exclusive of interest and costs, exceeds $75,000.

14. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) as a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this district.

## IV. FACTUAL ALLEGATIONS

**A. The Epic System and Its Safety-Critical Function** *(System Structure)*

15. Epic designs and licenses an EHR platform used for medication ordering, reconciliation, clinical documentation, patient communication, and reporting. Healthcare providers and

patients rely on the platform as the authoritative source of medication status, prescribing responsibility, treatment history, and clinical information. The system functions as the successor to the traditional paper medical chart and serves as the authoritative record through which patient information is created, maintained, communicated, and relied upon in clinical care.

16. It is not a passive recordkeeping tool but a centralized platform that structures clinical workflows, governs data entry, and determines how information is presented and used in patient care. The system also incorporates patient interaction as part of its operation, making patient-level impact a central function.

17. Epic maintains architectural control over core elements of the platform, including database structure, medication record design, reporting frameworks, and system logic governing medication timelines and historical data. The system's core architecture is fixed by Epic prior to distribution and constitutes the product as delivered into the stream of commerce.

18. The platform is subject to ongoing updates issued by Epic that modify functionality, workflows, and the structure and presentation of information, allowing Epic to continuously define how the system operates. Epic represented that its system met recognized health information technology standards, including requirements for medication management, clinical decision support, and interoperability.

19. Where the system's architecture failed to align with those standards in ways that affected how critical information was structured, surfaced, or enforced, those failures arose from Epic's design and implementation choices rather than independent user action.

20. Epic knew or should have known that design choices affecting medication-record structure, reporting clarity, and the differentiation of active versus historical information would directly influence how clinicians interpret patient records and could affect patient safety and survival.

21. Epic designed its system for complex, multi-provider clinical environments in which no single clinician has complete visibility into a patient's treatment history. In these settings, the electronic record serves as the primary mechanism of coordination among providers.

22. Epic knew or should have known that failures in the accuracy, clarity, or completeness of that record would foreseeably result in system-wide patient safety failures. Since Epic maintains ongoing control through system updates, the system's operation is continuously determined by Epic rather than solely at the time of initial deployment.

**B. Epic's Control and Direct Relationship to Patients** *(Control and Relationship)*

23. Epic owed a duty of reasonable care arising from its design, development, and distribution of a safety-critical system that foreseeably created a risk of physical harm. That duty extends to the patients whose records the system manages.

24. Patients are the foreseeable end users of Epic's system. Epic designs its platform with the understanding that patients will read and rely on medication records, make decisions based on what they can and cannot see, and be harmed by errors in those records. This foreseeability of harm to identifiable individuals, rather than abstract hospital clients, supports a duty of reasonable care.

25. Epic also maintains a direct relationship with patients through its MyChart platform, through which it communicates clinical information, presents medication records, and promotes the system's accuracy and utility. Epic is not merely a vendor to hospitals; it

Page 5

directly interfaces with patients and derives commercial benefit from their use, further supporting foreseeability and reliance.

26. Epic exclusively controls the structure through which medication data is created, stored, and displayed, and patients bear the risks when that structure fails. Those risks are foreseeable, unavoidable absent correction by Epic, and directly affect patients whose care depends on the accuracy of that information. Where the system fails to generate accurate and complete information, that failure occurs at the patient level and constrains all subsequent medical judgment.

## C. Architectural Control Versus Hospital Configuration *(System Constraints)*

27. Epic frequently represents that hospitals configure aspects of their EHR environments. However, hospitals cannot modify the underlying architecture of Epic's platform, including database structure, medication record design, reporting architecture, and system capabilities. No amount of hospital-level configuration can create functionality that the system's underlying architecture does not support, including the generation of a unified and reliable medication timeline.

28. Hospitals operate within a structural framework established and controlled by Epic, and systemic risks arising from ambiguous medication records, unclear reporting outputs, or fragmented information originate from that architecture rather than hospital configuration.

29. Although the system must be implemented and configured to function, including the establishment of workflows and system rules governing how information is processed and presented, those configuration-dependent elements are part of the system's design. Any hospital configuration operates within and is constrained by Epic's architecture.

30. Epic's platform is built on a unified data structure and shared architecture, demonstrating its capability to operate as a fully integrated system. To the extent variability exists, it arises from how Epic structures and delivers its product, not from independent user action. Where essential safety functions depend on optional modules or configurations, the resulting variability reflects a design choice that permits foreseeable gaps in patient protection.

31. The risks created by these architectural features are inherent in the system's design and do not depend solely on how any individual institution configures or uses it. The full extent of the system's configuration options, safeguards, and capabilities is within Defendant's exclusive knowledge and will be confirmed through discovery.

**D. System Architecture Governing Medication Information** *(Data Structure and Operation)*

32. Epic's electronic health record platform determines how medication information is created, stored, displayed, and reported. Clinicians do not design that structure; they enter information within the data fields, workflows, and reporting frameworks established by Epic. The system also constrains how information can be entered and categorized, limiting the ability to record clinically significant information in structured and visible form.

33. When the system permits incomplete medication timelines, fails to require start and stop dates, allows discontinued medications to remain displayed as active, or presents inconsistent information across reports without reconciliation, those conditions arise from system design, not physician judgment.

34. Clinicians rely on the electronic health record as the authoritative representation of a patient's medication history as the system is designed to function as the centralized

source of that information. Epic knew that clinicians would depend on the system's structure to communicate medication status across encounters and providers in complex clinical environments.

35. Where the system architecture prevents accurate medication status from being recorded or reliably reconstructed, the resulting absence of information is attributable to the system design. The defect arises from the engineering structure of the record rather than any individual clinical decision, and reliance on the record's accuracy is inherent in its design and use.

36. The system did not provide a coherent longitudinal record through which a clinician could determine the patient's condition, treatment progression, and medication status over time, instead requiring reconstruction across fragmented encounter-based entries. In complex cases, the record must function as a coherent timeline through which events can be identified and evaluated.

37. A record organized around isolated encounters rather than a continuous patient-level view requires reconstruction across fragmented entries and may obscure clinically significant information.

**E. Medication-Management Design Defects** *(System Defects)*

38. Epic designed its system in a manner that permits incomplete and unreliable medication records, including the absence of enforced start and stop dates, inconsistent prescriber attribution, and failure to clearly distinguish active from discontinued medications.

39. The system's medication-list architecture allows a drug to remain displayed as active after discontinuation, without any automated mechanism to expire or reclassify the entry. Its reconciliation module does not require affirmative reconciliation at care transitions,

allowing outdated or incorrect medication entries to persist across encounters. Its reporting outputs can display inconsistent information about the same drug without any system-level reconciliation requirement or alert to resolve those inconsistencies. In addition, its audit-control architecture does not support reliable reconstruction of medication status at prior points in time.

40. Where the system lacks structured mechanisms to capture clinically significant information, that information is instead forced into free-text fields, improper categories, or less visible portions of the record, reducing both its visibility and clinical utility. The system also lacks a structured method to record and track medication side effects distinct from allergies, resulting in misclassification or inconsistent documentation. It further fails to uniformly require validation or completion of critical safety-related steps before allowing clinical actions to proceed.

41. These design choices foreseeably create conditions in which medication histories and prescribing responsibility cannot be reliably determined. They are not configuration gaps but structural features of Epic's platform that hospitals cannot correct.

42. The system also lacks structured functionality to capture or evaluate relationships between medication changes and subsequent adverse clinical developments, limiting the ability to identify and track medication-related harm.

43. No workflow, training, or institutional policy can compensate for a system that fails to generate a coherent and reliable medication record. The absence of accurate information cannot be mitigated through user diligence where the system itself does not produce that information.

44. A system intended for use across institutions of varying size and sophistication is expected to embed baseline safety protections within its core architecture rather than depend on optional configurations or modules. Where safety features are optional or not enforced, the system permits high-risk actions to occur without necessary protections. That permissive design is itself a defect.

**F. Reporting and Data-Currency Failures** *(System Defects)*

45. Epic's reporting architecture permits duplication of data across reports and commingling of historical and current information without clear indicators of data currency. These limitations prevent clinicians and patients from reliably determining the patient's current clinical status from the record.

**G. Epic's Knowledge of Foreseeable Risk** *(Foreseeability)*

46. Based on federal health IT and patient-safety guidance, failures in medication lists, including reconciliation errors, inaccurate information, and unclear medication status, are recognized risks. The Office of the National Coordinator for Health Information Technology identifies these issues as EHR safety hazards, and the Agency for Healthcare Research and Quality links medication-list inaccuracies to adverse drug events.

47. Epic obtained ONC certification under 45 C.F.R. Part 170 for multiple products, including EpicCare Ambulatory, EpicCare Inpatient, MyChart, and ASAP, representing that these systems met federal criteria under § 170.315 governing core clinical functions. Those criteria include computerized provider order entry, drug interaction and allergy checks, maintenance of medication and problem lists, care coordination, and secure data exchange. Although certification is voluntary and modular, Epic knowingly pursued certification for systems used in direct patient care, where patients are the intended

beneficiaries of these safety functions. This certification reflects Epic's representation that its systems operate reliably within clinical workflows.

48. Epic therefore knew, or at minimum should have known, that defects in its medication-record architecture could result in patients receiving or continuing dangerous medications without detection and could cause serious injury or death in high-acuity, multi-provider settings.

49. Despite this knowledge, Epic failed to correct the architectural defects described above and continued to market its platform for medication management in those settings. Applicable standards require accurate, accessible, and longitudinal clinical information, and the system's failure to provide such information in a coherent and reliable form undermined those standards and contributed to the conditions that led to harm. A system designed for widespread clinical use must account for foreseeable variability in implementation and incorporate safeguards that function regardless of institutional differences.

## H. Application to Dov Fischman—Causation and Manifestation of System Failure
*(Application and Outcome)*

50. This case involves a single upstream failure: the absence of an accurate medication record, from which all downstream consequences flowed.

51. Dov Fischman received care at a facility using Epic's EHR system. His care involved a high-risk immunosuppressant managed across multiple providers over time in a multi-provider academic medical center environment, the setting in which Epic's medication-record defects create the greatest risk.

52. During the course of treatment, the Epic-generated record did not permit reconstruction of a coherent medication timeline. It did not identify which medications were active at any given time, consistent start and stop dates, prescribing responsibility, or a reliable distinction between current and historical information. Relevant information was fragmented across encounters, requiring post hoc reconstruction.

53. The system's encounter-based structure prevented a unified longitudinal view and failed to function as a meaningful clinical timeline through which the patient's deterioration could be identified and evaluated.

54. The system permitted initiation and continuation of Everolimus without enforced requirements for documented justification, approval, or monitoring. It did not require follow-up laboratory testing, monitoring of immunosuppressive levels, or structured evaluation of adverse effects.

55. The system failed to incorporate or present known risk information associated with the medication at issue. Everolimus was prescribed off-label and is not approved for use in heart transplant patients, yet the system provided no alert, warning, or decision-support mechanism identifying that status. It did not surface safer, established alternatives or prompt consideration of dose adjustment of existing therapies before escalation to a higher-risk medication. In a system intended to manage medication safety, the absence of these safeguards permitted initiation and continuation of a high-risk therapy without structured evaluation of safer options.

56. The system also lacked any structured approval or escalation mechanism for high-risk treatment decisions. It did not require documented authorization, secondary review, or supervisory approval before initiation of an off-label medication or other high-risk

interventions, nor did it provide any enforced workflow to ensure that such decisions were reviewed, justified, and tracked within the record. In a system intended to manage patient safety in complex clinical environments, the absence of an approval and escalation structure permitted high-risk interventions to proceed without documented evaluation, oversight, or accountability at the system level.

57. The system also failed to accurately represent the patient's condition in its recorded outputs. The record reflected a diagnosis of cancer despite a clinical course involving an unresolved infection and sepsis, and the system did not require reconciliation, prioritization, or verification of conflicting diagnostic information. As a result, inconsistent or inaccurate diagnostic coding persisted in the record without correction. In a system relied upon as the authoritative source of clinical information, such misclassification undermined the reliability of the record and impaired the ability to identify the true cause of deterioration. These conditions arose from the system's failure to enforce reconciliation, prioritization, and verification of critical clinical information, including the management of conflicting diagnostic state.

58. The system failed to enforce adequate data completeness and timely updating of the clinical record necessary to maintain an accurate and usable representation of the patient's condition. Entries reflecting significant clinical developments were minimal, fragmented, or conclusory, and the system did not require structured input, minimum detail, or completion of critical fields sufficient to convey current status. It also did not enforce update requirements, prompts, or completion rules to ensure that changes in diagnosis, treatment, or condition were accurately and promptly reflected. In a system relied upon as the authoritative source of patient information, the absence of enforced

completeness and update requirements permitted the record to remain incomplete, outdated, or inconsistent with the patient's actual condition, impairing the ability to understand the patient's status and progression of care.

59. As the patient's condition deteriorated, including complications consistent with excessive immunosuppression, the system did not aggregate these findings or generate alerts. Adverse developments were recorded, if at all, in isolated entries not integrated into a unified assessment. The system also lacked a reliable mechanism to capture and track medication-related adverse effects. These combined failures—absence of risk identification, lack of approval safeguards, and failure to synthesize clinical deterioration—prevented recognition of a common cause or timely intervention.

60. As a result, a complete and reliable understanding of the patient's clinical course, including medication exposure, attribution, monitoring, and progression of harm, could not be derived from the record.

61. Had the system enforced medication timelines, required prescriber attribution, reconciled active and discontinued medications, and produced reports distinguishing current from historical information, the dangerous condition would have been visible and correctable.

62. Instead, the defect directly caused Dov Fischman's death by preventing the existence of accurate medication information necessary to identify and correct the condition.

63. The defect is structural and informational. Epic's system failed to generate a medication record capable of conveying the information necessary to identify and correct the condition, and its outputs directly influence treatment decisions.

64. Where the system fails to properly structure or communicate critical information, those failures occur at the patient level and result in missed care, delayed treatment, or

misunderstanding of material medical information. The system's outputs are acted upon in patient care, creating a direct pathway from design to harm.

65. The causal chain is direct and unbroken. Epic's architecture allowed critical medication information to be unrecorded or inconsistently displayed while clinicians and patients relied on the record as authoritative. At critical times, the system failed to reflect the dangerous condition, preventing identification and correction. The resulting uncorrected condition directly caused the death. The harm flows from the system's design and outputs.

66. This claim does not arise from inaccurate recording after clinical decisions or from an unfavorable outcome. The defect existed at the level of system architecture and governed what information could be recorded, displayed, and interpreted.

67. Because Epic controlled medication timelines, visibility of discontinued medications, and consistency across reports, the absence of an accurate medication record was a direct consequence of its design.

68. That absence foreseeably prevented intervention, constrained downstream decision-making, and was a substantial factor in producing the harm. No independent intervening act breaks this causal chain.

69. The system did not require, surface, or synthesize critical medication-related information needed to evaluate treatment safety and allowed that course to proceed without interruption, alert, or reconciliation.

70. Epic is not alleged to be the sole cause, but its system was a substantial factor in enabling and failing to prevent the conditions that led to death.

## V. CLARIFICATION OF CLAIM NATURE

### A. Nature of Claims and Exclusion of Healthcare Liability Framework

71. This action does not constitute a health care liability claim under Tex. Civ. Prac. & Rem. Code Chapter 74. Defendant is not a health care provider, and the claims do not require evaluation of medical judgment or standards of care. The subject matter is software architecture and system design. The alleged defect exists upstream of any clinical decision and prevented the creation of an accurate medication record.

72. This action does not implicate the economic loss rule. Plaintiff seeks recovery for personal injury and death, not purely economic harm.

73. Plaintiff's claims do not impose duties inconsistent with federal regulation but enforce Defendant's independent duties under Texas law not to design and market an unreasonably dangerous system or make materially misleading representations. Any subsequently enacted statutes or regulations do not apply to the events at issue, which occurred prior to their effective dates.

### B. Product Liability Classification and Applicability to Software-Based Systems

74. Plaintiff alleges that Epic's EHR platform qualifies as a product subject to liability under the Texas Products Liability Act, Tex. Civ. Prac. & Rem. Code §§ 82.001 et seq. The Act defines "product" broadly as an item placed into the stream of commerce for use or consumption. Epic designs, develops, markets, and licenses a standardized software system for consideration, the core architecture of which is defined and controlled by Epic prior to distribution.

75. The platform's core components, including database structure, medication-record design, reconciliation logic, and reporting framework, are determined by Epic and are not modifiable by hospital licensees. Epic places the system into the stream of commerce for

use in clinical operations, where it is deployed and relied upon as an authoritative clinical record.

76. The system's behavior is determined at design and deployment, not at clinical use, and any defect exists independent of user conduct. The platform is not a real-time professional service but an engineered system whose operation is fixed by its architecture and determined by Epic's design choices.

77. Epic's platform does not fit within traditional service or information categories. It governs how critical data is captured, structured, and presented, including whether such data exists in the record at all. Its architecture and logic determine how information is organized and made available across care settings, and those functions are defined and controlled by Epic through design and ongoing updates.

78. Although software is often characterized as a service or intangible information, Epic's system is a centrally designed, continuously updated operational platform that structures, processes, and outputs clinical information in a manner that directly affects real-world medical decisions. The system's core architectural features, including its data structure, medication-record logic, and reporting framework, are standardized and uniform across installations and are not created or modified by individual hospital users.

79. Products liability doctrine developed in the mid-20th century in the context of tangible manufactured goods. See, e.g., *Greenman v. Yuba Power Products, Inc*. Courts have accordingly distinguished between tangible property and intangible information, including in Texas jurisprudence. See, e.g., *University of Texas Medical Branch v. York*. Those frameworks do not squarely address modern software systems that function as active, controlled, and continuously evolving operational environments.

80. To the extent the Court considers whether intangible software may qualify as a product, Epic's platform functions similarly to software embedded in medical devices, where defects are attributable to the manufacturer's design rather than professional judgment.

81. Plaintiff pleads, in the alternative, that Epic's platform constitutes a "product" within the meaning of applicable law, or that products liability principles apply given the system's design, centralized control, and operational function. In the alternative, the same facts support independent negligence liability, and the design-defect and negligence theories are pled in the alternative and are independently sufficient.

**C. Plaintiff's Position Regarding Product Liability Classification and Alternative Theories**

82. Plaintiff alleges that the claims asserted arise from defects in the design, structure, and operation of Epic's EHR platform and are properly analyzed under products liability principles. The system is not limited to passive storage of information; it governs how information is structured, processed, and presented, including the capture, omission, and display of critical medication-related data.

83. These claims do not arise from medical judgment or challenge clinical decision-making. They arise from the system's role in determining the availability, organization, and transmission of information upon which such decisions depend. The alleged defects concern system function, not provider conduct.

84. Based on the governing case law distinguishing between products and the passive transmission of information, Epic's system is a centrally designed and controlled operational platform whose architecture determines how clinical information is created, structured, and presented, including whether such information exists in the record at all. Those characteristics arise from its design and control prior to distribution, not from user

input at the point of care. These architectural features are fixed and uniform across deployments and are not the result of client-specific customization.

85. Plaintiff pleads, in the alternative, negligence claims to the extent the Court determines the platform is not a "product." These claims are asserted pursuant to principles permitting alternative and inconsistent pleading. See Federal Rules of Civil Procedure.

86. Defendant may attempt to characterize these claims as implicating healthcare liability or clinical judgment. Such characterization would be misplaced. Defendant is not a healthcare provider, and the claims arise from the design and operation of a system placed into the stream of commerce and relied upon as an authoritative clinical record.

87. Plaintiff submits that classification presents a threshold legal issue for the Court and pleads all applicable theories to ensure adjudication under the proper legal framework.

## D. Architectural Control as a Dispositive Distinction

88. The claims asserted here do not arise from a clinical misjudgment or a physician's failure to act correctly on available information. They arise from a system that failed to generate the information necessary for any clinical judgment to be made, and that distinction is dispositive.

89. Plaintiff's claims do not depend on whether any physician interpreted the record correctly or made an appropriate clinical decision. They turn on whether the record was capable of conveying accurate medication information at all. That is a question of system design, not clinical judgment. Even a physician exercising perfect judgment cannot act on information the system failed to generate.

90. The causal chain runs from Epic's design defect to the absence of accurate information to the inability to act, and exists entirely upstream of any clinical decision. Epic's system

defines the underlying data model through which patient information is structured, including the organization of information across discrete encounters rather than a unified longitudinal record. This structure is a design choice that governs how information is presented and understood.

91. The defects alleged are not matters of configuration or user preference. They are constraints imposed by the system's core architecture that determine what information can exist within the record. Hospitals cannot configure a system to generate data that the architecture does not require, store, or reconcile. A system that permits ambiguous or incomplete medication states as a matter of design cannot be rendered safe through downstream configuration. Where the architecture does not provide for a function, it cannot be created through configuration, workflow design, or user input.

## VI. CAUSES OF ACTION

## COUNT ONE: WRONGFUL DEATH

(Tex. Civ. Prac. & Rem. Code §§ 71.001–71.011)

92. Plaintiff incorporates all preceding paragraphs by reference. Plaintiff brings this action individually as the adult daughter of Dov Fischman and a statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. The wrongful acts, negligence, and product defects of Defendant were a proximate cause of Dov Fischman's death. As a result, Plaintiff has suffered damages including loss of companionship, mental anguish, loss of inheritance, and pecuniary loss.

## COUNT TWO: NEGLIGENCE

93. Plaintiff incorporates all preceding paragraphs by reference and asserts a claim for negligence against Defendant Epic Systems Corporation, alleging the following as to duty, breach, causation, and damages.

94. **Duty.** Epic owed a duty of reasonable care to Dov Fischman arising from its design, development, and distribution of a safety-critical electronic health record system for use by foreseeable end users, including patients whose care depends on the accuracy and completeness of that system.

95. **Breach.** Epic breached that duty by designing and licensing an EHR system with architectural defects, including the absence of enforced medication timelines, lack of required prescriber attribution, failure to reconcile medication information across care transitions, and failure to generate a coherent and reliable clinical record.

96. **Causation.** These defects were a proximate cause of Dov Fischman's death. Epic's system failed to generate the information necessary to identify and correct a dangerous medication condition, and that failure prevented timely intervention.

97. **Damages.** Plaintiff suffered damages as a direct result, including those recoverable under Texas wrongful death law.

## COUNT THREE: PRODUCTS LIABILITY—DESIGN DEFECT

(Tex. Civ. Prac. & Rem. Code §§ 82.001 et seq.)

98. Defendant's EHR platform is a product that was defectively designed and unreasonably dangerous when placed into the stream of commerce and at the time it left Defendant's control. Plaintiff incorporates all preceding allegations by reference. As alleged above, the platform qualifies as a product under the Texas Products Liability Act, and Defendant is its manufacturer and seller.

99. The platform contained a design defect in that it lacked enforced medication-timeline documentation, required no prescriber attribution across care transitions, permitted inconsistent medication information to be displayed without reconciliation, and did not support reliable reconstruction of medication status over time. These defects created a foreseeable risk of harm that outweighed any utility.

100. Safer alternative designs existed, including mandatory medication-timeline enforcement, automated expiration of discontinued medications, required reconciliation at care transitions, reporting structures that distinguish current from historical information, and system-level validation rules that prevent inconsistent or incomplete medication states. These safeguards are standard in safety-critical systems and were technologically and economically feasible at the time of design. The design defect was a producing and proximate cause of Dov Fischman's injury and death and existed independent of user input.

101. Defendant also failed to provide adequate warnings regarding the material limitations of its medication-record architecture to healthcare institutions and patients who would rely on the system for safety-critical decisions. These limitations were not apparent to end users but were known or knowable to Defendant at the time of distribution. Defendant knew users would rely on the system as an authoritative source of medication information and failed to disclose its limitations.

## COUNT FOUR: GROSS NEGLIGENCE

(Tex. Civ. Prac. & Rem. Code § 41.003)

102. Plaintiff incorporates all preceding paragraphs by reference. Defendant's conduct constitutes gross negligence under Tex. Civ. Prac. & Rem. Code § 41.001(11). The

deployment of a medication-management system with structural defects in high-acuity, multi-provider clinical settings created an extreme degree of risk, with a high probability of severe harm, including death.

103. Defendant had actual, subjective awareness of the risk. Public guidance, safety reports, and industry materials identify medication-list inaccuracies, reconciliation failures, and active-versus-discontinued display errors as patient safety hazards. Defendant had access to and participated in these efforts and was aware of the specific failure modes alleged here.

104. Epic acted through vice principals, including corporate officers and high-level executives to whom Epic had confided the management of the relevant department or division of Epic's EHR platform and medication-management functions. These vice principals had corporate authority over the design, governance, certification, development, release, and continued maintenance of the platform functions at issue, including the database logic, medication-record structures, reconciliation workflows, medication-status displays, and reporting frameworks described herein. They acted in Epic's corporate capacity and possessed authority to direct, supervise, and control the employees and teams responsible for those design, architecture, and release decisions. Their acts and omissions were therefore the acts of Epic itself. These vice principals possessed actual awareness of the patient-safety risks associated with incomplete medication validation, fragmented medication histories, active-versus-discontinued medication display errors, and care-transition data gaps within safety-critical clinical systems.

105. Despite actual, subjective awareness of the extreme risk described above, Defendant proceeded with conscious indifference by failing to correct the known architectural defects described herein, failing to disclose them, and continuing to market its system as meeting patient safety standards. Epic acted through these vice principals, who consciously chose to authorize, maintain, and ratify the challenged architectural decisions while preventing customer healthcare institutions from modifying the underlying system logic. The conscious indifference of these vice principals is imputed to Defendant as the conduct of the corporation itself. These acts and omissions constitute gross negligence. As such, Plaintiff is entitled to exemplary damages.

## VII. DAMAGES

106. Plaintiff seeks all damages recoverable under applicable law, including:

- Wrongful death damages under § 71.004, including loss of companionship, mental anguish, loss of inheritance, and pecuniary loss;

- Compensatory damages in an amount to be proven at trial;

- Exemplary damages under Tex. Civ. Prac. & Rem. Code §§ 41.003 and 71.009;

- Pre- and post-judgment interest at the maximum rate permitted by law; and

- Court costs and all other relief to which Plaintiff is justly entitled.

## VIII. JURY DEMAND

107. Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of Civil Procedure 38(b).

## IX. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiff respectfully prays that Defendant be required to appear and answer, and that upon final trial, Plaintiff, in her individual capacity as a statutory wrongful-death beneficiary, be awarded actual damages, exemplary damages pursuant to Chapter 41 of the Texas Civil Practice and Remedies Code based upon a unanimous jury verdict, pre-judgment and post-judgment interest, costs of court, and all such other and further relief to which Plaintiff is justly entitled.

Respectfully submitted,

Date: June 11, 2026

/s/ _____

**GALLIT FISCHMAN, Pro Se**

10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com

## CERTIFICATE OF SERVICE

I hereby certify that on June 11, 2026, a true and correct copy of the foregoing instrument was served by electronic filing through the Court's CM/ECF system on all counsel of record and registered ECF users entitled to notice in this case.

/s/ _____

Gallit Fischman, Plaintiff, Pro Se