**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **GALLIT FISCHMAN,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 3:26-CV-0770-D** |
| | § | |
| **EPIC SYSTEMS CORPORATION,** | § | |
| | § | |
| *Defendant.* | § | |

---

**DEFENDANT EPIC SYSTEMS CORPORATION'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT, OR,
ALTERNATIVELY, MOTION FOR A MORE DEFINITE STATEMENT**

---

Defendant Epic Systems Corporation ("Epic") respectfully submits this Motion to Dismiss ("Motion") Plaintiff Gallit Fischman's ("Plaintiff") Second Amended Complaint ("SAC") (Dkt. #25) under Rule 12(b)(6), or, alternatively, Motion for a More Definite Statement under Rule 12(e).

**TABLE OF CONTENTS**

I.    INTRODUCTION.................................................................................................................1

II.    LEGAL STANDARD..........................................................................................................2

III.    ARGUMENT AND AUTHORITIES ................................................................................3

    A.    The Court Should Dismiss Plaintiff's Gross Negligence Claim with Prejudice.................................................................................................................3

        1.    Plaintiff still fails to plead facts sufficient to identify vice principals or agents for whose conduct Epic could be liable..................................4

        2.    Plaintiff still fails to plead facts sufficient to establish subjective awareness.........................................................................................................5

    B.    The Court Should Dismiss the Remaining Claims Because Plaintiff Does Not Plausibly Plead Causation........................................................................8

        i.    Who controlled the design, configuration, and information in the UTSW EHR system and how it was used in UTSW clinical settings. .........................................................................................14

        ii.    What caused Dov Fischman's death. .........................................................17

    C.    Alternative Request for a More Definite Statement............................................20

IV.    CONCLUSION ..................................................................................................................22

## TABLE OF AUTHORITIES

**Cases**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................................passim

*Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540 (7th Cir. 1990) ...............................12

*Bazrowx v. Scott*, 136 F.3d 1053 (5th Cir. 1998) ..............................................................................................3

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ......................................................................................... 2, 20

*BellSouth Telecomms., Inc. v. La. Pub. Serv. Comm'n*, No. 06-324-C-M2, 2007 WL 9701563
    (M.D. La. Mar. 23, 2007) ......................................................................................................14

*Boerjan v. Rodriguez*, 436 S.W.3d 307 (Tex. 2014) .....................................................................................5, 6

*Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F. Supp. 2d 615 (N.D. Tex. 2012) ..........................2

*Brewster v. Dretke*, 587 F.3d 764 (5th Cir. 2009) ............................................................................................3

*Carter v. Target Corp.*, 541 F. App'x 413 (5th Cir. 2013) ..............................................................................12

*Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859 (S.D. Tex. 2020).................................................13

*Coulter v. Deere & Co.*, No. CV H-21-2105, 2022 WL 912778 (S.D. Tex. Mar. 29, 2022)....................6, 7

*De La Hoya Moreno v. K-Bar Tex. Elec., Inc.*, No. 07-18-00377-CV, 2020 WL 1161097
    (Tex. App.—Amarillo Mar. 10, 2020, no pet.) .................................................................... 7

*Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164 (Tex. 2005).........................................................6, 7, 8

*Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 653 F. Supp. 3d 359 (S.D. Tex. 2023) .............................12

*Doyle v. Combined Sys., Inc.*, No. 3:22-CV-01536-K, 2023 WL 5945857 (N.D. Tex. Sept.
    11, 2023) ...............................................................................................................................13

*Fernandez v. Allstate Fire & Cas. Ins. Co.*, No. 3:15-CV-2689-D, 2015 WL 6736675 (N.D.
    Tex. Nov. 4, 2015) .............................................................................................................. 5

*Fischman v. Boston Children's Hospital*, No. 1:26-cv-11504-WGY (D. Mass.)........................................ 9, 11

*Fischman v. Novartis Pharmaceuticals Corp.*, No. 3:26-cv-01882-K-BT (N.D. Tex.) .........................9, 10, 17

*Fischman v. University of Texas Southwestern Medical Center*, No. DC-25-18350 (101st Dist.
    Ct., Dallas County, Tex.) ................................................................................................10, 11

*Funk v. Stryker Corp.*, 631 F.3d 777 (5th Cir. 2011) ...................................................................................10

*Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387 (Tex. 1997)....................................................................4

*HEI Res., Inc. v. S. Lavon Evans, Jr. Operating Co.*, No. 5:09-CV-124, 2011 WL 1230338 (S.D. Tex. Mar. 29, 2011) ........................................................................................................14

*In re Motion for Sanctions Against Meyers*, No. 4:12-MC-015-A, 2014 WL 1494099 (N.D. Tex. Apr. 16, 2014) ..........................................................................................................13

*Lopez v. Lennar Homes of Tex. Land & Constr., Ltd*, Case No. 4:23-CV-02543, 2024 WL 7018320 (S.D. Tex. Sept. 13, 2024) ......................................................................................... 5

*Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015 (5th Cir. 1996) .............................................10

*Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917 (Tex. 1998) ...................................................... 4, 5

*Molski v. Mandarin Touch Rest.*, 359 F. Supp. 2d 924 (C.D. Cal. 2005) ..................................13

*Mortland v. IK Onkar Hosp. LLC*, 775 F. Supp. 3d 1024 (N.D. Ind. 2025) ...............................10

*Nix v. Major League Baseball, Off. of the Comm'r of Baseball*, No. CV H-21-4180, 2022 WL 2118986 (S.D. Tex. June 13, 2022) ..............................................................................13

*Norris v. Hearst Trust*, 500 F.3d 454 (5th Cir. 2007) .................................................................10

*Perez Librado v. M.S. Carriers, Inc.*, No. CIV.A.3:02-CV-2095-D, 2004 WL 1490304 (N.D. Tex. June 30, 2004) .................................................................................................... 8

*Quesnot v. Costco Wholesale Corp.*, No. 5:15-CV-1014-OLG, 2016 WL 11586209 (W.D. Tex. Aug. 24, 2016) ................................................................................................... 6

*Reginella Const. Co. v. Travelers Cas. & Sur. Co.*, 971 F. Supp. 2d 470 (W.D. Pa. 2013), *aff'd*, 568 F. App'x 174 (3d Cir. 2014) ....................................................................................21

*Sanders v. Univ. of Tex. Pan Am.*, 776 F. App'x 835 (5th Cir. 2019) ......................................13

*Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563 (5th Cir. 2003) ......................................... 3

*Smith v. Fed. Nat'l Mortgage Ass'n*, No. 3:11-CV-931-P, 2012 WL 13026816 (N.D. Tex. Feb. 29, 2012) ..........................................................................................................20

*Tafolla v. Rodermund*, 2025 WL 875488 (N.D. Tex. Mar. 19, 2025) ................................ 10, 13

*Tex. Dep't of Transp. v. Bagg*, No. 08-23-00148-CV, 2024 WL 4533568 (Tex. App.—El Paso Oct. 21, 2024, pet. denied) ....................................................................................... 7

*U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118 (Tex. 2012) .............................................. 6, 7

*United States ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371 (N.D. Tex. Sept. 17, 2019) ..................................................................... 3

*Williams v. Avon Prods., Inc.*, No. 4:19-CV-02337, 2019 WL 6040073 (S.D. Tex. Oct. 24, 2019) .................................................................................................................................. 7

*Williams v. X Corp.*, No. 4:25-CV-1084-P, 2026 WL 885208 (N.D. Tex. Mar. 16, 2026) ........................ 3

*Williams v. Zordan*, No. CV 21-1061, 2023 WL 6451111 (W.D. La. Sept. 29, 2023) ................................ 5

**Rules**

FED. R. CIV. P. 12(b)(6) ................................................................................................................... 2

FED. R. CIV. P. 12(e) ................................................................................................................ 20, 21

FED. R. CIV. P. 8(d) ........................................................................................................................ 14

FED. R. EVID. 201(b) ...................................................................................................................... 10

TEX. CIV. PRAC. & REM. CODE § 41.001(11) ................................................................................. 6

## I.       INTRODUCTION

On June 8, 2026, the Court dismissed Plaintiff's gross-negligence claim because Plaintiff's First Amended Complaint identified no agent or vice principal whose alleged gross negligence could be attributed to Epic. Dkt. #23 at 16. The Court granted leave to replead, and Plaintiff filed the SAC (Dkt. #25). However, the SAC does not cure the defects in the gross negligence claim. When combined with the facial implausibility of Plaintiff's causation allegations, the SAC is insufficient to survive Rule 12(b)(6).

First, Plaintiff's gross negligence claim still fails as the SAC does not plead facts sufficient for a plausible claim of gross negligence against Epic. The SAC merely adds the label "vice principals" and a paragraph reciting, nearly verbatim, the legal definition of the term; but it still names no officer, points to no decision, and alleges no facts as to what anyone at Epic knew or did. SAC ¶¶ 104–105. Even crediting the conclusory allegations in the SAC as true, the SAC pleads no facts showing that any decision-maker was subjectively aware that a specific feature of any Epic software posed an extreme degree of risk, much less any alleged feature at issue in Plaintiff's claims. The only awareness the SAC actually pleads is that the health-information-technology industry at large treats medication-list errors as a known hazard. SAC ¶ 103. Awareness of an industry-wide risk is not subjective awareness of an extreme risk. And Plaintiff's own allegation that limitations with the EHR were "known or knowable" (SAC ¶ 101) pleads an objective, should-have-known standard that is the opposite of the actual awareness allegation Texas law requires.

Second, Plaintiff's SAC allegations are contradicted by her pleadings in other cases she has brought concerning the medical treatment that led to her father's death. Plaintiff has filed at least three other lawsuits regarding her father's death, each against a different defendant. In each, she pleads a complete, self-contained account of how and why her father died, and that account is similar across those cases. None of those accounts depend on Epic or its software; the SAC is the outlier. Indeed,

1

in each, she attributes her father's death to the immunosuppressant drug Everolimus and to the conduct of entities other than Epic in providing, prescribing, or directing the use of that drug. Further, by Plaintiff's own account in the other lawsuits, the cause of her father's death and the control of the systems she faults Epic for in this lawsuit are both described in terms that cannot be squared with the allegations in the SAC. This confirms that the SAC's causal theory is not the plausible factual account Plaintiff must plead, but rather a conclusory label her own separate filings contradict and render implausible.

For these reasons, Epic's Motion should be granted, and Plaintiff's claims dismissed with prejudice. Alternatively, if the Court declines to dismiss, Epic requests that the Court order Plaintiff to provide a more definite statement under Rule 12(e). The allegations in the SAC are not specific enough for Epic to be able to assess what Plaintiff believes the causal link is between Epic and Dov Fischman's death. The SAC never identifies what information the Epic system used by her father's healthcare provider failed to display, which clinician was misled by its absence, or what any physician would have done differently that would have led to a different outcome for her father. Without those facts, the assertion that an architectural feature in the EHR "prevented timely intervention" is a vague, conclusory label to which Epic cannot reasonably respond, warranting a more specific amendment under Rule 12(e).

## II.    LEGAL STANDARD

To survive a Rule 12(b)(6) motion, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Bramlett v. Med. Protective Co. of Fort Wayne, Ind.*, 855 F. Supp. 2d 615, 618 (N.D. Tex. 2012) (Fitzwater, C.J.); FED. R. CIV. P. 12(b)(6). A court does "not accept as true a legal conclusion couched as a factual allegation," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Where the well-pleaded facts

"do not permit the court to infer more than the mere possibility of misconduct," the complaint has not shown an entitlement to relief. *Id.* at 679. Liberal construction of a pro se pleading does not change this standard; it permits the court to interpret the facts alleged, not to supply facts that are absent. *See* Dkt. #23 at 2, n.1, 16.

Moreover, if a plaintiff has been given an opportunity to replead and still fails to cure the defects in the complaint, the plaintiff's claims may be dismissed with prejudice—even if the plaintiff is pro se. *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003); *Brewster v. Dretke*, 587 F.3d 764, 768 (5th Cir. 2009) (affirming district court's authority to deny leave to amend on a pro se pleading where the plaintiff has already "pleaded his 'best case'" and still fails to meet pleading standards) (quoting *Bazrowx v. Scott*, 136 F.3d 1053, 1054 (5th Cir. 1998)); *see also, e.g.*, *Williams v. X Corp.*, No. 4:25-CV-1084-P, 2026 WL 885208, at *4, n.4 (N.D. Tex. Mar. 16, 2026), *R&R adopted sub nom.*, No. 4:25-CV-01084-P, 2026 WL 885048 (N.D. Tex. Mar. 31, 2026) (dismissing first amended complaint with prejudice because pro se plaintiff failed to plead a cognizable claim after being provided opportunity to replead); *U.S. ex rel. Emerson Park v. Legacy Heart Care, LLC*, No. 3:16-CV-0803-S, 2019 WL 4450371, at *4 (N.D. Tex. Sept. 17, 2019) (dismissing with prejudice where plaintiff failed to sufficient allegations after being put on notice of specific pleading deficiencies through the court's first dismissal order).

### III.   ARGUMENT AND AUTHORITIES

### A.   <u>The Court Should Dismiss Plaintiff's Gross Negligence Claim with Prejudice.</u>

The Court granted leave so that Plaintiff could "plead her best case." Dkt. #23 at 17. The Court identified the precise defect: her failure to identify and attribute gross negligence to any agent or vice principal. Dkt. #23 at 17. Plaintiff's repleading fails on the same ground. Accordingly, Count Four should be dismissed with prejudice. *See Schiller*, 342 F.3d at 567; *Brewster*, 587 F.3d at 768; *Williams*, 2026 WL 885208, at *4 n.4; *Emerson Park*, 2019 WL 4450371, at *4.

**1.    Plaintiff still fails to plead facts sufficient to identify vice principals or agents for whose conduct Epic could be liable.**

The Court dismissed Plaintiff's gross negligence claim in the First Amended Complaint because Plaintiff did not identify an agent or vice principal as required by *Mobil Oil Corp. v. Ellender*, 968 S.W.2d 917 (Tex. 1998). Dkt. #23 at 16. In *Ellender*, the Texas Supreme Court held that "[a] corporation may be liable in punitive damages for gross negligence only if the corporation itself commits gross negligence." 968 S.W.2d at 921. Because a corporation acts only through people, it is grossly negligent only when the corporation (1) authorizes or ratifies an agent's gross negligence, (2) is grossly negligent in hiring an unfit agent, or (3) commits gross negligence through a vice principal. *Id.* at 921–22. Thus, because the First Amended Complaint "failed to identify any agents or vice [principals] for whose actions Epic is liable," Plaintiff's gross negligence claim was dismissed without prejudice under Rule 12(b)(6). Dkt. #23 at 16.

The SAC fares no better. Plaintiff has added only a threadbare allegation in her SAC that "Epic acted through vice principals, including corporate officers and high-level executives," who had "corporate authority over the design, governance, certification, development, release, and continued maintenance" of the system and "authority to direct, supervise, and control" the responsible employees. SAC ¶ 104. But that is just the *Hammerly Oaks* definition of a vice principal restated as though it were a fact. *See Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391 (Tex. 1997) (defining "vice principal" as "(a) Corporate officers; (b) those who have authority to employ, direct, and discharge servants of the master; (c) those engaged in the performance of nondelegable or absolute duties of the master; and (d) those to whom a master has confided the management of the whole or a department or division of his business.") (internal citation omitted).

Pleading the legal definition of "vice principal" does not identify any agents or vice principals for whose actions Epic is liable. It merely identifies a category of persons—"corporate officers and high-level executives"—not a specific person for whom Epic may be responsible under a gross

4

negligence theory. Consequently, Plaintiff's reliance on a generic reference to "corporate officers and high-level executives" provides no more plausible factual detail than was present in the First Amended Complaint. *See Fernandez v. Allstate Fire & Cas. Ins. Co.*, No. 3:15-CV-2689-D, 2015 WL 6736675, at *3 (N.D. Tex. Nov. 4, 2015) ("Nor can [a plaintiff] rely on conclusory allegations that merely track the terms of the statutory provisions under which she seeks to recover,"); *Williams v. Zordan*, No. CV 21-1061, 2023 WL 6451111, at *9 (W.D. La. Sept. 29, 2023) ("A complaint's mere recitation of legal terminology is insufficient to plausibly allege a claim that will survive a Rule 12(b)(6) motion to dismiss."). Nowhere does Plaintiff name a person, point to a specific decision, or allege any individual's subjective knowledge of a risk from a specific Epic software solution. Courts in this district routinely dismiss gross negligence claims resting on exactly this kind of conclusory corporate attribution. *See, e.g.*, *White v. Charter Commc'ns, Inc.*, No. 3:24-CV-2139-D, 2024 WL 4895726, at *2 (N.D. Tex. Nov. 26, 2024) (Fitzwater, J.) (dismissing gross negligence claim with prejudice where plaintiff's pleading consisted of conclusory recitals); *Lopez v. Lennar Homes of Tex. Land & Constr., Ltd*, Case No. 4:23-CV-02543, 2024 WL 7018320, at *4 (S.D. Tex. Sept. 13, 2024) (dismissing where plaintiff's complaint simply restated the general gross negligence standard but failed to identify any agents or vice principals); *see also Iqbal*, 556 U.S. at 678 (a cause of action cannot be supported by mere conclusory allegations).

Thus, Plaintiff's gross negligence claim should be dismissed for the same reason this Court dismissed it before: it fails to plead facts sufficient to hold Epic liable under *Ellender*. And because the defects persisted even after Plaintiff was provided an opportunity to replead, dismissal should be with prejudice.

**2.**      **Plaintiff still fails to plead facts sufficient to establish subjective awareness.**

Gross negligence requires "actual, subjective awareness of the risk involved." Dkt. #23 at 16 (quoting *Boerjan v. Rodriguez*, 436 S.W.3d 307, 311 (Tex. 2014)); *see also* TEX. CIV. PRAC. & REM. CODE

§ 41.001(11); *U-Haul Intern., Inc. v. Waldrip,* 380 S.W.3d 118, 137 (Tex. 2012). The subjective awareness element is exacting: the plaintiff must show that the defendant "knew about the peril, but [its] acts or omissions demonstrate that [it] did not care." *Boerjan*, 436 S.W.3d at 311 (Tex. 2014). Generalized awareness that a category of risk exists is not enough. *See Diamond Shamrock*, 168 S.W.3d at 172–73. The standard requires **actual** awareness by an **identifiable** decision-maker that the **specific** conduct or feature at issue poses an extreme degree of risk. *Id.*

The SAC contains no facts from which the Court could infer that any vice principal possessed "subjective awareness" or made the "conscious choice" that a gross negligence claim requires. Plaintiff alleges that unnamed vice principals "possessed actual awareness of the patient-safety risks" of an Epic electronic health record system and "consciously chose to authorize, maintain, and ratify the challenged architectural decisions." SAC ¶¶ 104, 105. These allegations are the elements of the claim stated as conclusions—nothing more. Plaintiff does not allege that any identified person saw any particular report, participated in any particular decision, or knew that any specific feature in any specific Epic system posed an extreme risk. Thus, the allegations in the SAC are inadequate under *Iqbal. See, e.g., Quesnot v. Costco Wholesale Corp.*, No. 5:15-CV-1014-OLG, 2016 WL 11586209, at *2 (W.D. Tex. Aug. 24, 2016) (dismissing gross negligence claim under *Iqbal* because the "Plaintiffs' pleading that Defendant 'had actual, subjective awareness of the risk' and acted 'with conscious indifference'" was a conclusory assertion of subjective awareness); *Coulter v. Deere & Co.*, No. CV H-21-2105, 2022 WL 912778, at *3 (S.D. Tex. Mar. 29, 2022) (dismissing gross negligence claim because "allegation that 'Defendants had actual, subjective awareness of the risk of fuel spillage and fire, but nevertheless, proceeded in conscious indifference to the rights, safety, and/or welfare of Plaintiff'" was conclusory).

The subjective-awareness element fails for a second, independent reason the Court did not previously reach. Generalized knowledge of risk is insufficient to plead a gross negligence claim under

Rule 12(b)(6).[1] *See, e.g.*, *Coulter*, 2022 WL 912778, at *3 ("The plaintiffs . . . plead only that [the defendants] had knowledge of a general risk of 'fuel spillage and fire.' Texas law requires actual knowledge of the condition that renders the product defective."); *Williams v. Avon Prods., Inc.*, No. 4:19-CV-02337, 2019 WL 6040073, at *5 (S.D. Tex. Oct. 24, 2019), *R&R adopted*, No. 4.19-CV-02337, 2019 WL 6038525 (S.D. Tex. Nov. 14, 2019) ("Simply stating, without any additional factual basis whatsoever, that [the defendant] was aware of a product defect is not enough.").

The only facts the SAC offers on awareness are that "[p]ublic guidance, safety reports, and industry materials" identify medication-list inaccuracies and reconciliation failures as patient-safety hazards, and that Epic "had access to and participated in these efforts." SAC ¶ 103. That pleads awareness of a risk **category** known to the **entire** health-information-technology industry—not actual, subjective awareness that a specific feature of a specific Epic software product posed an extreme degree of risk to specific patients. *See Tex. Dep't of Transp. v. Bagg*, No. 08-23-00148-CV, 2024 WL 4533568, at *9 (Tex. App.—El Paso Oct. 21, 2024, pet. denied) ("Courts have consistently held that knowledge of a potential problem is not actual knowledge of an existing dangerous condition."); *see also, e.g.*, *De La Hoya Moreno v. K-Bar Tex. Elec., Inc.*, No. 07-18-00377-CV, 2020 WL 1161097, at *5 (Tex. App.—Amarillo Mar. 10, 2020, no pet.) (granting summary judgment because evidence of defendant's "knowledge of the general risk of electrocution inherent in working with electricity" was no evidence that the defendant had subjective knowledge of the risk of electrocution "when loosening bolts on the base of a light pole"); *Perez Librado v. M.S. Carriers, Inc.*, No. CIV.A.3:02-CV-2095-D, 2004

---

[1] The SAC itself confirms the gap. In the same pleading, Plaintiff alleges that the EHR's supposed limitations were "known or knowable" to Epic. SAC ¶ 101. "Knowable" is a should-have-known formulation, *i.e.*, an objective negligence standard. It is the opposite of the subjective awareness that gross negligence demands. *See U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012) (requiring "actual, subjective awareness of the risk involved"); *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 172–73 (Tex. 2005). A complaint that uses "knowable" language in one paragraph and asserts "actual awareness" in another does not make gross negligence plausible; it makes it self-contradictory. And to the extent paragraph 101's reference to a "known" risk is read as an allegation of actual knowledge, it fails for the reasons given above, *i.e.*, it is just a bare conclusion unsupported by any fact about any decision-maker, leaving only the objective "knowable" formulation that gross negligence does not satisfy.

WL 1490304, at *3 (N.D. Tex. June 30, 2004) (distinguishing between the risk of driving while fatigued, which is too general to show subjective risk, and the risk of driving while fatigued on a specific road, with a specific volume of traffic, at a specific time of day).

Participation in industry patient-safety efforts shows, at most, that Epic was aware a risk category existed. It does not show that any Epic decision-maker subjectively knew the specific features at issue created an extreme risk to Dov Fischman and consciously disregarded it. The SAC does not even attempt to explain how Epic could have subjective awareness of an unspecified structural risk when the allegedly defective EHR was used by UTSW to treat Dov Fischman—without issue or incident—for over nine years before his death.[2] *See* App. 007 ¶ 16, App. 089–90; *see also, e.g.*, *Diamond Shamrock Refin. Co. v. Hall*, 168 S.W.3d 164, 171–72 (Tex. 2005) (affirming no evidence of gross negligence because the plaintiff's allegation that the defendant's operator "thought the check valve was leaking" was not evidence that the defendant "actually knew that [the valve] presented any danger" when it had "worked without incident for fifteen years").

Accordingly, because the SAC fails to plead facts sufficient to establish subjective awareness and does not identify a vice principal or agent for whose conduct Epic could be liable (even after being provided an opportunity to amend), the Court should dismiss Plaintiff's gross negligence claim with prejudice.

## B.    <u>The Court Should Dismiss the Remaining Claims Because Plaintiff Does Not Plausibly Plead Causation.</u>

Each remaining claim requires causation. At this stage, Plaintiff must plead facts that "allow[] the court to draw the reasonable inference" that Epic's conduct caused Dov Fischman's death. *See Iqbal*, 556 U.S. at 678. Plaintiff cannot satisfy that standard through the SAC. Plaintiff's own allegations

---

[2] *See also* App. 156 (Plaintiff's Response to UTSW's Plea in Abatement) ("Mr. Fischman received a heart transplant at UT Southwestern in April 2015 and remained stable for ~nine years . . . His chart from this period shows detailed, protocol-driven documentation.").

in several other lawsuits—including two filed after this one and one repleaded as recently as July 8, 2026—place the cause of death entirely outside any Epic software and outside Epic's control, negating the but-for premise on which Plaintiff's claims against Epic depend. Thus, Plaintiff's allegations against Epic are implausible and should be dismissed.

As an initial matter, this challenge rests on materials that were not before the Court when it previously considered dismissal. And, importantly, Epic's causation challenge in this Motion does not reopen the question the Court has already resolved. The Court declined to dismiss the First Amended Complaint on causation because, in its view, a defendant's conduct need not be the sole cause of an injury, Dkt. #23 at 10, and Epic does not contend otherwise in this Motion. The contradictory causation allegations in the attached materials and discussed below are not offered to show that some other cause predominated, but that the Plaintiff's own contemporaneous descriptions of the same system and the same death render the allegations against Epic in the SAC implausible. Thus, the causation issues presented here should still be considered by the Court despite its prior ruling.

Epic submits documents from three other lawsuits for the Court's consideration: Plaintiff's Original Complaint (filed June 5, 2026) (App. 001–55) and notice of related case (App. 180–182) (filed June 5, 2026) in *Fischman v. Novartis Pharmaceuticals Corp.*, No. 3:26-cv-01882-K-BT (N.D. Tex.); Plaintiff's First Amended Complaint (filed July 8, 2026) (App. 056–111) in *Fischman v. Boston Children's Hospital*, No. 1:26-cv-11504-WGY (D. Mass.) (superseding her original complaint filed March 30, 2026, and constituting, by its own terms, "the operative pleading in this action"); and Plaintiff's Sixth Amended Petition (filed February 9, 2026) (App. 112–130) and related filings (including a verified

9

factual account) (App. 131–179) in *Fischman v. University of Texas Southwestern Medical Center*, No. DC-25-18350 (101st Dist. Ct., Dallas County, Tex.).[3]

In *Fischman v. Novartis Pharmaceuticals Corp.*, Plaintiff sued Novartis, the manufacturer of Everolimus, for wrongful death, strict products liability for an unreasonably dangerous product, strict products liability for failure to warn, negligence, gross negligence, and violations of the Texas Deceptive Trade Practices Act related to her father's death. *See* App. 004 ¶ 5. Plaintiff alleges that converting her father from a stable, decade-long immunosuppressant regimen to Everolimus caused immune collapse, post-transplant lymphoproliferative disorder presenting as Hodgkin's lymphoma, severe infection, and fatal sepsis. App. 002–03 ¶ 1; App. 010 ¶ 24. By Plaintiff's own account, "[s]epsis was the immediate cause of death, **as reflected in his treatment course and medical record**," and Novartis's conduct was "a cause-in-fact and proximate cause of Dov Fischman's injuries and death." App. 010 ¶ 24; App. 030 ¶ 77 (emphasis added). Specifically, Plaintiff blames Novartis's "fragmented risk framework," which she alleges made the cause of her father's decline harder to recognize and delayed the physicians' ability to identify Everolimus as the cause. App. 010 ¶ 26. The Novartis complaint does not mention Epic or any purported defect in the Epic electronic health record system configured, maintained, and used by an Epic customer. Further, based on the Novartis complaint, Plaintiff clearly knows what allegations are necessary to establish causation, as shown by the detailed

---

[3] A court may notice matters of public record—including the pleadings, motions, and orders filed in other cases—because a document filed in a court of record is a source "whose accuracy cannot reasonably be questioned." FED. R. EVID. 201(b); *see Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007); *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011); *Lovelace v. Software Spectrum Inc.*, 78 F.3d 1015, 1017-18 (5th Cir. 1996); *see also Tafolla v. Rodermund*, 2025 WL 875488, at *1 n.1 (N.D. Tex. Mar. 19, 2025) (taking judicial notice of plaintiff's factual assertions in a prior case the same plaintiff brought in the Fort Worth Division of the Northern District of Texas, and incorporating those assertions into its Rule 12(b)(6) analysis, over the plaintiff's objection). Plaintiff herself admitted that this lawsuit and her lawsuit against Novartis share a "common nucleus of operative fact, including overlapping factual allegations concerning Dov Fischman, Everolimus treatment, transplant-related care, clinical information management, medical-record information, chronology, causation, and related events." *See* App. 181. Accordingly, the Court may properly take judicial notice of Plaintiff's complaints against Novartis, Boston Children's, and UTSW in ruling on this Motion. *See generally, e.g.*, *Mortland v. IK Onkar Hosp. LLC*, 775 F. Supp. 3d 1024, 1029 (N.D. Ind. 2025) (taking judicial notice of contradictory complaint plaintiff filed in separate lawsuit for dismissal analysis under Rule 12(b)(1)).

medical background and related facts she pleads against Novartis. Yet she omits those same facts and level of detail in the SAC here.

In *Fischman v. Boston Children's Hospital*, Plaintiff sued Boston Children's, the hospital allegedly overseeing the TEAMMATE clinical trial of Everolimus at participating sites like UTSW, for institutional negligence and negligent undertaking, negligent failure to warn, gross negligence, and wrongful death related to her father's death. *See* App. 081–85 ¶¶ 81–102. As in the Novartis action, Plaintiff alleges that her father "developed post-transplant lymphoproliferative disorder (PTLD) and a severe opportunistic infection, both recognized risks of the drug," and that "his death was proximately caused by the use of everolimus in a clinical setting shaped by TEAMMATE's everolimus-conversion framework, but without the safeguards TEAMMATE used to evaluate, monitor, and respond to those same risks." App. 058 ¶ 4; App. 076 ¶ 73. That causal account runs through the drug and the trial's missing safeguards—not any electronic health record. Plaintiff then blames Boston Children's for failing to implement certain safeguards related to its TEAMMATE trial. *See* App. 066–67 ¶¶ 32, 37 (alleging that Boston Children's "took centralized authority over the trial's structure, protocol, and oversight across every participating site, including UTSW," but "failed to implement safeguards adequate to keep trial-related frameworks from displacing individualized clinical judgment or exposing non-enrolled patients to study risks without protection"). Again, Plaintiff's allegations assert no causal role for Epic or its software; the operative complaint's only mention of Epic is a question Plaintiff says she "expects discovery to address"—"[w]hether TEAMMATE utilized the same Epic electronic health record system as the clinical environment, and whether treating physicians could access information generated through the trial." App. 078 ¶ 80.

In *Fischman v. University of Texas Southwestern Medical Center*, Plaintiff sued UTSW, the institution that Plaintiff alleges prescribed and administered Everolimus, alleging two causes of action in her Sixth

Amended Petition: wrongful death and negligence.[4] *See* <u>App. 124–25</u> ¶¶ 7.1, 7.2. Here too, the causal account runs through the drug and UTSW's institutional controls, not Epic. Plaintiff alleges that "[b]ut for [UTSW's] failures in institutional authorization, documentation, monitoring, escalation, and oversight," her father "would not have suffered the injuries that led to his death"; that Everolimus was the "agent of change" and "most probable cause" of his decline; and that "[n]o independent or superseding cause intervened."[5] <u>App. 122–24</u> ¶¶ 6.6, 6.7.

Plaintiff's accounts in the Novartis, Boston Children's, and UTSW lawsuits of what caused her father's death and of who controlled the relevant systems bear directly on whether the SAC plausibly alleges that any defect in any Epic software caused Dov Fischman's death. A plaintiff's contemporaneous allegations in parallel suits—filed weeks before and after the operative pleading including an amended complaint filed in the District of Massachusetts on July 8, 2026, nearly a month after the SAC—that affirmatively contradict the factual premise of the plaintiff's claims are precisely the kind of material a court may consider in assessing plausibility. *See Carter v. Target Corp.*, 541 F. App'x 413, 416–17 (5th Cir. 2013) (a court need not accept allegations contradicted by a document it may properly consider); *Doe v. Univ. of Tex. M.D. Anderson Cancer Ctr.*, 653 F. Supp. 3d 359, 370 (S.D. Tex. 2023).[6] A court may (and should) weigh these cross-suit contradictions. *See Tafolla v. Rodermund*, 2025

---

[4] Fischman's Sixth Amended Petition drastically narrowed the scope of her prior claims, which included claims for breach of fiduciary duty, violations of the Texas Public Information Act, a survival action, waiver of immunity under the Texas Tort Claims Act, and "Institutional Governance Failures and Unauthorized Administration."

[5] In March 2026, Plaintiff nonsuited her case against UTSW after encountering statutory barriers under Texas's healthcare liability act that prevented her from obtaining discovery from UTSW pertaining to her father's death. Six days before she nonsuited, Plaintiff filed this lawsuit against Epic. Then, on June 1, Plaintiff issued a non-party subpoena to UTSW to request the same discovery from UTSW that she could not obtain in Texas state court—raising the question of whether this lawsuit was filed against Epic because Plaintiff legitimately believes that Epic played any role in her father's death, or instead, as a mere vehicle to obtain discovery from UTSW. Further underscoring this point, "UTSW" is never mentioned in the SAC, despite the very specific and detailed allegations Plaintiff raises about UTSW in her other lawsuits. *See, e.g.*, <u>App. 066–71</u>.

[6] To be clear: Epic is not suggesting the Court apply a formal judicial estoppel analysis or treat Plaintiff's other lawsuits as if they were central to the claims in the SAC like in *Carter*. Rather, Epic is requesting the Court consider Plaintiff's parallel pleadings in deciding whether the allegations of causation against Epic in the SAC are sufficient under *Iqbal*. That said, the logic behind judicial estoppel, as well as in *Carter*, is instructive. *See generally Astor Chauffeured Limousine Co. v. Runnfeldt Inv. Corp.*, 910 F.2d 1540, 1548 (7th Cir. 1990) (noting, in judicial estoppel analysis, that "[i]nconsistent positions in different suits are much harder to justify" than inconsistent positions taken in the same suit); *Carter*, 541 F. Appx. at 417 (relying on

WL 875488, at *1 n.1 (N.D. Tex. Mar. 19, 2025); *Nix v. Major League Baseball, Off. of the Comm'r of Baseball*, No. CV H-21-4180, 2022 WL 2118986, at *5 (S.D. Tex. June 13, 2022), *aff'd and remanded sub nom.*, 62 F.4th 920 (5th Cir. 2023). And a court need not "strain to accept conclusory allegations or unwarranted factual inferences," including allegations "refuted by a fact of which the court has taken judicial notice." *Cicalese v. Univ. of Tex. Med. Branch*, 456 F. Supp. 3d 859, 872 (S.D. Tex. 2020).

Epic does not ask the Court to decide that any competing account is true. Rather, Epic requests that the Court credit that the allegations are Plaintiff's **own** assertions of the facts, which she has not disavowed. A plaintiff's factual allegations in one suit are non-binding admissions that a court may consider on a motion to dismiss in a related case; the plaintiff retains the right to explain, retract, or controvert them, but where she does not, the court may treat them as undisputed. *See Sanders v. Univ. of Tex. Pan Am.*, 776 F. App'x 835, 837–38 (5th Cir. 2019) (admissions in a superseded pleading lose their binding force but "retain value as evidentiary admissions," and the plaintiff had "every right to explain or controvert" them); *Doyle v. Combined Sys., Inc.*, No. 3:22-CV-01536-K, 2023 WL 5945857, at *7 (N.D. Tex. Sept. 11, 2023) (treating the plaintiffs' allegations in a separate proceeding as non-binding admissions and dismissing claims where plaintiffs failed to explain or controvert allegations in other case).

Importantly, Plaintiff cannot immunize these contradictions by invoking her latitude to plead in the alternative. Rule 8(d)(2)–(3) permits a party to set out inconsistent or alternative allegations of a claim or defense, but that permission is confined to a single pleading in a single action. FED. R.

---

documents central to the complaint to conclude that the plaintiff's allegations were not "well-pled" and thus subject to dismissal because the documents showed that the plaintiff had elsewhere admitted facts contradicting the allegations in the complaint). Courts have also considered contradictory allegations in parallel pleadings in assessing whether a party failed to comply with the good faith pleading requirements under Rule 11. *See generally, e.g.*, *In re Motion for Sanctions Against Meyers*, No. 4:12-MC-015-A, 2014 WL 1494099, at *7 (N.D. Tex. Apr. 16, 2014) (considering plaintiff's filing of contradictory allegations in at least two other lawsuits in sanctions analysis under Rule 11); *Molski v. Mandarin Touch Rest.*, 359 F. Supp. 2d 924 (C.D. Cal. 2005), *aff'd sub nom.*, 500 F.3d 1047 (9th Cir. 2007) *and vacated on other grounds*, No. 2:04-CV-00450-ER, 2013 WL 6571126 (C.D. Cal. Nov. 18, 2013) (considering plaintiff's filing of multiple, separate lawsuits against different defendants for the same injury in sanctions analysis).

CIV. P. 8(d). By its text and title, Rule 8 governs what one pleading may contain, not what a litigant may assert across separate suits in different courts. *See HEI Res., Inc. v. S. Lavon Evans, Jr. Operating Co.*, No. 5:09-CV-124, 2011 WL 1230338, at *6 (S.D. Tex. Mar. 29, 2011) ("Rule 8(d)(2) does not allow for multiple inconsistent averments from different pleadings in different courts."). The rule serves a single-forum purpose: early in a case, before discovery, a pleader uncertain of the facts may preserve alternative positions because one tribunal will ensure that only one of the pleader's theories will ultimately prevail. That justification disappears across parallel suits, where inconsistent positions are "much harder to justify." *BellSouth Telecomms., Inc. v. La. Pub. Serv. Comm'n*, No. 06-324-C-M2, 2007 WL 9701563, at *7, n. 14 (M.D. La. Mar. 23, 2007) (internal citation omitted).

Thus, the fact that Plaintiff has elsewhere pleaded a complete, detailed causal account of the same death—one that affirmatively treats the EHR record as accurate and locates the cause in a pharmaceutical drug and its prescription and administration to her father—confirms that the SAC's abstract causal theory against Epic is not plausible. As discussed below, Plaintiff's allegations in her other cases cannot be squared with the SAC in at least two respects.

> ### i. Who controlled the design, configuration, and information in the UTSW EHR system and how it was used in UTSW clinical settings.

First, Plaintiff's allegations in her lawsuit against UTSW contradict the architectural premise of her design-defect claim against Epic. In the SAC, Plaintiff takes issue with Epic's architectural design, alleging that an Epic system allegedly used by a (unidentified) provider lacked (unspecified) safeguards that hospitals like UTSW could not control. SAC ¶¶ 84, 91 (alleging that the safeguard "cannot be created through configuration, workflow design, or user input"). Yet, by Plaintiff's own account in her petition against UTSW, the system was within UTSW's control. *See* App. 124–25 ¶ 7.2.

In the UTSW petition, and in contrast with the SAC, Plaintiff alleges that UTSW "created and controlled the institutional disclosure and authorization framework" for high-risk, off-label

medication transitions, and "controlled the electronic and administrative systems through which medication orders were authorized and executed." App. 124–25 ¶ 7.2. In fact, Plaintiff alleges that UTSW held "**exclusive** control over authorization systems, records governance, . . . dispensing pathways, [and] monitoring frameworks[.]" App. 120 ¶ 6.1 (emphasis added).[7] She maintains that UTSW's systems "should not have permitted the medication to be authorized, released, or deployed unless a completed disclosure and authorization document was uploaded, validated, and linked within the system," but UTSW "failed to implement or enforce such controls."[8] App. 124–25 ¶ 7.2. For "nearly a decade" her father "remained stable under [UTSW's] enforced institutional safeguards," a stability that she says, "demonstrates [its] ability to operate effective institutional controls when enforced," until UTSW "weakened or ceased enforcing these safeguards." App. 120–21 ¶ 6.2.[9]

In the SAC, by contrast, Plaintiff alleges of the same Epic EHR system that the "safeguard" on which she bases her claims against Epic "cannot be created through configuration, workflow design, or user input," and that "[h]ospitals cannot configure a system to generate data that the architecture does not require, store, or reconcile." SAC ¶ 91. She alleges the defect is "fixed and uniform across deployments." SAC ¶ 84; *see also* SAC ¶¶ 27, 41. Both accounts cannot be true.

---

[7] *See also* App. 169 (Plaintiff's Response to UTSW's Plea in Abatement) ("UT Southwestern's MyChart system proves no follow-up appointments or labs were scheduled post-Everolimus despite FDA monitoring requirements. In hospital-configured Epic systems, order sets for high-risk medication initiation include mandatory linked appointments and labs; scheduling modules require booking before encounter closure; BPAs alert when monitoring is overdue. The absence of any scheduled follow-up reveals UTSW failed to configure mandatory workflows for high-risk drug monitoring.").

[8] *See also* App. 174 (Plaintiff's Response to UTSW's Plea in Abatement) ("UT Southwestern's conduct centers on how **it** programmed and monitored **its system**: creating detailed monitoring for Everolimus trial subject while maintaining 'no documents' for clinical patients; rotating physicians without accountable oversight; failing to require basic monitoring; maintaining documentation and PIA practices obscuring what was done and why.") (emphasis added).

[9] Plaintiff's allegations against UTSW also show that Plaintiff knows how to plead sufficient allegations of causation; yet she pleads no such allegations against Epic.

15

Either UTSW controlled the system—as Plaintiff alleges in her petition against UTSW—or it didn't—as she alleges here.[10]

Moreover, Plaintiff's design defect theory against Epic depends entirely on the premise that the alleged deficiency in the EHR was unconfigurable. But her pleading against UTSW squarely contradicts that premise. There, Plaintiff alleges that UTSW controlled not a paper process but "the data systems used to authorize and execute medication deployment," then faults UTSW for the absence of "system-level gating" that would have conditioned authorization, release, and deployment of the medication upon a validated, linked authorization record within the system. App. 124–25 ¶ 7.2. That allegation describes a system that requires, stores, and reconciles authorization data and gates the medication order upon it—the very capability that the SAC alleges Epic's architecture is defective for being incapable of providing. Put differently: Plaintiff alleges that the same safeguard she faults Epic for omitting was achievable through the configuration that ***UTSW*** controlled. *See* App. 138 (Plaintiff's Verified Response to UTSW's Answer) ("UTSW failed to configure Epic EHR's automated scheduling and monitoring capabilities for Everolimus use[.]").[11]

Plaintiff's allegations against UTSW also contradict the allegations this Court relied on in its prior dismissal order. Dkt. # 23. The order cites Plaintiff's allegations that Epic "exclusively controls the structure through which medication data is created, stored, and displayed" and that the EHR system "cannot be modified by hospitals." Dkt. #23 at 2, 7. On these representations, the Court concluded Plaintiff sufficiently pleaded that Epic had control over the alleged deficiencies in the EHR and thus owed a duty of care to Plaintiff's father. Dkt. #23 at 8. But Plaintiff's allegations against

---

[10] The operative Boston Children's complaint reflects the same understanding. Plaintiff's question whether "treating physicians could access information generated through the trial" through the same Epic system (App. 078–79 ¶ 80) treats the flow of trial-related information through the EHR as a function of institutional access and setup—not of an architecture that, as the SAC alleges, "cannot be created through configuration, workflow design, or user input." SAC ¶ 91.

[11] *See also* App. 163 (Plaintiff's Response to UTSW's Plea in Abatement) ("UT Southwestern operated as a premier medical center with . . . sophisticated Epic systems capable of enforcing clinical workflows . . .").

UTSW make her "exclusive control" allegations against Epic implausible. Not only does this undermine the basis for the Court's prior order, but it renders Plaintiff's allegations insufficient to survive this renewed motion to dismiss.

### ii.     *What caused Dov Fischman's death.*

Moreover, in her other lawsuits, Plaintiff identifies the conversion of her father's post-transplant regimen to include Everolimus and its administration as the cause of her father's death. She never traces his death to any feature of any Epic software or to missing or incorrect information in his EHR record that affected or instructed the decision to prescribe Everolimus or treat the alleged side effects from it. *See, e.g.*, App. 002–03 ¶ 1; App. 076 ¶ 73; App. 124 ¶ 7.1. Instead, she places that change at the feet of a new provider who had a background with Everolimus and was determined to move Dov Fischman onto an Everolimus treatment plan. In every other account Plaintiff has given of Dov Fischman's death, Epic, and the Epic-related causal link the SAC asks the Court to infer, are completely absent.

In her *Novartis* complaint, Plaintiff states plainly that "[s]epsis was the immediate cause of death, as reflected in his treatment course and medical record."[12] App. 010 ¶ 24. Similarly, in the operative Boston Children's complaint, Plaintiff alleges that Dov Fischman "developed post-transplant lymphoproliferative disorder (PTLD) and a severe opportunistic infection, both recognized risks of the drug" (App. 058 ¶ 4), that "his death was proximately caused by the use of everolimus in a clinical setting shaped by TEAMMATE's everolimus-conversion framework, but without the safeguards TEAMMATE used to evaluate, monitor, and respond to those same risks" (App. 076 ¶ 73), placing the blame on the drug, its off-label administration, and the trial's missing safeguards. Notably, neither case mentions Epic, much less asserts any causal link to Epic. Instead, Plaintiff

---

[12] Notably, despite Plaintiff's allegation that the EHR was somehow defective, her allegations elsewhere indicate that the medical record was functioning properly and accurately processing patient information.

attributes her father's death solely to pharmaceutical causation and the decision to prescribe that pharmaceutical—not a lack of information (or even inconsistent or incorrect information) in his medical record caused by the allegedly defective architecture in any Epic software.

Additionally, Plaintiff's allegations against Novartis and Boston Children's treat the medical record as an accurate reflection of the clinical course—the precise opposite of the premise in the SAC that any Epic EHR system "failed to generate the information necessary to identify and correct a dangerous medication condition." SAC ¶ 96. To be sure, the only deficiency Plaintiff identifies in the Novartis lawsuit is a deficiency in the manufacturer's risk warnings, *i.e.*, Novartis's "fragmented risk framework," which she alleges made Everolimus harder to recognize as the cause of decline. App. 010 ¶ 26. A recognition delay attributed to inadequate drug warnings is a different deficiency, from a different source than the record-generation failure the SAC pins on Epic.

Plaintiff's own account of the missing information likewise never runs through Epic. In the operative Boston Children's complaint, the informational failure is one of disclosure and consent: Plaintiff alleges that her father "was never told the drug was unapproved for heart transplantation," that "[h]ad those facts been disclosed, he would not have agreed to the conversion" (App. 074 ¶ 64), and that Boston Children's "approved the consent materials" that failed to make those disclosures (App. 072 ¶ 58). And by Plaintiff's own account, the underlying risk information was never missing at all: everolimus's risks of serious infection, malignancy, and increased mortality in heart transplantation appear in FDA Black Box Warnings that "were well documented at the time of TEAMMATE." (App. 068 ¶ 43; *see also* App. 082–83 ¶¶ 89–90. The information Plaintiff says her father's caregivers and family lacked thus existed in the public FDA label, and the duty she alleges to convey it ran through consent materials and physician disclosure—not through any data field that, in the SAC's words, Epic's architecture "does not require, store, or reconcile." SAC ¶ 91. Plaintiff's own pleadings

18

therefore negate the but-for premise of her claims here: that a gap in Epic's software was the source of the missing information.

Plaintiff's operative pleading also places the decision to convert her father to everolimus in the independent judgment of his prescribing physician—not in any software output. By Plaintiff's own account, the prescribing physician "had prior everolimus experience at another TEAMMATE site" (App. 074 ¶ 62), "told Plaintiff's family she had converted patients to everolimus at her prior institution . . . and intended to do the same at UTSW" (App. 074 ¶ 63), and exercised the "heightened independent clinical judgment" that Plaintiff alleges any off-label prescription "required," in a setting where "treatment decisions were left to physician discretion" (App. 079 ¶ 68; App. 078 ¶ 79). Epic does not contend that the physician caused Dov Fischman's death, and the Court need not resolve any question of medical causation. The point is a pleading point: Plaintiff herself situates the operative decision in a physician's independent clinical judgment, informed by that physician's own prior experience—an account that leaves no work for the "absence of accurate information" the SAC attributes to Epic's architecture. SAC ¶¶ 88–90.

Plaintiff has thus admitted two things: (1) UTSW controlled her father's medical record, not Epic; and (2) her father's death was caused by Everolimus as reflected in his accurate medical record. These admissions render Plaintiff's allegations against Epic implausible. Plaintiff's decision to omit from her other lawsuits the supposed link between her father's medical record and his death, but to maintain the link to Everolimus and other system failures, is telling, and reinforces the pleading gap that exists here. That a plaintiff who has described the same death repeatedly, and in detail, never once pleads the facts that her theory against Epic requires confirms that the SAC's causal link is conclusory and not a well-pleaded, plausible allegation. Indeed, the SAC stands apart from the other pleadings as avoiding the recitation of events included in those actions. The SAC includes no mention of UTSW,

19

of Novartis, of TEAMMATE, of Boston Children's Hospital, and it contains only two passing mentions of Everolimus. SAC ¶¶ 54–55.

In short, Plaintiff's own contemporaneous allegations in the Novartis, Boston Children's, and UTSW lawsuits foreclose the causal inference the SAC asks this Court to draw. She has alleged that UTSW—not Epic—controlled the relevant systems, and that Everolimus—not any defect in any Epic software—caused her father's death. And in her most recent operative pleading, she concedes that whether any Epic software was even involved remains an open question for discovery. Accordingly, the Court should find Plaintiff's causation theory implausible as a matter of law and dismiss all claims with prejudice.

## C.      Alternative Request for a More Definite Statement

In the event the Court denies dismissal with prejudice under Rule 12(b)(6), Epic alternatively requests the Court order Plaintiff to provide a more definite statement of causation under Rule 12(e). *See, e.g.*, *Smith v. Fed. Nat'l Mortgage Ass'n*, No. 3:11-CV-931-P, 2012 WL 13026816, at \*5 (N.D. Tex. Feb. 29, 2012) (granting alternative request for a more definite statement under Rule 12(e) after denying dismissal under Rule 12(b)(6)); *but see Twombly*, 550 U.S. at 569, n.14 (noting that dismissal, not a directive to replead with particularity, is the appropriate remedy where the complaint "fail[s] *in toto* to render plaintiffs' entitlement to relief plausible"). Rule 12(e) provides that "[a] party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response." FED. R. CIV. P. 12(e).

The SAC currently alleges that a design defect in the Epic EHR used by her father's healthcare provider produced an "absence of accurate information," which produced an "inability to act," and that this chain "exists entirely upstream of any clinical decision." SAC ¶¶ 88–90; *see also* SAC ¶ 96 (the "system failed to generate the information necessary to identify and correct a dangerous medication condition," and "that failure prevented timely intervention"). The SAC's theory requires three factual

20

predicates: (1) what information, such as what specific medication or condition, in the Epic software allegedly failed to generate or display in Dov Fischman's clinical record as it appeared to treating physicians; (2) which clinician was in fact misled or deprived of information by that alleged failure; and (3) how the availability of accurate information would have altered the clinical course—*i.e.*, what any physician would have done differently in treating Dov Fischman and how the information should have been entered into the EHR to cure the alleged defect. None of these facts are alleged.[13]

Without factual allegations to support all three predicates, the assertion that an undefined architectural feature "prevented timely intervention" is not a factual allegation but a conclusory label. Accepting that conclusory label as true would amount to "alchemizing legally insufficient statements into a plausible cause of action," which is "akin to no review at all, and most importantly, is not the law." *Reginella Const. Co. v. Travelers Cas. & Sur. Co.*, 971 F. Supp. 2d 470, 475 (W.D. Pa. 2013), *aff'd*, 568 F. App'x 174 (3d Cir. 2014). Thus, the SAC's factual allegations (or lack thereof) to explain a causal link between the Epic EHR system deployed at UTSW and Dov Fischman's death are "so vague and ambiguous" that Epic "cannot reasonably be required to frame a responsive pleading." FED. R. CIV. P. 12(e).

The need for a more definitive statement is more pressing given Plaintiff's recent discovery efforts. Within days of filing her amended complaint, Plaintiff served fourteen interrogatories and sixty-three requests for production spanning every conceivable aspect of Epic's business related to electronic health records—from requesting credentialed access to sandbox environments and internal documentation repositories to seeking source-code-level data schemas, system architectures, years of internal support tickets, executive sign-offs, engineering evaluations, and the entirety of Epic's

---

[13] The omission of these facts is even more perturbing considering Plaintiff's sworn statement in her UTSW lawsuit that she has "2.5 years" of "professional experience" in "development of Epic-integrated systems" and "relevant factual knowledge to identify systemic operational deficiencies." App. 135; *see also* App. 149 ("I worked as Solution Architect at Accenture for approximately 2.5 years on healthcare IT projects for Geisinger Health System, Bon Secours Mercy Health, and Pfizer, where I developed Epic-integrated systems . . .").

21

customer and implementer portals. Without a more definite statement clarifying the specific theories of liability and the factual bases underlying Plaintiff's causal theory, Epic cannot reasonably determine the scope of what is relevant to this litigation, much less respond to discovery requests of this breadth. Nor should Epic be required to undertake the extraordinary burden of responding to them until after the Court resolves this Motion, which will likely narrow or eliminate the claims on which this discovery is purportedly based.

Accordingly, if the Court does not dismiss under Rule 12(b)(6), Epic alternatively requests that the Court order Plaintiff to provide a more definite statement as set forth above.

## IV. CONCLUSION

For these reasons, Epic respectfully requests that the Court dismiss with prejudice all claims in the Second Amended Complaint, or, alternatively, require Plaintiff to replead causation with the specificity set forth above, and grant Epic all other relief to which it is justly entitled.

DATE: July 9, 2026

Respectfully submitted,

*/s/Jessica D. Cox*
Christopher J. Schwegmann
Texas Bar No. 24051315
cschwegmann@lynnllp.com
Jessica D. Cox
Texas Bar No. 24114769
jcox@lynnllp.com
Madelyn C. Stanley
Texas Bar No. 24121529
mstanley@lynnllp.com
**LYNN PINKER HURST & SCHWEGMANN, LLP**
2100 Ross Avenue, Suite 2700
Dallas, Texas 75201
214-981-3800 – Telephone
214-981-3839 – Facsimile

**ATTORNEYS FOR DEFENDANT**

## CERTIFICATE OF SERVICE

I certify that on July 9, 2026, a true and correct copy of the foregoing was filed electronically and served on all counsel and parties of record, including pro se Plaintiff Gallit Fischman, through the Court's CM/ECF system and/or by email and U.S. mail in accordance with the Federal Rules of Civil Procedure.

*/s/ Jessica D. Cox*
Jessica D. Cox

23