THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| GALLIT FISCHMAN, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | **Case No. 3:26-CV-0770-D** |
| | § | |
| EPIC SYSTEMS CORPORATION, | § | |
| | § | |
| *Defendant.* | § | |

---

**APPENDIX TO DEFENDANT EPIC SYSTEMS CORPORATION'S
MOTION TO DISMISS THE SECOND AMENDED COMPLAINT, OR,
ALTERNATIVELY, MOTION FOR MORE DEFINITIVE STATEMENT**

---

Ex. A – *Fischman v. Novartis – Original Complaint* (6/5/2026).............................................................App.1-55

Ex. B – *Fischman v. Boston Children's Hospital* – First Amended Complaint (7/8/2026) ........App. 56-111

Ex. C – *Fischman v. UTSW* – Sixth Amended Petition (2/9/2026) ........................................ App. 112-130

Ex. C-1 – *Fischman v. UTSW* – Plaintiff's Motion to Strike (11/17/2025) ........................... App. 131-152

Ex. C-2 – *Fischman v. UTSW* – Plaintiff's Verified Response to UTSW's Plea in
Abatement (12/1/2025) ............................................................................................. App. 153-179

Ex. D – *Fischman v. Novartis* – Plaintiff's Notice of Related Case (6/5/2026) ..................... App. 180-182

DATE: July 9, 2026                              Respectfully submitted,


                                                */s/Christopher J. Schwegmann*
                                                Christopher J. Schwegmann
                                                Texas Bar No. 24051315
                                                cschwegmann@lynnllp.com
                                                Jessica D. Cox
                                                Texas Bar No. 24114769
                                                jcox@lynnllp.com
                                                Madelyn C. Stanley
                                                Texas Bar No. 24121529
                                                mstanley@lynnllp.com
                                                **LYNN PINKER HURST & SCHWEGMANN, LLP**
                                                2100 Ross Avenue, Suite 2700
                                                Dallas, Texas 75201
                                                214-981-3800 – Telephone
                                                214-981-3839 – Facsimile

                                                **ATTORNEYS FOR DEFENDANT**


## CERTIFICATE OF SERVICE

I certify that on July 9, 2026, a true and correct copy of the foregoing was filed electronically and served on all counsel and parties of record, including pro se Plaintiff Gallit Fischman, through the Court's CM/ECF system and/or by email and U.S. mail in accordance with the Federal Rules of Civil Procedure.

                                                */s/ Christopher J. Schwegmann*
                                                Christopher J. Schwegmann

# EXHIBIT A

ORIGINAL



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

FILED

JUN - 5 2026

CLERK, U.S. DISTRICT COURT
By _____ JJF _____
Deputy

| | |
|---|---|
| GALLIT FISCHMAN, Individually, §§§§§ Plaintiff, § § v. § § NOVARTIS PHARMACEUTICALS § CORPORATION, § § Defendant. § | **3-26Cv1882-K** Civil Action No. _____ |

## COMPLAINT
## (JURY TRIAL DEMANDED)

## I. NATURE OF THE ACTION

1. This civil action arises from the death of Dov Fischman, a heart-transplant recipient who died on January 6, 2025, after being converted from a stable, decade-long immunosuppressive regimen to everolimus, a drug Defendant Novartis Pharmaceuticals Corporation created, brought to market, and promoted for transplant use. Dov Fischman had lived for nearly nine years after his 2015 heart transplant with no documented rejection and no clinical need to change his regimen. Within approximately one month after everolimus was introduced, he developed immune collapse, post-transplant lymphoproliferative disorder manifesting as Hodgkin's lymphoma, severe infection, and fatal sepsis. Plaintiff Gallit Fischman, his adult daughter, brings this action solely in

her individual capacity as a statutory wrongful-death beneficiary. She does not assert any survival claim or seek damages belonging to any estate.

2. This case is not about the physical manufacture of the generic tablet dispensed to Dov Fischman or about second-guessing a prescribing physician's clinical judgment. Plaintiff seeks to hold Defendant liable for its own upstream conduct: the architecture of everolimus's warning structure, the marketplace narrative through which Defendant positioned everolimus for heart-transplant conversion use, and Defendant's control over the risk-disclosure framework that governed how everolimus was understood by prescribers and patients, including the prescribing environment in which Dov Fischman was treated.

3. Defendant's liability arises from converging and independent lines of conduct. Defendant held or controlled the New Drug Application and reference labeling for both Zortress®/everolimus and Neoral®/cyclosporine modified, placing it in a uniquely asymmetric position: it sold Dov Fischman cyclosporine-based immunosuppression for approximately nine years, had visibility into its long-term clinical profile, and then promoted the drug that displaced it. Everolimus is a minimally modified derivative of sirolimus, differing only in pharmacokinetics while leaving the mTOR-inhibition mechanism intact. It entered the U.S. transplant market after a $490.9 million federal enforcement resolution involving sirolimus for the same category of off-label transplant-conversion promotion, and Plaintiff alleges Defendant advanced everolimus as a commercial reset of that strategy. Defendant also used three brand identities, Zortress® for U.S. transplant use, Afinitor® for oncology, and Certican® for non-U.S. heart-transplant markets, in a way that allowed the Certican® heart-transplant approval narrative to migrate into the U.S. prescribing environment while Zortress®'s restrictive U.S. warning was de-emphasized.

App. 003

4. Defendant's warning and risk-communication framework failed heart-transplant patients at every level. The Black Box Warning framed the mortality and infection risk around *de novo* transplant patients in a way that foreseeably made the warning appear inapplicable to stable patients converted years later, and a reviewing physician confirmed that reading after Dov Fischman's death. The remainder of the insert gave kidney- and liver-transplant patients a complete adverse-event profile, dosing guidance, and monitoring framework that heart-transplant patients never received. Defendant had the regulatory authority to fill that gap through label changes, Dear Healthcare Provider letters, or supplemental prescriber documentation, and did not. Defendant also disseminated misleading benefit narratives: the kidney-sparing story falsely credited everolimus with a renal benefit that came entirely from reducing cyclosporine, a goal achievable with approved alternatives, while the CMV narrative failed to address what happens when antiviral prophylaxis is removed from a high-risk patient at conversion, which is precisely what occurred with Dov Fischman. Defendant advanced these narratives while providing no dosing guide, transition protocol, or monitoring schedule for off-label heart-transplant conversion use. When Dov Fischman deteriorated after everolimus was discontinued, Defendant's fragmented risk framework made it harder for his treating physicians to recognize everolimus as the cause, delaying the clinical response that might have saved his life.

5. Plaintiff brings separate and alternative Texas-law claims for wrongful death, unreasonably dangerous product, failure to warn, negligence, gross negligence, and violations of the Texas Deceptive Trade Practices–Consumer Protection Act ("DTPA"), Tex. Bus. & Com. Code §§ 17.41–63.

## II. PARTIES

App. 004

6. Plaintiff Gallit Fischman is a citizen of Texas and resides at 10114 Deermont Trail, Dallas, Texas 75243. She is the adult daughter of Dov Fischman, deceased, and brings this action solely in her individual capacity as a statutory wrongful death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. She does not purport to represent, bind, waive, release, adjudicate, or recover on behalf of any nonparty beneficiary.

7. Plaintiff alleges that the other statutory wrongful death beneficiaries are aware of this action and will not be joining. Their non-participation does not impair Plaintiff's individual wrongful-death claim or subject Defendant to inconsistent obligations.

8. Decedent Dov Fischman was a resident of Dallas County, Texas at all times relevant to this action and received the treatment at issue within this District.

9. Defendant Novartis Pharmaceuticals Corporation is a corporation organized under the laws of the State of Delaware, with its principal place of business at One Health Plaza, East Hanover, New Jersey 07936-1080. Defendant manufactures, labels, and distributes pharmaceutical products throughout the United States, including in Texas. Defendant holds or controls the New Drug Application and reference labeling for Zortress®/everolimus and Neoral®/cyclosporine modified. Defendant may be served through its registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701.

### III. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction under 28 U.S.C. § 1332. Plaintiff is a citizen of Texas. Defendant is a citizen of Delaware and New Jersey. The amount in controversy exceeds $5,000,000, exclusive of interest and costs.

App. 005

11. This Court has personal jurisdiction over Defendant, which conducts pharmaceutical business in Texas, markets and distributes pharmaceutical products for use by Texas patients, and whose product conduct gave rise to the claims alleged here within this District.

12. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to this action occurred here, including the prescription, administration, and resulting injuries.

## IV. CONDITIONS PRECEDENT

13. All conditions precedent applicable to Plaintiff's DTPA claim have been satisfied. On February 20, 2026, Plaintiff provided written pre-suit notice to Defendant under Tex. Bus. & Com. Code § 17.505 by certified mail, return receipt requested, through Defendant's Texas registered agent, Corporation Service Company, 211 E. 7th Street, Suite 620, Austin, Texas 78701-3218. The notice identified Plaintiff's consumer-protection complaint in reasonable detail and stated the economic damages, mental-anguish damages, and expenses claimed. The sixty-day statutory waiting period has expired. To the extent any other claim requires a condition precedent, Plaintiff alleges that all such applicable conditions have been performed or have occurred.

## V. MANUFACTURER LIABILITY AND CHAPTER 74 NON-APPLICABILITY

14. The gravamen of Plaintiff's claims is Defendant's own conduct as a pharmaceutical manufacturer and NDA holder, not medical malpractice. Defendant is not a physician, health care provider, or health care institution within the meaning of Tex. Civ. Prac. & Rem. Code § 74.001. Plaintiff does not allege treatment, lack of treatment, or any clinical duty owed by a physician. These claims fall outside Chapter 74.

15. Plaintiff's wrongful-death theory does not require Defendant to be the sole contributor to Dov Fischman's injuries and death. Defendant's warning, labeling, and risk-communication

App. 006

framework placed everolimus into the transplant prescribing environment and was a producing and proximate cause of Dov Fischman's exposure and death, even if responsibility is later allocated among other responsible parties under Texas law. Defendant cannot avoid liability for its own communications, omissions, and risk framework by pointing to later decisions made within the everolimus narrative Defendant allegedly created. *Centocor, Inc. v. Hamilton*, 372 S.W.3d 140 (Tex. 2012).

16.  After his April 14, 2015 heart transplant, Dov Fischman obtained and used transplant immunosuppressive pharmaceutical goods for his direct personal medical use, including Defendant's branded Neoral® as part of his long-term maintenance care. That relationship continued for approximately nine years. His medication records reflect that Neoral® was designated "Brand Medically Necessary," meaning Defendant's specific branded product was required for his care and establishing a direct consumer relationship with Defendant as manufacturer. He was a consumer within the meaning of the DTPA and a foreseeable end user for Plaintiff's products-liability and negligence theories. The DTPA does not require direct contractual privity where the consumer sought or acquired goods forming the basis of the complaint. *Flenniken v. Longview Bank & Trust Co.*, 661 S.W.2d 705, 707 (Tex. 1983); *Kennedy v. Sale*, 689 S.W.2d 890, 892–93 (Tex. 1985).

17.  Everolimus was supplied to Dov Fischman through a medication-access or patient-assistance channel whose records, terms, participants, and risk disclosures have not been produced. Defendant's 2024–2025 NPAF Policy Change confirms that Defendant operated a patient-assistance infrastructure covering relevant transplant medications, including Neoral® and Zortress®, and that both were removed from that program effective January 1, 2025, six days before Dov Fischman's death. No signed informed-consent document authorizing non-approved

App. 007

heart-transplant use of everolimus has been produced to Plaintiff. Plaintiff alleges that any Defendant-controlled omission or misrepresentation in the access process occurred in connection with the consumer transaction at issue and supports DTPA liability.

18. The drug dispensed to Dov Fischman was generic everolimus, but generic substitution did not sever Defendant's responsibility for Zortress® and its generic warning framework or the everolimus transplant-market narrative. Under the federal generic-drug framework, an ANDA applicant must use labeling that is the same as the approved labeling for the listed drug, except for limited permissible differences. Defendant therefore controlled the reference-labeling framework that generic everolimus products were required to follow. Generic manufacturers are generally preempted from independently changing that labeling. *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011); *Mutual Pharmaceutical Co. v. Bartlett*, 570 U.S. 472 (2013). Plaintiff does not seek to hold Defendant liable for physically manufacturing the generic tablet Dov Fischman received. Plaintiff seeks to hold Defendant liable for its own control over Zortress® and its generic warning framework and the transplant-market narrative built on it.

19. Plaintiff seeks discovery into Defendant's everolimus-related institutional materials and relationships, including any data-sharing relationship with UT Southwestern Medical Center, any use or retention of information derived from Dov Fischman's immunosuppressant care, and any medication-transition or clinical-outcome data. Plaintiff also seeks discovery into TEAMMATE-connected materials to the extent they involved Defendant or the labeling and prescriber-notification framework applicable to everolimus. TEAMMATE (NCT03386539) was a clinical trial involving everolimus-based immunosuppression at institutions connected to Dov Fischman's transplant care, and any Defendant involvement in that trial's design, data, prescriber

App. 008

communications, or risk-disclosure framework is relevant to Defendant's knowledge of everolimus risks and its connection to the prescribing environment at issue.

## VI. FACTUAL ALLEGATIONS

### A. Dov Fischman: Nine Years of Stability

20.  Dov Fischman underwent a heart transplant on April 14, 2015, after developing heart failure caused by prior chemotherapy. For approximately nine years afterward, he remained stable on a cyclosporine-based immunosuppressive regimen anchored by Defendant's branded Neoral® and generic azathioprine, with no documented rejection.

21.  Transplant immunosuppression requires balance: enough suppression to prevent rejection, but not so much that immune function cannot defend against infection and malignancy. Dov Fischman's cyclosporine-based regimen maintained that balance for nearly a decade by targeting rejection pathways, not broadly disabling the immune system as everolimus did. Before everolimus, he never experienced rejection or any unmanageable adverse effect.

22.  He was also a patient with a specific vulnerability: his original heart failure stemmed from chemotherapy-related cardiac injury. The drug that would be introduced to alter his stable regimen (everolimus) is the same active compound Defendant markets as Afinitor® for oncology, where mTOR inhibition is the mechanism used to interfere with cellular growth and proliferation. That convergence was not incidental. It was a known pharmacologic risk that Defendant's market narrative obscured.

### B. The May 2024 Conversion and What Followed

23.  In May 2024, Dov Fischman's regimen was changed. Azathioprine was removed, everolimus was added, and cyclosporine was continued at a reduced dose. This was the tradeoff

Page 8 of 38

App. 009

Defendant's marketplace narrative had positioned as a modern, kidney-protective upgrade to CNI-based maintenance therapy.

24. Within approximately one month, Dov Fischman experienced a drastic clinical decline. He developed systemic immune dysfunction, post-transplant lymphoproliferative disorder manifesting as Hodgkin's lymphoma, severe infection, and sepsis. Sepsis was the immediate cause of death, as reflected in his treatment course and medical record. None of these conditions had presented before everolimus was introduced.

25. The harms that followed matched the dangers Defendant's own labeling identified for heart-transplant everolimus use (increased mortality often associated with serious infection), yet Defendant's marketplace conduct had made those risks appear remote, inapplicable, or outweighed by purported benefits. Dov Fischman died on January 6, 2025.

26. Plaintiff further alleges that Defendant's fragmented risk framework made the cause of Dov Fischman's decline harder to recognize in real time. After everolimus was discontinued, he continued to decline for approximately five months. The absence of a clear, complete heart-transplant risk framework prevented his treating physicians from timely identifying everolimus exposure as the cause or a contributing cause of his immune collapse, delaying or foreclosing the clinical response that might have changed his outcome.

## C. The Heart-Transplant Warning Gap

27. Everolimus (Zortress®) was FDA-approved for prophylaxis of organ rejection in certain adult kidney- and liver-transplant patients only. Heart-transplant immunosuppression was not an approved indication. The label provided dosing, patient-selection, monitoring, and benefit-

App. 010

risk guidance for kidney and liver recipients, but no equivalent framework for heart-transplant patients.

28. The Zortress® prescribing insert was internally inconsistent in a way that foreseeably undermined the warning it purported to give. The front-page summary stated, without qualification, that use in heart transplantation was not recommended. The detailed Boxed Warning then tied that statement to a clinical trial involving *de novo* heart-transplant patients, creating an opening to argue that the warning applied only to newly transplanted patients and not to stable patients converted years later. Plaintiff alleges on information and belief that post-hoc review of Dov Fischman's case relied on that opening. Defendant structured that inconsistency into the label and is responsible for what it produced. See Exhibit A.

29. The remainder of the insert was structured for kidney- and liver-transplant patients. It identified serious and potentially fatal risks associated with everolimus exposure, including infection, sepsis, post-transplant lymphoproliferative disorder, malignancy, impaired wound healing, pulmonary toxicity, and nephrotoxicity. A heart-transplant patient or prescriber received a mortality warning at the top, followed by a detailed risk profile organized around different patient populations. The heart-transplant-specific risks were not assembled, contextualized, or presented as a coherent clinical picture for that patient class.

30. That structural gap was itself a failure of Defendant's duty as NDA holder and manufacturer. The Black Box Warning gave heart-transplant patients a mortality signal with no supported dosing framework, patient-selection criteria, monitoring protocol, adverse-event profile, antiviral-management guidance, or benefit-risk assessment for that population. Once Defendant knew, or should have known, that heart-transplant everolimus use involved additional material risks not captured by that warning, Defendant had a responsibility to update or strengthen the

App. 011

warning framework so it presented a complete and non-misleading heart-transplant risk profile. Defendant had the regulatory mechanism to expand or clarify the warning under 21 C.F.R. §§ 201.57(c)(1) and 314.70(c)(6)(iii)(A), and the ability to distribute supplemental prescriber documentation addressing the risks of everolimus in stable heart-transplant recipients. Defendant used none of those mechanisms to give heart-transplant patients and prescribers the complete risk profile they needed.

31. Plaintiff does not allege that the Black Box Warning was absent. Plaintiff alleges that Defendant structured the warning in a way that foreseeably stripped it of practical force for the exact population at risk: stable heart-transplant patients converted to everolimus years after transplantation. The warning's *de novo* framing gave prescribers a textual basis to read the mortality signal as inapplicable to converted patients, and the remainder of the insert provided no compensating heart-transplant risk profile to close that gap.

32. That reading occurred in practice. Plaintiff alleges on information and belief that physicians reviewing Dov Fischman's case after his death relied on the *de novo* wording to conclude that everolimus use was medically justifiable, reasoning that the Black Box Warning applied to newly transplanted patients and not to a stable patient converted years after transplantation. Plaintiff further alleges that this reading was not idiosyncratic, but the foreseeable consequence of a labeling structure whose summary warned broadly against heart-transplant use while its detailed explanation invited a narrower reading. Defendant cannot control the language that made the warning appear limited, decline to fill the gap with a complete heart-transplant risk profile, and then disclaim responsibility when that limitation was used to justify the exact conversion the warning was meant to prevent.

Page 11 of 38

App. 012

33. As NDA holder and manufacturer, Defendant was responsible for maintaining labeling that reflected material safety information as it developed, including the authority to add or strengthen warnings based on newly acquired information under 21 C.F.R. §§ 201.57(c)(6) and 314.70(c)(6)(iii)(A). Post-approval heart-transplant use, study activity, and Defendant's own market-facing conduct made converted heart-transplant recipients a real-world everolimus population. Defendant had both the mechanism and the obligation to provide a complete heart-transplant risk profile, either in the labeling or through supplemental prescriber communication. It did neither. Plaintiff alleges that Defendant cannot help create or normalize a converted-patient population and then rely on the absence of an FDA-approved heart-transplant framework to avoid responsibility for the risks that population faced.

## D. Off-Label Promotion and Market Normalization

34. On information and belief, Defendant materially advanced everolimus use in heart-transplant patients despite the absence of FDA approval for that indication. Defendant used transplant materials, publications, study-related activity, and market-facing risk communications to present everolimus as a viable heart-transplant conversion option, normalizing that use despite the warning gap and the heightened risk created when a stable CNI-based regimen was displaced.

35. Off-label prescribing by physicians and off-label promotion by manufacturers are different. Physicians may prescribe approved drugs off-label. Manufacturers may not promote, normalize, or materially advance unapproved uses while failing to give full practical force to the associated risk framework. FDA guidance recognizes that communications about unapproved uses require safeguards so prescribers can evaluate the strengths, weaknesses, and clinical utility of the information conveyed. The FDCA prohibits introducing or delivering misbranded drugs into

App. 013

interstate commerce and introducing drugs in violation of FDA approval requirements. 21 U.S.C. §§ 331(a), 331(d), 355(a).

36.    When a manufacturer normalizes, promotes, or materially advances an off-label use, it cannot then disclaim responsibility for the clinical framework that use requires. Defendant may argue that heart-transplant conversion was off-label and therefore outside any obligation to provide complete prescribing guidance. Plaintiff alleges that Defendant's own marketplace conduct created that obligation. If Defendant was going to advance non-approved heart-transplant use of everolimus, it had to provide the infrastructure needed to evaluate and carry out that use responsibly. Defendant provided none: no heart-transplant prescribing guide, no starting-dose or titration protocol, no transition framework, no monitoring schedule, no patient-selection criteria, no guidance identifying which clinical rationales could justify conversion, and no discontinuation criteria when infection, malignancy, immune collapse, or other warning signs appeared.

37.    Plaintiff alleges that this absence of clinical infrastructure was especially dangerous. Everolimus conversion in a stable heart-transplant patient was not a routine medication adjustment; it was a fundamental change to the immunosuppressive backbone of a patient whose immune balance had been calibrated over years. The prescribing physician was left to navigate that change through a kidney- and liver-transplant insert, a Black Box Warning that appeared limited to *de novo* cases, and benefit narratives that omitted the complete risk picture. In Dov Fischman's case, Plaintiff alleges that this missing framework was reflected in an approximately one-month monitoring gap after everolimus was introduced, despite the heightened risk created by altering his immunosuppression. Defendant created the market conditions that made the conversion appear clinically supported while leaving prescribers without the tools needed to carry

Page 13 of 38

App. 014

it out safely. That is not independent off-label prescribing. It is a manufacturer advancing a use it would not support with the documentation that use required.

38. Defendant's market-facing conduct created a public information environment in which heart-transplant everolimus use appeared normalized, clinically supported, and available as a conversion strategy. On information and belief, Defendant's study registrations, publication activity, and transplant communications contributed to that environment. Plaintiff has identified public clinical-trial records and transplant literature associated with Defendant or Defendant-linked everolimus research addressing heart-transplant use; a representative pre-filing capture is attached as Exhibit C as corroborating context, not as the sole evidentiary basis. Plaintiff alleges that the visibility of those materials made heart-transplant conversion appear to be a supported clinical pathway rather than an unapproved use lacking a complete risk framework. Discovery will establish the full scope of Defendant's heart-transplant market conduct.

39. That normalization mattered directly to Dov Fischman's care. His conversion occurred within a prescribing environment shaped by Defendant's market conduct. Defendant cannot use the prescribing pathway as the vehicle through which its everolimus narrative reached patients, and then disclaim responsibility for prescribing decisions that pathway produced.

### E. Brand Conflation and Warning Dilution

40. Defendant did not consistently anchor its transplant messaging to the United States brand name Zortress®. Instead, Defendant used the shared drug name "everolimus," even though that name covered different brands, different approvals, and different warning frameworks.

41. That distinction mattered. Zortress® was the United States transplant brand. It was approved for kidney- and liver-transplant rejection prophylaxis only, and its label warned that

App. 015

heart-transplant use was not recommended. Certican® was Defendant's European and non-U.S. transplant brand. In multiple non-U.S. markets, Certican® carried a heart-transplant approval or indication. Afinitor® was Defendant's oncology brand for the same active drug. Defendant therefore controlled three everolimus narratives at the same time: a United States transplant label that warned against heart-transplant use, a non-U.S. transplant narrative in which everolimus appeared approved for heart-transplant use, and an oncology identity that was not clearly disclosed in the U.S. transplant framing.

42. By centering the market narrative on "everolimus," Defendant blurred those critical distinctions. The shared drug name allowed Certican®'s heart-transplant approval narrative to migrate into the United States prescribing environment while Zortress®'s restrictive warning lost force. It also allowed everolimus's oncology identity to recede from the transplant framing. Plaintiff alleges that this was not a harmless naming issue. It made everolimus appear more accepted, more approved, and more clinically supported for heart-transplant conversion than the United States Zortress® label allowed.

43. Defendant's later removal of both Afinitor® and Zortress® from its patient-assistance program reinforces this pattern. Defendant treated everolimus through a shared drug identity while moving away from brand-specific risk distinctions. That made everolimus appear accepted across use pathways while the message to United States heart-transplant patients was no longer anchored to the Zortress® warning. A true and correct copy of Defendant's 2024–2025 NPAF Policy Change is attached as Exhibit B. Plaintiff alleges that this brand conflation misrepresented everolimus's characteristics and approval significance in the United States market under Tex. Bus. & Com. Code §§ 17.46(b)(5) and (7), and diluted the Zortress® heart-transplant warning in the prescribing environment.

App. 016

### F. The Misleading Benefit Narratives

44. Defendant did not present everolimus as merely another transplant immunosuppressant. It positioned everolimus as a safer, more modern, and clinically superior alternative to established CNI-based maintenance therapy, including the cyclosporine-based regimen that had kept Dov Fischman stable for nine years. Defendant controlled the transplant-drug narratives for both Neoral® and Zortress®, giving it asymmetric knowledge of the long-term clinical profile of cyclosporine-based maintenance and the risk profile of everolimus conversion. Plaintiff alleges that Defendant used that knowledge to favor everolimus conversion while diminishing the perceived clinical value of the therapy it had sold Dov Fischman for years.

45. Defendant's study and publication environment emphasized three purported benefits: **renal protection, cardiac-allograft vasculopathy (CAV) reduction**, and **CMV-related outcomes**. Each narrative was incomplete or misleading in a way that materially affected how conversion risk was perceived.

46. The **renal-protection** narrative was materially misleading. Kidney burden is a foreseeable vulnerability in long-term transplant care, and Defendant allegedly used that vulnerability to construct a market story in which cyclosporine was the kidney problem and everolimus was the solution. But the claimed renal benefit did not come from anything everolimus independently does to protect kidney function. It came from reducing cyclosporine exposure. Defendant credited everolimus with a benefit that belonged to lowering another drug.

47. The deception went beyond attribution. If the clinical goal was reducing cyclosporine's kidney burden, that goal could have been pursued by reducing cyclosporine itself or pairing a lower cyclosporine dose with approved, established immunosuppressants such as mycophenolate mofetil, azathioprine, or a dose-adjusted CNI. Plaintiff alleges there was no

App. 017

pharmacologic basis requiring everolimus specifically. The kidney-protection goal did not require introducing an mTOR inhibitor. It required less cyclosporine. Defendant packaged a cyclosporine-reduction benefit as an everolimus benefit and used a clinical goal other approved drugs could have served to market a drug those alternatives would not have required.

48. That substitution was especially indefensible given what everolimus is. Everolimus is not pharmacologically novel relative to sirolimus, the active drug in Rapamune®. It is a chemical derivative modified by adding a 2-hydroxyethyl chain at position 40, a change that affected absorption and persistence but did not change the mTOR-inhibition mechanism responsible for immune suppression and interference with cellular growth. Plaintiff alleges that everolimus acts on the immune system in a manner materially similar to sirolimus, with adjusted pharmacokinetics. Defendant marketed it as a transplant innovation even though its fundamental immune-system effect remained materially similar to a drug already pursued by the federal government for unlawful off-label promotion in the same transplant-conversion context.

49. Dov Fischman's own history shows why that narrative mattered. His kidney fluctuations had been managed for years through cyclosporine dose adjustment within the CNI pathway, without introducing a new drug. Newer calcineurin inhibitors, such as voclosporin, further show that kidney burden can be addressed while staying within the established CNI framework. Plaintiff alleges that Defendant's kidney-sparing narrative functioned as marketing rather than an independent clinical finding: Defendant identified a common transplant vulnerability, attributed relief to everolimus rather than cyclosporine reduction, and used that benefit story to displace approved, tolerated, long-term immunosuppression with an oncology-lineage mTOR inhibitor carrying a heart-transplant mortality warning. That strategy required hiding what the benefit actually was, and that omission was material.

App. 018

50. The **CAV-reduction** narrative was incomplete. CAV is a slow-developing transplant complication, and statin therapy is widely recognized in post-heart-transplant CAV prevention and management. Any claimed CAV benefit attributed to everolimus did not answer the core safety question: whether a stable heart-transplant patient should be converted from tolerated, long-term CNI-based therapy to broader mTOR-based immunosuppression, with the immediate risks of immune collapse, serious infection, malignancy, and death that Defendant's own labeling identified.

51. The **CMV-related-outcomes** narrative was especially misleading as applied to Dov Fischman. He was CMV-seronegative and had received a CMV-seropositive donor heart, placing him in a high-risk category for CMV-related complications. He had been maintained on Valcyte®/valganciclovir for antiviral protection until immediately before everolimus was prescribed. That coverage was removed at the same time he was moved into broader mTOR-based immunosuppression. Defendant's study environment presented CMV-related outcomes as a benefit of switching to everolimus, yet did not clearly address the materially different risk created when antiviral prophylaxis is removed from a high-risk heart-transplant patient at conversion. Published literature evaluated early everolimus conversion combined with valganciclovir prophylaxis to prevent CMV infection in heart-transplant recipients. Defendant's labeling and risk framework did not clearly address what happens when that prophylaxis is removed.

52. Plaintiff further alleges that Defendant's benefit narratives omitted other mTOR-related risks material to heart-transplant conversion. Published literature connects long-term mTOR-inhibitor exposure to muscle wasting and disruption of mitochondrial integrity in cardiomyocytes, the heart-muscle cells responsible for contraction, leading to mitochondrial fragmentation and metabolic dysfunction. Those risks mattered to a heart-transplant patient

App. 019

converted from stable maintenance therapy, yet Defendant's market narrative emphasized selected benefits while failing to present the broader mTOR risk profile needed to evaluate whether conversion was justified.

### G. Cancer-Drug Framing and the mTOR Reality

53. Defendant controlled the public and clinical categorization of everolimus across its brands. Defendant chose to market everolimus as a "targeted cancer therapy," not as chemotherapy, making the drug appear more precise and less systemically destructive. But everolimus produced a chemotherapy-comparable systemic consequence: it interfered with cellular growth and proliferation by inhibiting mTOR, a pathway that controls how cells divide and multiply. Plaintiff alleges that this distinction was narrow in the way that mattered here: everolimus disrupted the body's ability to generate and maintain cells, including immune cells needed to fight infection and suppress abnormal cell growth. By positioning everolimus as targeted and precise rather than as a drug with chemotherapy-comparable systemic effects, Defendant softened its perceived danger and created the conditions for moving the same active drug into transplant immunosuppression while obscuring its systemic consequences.

54. That positioning had direct consequences for Dov Fischman and constituted a material omission in the transplant-risk framework. The drug introduced to alter his regimen was the same active compound Defendant used in oncology to interfere with cellular growth, yet the Zortress® transplant information did not clearly disclose that dual identity or the chemotherapy-comparable systemic effects it carried. A heart-transplant patient and prescriber evaluating conversion needed to know that everolimus was not merely a modern rejection-control drug, but an oncology-lineage mTOR inhibitor capable of weakening the cellular defenses needed to fight infection and detect abnormal cell growth. That warning was especially material for a patient whose original heart

Page 19 of 38

failure was caused by chemotherapy-related injury, yet the transplant-risk framework did not identify prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution before everolimus conversion. Plaintiff alleges that adding everolimus while reducing cyclosporine made an oncology-lineage drug central to Dov Fischman's immunosuppression, making the conversion especially dangerous in his clinical context.

## H. mTOR Lineage and Prior Enforcement

55.    Everolimus is not a pharmacologically novel compound. It is a chemical derivative of sirolimus, created by adding a single 2-hydroxyethyl chain at position 40 of the sirolimus molecule. That modification did not alter the drug's mechanism of action; it primarily affected how quickly everolimus is absorbed and how long it remains in the body. The mTOR-inhibition pathway, the mechanism by which the drug suppresses immune function and interferes with cellular growth and proliferation, is materially the same pathway used by sirolimus. In every pharmacologically meaningful sense relevant here, everolimus and sirolimus act on the immune system through materially similar mechanisms. Defendant brought this minimally differentiated compound to the transplant market and positioned it as a modern clinical advance, while its fundamental action remained materially similar to its predecessor.

56.    In 2013, the U.S. Department of Justice announced a $490.9 million civil and criminal resolution involving Wyeth Pharmaceuticals, then a Pfizer subsidiary, for unlawful off-label promotion of Rapamune, including conversion use, meaning switching patients from another immunosuppressant to Rapamune for uses not approved by FDA as safe and effective. See Exhibit D. Plaintiff pleads that history as product-lineage, knowledge, and marketplace context, not as character evidence or as a predicate for any government-fraud theory. The fact that Wyeth and Pfizer were the direct targets of the Rapamune resolution does not make the enforcement history

App. 021

irrelevant. What matters is that the resolution placed the pharmaceutical industry on notice that mTOR-based transplant-conversion promotion carried serious legal and clinical risk, and Defendant allegedly entered the market afterward using a pharmacologically similar mTOR-inhibition mechanism, a new brand identity, and the same conversion strategy. Plaintiff does not allege that Defendant inherited liability from Wyeth or Pfizer. Plaintiff alleges that Defendant adopted and advanced the same playbook after the risk had already been exposed. That conduct supports the inference that everolimus represented a commercial reset of the same strategy rather than a clinically distinct therapeutic advance, and supports Plaintiff's gross-negligence allegations and rebuttal of any labeling presumption under Tex. Civ. Prac. & Rem. Code § 82.007(b)(3).

## I. Patient-Assistance Removal and Drug-Safety Questions

57. In August 2024, Defendant decided to remove both Afinitor® and Zortress® from its Novartis Patient Assistance Foundation program, effective January 1, 2025, six days before Dov Fischman's death. Plaintiff alleges that removing the U.S. oncology and transplant everolimus brands from the same access program reinforces Defendant's treatment of everolimus as a shared drug identity rather than separate brands with separate risk meanings. That change is relevant to Defendant's knowledge, risk communication, and safety assessment.

58. The specific access channel through which Dov Fischman received generic everolimus has not been fully identified, and Plaintiff does not presently have complete records showing who controlled that channel or what product and safety information accompanied the drug. Plaintiff alleges in the alternative that the Neoral® consumer relationship described above is independently sufficient to establish DTPA consumer standing, and that any Novartis-controlled or Novartis-affiliated everolimus access pathway also forms part of the consumer transaction at issue. Plaintiff seeks discovery into Defendant's role in that access channel, including any

Page 21 of 38

App. 022

Defendant-controlled omission or misrepresentation in the access process. The uncertainty reflects the absence of records, not the absence of a consumer relationship.

### J. Adverse-Event Reporting and Causation Suppression

59.  As NDA holder for Zortress®, Defendant had continuing safety-reporting obligations concerning adverse drug experiences, including duties to maintain adverse-event records and report qualifying information to FDA. 21 C.F.R. § 314.80. Plaintiff alleges that Defendant's risk-dampening narrative affected not only prescribing, but also whether later harms were recognized and reported as everolimus-related adverse events.

60.  When a manufacturer softens or fragments the risk presentation, physicians may fail to connect immune collapse, PTLD, severe infection, and death to the drug exposure that caused or contributed to them. Plaintiff alleges that occurred here. After everolimus was discontinued, Dov Fischman continued to decline for approximately five months. The absence of a clear everolimus risk-recognition framework prevented his treating physicians from timely recognizing everolimus as the cause or contributing cause of his immune collapse, foreclosing the clinical response that might have changed the outcome before the injury progressed to fatal sepsis. The prescribing physicians were research-oriented physicians familiar with everolimus and its study environment, but they were not the physicians managing Dov Fischman's deterioration. The later treating physicians lacked the drug-specific information, warning context, and clinical safeguards needed to recognize mTOR-related immune collapse. Defendant's narrative reached the research-oriented prescribing environment, but its warnings and safeguards did not equip the broader care team responsible for recognizing and responding to the harm after exposure. A clear and complete risk framework also would have made the decline more likely to be reported through FDA adverse-

App. 023

event channels and transplant-safety pathways, helping prevent similar harm to other heart-transplant patients.

### K. Evidence Control and Discovery Need

61. Critical evidence remains within Defendant's possession, custody, or control, including internal safety analyses, postmarketing adverse-event information, commercialization materials, access-channel records, institutional communications, data-sharing materials, TEAMMATE-connected materials, and everolimus prescriber communications. Plaintiff conducted substantial pre-filing investigation through public materials, regulatory records, published literature, and market-facing sources, but discovery is necessary to determine Defendant's full knowledge, strategy, and connection to Dov Fischman's medication transition and outcome. The filing of this Complaint gives Defendant notice to preserve all documents, data, communications, and electronically stored information potentially relevant to the claims and defenses in this action.

62. Plaintiff pleads these allegations collectively and in the alternative and invokes the discovery rule. Defendant's upstream role and contribution to Dov Fischman's injuries and death were not reasonably apparent at the time of death. The connection between Defendant's risk-disclosure conduct, heart-transplant benefit narratives, 2024–2025 patient-assistance change, and Dov Fischman's post-conversion collapse became apparent only after substantial investigation.

## VII. CAUSES OF ACTION

### COUNT ONE: WRONGFUL DEATH

*Tex. Civ. Prac. & Rem. Code §§ 71.001–71.011*

App. 024

63. Plaintiff incorporates all preceding paragraphs. Plaintiff brings this wrongful-death claim individually as Dov Fischman's daughter and statutory beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004. Plaintiff does not assert a survival claim or seek estate damages.

64. Defendant's wrongful conduct was a producing and proximate cause of Dov Fischman's death. Defendant controlled the warning framework and marketplace narrative for everolimus, structured that framework so the heart-transplant mortality warning foreseeably lost practical force for stable converted patients, and advanced heart-transplant conversion use without the prescribing guide, transition protocol, dosing framework, or monitoring schedule needed to make that use safe. Defendant also promoted conversion through a misleading kidney-sparing narrative that obscured why everolimus was being selected and what approved alternatives could have served the same stated goal. That conduct reached the prescribing environment in which Dov Fischman was treated. A reviewing physician later concluded the Black Box Warning did not apply to him, reasoning that he was a stable converted patient rather than a *de novo* one. That conclusion was the interpretation Defendant's warning structure made available and confirms the foreseeability of the same warning failure that operated before the May 2024 conversion. Within approximately one month after that conversion, Dov Fischman developed immune collapse, PTLD manifesting as Hodgkin's lymphoma, severe infection, and sepsis. He died on January 6, 2025. Defendant's upstream conduct materially contributed to each link in that chain.

65. Plaintiff is entitled to recover all wrongful-death damages permitted under Texas law in her individual capacity as a statutory beneficiary, including loss of companionship, mental anguish, and pecuniary losses sustained as a result of Dov Fischman's death.

## COUNT TWO: STRICT PRODUCTS LIABILITY — UNREASONABLY DANGEROUS PRODUCT

Page 24 of 38

App. 025

66. Plaintiff incorporates all preceding paragraphs. Plaintiff asserts this count based on Defendant's warning, labeling, and marketplace conduct. Plaintiff does not assert a manufacturing-defect claim based on the physical generic tablet dispensed to Dov Fischman, and Plaintiff does not assert a design-defect claim requiring proof of a safer alternative drug design.

67. Everolimus was unreasonably dangerous as marketed and warned. Defendant released it into the heart-transplant prescribing environment without the warning and risk-communication infrastructure safe use required. The product defect was structural: the insert gave kidney- and liver-transplant patients a complete adverse-event profile, dosing guidance, patient-selection criteria, and monitoring framework, while giving heart-transplant patients only a mortality signal whose *de novo* framing made it appear inapplicable to stable converted patients. That incomplete and misleading risk architecture, combined with Defendant's off-label promotion and benefit narratives, including the kidney-sparing story that falsely credited everolimus with a benefit produced by reducing cyclosporine, made the product unreasonably dangerous in the foreseeable use environment Defendant created. Defendant's use of Zortress®, Afinitor®, and Certican® under the shared name "everolimus" compounded that danger by allowing Certican®'s non-U.S. heart-transplant approval narrative to circulate in the U.S. prescribing environment while Zortress®'s restrictive warning was de-emphasized.

68. The danger arose not from isolated physician misuse, but from the foreseeable use environment Defendant created or materially advanced: one in which heart-transplant conversion appeared normalized, clinically supported, and kidney-protective, while the complete risk profile for that population had never been assembled or disclosed. Even under Defendant's anticipated learned-intermediary argument, the warnings to prescribing physicians were inadequate. The *de novo* framing was read in practice as inapplicable to converted patients, and no supplemental

App. 026

prescriber documentation, Dear Healthcare Provider letter, or clinical framework existed to close that gap. Adequate warnings would have prevented or materially changed Dov Fischman's exposure. This unreasonably dangerous conduct was a producing cause of his injuries and death.

69. To the extent Defendant invokes Tex. Civ. Prac. & Rem. Code § 82.007(a), Plaintiff invokes § 82.007(b)(3). Defendant materially advanced heart-transplant use of everolimus in a manner inconsistent with FDA's approved indication and warning framework, and did so using a commercial strategy that mirrored the off-label promotion conduct for which its pharmacologic predecessor had already been subject to a $490.9 million federal enforcement resolution. Dov Fischman's injuries and death were causally related to that off-label use.

## COUNT THREE: STRICT PRODUCTS LIABILITY — FAILURE TO WARN

70. Plaintiff incorporates all preceding paragraphs. Defendant had a duty to provide adequate warnings to prescribing physicians and other learned intermediaries concerning everolimus, including a duty to ensure that the heart-transplant warning retained practical force in the real-world prescribing environment and that physicians had the complete risk information needed to evaluate whether everolimus was appropriate for any particular heart-transplant patient. To the extent Defendant invokes the learned-intermediary doctrine, that doctrine does not protect a manufacturer that deliberately cultivated physician adoption through clinical trial activity, study registrations, and market-facing benefit narratives, and then relies on the judgment of the very physicians it shaped as a shield against liability.

71. Defendant's warnings were inadequate on multiple independent grounds. The Black Box Warning's *de novo* framing foreseeably caused prescribers to read the mortality signal as inapplicable to stable converted heart-transplant patients, and that reading occurred in practice. The remainder of the insert provided no heart-transplant-specific adverse-event profile, dosing

Page 26 of 38

App. 027

framework, patient-selection criteria, monitoring schedule, risk-recognition safeguards, or benefit-risk assessment, leaving prescribers and later treating physicians with a risk framework built for different patient populations. Defendant failed to update or strengthen the warning once heart-transplant conversion became a real-world prescribing pathway and once additional material risks were not captured by the existing Black Box Warning. The warning framework also failed to address antiviral management, the risk of removing Valcyte®/valganciclovir from a high-risk CMV patient at conversion, the long-term mTOR-related risks relevant to heart-transplant patients, or prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution. Defendant's benefit narratives and brand-conflation strategy further diluted the warning by making conversion appear protective and clinically supported while allowing non-U.S. heart-transplant approval information to obscure Zortress®'s restrictive U.S. warning and allowing everolimus's oncology identity to recede from the transplant framing.

72. This failure was a producing cause of Dov Fischman's exposure, injuries, and death. Had Defendant clearly communicated the complete heart-transplant risk profile, including the applicability of the warning to converted patients, the absence of an approved heart-transplant framework, the CMV and antiviral-protection risks, the systemic mTOR immune effects, the true source of any kidney benefit, and the heightened caution required for a patient whose original heart failure was caused by chemotherapy-related injury, the prescribing physician would not have treated the warning as inapplicable to Dov Fischman, and he would not have been exposed to everolimus under the same circumstances, if at all. At minimum, adequate warnings would have required a materially different risk-benefit analysis, monitoring plan, antiviral-management decision, patient-selection assessment, and informed prescribing pathway before conversion proceeded.

App. 028

73. To the extent Defendant invokes Tex. Civ. Prac. & Rem. Code § 82.007(a), Plaintiff invokes § 82.007(b)(3), as alleged above.

### COUNT FOUR: NEGLIGENCE

74. Plaintiff incorporates all preceding paragraphs. Defendant owed reasonable-care duties arising from its control over the warning, labeling, risk-communication, and market-facing conduct through which everolimus reached prescribing physicians and foreseeable patients, including Dov Fischman. Plaintiff does not allege that Defendant owed a freestanding duty to treat Dov Fischman, override any physician, or manufacture the generic tablet dispensed to him. Defendant's duty arose from its own conduct: controlling the reference-labeling framework, advancing the transplant-conversion narrative, and shaping the information environment in which prescribing decisions were made.

75. Defendant breached those duties by maintaining a warning framework whose *de novo* framing foreseeably made the Black Box Warning appear inapplicable to stable converted patients, a reading that occurred in practice. Defendant failed to update or supplement the warning despite knowing, through post-approval use, study activity, and its own market conduct, that converted heart-transplant recipients were a real-world everolimus population requiring a complete risk disclosure. Defendant also advanced heart-transplant conversion as normalized and clinically supported while providing no dosing guide, transition protocol, monitoring schedule, contraindication framework, patient-selection criteria, or risk-recognition safeguards, leaving prescribers and later treating physicians without the clinical infrastructure Defendant had the ability and responsibility to provide. Defendant further disseminated misleading benefit narratives, including a kidney-sparing story that misattributed a cyclosporine-reduction benefit to everolimus and made conversion appear safer and more justified than the complete risk picture supported.

Page 28 of 38

76. Adequate discharge of those duties would have prevented or materially changed Dov Fischman's exposure. A clarified warning for converted heart-transplant recipients would have prevented the Black Box Warning from being read as inapplicable. A complete heart-transplant risk profile or prescribing framework would have changed the information available before conversion. Accurate disclosure that the kidney benefit came from cyclosporine reduction, and could be achieved through approved alternatives, would have removed the principal market justification for everolimus. Disclosure of the antiviral-management risk would have identified a specific precaution applicable to Dov Fischman's CMV profile at the time of conversion. Disclosure that everolimus was an oncology-lineage mTOR inhibitor with chemotherapy-comparable systemic effects would have required heightened caution in a patient whose original heart failure was caused by chemotherapy-related injury.

77. Defendant's breaches were a cause-in-fact and proximate cause of Dov Fischman's injuries and death. The causal chain is direct and foreseeable: Defendant's inadequate warning allowed the heart-transplant prohibition to be read as inapplicable to a stable converted patient; that interpretation supported the May 2024 conversion; the conversion was followed by Dov Fischman's immune collapse, post-transplant lymphoproliferative disorder, severe infection, and sepsis; and sepsis caused his death on January 6, 2025. Each step in that chain was the foreseeable result of Defendant's specific breaches. Plaintiff is entitled to recover all wrongful-death damages permitted under Tex. Civ. Prac. & Rem. Code § 71.004 in her individual capacity as a statutory beneficiary.

**COUNT FIVE: GROSS NEGLIGENCE**

*Tex. Civ. Prac. & Rem. Code § 41.003*

Page 29 of 38

App. 030

78. Plaintiff incorporates all preceding paragraphs. Defendant's conduct constituted gross negligence under Tex. Civ. Prac. & Rem. Code § 41.001(11). From Defendant's standpoint, advancing everolimus for heart-transplant conversion use involved an extreme degree of risk. Defendant's own labeling identified increased mortality and serious infection concerns in the heart-transplant context. Everolimus was not ordinary transplant maintenance therapy, but an oncology-lineage mTOR inhibitor whose mechanism reaches beyond rejection control and impairs the cellular defenses needed to fight infection and suppress abnormal cell growth. That risk was especially acute where the patient's original heart failure was caused by chemotherapy-related injury. Defendant also knew, from the Rapamune enforcement history preceding everolimus's market entry, that mTOR transplant-conversion promotion carried serious legal and clinical risk. Defendant nevertheless advanced a use for which it provided no clinical prescribing framework, monitoring protocol, risk-recognition safeguards, or complete heart-transplant risk profile, making the known risk even more extreme.

79. Defendant had actual, subjective awareness of that risk from its own labeling, postmarketing adverse-event obligations, study activity, market-facing materials, patient-assistance decisions, and the Rapamune enforcement record. Defendant knew the kidney-sparing narrative misattributed a cyclosporine-reduction effect to everolimus, that the CAV and CMV benefit narratives did not answer the core safety question for stable converted patients, and that removing antiviral prophylaxis from a high-risk CMV patient at conversion created a serious risk not disclosed in its labeling or risk communications. Defendant also knew everolimus used a materially similar mTOR-inhibition mechanism to sirolimus, and that its everolimus strategy mirrored the transplant-conversion strategy already exposed through the Rapamune resolution.

App. 031

80. Despite that actual awareness, Defendant proceeded with conscious indifference. Plaintiff alleges that Defendant brought everolimus into the same transplant-conversion market after the Rapamune resolution, using a materially similar mTOR compound, a new brand identity, and the same conversion strategy. Defendant continued to support benefit-focused transplant narratives, brand-blurring practices, off-label normalization, and access-channel conduct that weakened the practical force of the heart-transplant warning while knowing similar conduct had already been the subject of a major federal enforcement resolution. These were corporate-level decisions made or ratified by officers, directors, or personnel with authority to set corporate policy. Choosing to advance the same mTOR conversion strategy while providing no clinical infrastructure to make that use safe reflects conscious disregard of known danger to heart-transplant patients, including Dov Fischman, and warrants exemplary damages under Texas law.

## COUNT SIX: TEXAS DECEPTIVE TRADE PRACTICES–CONSUMER PROTECTION ACT

*Tex. Bus. & Com. Code §§ 17.41–63*

81. Plaintiff incorporates all preceding paragraphs. Dov Fischman was a consumer within the meaning of the DTPA: he sought and acquired pharmaceutical goods and related access services for his direct personal medical use, including Defendant's branded Neoral® over approximately nine years of transplant maintenance, and the everolimus and access pathway through which he received it. The DTPA does not require direct contractual privity where the consumer sought or acquired goods forming the basis of the complaint.

82. Defendant engaged in false, misleading, or deceptive acts or practices under Tex. Bus. & Com. Code § 17.46(b), including §§ 17.46(b)(5), (7), and (24). Defendant represented that everolimus had characteristics and approval significance it did not have, including kidney-sparing

Page 31 of 38

App. 032

properties and heart-transplant clinical support. The kidney-sparing representation was false: the claimed renal benefit came from reducing cyclosporine, not from anything everolimus itself does for kidney function. Defendant credited everolimus with a benefit produced by lowering another drug while failing to disclose that the same renal goal could have been achieved through approved alternatives without introducing an oncology-lineage mTOR inhibitor. Defendant also created a false impression of U.S. heart-transplant support by centering the transplant narrative on the shared generic name "everolimus" rather than Zortress®, allowing Certican®'s non-U.S. heart-transplant approval narrative to migrate into the U.S. prescribing environment while Zortress®'s warning was de-emphasized and everolimus's oncology identity was not clearly disclosed in the transplant framing.

83. Defendant also failed to disclose material information in violation of Tex. Bus. & Com. Code § 17.46(b)(24). The warning's *de novo* framing was deceptive by omission: it foreseeably caused physicians and patients to understand the mortality warning as inapplicable to stable converted heart-transplant patients, while Defendant failed to disclose the complete heart-transplant risk profile. Those omissions included the absence of an FDA-approved dosing, monitoring, patient-selection, risk-recognition, and benefit-risk framework for converted patients; the CMV and antiviral-management risks created by removing Valcyte®/valganciclovir at conversion; the long-term mTOR-related systemic risks; the true origin of the kidney benefit; the oncology identity and chemotherapy-comparable systemic effects of everolimus; and prior chemotherapy-related cardiac injury as a patient-selection factor requiring heightened caution. Each omission concerned information material to the goods and access transaction at issue.

84. Defendant's deceptive conduct was connected to the transaction through which Dov Fischman obtained everolimus for personal medical use in Dallas, Texas. That transaction

App. 033

occurred within a broader Novartis transplant-drug relationship, including his long-term use of Defendant's branded Neoral® as a "Brand Medically Necessary" transplant medication, and depended on Defendant-controlled product information, labeling, risk disclosures, and transplant-market materials that shaped how everolimus was understood before he received it.

85.   Defendant also engaged in unconscionable conduct within the meaning of Tex. Bus. & Com. Code § 17.45(5) by taking advantage of Dov Fischman's lack of knowledge, ability, and experience to a grossly unfair degree. He had no meaningful ability to evaluate the *de novo* warning structure, the absence of an FDA-approved heart-transplant framework, the misleading benefit narratives, the consequences of removing antiviral protection at conversion, the oncology identity and chemotherapy-comparable systemic effects of everolimus, or the systemic risk created by replacing a decade-stable CNI-based regimen with an oncology-lineage mTOR inhibitor. He was wholly dependent on manufacturer-controlled risk information, and that information was structured to obscure the risks he needed to understand.

86.   Plaintiff alleges that Defendant acted knowingly and intentionally within the meaning of Tex. Bus. & Com. Code § 17.50(b)(1). Defendant had actual awareness of the heart-transplant warning, the lack of FDA approval for heart-transplant use, the Rapamune enforcement history, the misleading kidney-sparing narrative, the antiviral-management risks for high-risk CMV patients, and the 2024 patient-assistance removal decision. Defendant knew its everolimus strategy mirrored the strategy that had already generated a $490.9 million federal enforcement resolution involving its pharmacologic predecessor, yet continued to position everolimus in a manner that obscured the real-world significance of those risks. Plaintiff therefore seeks all additional damages authorized by the DTPA for knowing and intentional conduct.

## VIII. DAMAGES

Page 33 of 38

App. 034

87. Plaintiff seeks all damages recoverable under applicable law in her individual capacity as a statutory wrongful death beneficiary, including wrongful-death damages under Tex. Civ. Prac. & Rem. Code § 71.004; actual damages under the DTPA; additional DTPA damages for Defendant's knowing and intentional conduct; exemplary damages under Tex. Civ. Prac. & Rem. Code § 41.003; pre- and post-judgment interest; and costs of court. Plaintiff does not seek survival damages or damages belonging to any estate. The amount in controversy substantially exceeds $5 million.

## IX. JURY DEMAND

88. Plaintiff demands a trial by jury on all issues so triable.

## X. PRAYER

89. WHEREFORE, Plaintiff Gallit Fischman respectfully requests that the Court enter judgment against Defendant Novartis Pharmaceuticals Corporation for all actual damages proven at trial; additional DTPA damages; exemplary damages; pre- and post-judgment interest; costs of court; and any additional relief to which Plaintiff is justly entitled.

Respectfully submitted,

Date: May 29, 2026

/s/ _Gallit Fischman_____

**GALLIT FISCHMAN, PRO SE**
10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com

Page 34 of 38

**App. 035**

App. 036

# EXHIBIT A

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
These highlights do not include all the information needed to use ZORTRESS safely and effectively. See full prescribing information for ZORTRESS.

**ZORTRESS® (everolimus) tablets, for oral use**
Initial U.S. Approval: 2010

---

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**
*See full prescribing information for complete boxed warning.*

- Only physicians experienced in immunosuppressive therapy and management of transplant patients should use Zortress (5.1)
- Increased susceptibility to infection and the possible development of malignancies may result from immunosuppression (5.2, 5.3)
- Increased incidence of kidney graft thrombosis (5.4)
- Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce nephrotoxicity (2.4, 2.5, 5.6, 12.7, 12.8)
- Increased mortality in a heart transplant clinical trial. Use in heart transplantation is not recommended (5.7)

---

----------------------------RECENT MAJOR CHANGES----------------------------
Warnings and Precautions, Cannabidiol Drug Interactions (5.22)    9/2023

---------------------------INDICATIONS AND USAGE---------------------------
Zortress is an mTOR inhibitor immunosuppressant indicated for the prophylaxis of organ rejection in adult patients:
- Kidney Transplant: at low-moderate immunologic risk. Use in combination with basiliximab, cyclosporine (reduced doses) and corticosteroids (1.1)
- Liver Transplant: Administer no earlier than 30 days posttransplant. Use in combination with tacrolimus (reduced doses) and corticosteroids (1.2, 5.5)

Limitations of Use: Safety and efficacy have not been established in the following:
- Kidney transplant patients at high immunologic risk (1.3)
- Recipients of transplanted organs other than kidney or liver (1.3, 5.7)
- Pediatric patients (less than 18 years) (1.3)

----------------------DOSAGE AND ADMINISTRATION----------------------
- Kidney Transplantation: starting oral dose of 0.75 mg twice daily as soon as possible after transplantation (2.1)
- Liver Transplantation: starting oral dose of 1 mg twice daily starting 30 days after transplantation (2.2)
- Monitor Everolimus Concentrations: Adjust maintenance dose to achieve trough concentrations within the 3 to 8 ng/mL target range using LC/MS/MS assay method (2.1, 2.2, 2.3)
- Administer consistently with or without food at the same time as cyclosporine or tacrolimus (2.6, 12.3)
- Mild Hepatic Impairment: Reduce initial daily dose by one-third (2.7)
- Moderate or Severe Hepatic Impairment: Reduce initial daily dose by one-half (2.7, 12.6)

---------------------DOSAGE FORMS AND STRENGTHS---------------------
Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets (3)

-------------------------------CONTRAINDICATIONS-------------------------------
- Hypersensitivity to everolimus, sirolimus, or to components of the drug product (4)

-----------------------WARNINGS AND PRECAUTIONS-----------------------
- Angioedema [increased risk with concomitant angiotensin converting enzyme (ACE inhibitors)]: Monitor for symptoms and treat promptly (5.8)
- Delayed Wound Healing/Fluid Accumulation: Monitor symptoms; treat promptly to minimize complications (5.9)
- Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis: Monitor for symptoms or radiologic changes; manage by dose reduction or discontinuation until symptoms resolve; consider use of corticosteroids (5.10)
- Hyperlipidemia (elevations of serum cholesterol and triglycerides): Monitor and consider anti-lipid therapy (5.11)
- Proteinuria (increased risk with higher trough concentrations): Monitor urine protein (5.12)
- Polyoma Virus Infections (activation of latent viral infections; BK virus associated nephropathy): Consider reducing immunosuppression (5.13)
- TMA/TTP/HUS (concomitant use with cyclosporine may increase risk): Monitor for hematologic changes or symptoms (5.15)
- New Onset Diabetes After Transplantation: Monitor serum glucose (5.16)
- Male Infertility: Azoospermia or oligospermia may occur (5.18, 13.1)
- Immunizations: Avoid live vaccines (5.19)
- Embryo-Fetal Toxicity: Advise females of reproductive potential of the potential risk to a fetus and to use effective contraception during treatment with Zortress and for 8 weeks after final dose (5.17, 8.1, 8.3)

-------------------------------ADVERSE REACTIONS-------------------------------
Most common adverse reactions were as follows:
- Kidney Transplantation (incidence greater than or equal to 20%): peripheral edema, constipation, hypertension, nausea, anemia, urinary tract infection (UTI), and hyperlipidemia (6.1)
- Liver Transplantation (incidence greater than 10%): diarrhea, headache, peripheral edema, hypertension, nausea, pyrexia, abdominal pain, leukopenia, and hypercholesterolemia (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Novartis Pharmaceuticals Corporation at 1-888-669-6682 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

---------------------------------DRUG INTERACTIONS---------------------------------
Strong-moderate CYP3A4 inhibitors (e.g., cyclosporine, ketoconazole, erythromycin, verapamil) and CYP3A4 inducers (e.g., rifampin) may affect everolimus concentrations (7.1). Consider Zortress dose adjustment (5.14)

Therapeutic drug monitoring and dose reduction for Zortress should be considered when Zortress is coadministered with cannabidiol (5.22, 7.13)

---------------------------USE IN SPECIFIC POPULATIONS---------------------------
- Pregnancy: Based on animal data, may cause maternal and fetal harm (8.1)
- Lactation: Breastfeeding not recommended (8.2)
- Females and Males of Reproductive Potential: May impair fertility (8.1, 8.3, 13.1)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 2/2024**

**FULL PRESCRIBING INFORMATION: CONTENTS***
**WARNING: MALIGNANCIES and SERIOUS INFECTIONS;**
**KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and**
**MORTALITY IN HEART TRANSPLANTATION**

**1    INDICATIONS AND USAGE**
  1.1    Prophylaxis of Organ Rejection in Kidney Transplantation
  1.2    Prophylaxis of Organ Rejection in Liver Transplantation
  1.3    Limitations of Use
**2    DOSAGE AND ADMINISTRATION**
  2.1    Dosage in Adult Kidney Transplant Patients
  2.2    Dosage in Adult Liver Transplant Patients
  2.3    Therapeutic Drug Monitoring (TDM) - Everolimus
  2.4    Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients
  2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients
  2.6    Administration
  2.7    Hepatic Impairment
**3    DOSAGE FORMS AND STRENGTHS**
**4    CONTRAINDICATIONS**
  4.1    Hypersensitivity Reactions
**5    WARNINGS AND PRECAUTIONS**
  5.1    Management of Immunosuppression
  5.2    Lymphomas and Other Malignancies
  5.3    Serious Infections
  5.4    Kidney Graft Thrombosis
  5.5    Hepatic Artery Thrombosis
  5.6    Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity
  5.7    Heart Transplantation
  5.8    Angioedema
  5.9    Wound Healing and Fluid Accumulation
  5.10   Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis
  5.11   Hyperlipidemia
  5.12   Proteinuria
  5.13   Polyoma Virus Infections
  5.14   Interaction With Strong Inhibitors and Inducers of CYP3A4
  5.15   Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome
  5.16   New Onset Diabetes After Transplant
  5.17   Embryo-Fetal Toxicity
  5.18   Male Infertility
  5.19   Immunizations
  5.20   Interaction With Grapefruit Juice
  5.21   Patients With Hereditary Disorders/Other
  5.22   Cannabidiol Drug Interactions
**6    ADVERSE REACTIONS**
  6.1    Serious and Otherwise Important Adverse Reactions
  6.2    Clinical Trials Experience
  6.3    Postmarketing Experience
**7    DRUG INTERACTIONS**
  7.1    Interactions With Strong Inhibitors or Inducers of CYP3A4 and P-glycoprotein
  7.2    Cyclosporine (CYP3A4/P-gp Inhibitor and CYP3A4 Substrate)
  7.3    Ketoconazole and Other Strong CYP3A4 Inhibitors
  7.4    Erythromycin (Moderate CYP3A4 Inhibitor)
  7.5    Verapamil (CYP3A4 and P-gp Substrate)
  7.6    Atorvastatin (CYP3A4 Substrate) and Pravastatin (P-gp Substrate)
  7.7    Simvastatin and Lovastatin
  7.8    Rifampin (Strong CYP3A4/P-gp Inducers)
  7.9    Midazolam (CYP3A4/5 Substrate)
  7.10   Other Possible Interactions
  7.11   Octreotide
  7.12   Tacrolimus
  7.13   Cannabidiol
**8    USE IN SPECIFIC POPULATIONS**
  8.1    Pregnancy
  8.2    Lactation
  8.3    Females and Males of Reproductive Potential
  8.4    Pediatric Use
  8.5    Geriatric Use
  8.6    Hepatic Impairment
  8.7    Renal Impairment
**10    OVERDOSAGE**
**11    DESCRIPTION**
**12    CLINICAL PHARMACOLOGY**
  12.1   Mechanism of Action
  12.3   Pharmacokinetics
  12.5   Drug-Drug Interactions
  12.6   Specific Populations
  12.7   Everolimus Whole Blood Concentrations Observed in Kidney and in Liver Transplant Patients
  12.8   Cyclosporine Concentrations Observed in Kidney Transplant Patients
  12.9   Tacrolimus Concentrations in Liver Transplant
**13    NONCLINICAL TOXICOLOGY**
  13.1   Carcinogenesis, Mutagenesis, Impairment of Fertility
  13.2   Animal Toxicology and/or Pharmacology
**14    CLINICAL STUDIES**
  14.1   Prevention of Organ Rejection After Kidney Transplantation
  14.2   Prevention of Organ Rejection After Liver Transplantation
**16    HOW SUPPLIED/STORAGE AND HANDLING**
**17    PATIENT COUNSELING INFORMATION**

*Sections or subsections omitted from the full prescribing information are not listed.

App. 038

# FULL PRESCRIBING INFORMATION

---

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**

**Malignancies and Serious Infections**

- Only physicians experienced in immunosuppressive therapy and management of transplant patients should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for maintenance therapy should have complete information requisite for the follow-up of the patient *[see Warnings and Precautions (5.1)]*.
- Increased susceptibility to infection and the possible development of malignancies, such as lymphoma and skin cancer, may result from immunosuppression *[see Warnings and Precautions (5.2, 5.3)]*.

**Kidney Graft Thrombosis**

- An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, was reported, mostly within the first 30 days posttransplantation *[see Warnings and Precautions (5.4)]*.

**Nephrotoxicity**

- Increased nephrotoxicity can occur with use of standard doses of cyclosporine in combination with Zortress. Therefore, reduced doses of cyclosporine should be used in combination with Zortress in order to reduce renal dysfunction. It is important to monitor the cyclosporine and everolimus whole blood trough concentrations *[see Dosage and Administration (2.4, 2.5), Warnings and Precautions (5.6), Clinical Pharmacology (12.7, 12.8)]*.

**Mortality in Heart Transplantation**

- Increased mortality, often associated with serious infections, within the first three months posttransplantation was observed in a clinical trial of *de novo* heart transplant patients receiving immunosuppressive regimens with or without induction therapy. Use in heart transplantation is not recommended *[see Warnings and Precautions (5.7)]*.

---

## 1 INDICATIONS AND USAGE

### 1.1 Prophylaxis of Organ Rejection in Kidney Transplantation

Zortress is indicated for the prophylaxis of organ rejection in adult patients at low to moderate immunologic risk receiving a kidney transplant *[see Clinical Studies (14.1)]*. Zortress is to be administered in combination with basiliximab induction and concurrently with reduced doses of cyclosporine and with corticosteroids. Therapeutic drug monitoring (TDM) of everolimus and cyclosporine is recommended for all patients receiving these products *[see Dosage and Administration (2.2, 2.3)]*.

### 1.2 Prophylaxis of Organ Rejection in Liver Transplantation

Zortress is indicated for the prophylaxis of allograft rejection in adult patients receiving a liver transplant. Zortress is to be administered no earlier than 30 days posttransplant concurrently in combination with reduced doses of tacrolimus and with corticosteroids *[see Warnings and Precautions (5.5), Clinical Studies (14.2)]*. TDM of everolimus and tacrolimus is recommended for all patients receiving these products *[see Dosage and Administration (2.3, 2.5)]*.

### 1.3 Limitations of Use

The safety and efficacy of Zortress has not been established in the following populations:

- Kidney transplant patients at high immunologic risk.
- Recipients of transplanted organs other than kidney and liver *[see Warnings and Precautions (5.7)]*.
- Pediatric patients (less than 18 years).

## 2 DOSAGE AND ADMINISTRATION

Patients receiving Zortress may require dose adjustments based on everolimus blood concentrations achieved, tolerability, individual response, change in concomitant medications and the clinical situation. Optimally, dose adjustments of Zortress should be based on trough concentrations obtained 4 or 5 days after a previous dosing change. Dose adjustment is required if the trough concentration is below 3 ng/mL. The total daily dose of Zortress should be doubled using the available tablet strengths (0.25 mg, 0.5 mg, 0.75 mg, or 1 mg). Dose adjustment is also required if the trough

**App. 039**

concentration is greater than 8 ng/mL on 2 consecutive measures; the dose of Zortress should be decreased by 0.25 mg twice daily *[see Dosage and Administration (2.3), Clinical Pharmacology (12.3)]*.

### 2.1    Dosage in Adult Kidney Transplant Patients

An initial Zortress dose of 0.75 mg orally twice daily (1.5 mg per day) is recommended for adult kidney transplant patients in combination with reduced-dose cyclosporine, administered as soon as possible after transplantation *[see Dosage and Administration (2.3, 2.4), Clinical Studies (14.1)]*.

Oral prednisone should be initiated once oral medication is tolerated. Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

### 2.2    Dosage in Adult Liver Transplant Patients

Start Zortress at least 30 days posttransplant. An initial dose of 1 mg orally twice daily (2 mg per day) is recommended for adult liver transplant patients in combination with reduced-dose tacrolimus *[see Dosage and Administration (2.3, 2.5), Clinical Studies (14.2)]*.

Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

### 2.3    Therapeutic Drug Monitoring (TDM) - Everolimus

Routine everolimus whole blood therapeutic drug concentration monitoring is recommended for all patients. The recommended everolimus therapeutic range is 3 to 8 ng/mL *[see Clinical Pharmacology (12.7)]*. Careful attention should be made to clinical signs and symptoms, tissue biopsies, and laboratory parameters. It is important to monitor everolimus blood concentrations, in patients with hepatic impairment, during concomitant administration of CYP3A4 inducers or inhibitors or cannabidiol, when switching cyclosporine formulations and/or when cyclosporine dosing is reduced according to recommended target concentrations *[see Drug Interactions (7), Clinical Pharmacology (12.7, 12.8)]*.

There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced. There is little to no pharmacokinetic interaction of tacrolimus on everolimus, and thus, everolimus concentrations do not decrease if the tacrolimus exposure is reduced *[see Drug Interactions (7.2)]*.

The everolimus recommended therapeutic range of 3 to 8 ng/mL is based on an LC/MS/MS assay method. Currently in clinical practice, everolimus whole blood trough concentrations may be measured by chromatographic or immunoassay methodologies. Because the measured everolimus whole blood trough concentrations depend on the assay used, individual patient sample concentration values from different assays may not be interchangeable. Consideration of assay results must be made with knowledge of the specific assay used. Therefore, communication should be maintained with the laboratory performing the assay.

### 2.4    Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients

Both cyclosporine doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the risk of nephrotoxicity *[see Warnings and Precautions (5.6), Drug Interactions (7.2), Clinical Pharmacology (12.8)]*.

The recommended cyclosporine therapeutic ranges when administered with Zortress are 100 to 200 ng/mL through Month 1 posttransplant, 75 to 150 ng/mL at Months 2 and 3 posttransplant, 50 to 100 ng/mL at Month 4 posttransplant, and 25 to 50 ng/mL from Month 6 through Month 12 posttransplant. The median trough concentrations observed in the clinical trial ranged between 161 to 185 ng/mL through Month 1 posttransplant and between 111 to 140 ng/mL at Months 2 and 3 posttransplant. The median trough concentration was 99 ng/mL at Month 4 posttransplant and ranged between 46 to 75 ng/mL from Months 6 through Month 12 posttransplant *[see Clinical Pharmacology (12.8), Clinical Studies (14.1)]*.

Cyclosporine, USP Modified is to be administered as oral capsules twice daily unless cyclosporine oral solution or intravenous administration of cyclosporine cannot be avoided. Cyclosporine, USP Modified should be initiated as soon as possible, and no later than 48 hours after reperfusion of the graft and dose adjusted to target concentrations from Day 5 onwards.

If impairment of renal function is progressive, the treatment regimen should be adjusted. In renal transplant patients, the cyclosporine dose should be based on cyclosporine whole blood trough concentrations *[see Clinical Pharmacology (12.8)]*.

**App. 040**

In renal transplantation, there are limited data regarding dosing Zortress with reduced cyclosporine trough concentrations of 25 to 50 ng/mL after 12 months. Zortress has not been evaluated in clinical trials with other formulations of cyclosporine. Prior to dose reduction of cyclosporine, it should be ascertained that steady-state everolimus whole blood trough concentration is at least 3 ng/mL. There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced *[see Drug Interactions (7.2)]*.

### 2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients

Both tacrolimus doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the potential risk of nephrotoxicity *[see Warnings and Precautions (5.6), Clinical Pharmacology (12.9)]*.

The recommended tacrolimus therapeutic range when administered with Zortress are whole blood trough ($C_{-0h}$) concentrations of 3 to 5 ng/mL by three weeks after the first dose of Zortress (approximately Month 2) and through Month 12 posttransplant.

The median tacrolimus trough concentrations observed in the clinical trial ranged between 8.6 to 9.5 ng/mL at Weeks 2 and 4 posttransplant (prior to initiation of everolimus). The median tacrolimus trough concentrations ranged between 7 to 8.1 ng/mL at Weeks 5 and 6 posttransplant, between 5.2 to 5.6 ng/mL at Months 2 and 3 posttransplant, and between 4.3 to 4.9 ng/mL between Months 4 and 12 posttransplant *[see Clinical Pharmacology (12.9), Clinical Studies (14.2)]*.

Tacrolimus is to be administered as oral capsules twice daily unless intravenous administration of tacrolimus cannot be avoided.

In liver transplant patients, the tacrolimus dose should be based on tacrolimus whole blood trough concentrations *[see Clinical Pharmacology (12.9)]*.

In liver transplantation, there are limited data regarding dosing Zortress with reduced tacrolimus trough concentrations of 3 to 5 ng/mL after 12 months. Prior to dose reduction of tacrolimus, it should be ascertained that the steady-state everolimus whole blood trough concentration is at least 3 ng/mL. Unlike the interaction between cyclosporine and everolimus, tacrolimus does not affect everolimus trough concentrations, and consequently, everolimus concentrations do not decrease if the tacrolimus exposure is reduced.

### 2.6    Administration

Zortress tablets should be swallowed whole with a glass of water and not crushed before use.

Administer Zortress consistently approximately 12 hours apart with or without food to minimize variability in absorption and at the same time as cyclosporine or tacrolimus *[see Clinical Pharmacology (12.3)]*.

### 2.7    Hepatic Impairment

Whole blood trough concentrations of everolimus should be closely monitored in patients with impaired hepatic function. For patients with mild hepatic impairment (Child-Pugh Class A), the initial daily dose should be reduced by approximately one-third of the normally recommended daily dose. For patients with moderate or severe hepatic impairment (Child-Pugh Class B or C), the initial daily dose should be reduced to approximately one-half of the normally recommended daily dose. Further dose adjustment and/or dose titration should be made if a patient's whole blood trough concentration of everolimus, as measured by an LC/MS/MS assay, is not within the target trough concentration range of 3 to 8 ng/mL *[see Clinical Pharmacology (12.6)]*.

### 3    DOSAGE FORMS AND STRENGTHS

Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets.

**Table 1. Description of Zortress (everolimus) Tablets**

| Dosage strength | 0.25 mg | 0.5 mg | 0.75 mg | 1 mg |
|---|---|---|---|---|
| Appearance | White to yellowish, marbled, round, flat tablets with beveled edge | | | |
| Imprint | "C" on one side and "NVR" on the other | "CH" on one side and "NVR" on the other | "CL" on one side and "NVR" on the other | "CU" on one side and "NVR" on the other |

## 4 CONTRAINDICATIONS

### 4.1 Hypersensitivity Reactions

Zortress is contraindicated in patients with known hypersensitivity to everolimus, sirolimus, or to components of the drug product.

## 5 WARNINGS AND PRECAUTIONS

### 5.1 Management of Immunosuppression

Only physicians experienced in management of systemic immunosuppressant therapy in transplantation should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for the maintenance therapy should have complete information requisite for the follow-up of the patient. In limited data with the complete elimination of calcineurin inhibition (CNI), there was an increased risk of acute rejection.

### 5.2 Lymphomas and Other Malignancies

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing lymphomas and other malignancies, particularly of the skin. The risk appears to be related to the intensity and duration of immunosuppression rather than to the use of any specific agent.

As usual for patients with increased risk for skin cancer, exposure to sunlight and ultraviolet light should be limited by wearing protective clothing and using a sunscreen with a high protection factor.

### 5.3 Serious Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing bacterial, viral, fungal, and protozoal infections, including opportunistic infections [see Warnings and Precautions (5.13), Adverse Reactions (6.1, 6.2)]. These infections may lead to serious, including fatal, outcomes. Because of the danger of over-immunosuppression, which can cause increased susceptibility to infection, combination immunosuppressant therapy should be used with caution.

Antimicrobial prophylaxis for Pneumocystis jiroveci (carinii) pneumonia and prophylaxis for cytomegalovirus (CMV) is recommended in transplant recipients.

### 5.4 Kidney Graft Thrombosis

An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, has been reported, usually within the first 30 days posttransplantation [see Boxed Warning].

### 5.5 Hepatic Artery Thrombosis

Mammalian target of rapamycin (mTOR) inhibitors are associated with an increase in hepatic artery thrombosis (HAT). Reported cases mostly have occurred within the first 30 days posttransplant and most also lead to graft loss or death. Therefore, Zortress should not be administered earlier than 30 days after liver transplant.

### 5.6 Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity

In kidney transplant recipients, Zortress with standard dose cyclosporine increases the risk of nephrotoxicity resulting in a lower glomerular filtration rate. Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce renal dysfunction [see Boxed Warning, Indications and Usage (1.1), Clinical Pharmacology (12.8)].

**App. 042**

In liver transplant recipients, Zortress has not been studied with standard dose tacrolimus. Reduced doses of tacrolimus should be used in combination with Zortress in order to minimize the potential risk of nephrotoxicity *[see Indications and Usage (1.2), Clinical Pharmacology (12.9)]*.

Renal function should be monitored during the administration of Zortress. Consider switching to other immunosuppressive therapies if renal function does not improve after dose adjustments or if the dysfunction is thought to be drug related. Caution should be exercised when using other drugs which are known to impair renal function.

## 5.7 Heart Transplantation

In a clinical trial of *de novo* heart transplant patients, Zortress in an immunosuppressive regimen, with or without induction therapy, resulted in an increased mortality often associated with serious infections within the first three months posttransplantation compared to the control regimen. Use of Zortress in heart transplantation is not recommended.

## 5.8 Angioedema

Zortress has been associated with the development of angioedema. The concomitant use of Zortress with other drugs known to cause angioedema, such as angiotensin converting enzyme (ACE) inhibitors may increase the risk of developing angioedema.

## 5.9 Wound Healing and Fluid Accumulation

Zortress increases the risk of delayed wound healing and increases the occurrence of wound-related complications like wound dehiscence, wound infection, incisional hernia, lymphocele and seroma. These wound-related complications may require more surgical intervention. Generalized fluid accumulation, including peripheral edema (e.g., lymphoedema) and other types of localized fluid collection, such as pericardial and pleural effusions and ascites have also been reported.

## 5.10 Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis

A diagnosis of interstitial lung disease (ILD) should be considered in patients presenting with symptoms consistent with infectious pneumonia but not responding to antibiotic therapy and in whom infectious, neoplastic and other non-drug causes have been ruled out through appropriate investigations. Cases of ILD, implying lung intraparenchymal inflammation (pneumonitis) and/or fibrosis of non-infectious etiology, some reported with pulmonary hypertension [including pulmonary arterial hypertension (PAH)] as a secondary event, have occurred in patients receiving rapamycins and their derivatives, including Zortress. Most cases generally resolve on drug interruption with or without glucocorticoid therapy. However, fatal cases have also occurred.

## 5.11 Hyperlipidemia

Increased serum cholesterol and triglycerides, requiring the need for anti-lipid therapy, have been reported to occur following initiation of Zortress and the risk of hyperlipidemia is increased with higher everolimus whole blood trough concentrations *[see Adverse Reactions (6.2)]*. Use of anti-lipid therapy may not normalize lipid levels in patients receiving Zortress.

Any patient who is administered Zortress should be monitored for hyperlipidemia. If detected, interventions, such as diet, exercise, and lipid-lowering agents should be initiated as outlined by the National Cholesterol Education Program guidelines. The risk/benefit should be considered in patients with established hyperlipidemia before initiating an immunosuppressive regimen containing Zortress. Similarly, the risk/benefit of continued Zortress therapy should be reevaluated in patients with severe refractory hyperlipidemia. Zortress has not been studied in patients with baseline cholesterol levels greater than 350 mg/dL.

Due to an interaction with cyclosporine, clinical trials of Zortress and cyclosporine in kidney transplant patients strongly discouraged patients from receiving the HMG-CoA reductase inhibitors simvastatin and lovastatin. During Zortress therapy with cyclosporine, patients administered an HMG-CoA reductase inhibitor and/or fibrate should be monitored for the possible development of rhabdomyolysis and other adverse effects, as described in the respective labeling for these agents *[see Drug Interactions (7.7)]*.

## 5.12 Proteinuria

The use of Zortress in transplant patients has been associated with increased proteinuria. The risk of proteinuria increased with higher everolimus whole blood trough concentrations. Patients receiving Zortress should be monitored for proteinuria *[see Adverse Reactions (6.2)]*.

### 5.13   Polyoma Virus Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk for opportunistic infections, including polyoma virus infections. Polyoma virus infections in transplant patients may have serious, and sometimes fatal, outcomes. These include polyoma virus-associated nephropathy (PVAN), mostly due to BK virus infection, and JC virus associated progressive multiple leukoencephalopathy (PML). PVAN has been observed in patients receiving immunosuppressants, including Zortress. PVAN is associated with serious outcomes; including deteriorating renal function and kidney graft loss *[see Adverse Reactions (6.2)]*. Patient monitoring may help detect patients at risk for PVAN. Reductions in immunosuppression should be considered for patients who develop evidence of PVAN or PML. Physicians should also consider the risk that reduced immunosuppression represents to the functioning allograft.

### 5.14   Interaction With Strong Inhibitors and Inducers of CYP3A4

Coadministration of Zortress with strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, voriconazole, clarithromycin, telithromycin, ritonavir, boceprevir, telaprevir) or strong CYP3A4 inducers (e.g., rifampin, rifabutin) is not recommended without close monitoring of everolimus whole blood trough concentrations *[see Drug Interactions (7)]*.

### 5.15   Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome

The concomitant use of Zortress with cyclosporine may increase the risk of thrombotic microangiopathy (TMA)/thrombotic thrombocytopenic purpura (TTP)/hemolytic uremic syndrome (HUS). Monitor hematologic parameters *[see Adverse Reactions (6.2)]*.

### 5.16   New Onset Diabetes After Transplant

Zortress has been shown to increase the risk of new onset diabetes mellitus after transplant. Blood glucose concentrations should be monitored closely in patients using Zortress.

### 5.17   Embryo-Fetal Toxicity

Based on animal studies and the mechanism of action *[see Clinical Pharmacology (12.1)]*, Zortress may cause fetal harm when administered to a pregnant woman. In animal studies, everolimus caused embryo-fetal toxicity when administered during the period of organogenesis at maternal exposures that were equal to or less than human exposures at the recommended lowest starting dose. Advise pregnant women of the potential risk to a fetus. Advise female patients of reproductive potential to avoid becoming pregnant and to use effective contraception while using Zortress and for 8 weeks after ending treatment *[see Use in Specific Populations (8.1, 8.3)]*.

### 5.18   Male Infertility

Azoospermia or oligospermia may be observed *[see Adverse Reactions (6.2), Nonclinical Toxicology (13.1)]*. Zortress is an anti-proliferative drug and affects rapidly dividing cells like the germ cells.

### 5.19   Immunizations

The use of live vaccines should be avoided during treatment with Zortress; examples include (not limited to) the following: intranasal influenza, measles, mumps, rubella, oral polio, BCG, yellow fever, varicella, and TY21a typhoid vaccines.

### 5.20   Interaction With Grapefruit Juice

Grapefruit and grapefruit juice inhibit cytochrome P450 3A4 and P-gp activity and should therefore be avoided with concomitant use of Zortress and cyclosporine or tacrolimus.

### 5.21   Patients With Hereditary Disorders/Other

Patients with rare hereditary problems of galactose intolerance, the Lapp lactase deficiency or glucose-galactose malabsorption should not take Zortress as this may result in diarrhea and malabsorption.

### 5.22   Cannabidiol Drug Interactions

When cannabidiol and Zortress are coadministered, closely monitor for an increase in everolimus blood levels and for adverse reactions suggestive of everolimus toxicity. A dose reduction of Zortress should be considered as needed when Zortress is coadministered with cannabidiol *[see Dosage and Administration (2.3), Drug Interactions (7.13)]*.

**App. 044**

App. 045

# EXHIBIT B

# 2024 – 2025 NPAF Policy Change

These policy changes are applicable for _all_ patients as of October 1, 2024

## *Continuation of NPAF Support for Currently Enrolled Patients*

- **Patients with Private Insurance** will continue to receive their Novartis medication through the end of their current enrollment period, up to the end of the calendar year.

- **Patients with Government Insurance** will continue to receive their Novartis medication through the end of the calendar year.

- **Uninsured Patients** will continue to receive their Novartis medication through the end of their current enrollment period (except for the discontinued products identified below).

## *Insurance and Income Criteria*

- **Private Insurance** (otherwise known as "Commercial Insurance" which is either provided by an employer or self-pay): Patients who have commercial insurance are **not** eligible for NPAF support
  - These changes apply to all patients with Private Insurance, even if their insurance does not cover the medication

- **Medicare:** Patients must have a household income of less than or equal to $81,760 (for a household size of two) to be considered for NPAF. See the NPAF Eligibility Income Limit Chart below if a patient's household size is greater or less than two

  ### For Part D, the following is also applicable:

  - If a patient's income is less than or equal to $30,660 for a married couple (or less than or equal to $22,590 for a single person) they may be eligible for Extra Help and must apply prior to applying for NPAF assistance

  - If they qualify for Extra Help they will not be eligible for NPAF support

  - If they are denied for Extra Help, they need to provide the Extra Help denial letter as part of their NPAF application

- **Medicaid, Government (Tricare, DoD, VA) and/or Uninsured:** Patients must have a household income of less than or equal to $81,760 (for a household size of two) to be considered for NPAF. See the NPAF Eligibility Income Limit Chart below if a patient's household size is greater or less than two

- **All Patients:** These changes are applicable to all on-label and off-label prescriptions

**ᗡ NOVARTIS**

**Novartis Pharmaceuticals Corporation**
East Hanover, New Jersey 07936-1080          © 2024          8/24          FA-11258316

**App. 046**

## 2024 – 2025 NPAF Policy Change

### NPAF Eligibility Income Limit Chart (for different household sizes)

| Household Size (as reported in your Tax Return) | 48 Contiguous States & U.S. Territories | Alaska | Hawaii |
|---|---|---|---|
| 1 | $60,240 | $75, 240 | $69,240 |
| 2 | $81,760 | $102,160 | $94,000 |
| 3 | $103,280 | $129,080 | $118,760 |
| 4 | $124,800 | $156,000 | $143,520 |
| Each Addt'l. Person | +$21,520 | + $26,920 | + $24,760 |

### NPAF Product Discontinuation List

As of January 1, 2025, the following products will **no longer be available** through NPAF:

- Afinitor*(everolimus)
- Exjade (deferasirox)
- Gilenya*(fingolimod)
- Gleevec (imatinib mesylate)
- Jadenu*(deferasirox)
- Myfortic (mycophenolic acid)
- Neoral (cyclosporine, USP)
- Sandimmune (cyclosporine)
- Tegretol (carbamazepine, USP)
- Tegretol XR (carbamazepine)
- Trileptal (oxcarbazepine)
- Zortress (everolimus)

*Note: Afinitor Disperz (everolimus), Gilenya (pediatric) (fingolimod), and Jadenu Sprinkles (deferasirox) will continue to be supported in NPAF.*



**Novartis Pharmaceuticals Corporation**
East Hanover, New Jersey 07936-1080          © 2024          8/24          FA-11258316

App. 048

# EXHIBIT C

everolimus and heart transplant/Google Search



AI Mode    **All**    Images    Videos    Shopping    Forums    Short videos    More ▾    Tools ▾

◆ AI Overview      ⋮

Everolimus (Certican, Zortress) is **an mTOR inhibitor immunosuppressant used to prevent organ rejection in heart transplant recipients**. By reducing the body's immune response, it helps prevent white blood cells from attacking the new heart. It is uniquely valuable for preventing cardiac allograft vasculopathy (CAV) and protecting kidney function when combined with low-dose calcineurin inhibitors (CNIs). ▶ National Institutes of Health (.gov) +3

## Primary Uses & Benefits



Show more ∨



**National Institutes of Health (.gov)**
https://pmc.ncbi.nlm.nih.gov › articles › PMC3870122

## Everolimus in Heart Transplantation: An Update - PMC - NIH

by SW Hirt · 2013 · Cited by 49 — **Everolimus is currently the only mTOR inhibitor approved for use in heart transplantation**. It was developed to improve the pharmacokinetics of the mTOR ... Read more



**JAMA**
https://jamanetwork.com › JAMA

## Everolimus and Low-Dose Tacrolimus After Heart ...

by CS Almond · 2025 · Cited by 1 — **Everolimus, a mammalian target of rapamycin (mTOR) inhibitor**, and low-dose tacrolimus have been shown to reduce the risk of several transplant ... Read more



**The New England Journal of Medicine**
https://www.nejm.org › doi › full › NEJMoa022171

## Everolimus for the Prevention of Allograft Rejection and ...

App. 049

Case 3:26-cv-00782-EK-BI   Document 33-13   Filed 06/09/26   Page 52 of 184   PageID 538

by HJ Eisen · 2003 · Cited by 1428 — Sirolimus has been shown **to reduce the incidence of acute rejection** among renal-transplant recipients and to prevent cardiac-allograft vasculopathy in...



**The Journal of Heart and Lung Transplantation**
https://www.jhltonline.org › article › fulltext

## Long-term follow-up of the randomized, prospective ...

by E Bollano · 2024 · Cited by 6 — **Everolimus immunosuppression in de novo heart transplant recipients**: what does the evidence tell us now? Transpl Rev (Orlando). 2013; 27:76-84.   Read more



**American College of Cardiology**
https://www.acc.org › 2023/11/10 › teammate

## Tacrolimus and Everolimus Against Mycophenolate Mofetil ...

Nov 12, 2023 — The TEAMMATE trial showed that **everolimus with low-dose tacrolimus is safe in children and young adults** when given ≥6 months after cardiac ...   Read more



**ScienceDirect.com**
https://www.sciencedirect.com › article › abs › pii

## Maintenance Immunosuppression With Tacrolimus and ...

by M Vigil-Escalera · 2025 — Maintenance immunosuppression with delayed initiation of Everolimus in combination with Tacrolimus **is considered a valid strategy in heart transplant patients**.   Read more



**American Journal of Transplantation**
https://www.amjtransplant.org › article › fulltext

## Everolimus in Heart Transplantation: Does It Finally Have a ...

by JA Kobashigawa · 2014 · Cited by 8 — This editorial **approves the use of everolimus to wean calcineurin inhibitors** (by 7–11 weeks postoperative) as safe and effective with improved first-...



**JACC Journals**
https://www.jacc.org › doi › j.jchf.2021.01.007

## Everolimus for the Prevention of Calcineurin-Inhibitor ...

by C Anthony · 2021 · Cited by 30 — In **cardiac transplant** recipients, immunosuppressive therapy using combined low-dose **everolimus** and low-dose tacrolimus is safe and more effective in the ...   Read more

**National Institutes of Health (.gov)**
https://pmc.ncbi.nlm.nih.gov › articles › PMC6275357

## The role of everolimus in treatment of cardiac allograft ... - PMC

by T Watanabe · 2013 — **Everolimus has not yet been approved by the US Food and Drug Administration** to prevent organ rejection in heart transplantation recipients. Everolimus may be...

App. 050

## People also ask

Is everolimus used in heart transplant patients?                       ⌄

What medications should you avoid after a heart transplant?            ⌄

Is everolimus better than tacrolimus?                                 ⌄

Can everolimus cause heart problems?                                  ⌄

▶  YouTube · American Society of Transplantation
    240+ views · 5 months ago

## Everolimus and Low-Dose Tacrolimus After Heart Transplant ...

The largest to date multic-center trial investigating the use of a regimen involving everolamus and lowd dose tcrolamus in pediatric heart transplant.

1 02 41

5 key moments in this video   ⌄

## People also search for

| | |
|---|---|
| Everolimus and **low-dose tacrolimus after** heart transpla...  🔍 | **Tacrolimus vs** everolimus **vs sirolimus**  🔍 |
| Everolimus **vs sirolimus**  🔍 | Everolimus **vs tacrolimus**  🔍 |

1  2  3  4  5  6  7  8  9  10        Next

Results are personalized - Try without personalization

75243, Dallas, TX - Based on your past activity - Update location

Help     Send feedback     Privacy     Terms

App. 051

App. 052

# EXHIBIT D

 An official website of the United States government
Here's how you know

FULL TEXT LINKS

 SpringerLink
FULL-TEXT ARTICLE

Review    Clin Pharmacokinet. 2004;43(2):83-95. doi: 10.2165/00003088-200443020-00002.

# Clinical pharmacokinetics of everolimus

Gabriele I Kirchner [1], Ivo Meier-Wiedenbach, Michael P Manns

Affiliations
PMID: 14748618    DOI: 10.2165/00003088-200443020-00002

## Abstract

Everolimus is an immunosuppressive macrolide bearing a stable 2-hydroxyethyl chain substitution at position 40 on the sirolimus (rapamycin) structure. Everolimus, which has greater polarity than sirolimus, was developed in an attempt to improve the pharmacokinetic characteristics of sirolimus, particularly to increase its oral bioavailability. Everolimus has a mechanism of action similar to that of sirolimus. It blocks growth-driven transduction signals in the T-cell response to alloantigen and thus acts at a later stage than the calcineurin inhibitors ciclosporin and tacrolimus. Everolimus and ciclosporin show synergism in immunosuppression both in vitro and in vivo and therefore the drugs are intended to be given in combination after solid organ transplantation. The synergistic effect allows a dosage reduction that decreases adverse effects. For the quantification of the pharmacokinetics of everolimus, nine different assays using high performance liquid chromatography coupled to an electrospray mass spectrometer, and one enzyme-linked immunosorbent assay, have been developed. Oral everolimus is absorbed rapidly, and reaches peak concentration after 1.3-1.8 hours. Steady state is reached within 7 days, and steady-state peak and trough concentrations, and area under the concentration-time curve (AUC), are proportional to dosage. In adults, everolimus pharmacokinetic characteristics do not differ according to age, weight or sex, but bodyweight-adjusted dosages are necessary in children. The interindividual pharmacokinetic variability of everolimus can be explained by different activities of the drug efflux pump P-glycoprotein and of metabolism by cytochrome P450 (CYP) 3A4, 3A5 and 2C8. The critical role of the CYP3A4 system for everolimus biotransformation leads to drug-drug interactions with other drugs metabolised by this cytochrome system. In patients with hepatic impairment, the apparent clearance of everolimus is significantly lower than in healthy volunteers, and therefore the dosage of everolimus should be reduced by half in these patients. The advantage of everolimus seems to be its lower nephrotoxicity in comparison with the standard immunosuppressants ciclosporin and tacrolimus. Observed adverse effects with everolimus include hypertriglyceridaemia, hypercholesterolaemia, opportunistic infections, thrombocytopenia and leucocytopenia. Because of the variable oral bioavailability and narrow therapeutic index of everolimus, blood concentration monitoring seems to be important. The excellent correlation between steady-state trough concentration and AUC makes the former a simple and reliable index for monitoring everolimus exposure. The target trough concentration of everolimus should range between 3 and 15 microg/L in combination therapy with ciclosporin (trough concentration 100-300 microg/L) and prednisone.

PubMed Disclaimer

## Related information

GEO Profiles
PubChem Compound

App. 053

JS 44 (Rev. 06/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

GALLIT FISCHMAN

**(b)** County of Residence of First Listed Plaintiff **Dallas**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Gallit Fischman (Pro Se)
10114 Deermont Trail, Dallas, TX 75243
[214-893-6720] | [gallitfischman@yahoo.com]

## DEFENDANTS

NOVARTIS PHARMACEUTICALS CORPORATION

County of Residence of First Listed Defendant **Morris (NJ)**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

RECEIVED
JUN -5 2026
CLERK U.S. DISTRICT COURT

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question
(U.S. Government Not a Party)

☒ 4 Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders' Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability
☐ 196 Franchise

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
☐ 365 Personal Injury - Product Liability
☒ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
☐ 440 Other Civil Rights
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/ Accommodations
☐ 445 Amer. w/Disabilities - Employment
☐ 446 Amer. w/Disabilities - Other
☐ 448 Education

**FORFEITURE/PENALTY**
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Management Relations
☐ 740 Railway Labor Act
☐ 751 Family and Medical Leave Act
☐ 790 Other Labor Litigation
☐ 791 Employee Retirement Income Security Act

**PRISONER PETITIONS**
**Habeas Corpus:**
☐ 463 Alien Detainee
☐ 510 Motions to Vacate Sentence
☐ 530 General
☐ 535 Death Penalty
**Other:**
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition
☐ 560 Civil Detainee - Conditions of Confinement

**IMMIGRATION**
☐ 462 Naturalization Application
☐ 465 Other Immigration Actions

**BANKRUPTCY**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 835 Patent - Abbreviated New Drug Application
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
☐ 375 False Claims Act
☐ 376 Qui Tam (31 USC 3729(a))
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 480 Consumer Credit
☐ 485 Telephone Consumer Protection Act
☐ 490 Cable/Sat TV
☐ 850 Securities/Commodities/ Exchange
☐ 890 Other Statutory Actions
☐ 891 Agricultural Acts
☐ 893 Environmental Matters
☐ 895 Freedom of Information Act
☐ 896 Arbitration
☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from Another District *(specify)*
☐ 6 Multidistrict Litigation - Transfer
☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. § 1332 (Diversity of Citizenship)

Brief description of cause:
Wrongful death, pharmaceutical products liability and negligence.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $ 75.00

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*
JUDGE _____ DOCKET NUMBER _____

DATE
05/29/2026

SIGNATURE OF ATTORNEY OF RECORD
/s/ Gallit Fischman, Pro Se

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**App. 054**



App. 056

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GALLIT FISCHMAN, Individually,           §
                                         §
        Plaintiff,                       §
                                         §
v.                                       §        Civil Action No. 1:26-cv-11504
                                         §
BOSTON CHILDREN'S HOSPITAL,              §
                                         §
        Defendant.                       §

---

**FIRST AMENDED COMPLAINT FOR NEGLIGENCE, NEGLIGENT UNDERTAKING, NEGLIGENT FAILURE TO WARN, GROSS NEGLIGENCE, AND WRONGFUL DEATH**
**(JURY TRIAL DEMANDED)**

---

Plaintiff Gallit Fischman files this First Amended Complaint against Defendant Boston Children's Hospital ("BCH"), referred to herein as "Boston Children's Hospital," "BCH," or "Defendant." This First Amended Complaint supersedes Plaintiff's original Complaint and is the operative pleading in this action.

### NATURE OF THE ACTION

1. This is a wrongful death and negligence action against BCH, the academic medical institution that contractually accepted primary regulatory oversight of TEAMMATE, a multi-site pediatric transplant study of the immunosuppressant everolimus, made by Novartis Pharmaceuticals.

2. This action concerns only the TEAMMATE clinical trial. BCH is named solely for its alleged role in accepting and exercising primary regulatory oversight of TEAMMATE. Plaintiff's claims target that conduct, not BCH's hospital operations or nonprofit status. TEAMMATE has

Page 1

**App. 057**

no separate legal existence, and Plaintiff asserts claims against BCH only as the entity alleged to have accepted and exercised that oversight.

3. BCH's primary oversight role is supported by documented representations made to the Texas Attorney General. UT System's counsel informed the Texas Attorney General that BCH's IRB held primary regulatory oversight of TEAMMATE under the SMART IRB Master Reliance Agreement, and that UTSW staff served as investigators or support under that framework. Those representations, and the Attorney General's ruling confirming them, are attached as Exhibits A and B.

4. Plaintiff's father, Dov Fischman, was never enrolled in TEAMMATE. He was treated in UTSW's adult heart transplant program, distinct from the UTSW pediatric program that served as one of TEAMMATE's participating trial sites under BCH's oversight. He had been clinically stable for nine years on an established immunosuppressive regimen, and everolimus was never offered or presented to him as an option during that period. Plaintiff alleges, on information and belief, that TEAMMATE introduced and normalized an everolimus-conversion framework within UTSW's transplant environment and displaced the clinic's long-standing reliance on Dov Fischman's stable regimen. After a new physician from another TEAMMATE participating site joined his care team, he was advised to switch to everolimus, a drug never FDA-approved for heart transplantation, despite no therapeutic failure of his existing regimen. Plaintiff alleges that this timing was not coincidental and that TEAMMATE's everolimus-conversion framework reached Dov Fischman through physicians and channels connecting UTSW's pediatric and adult programs despite his non-enrollment. He developed post-transplant lymphoproliferative disorder (PTLD) and a severe opportunistic infection, both recognized risks of the drug, and died in January 2025.

App. 058

5.  BCH provided no care to Dov Fischman and had no physician-patient relationship with him. The duties alleged here arise solely from BCH's voluntary undertaking, independent of any clinical relationship.

## I. ALTERNATIVE PLEADING AND REQUEST FOR ISSUE-BY-ISSUE DETERMINATION

6.  Plaintiff's choice of forum reflects the distinct roles played by Massachusetts and Texas in the events giving rise to this action. From the outset, Plaintiff's intention has been that the wrongful-death claim be governed by Texas law, as the prescribing decisions, treatment, injuries, death, and resulting damages all occurred in Texas. Plaintiff filed this action in the District of Massachusetts, where the institutional conduct giving rise to Defendant's alleged liability occurred principally in Massachusetts. Boston Children's Hospital is domiciled in Massachusetts, and Plaintiff alleges that BCH accepted, organized, directed, and exercised primary regulatory oversight over the TEAMMATE clinical trial from Massachusetts pursuant to the SMART IRB Master Reliance Agreement.

7.  At the same time, TEAMMATE was a multi-site clinical trial extending beyond Massachusetts through participating institutions across the country, including UT Southwestern Medical Center in Texas. Plaintiff alleges that, by voluntarily accepting primary regulatory oversight of that multi-site undertaking, BCH assumed responsibilities whose foreseeable effects were not confined to Massachusetts but extended to participating institutions where the protocol was implemented.

8.  Accordingly, Plaintiff does not contend that every issue in this action is governed exclusively by the law of a single jurisdiction. Rather, Plaintiff alleges that the Court should determine the law applicable to each claim or issue according to the jurisdiction having the most

Page 3

significant relationship to that claim or issue. Plaintiff specifically alleges that Texas law governs the wrongful-death claim arising from the treatment, injury, and death occurring in Texas, while Massachusetts law governs Defendant's institutional conduct in accepting and exercising primary regulatory oversight of TEAMMATE from Massachusetts.

9.   Plaintiff's claims are directed at BCH solely as the legal entity that allegedly accepted and exercised the institutional authority, responsibilities, and oversight of the TEAMMATE clinical trial. Plaintiff does not seek to impose liability upon BCH based upon its status as a hospital or healthcare provider, but based upon the institutional duties Plaintiff alleges BCH voluntarily undertook in governing TEAMMATE.

10.   In the alternative, should the Court determine that Texas law does not govern the wrongful-death claim, or that Plaintiff may not pursue that claim in her present capacity under the applicable law, Plaintiff respectfully requests that any such ruling be limited to the wrongful-death claim. Plaintiff further requests leave to amend this First Amended Complaint consistent with the Court's ruling and to proceed on any remaining causes of action the Court determines are independently cognizable.

## II. PARTIES

11.   Plaintiff Gallit Fischman is an individual residing in Dallas County, Texas. She brings this action solely in her individual capacity as a statutory wrongful-death beneficiary of her father, Dov Fischman, who died in January 2025 following treatment with everolimus at UT Southwestern Medical Center in Dallas, Texas. Plaintiff does not bring this action on behalf of any other person or entity. No estate has been opened, no survival claims are asserted, and Plaintiff seeks only those damages recoverable in her own right under the Texas Wrongful Death Act or any other independently cognizable cause of action permitted by the Court.

App. 060

12. Defendant Boston Children's Hospital is the trade name of The Children's Hospital Corporation, a Massachusetts nonprofit corporation with its principal place of business at 300 Longwood Avenue, Boston, Massachusetts 02115. BCH created, funds, staffs, and operates its Institutional Review Board ("BCH IRB") to meet its federal human-subjects research obligations. The IRB is BCH's instrumentality, and its acts and omissions alleged here are BCH's.

13. At all relevant times, BCH, through its IRB and the SMART IRB Master Reliance Agreement, served as the reviewing authority with primary regulatory oversight of TEAMMATE.

14. Public descriptions of TEAMMATE identify both Stanford Children's Hospital and BCH as leading the study. Stanford's precise role is not yet known. Plaintiff reserves the right to amend the pleadings to add Stanford or any other responsible entity if discovery reveals that it exercised relevant authority over the design, conduct, oversight, or administration of the trial.

### III. JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a)(1). Plaintiff is domiciled in Texas. Defendant, The Children's Hospital Corporation, is a Massachusetts nonprofit corporation with its principal place of business in Boston, Massachusetts. The amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff seeks damages exceeding $5,000,000 for wrongful death, loss of parental companionship, mental anguish, medical expenses, funeral expenses, and other damages recoverable under applicable law.

16. Venue is proper under 28 U.S.C. § 1391(b)(1), where BCH resides, and under § 1391(b)(2), where BCH's approval, continuing review, and oversight of the TEAMMATE protocol occurred in Massachusetts. This venue allegation does not waive Plaintiff's position that Texas wrongful-death law governs Plaintiff's wrongful-death claim.

### IV. APPLICABLE LAW

App. 061

17.    Massachusetts applies the "most significant relationship" test to choice-of-law in tort cases. See *Bushkin Assocs., Inc. v. Raytheon Co.*, 393 Mass. 622, 631–32 (1985). BCH's oversight conduct, including its approvals, reviews, and omissions, occurred in Massachusetts. Massachusetts law therefore governs Plaintiff's claims for institutional negligence, negligent undertaking, negligent failure to warn, and gross negligence only. Plaintiff's wrongful-death claim is governed solely by the Texas Wrongful Death Act. To the extent additional choice-of-law issues arise during the litigation, Plaintiff requests that they be resolved on a claim-by-claim or issue-by-issue basis after the factual record has been developed.

18. Plaintiff invokes the Common Rule, 45 C.F.R. Part 46, and FDA regulations governing informed consent and IRB oversight, 21 C.F.R. Parts 50 and 56, as evidence of the standard of care applicable to an institution that voluntarily accepted primary IRB oversight of a federally regulated clinical trial, not as independent causes of action or as the basis for a private right of action. Those regulations reflect and parallel the independent common-law duties of reasonable care Plaintiff alleges BCH assumed through its voluntary institutional undertaking. See *Thorson v. Mandell*, 402 Mass. 744, 750 (1988). Courts outside Massachusetts have likewise recognized, as persuasive authority, that human-subject research may create duties owed by research institutions to persons foreseeably affected by their undertakings. See *Grimes v. Kennedy Krieger Inst., Inc.*, 782 A.2d 807, 858 (Md. 2001). Those duties arise from BCH's voluntary assumption of responsibility through its institutional undertaking and are not avoided by delegation to participating sites.

19.    Plaintiff pleads duty, breach, and proximate cause independently. Duty arises from BCH's voluntary oversight of TEAMMATE; breach arises from its alleged failure to exercise reasonable care in that role; and causation arises from the pathway by which TEAMMATE's

Page 6

investigational framework allegedly reached Dov Fischman's treatment. A dispute over duty does not dispose of the separately pleaded breach and causation allegations.

20.    The Texas Wrongful Death Act, Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012, governs Count IV. Dov Fischman was domiciled in Texas, the prescribing decision and injury occurred there, and Plaintiff is his surviving child and a statutory beneficiary under § 71.004(a). These claims rest on BCH's independent institutional conduct, not on the standard of care owed by individual treating providers.

21.    BCH never prescribed anything to Dov Fischman, examined him, treated him, or had clinical contact with him. BCH is a defendant after contractually assuming primary regulatory oversight of TEAMMATE at institutions involved in his care and allegedly failing to exercise reasonable care in that role. Plaintiff does not challenge any treating physician's standard of care or clinical judgment and does not rely on Dov Fischman's medical records to establish BCH's liability. The claims target what BCH designed, approved, and controlled institutionally: the trial structure, the oversight imposed on participating sites, and the foreseeable consequences of a system it built and failed to safeguard. These are institutional and regulatory failures, not medical-malpractice claims.

22.    The tribunal requirement of M.G.L. c. 231, § 60B applies to malpractice claims against health care providers. BCH provided no health care to Dov Fischman, and Plaintiff does not allege malpractice by BCH. Convening a tribunal would serve no purpose. This action proceeds under Massachusetts negligence law governing research-oversight institutions.

23.    Nor does the Texas Medical Liability Act apply. Plaintiff's claims rest on BCH's independent institutional conduct in governing and overseeing TEAMMATE, not on treatment, lack of treatment, or the standard of care rendered to Dov Fischman.

Page 7

24. The absence of a physician-patient relationship between BCH and Dov Fischman does not eliminate the duty alleged herein. Plaintiff alleges that BCH's duty arose independently from its voluntary undertaking in accepting and exercising primary regulatory oversight over TEAMMATE. That alleged duty exists separately from any duty owed by a treating physician and is governed by the law applicable to institutional negligence and negligent undertaking rather than statutes governing claims arising from the rendition of medical care.

25. BCH's nonprofit status does not bar or limit this action. Nonprofit designation does not eliminate the duty of reasonable care, insulate an institution from its own negligence, or convert operational conduct into protected charitable activity. BCH is not sued for providing charitable medical services. It is sued for its affirmative undertaking of primary regulatory oversight of a multi-site trial and the centralized authority it exercised over that trial's design, approval, and supervision. Plaintiff alleges liability arises from the foreseeable consequences of that system, not from BCH's charitable status.

26. To the extent BCH invokes G.L. c. 231, § 85K on the theory that governing a multi-center trial is categorically a charitable act, that argument does not resolve this case at the pleading stage. Whether governing a twenty-five-institution investigational trial, spanning institutions unaffiliated with BCH, falls within BCH's charitable purpose is itself a factual and legal issue requiring a developed record. BCH's articles of organization describe its purpose as providing medical care, operating hospitals, training clinicians, supporting patient-care research, and promoting community health. Plaintiff does not dispute BCH's charitable status, but the challenged conduct was not confined to medical care in BCH's own hospital or research for BCH's own patients. A charitable corporation does not carry every activity into its charitable shield merely by virtue of its corporate status.

**App. 064**

27.  Plaintiff alleges that Defendant is not entitled to any governmental or derivative immunity based solely on TEAMMATE's receipt of funding from the United States Department of Defense. Plaintiff alleges, on information and belief, that Defendant did not enter into a procurement contract to perform services for the United States Government, but instead participated in TEAMMATE through federal research grant funding. Such grant funding did not transform Defendant into a government contractor or immunize Defendant from claims based on its own independent institutional conduct, decisions, omissions, and responsibilities. Any asserted immunity defense therefore does not bar the claims asserted herein.

## V. INVESTIGATIONAL RESEARCH OVERSIGHT AND PUBLIC ACCOUNTABILITY

28.  Defendant voluntarily accepted primary regulatory oversight over the TEAMMATE clinical trial and assumed institutional responsibilities arising from that undertaking. Plaintiff alleges that Defendant owed a duty to exercise reasonable care in performing those responsibilities, including implementing reasonable safeguards to prevent foreseeable spillover of an investigational treatment framework beyond the confines of the trial.

29.  Plaintiff does not allege a duty extending to all research institutions, all clinical trials, or all patients prescribed similar medications. Plaintiff alleges a duty arising solely from Defendant's own voluntary undertaking, its own institutional conduct, and the foreseeable consequences of that conduct within the specific multi-site clinical trial over which Defendant accepted primary regulatory oversight.

30.  Plaintiff further alleges that recognition of such a duty advances the public interest by promoting responsible institutional oversight, accurate risk communication, and appropriate separation between clinical research and routine patient care. Public confidence in clinical research

App. 065

is strengthened by requiring institutions that voluntarily undertake primary regulatory oversight to exercise reasonable care in fulfilling those responsibilities.

## VI. FACTUAL ALLEGATIONS

31.  Plaintiff does not allege BCH treated Dov Fischman or owed him a physician-patient duty. She alleges BCH voluntarily undertook institutional responsibility by accepting and exercising primary regulatory oversight of TEAMMATE, and that the duties alleged here arise from that undertaking.

### A. BCH's Assumption of Primary Oversight Responsibility

32.  By executing the SMART IRB Master Reliance Agreement and accepting the role of primary reviewing IRB for TEAMMATE, BCH did more than grant administrative approval: it took centralized authority over the trial's structure, protocol, and oversight across every participating site, including UTSW. Plaintiff alleges that undertaking obligated BCH to ensure the trial complied with federal human-subject protections, that its risks were justified and disclosed, and that conflicts of interest, including investigators who also treated patients, were identified and managed. BCH also assumed ongoing duties of adverse-event reporting, continuing review, and corrective action.

33.  TEAMMATE would not have proceeded without BCH's institutional actions. Such a research process exists to evaluate an investigational strategy's safety and effectiveness within a controlled framework before it reaches routine patient care.

34.  The duties alleged here arise not from BCH's status as a hospital, but from the institutional responsibilities it voluntarily accepted for TEAMMATE. Had another institution accepted those responsibilities instead, Plaintiff's claims would be directed there.

Page 10

35.  TEAMMATE ran through UTSW's pediatric transplant program, but its influence was not necessarily confined to enrolled pediatric participants. Plaintiff alleges, on information and belief, that TEAMMATE generated data, protocols, conclusions, and an everolimus-conversion framework that could be shared through institutional practice, physician knowledge, transplant-program communication, and treatment norms within UTSW. Through those channels, the TEAMMATE framework was capable of moving beyond the pediatric study population and influencing UTSW's separate adult transplant program, where Dov Fischman was treated.

36.  Absent controls separating research use from ordinary clinical decision-making, that pathway made it foreseeable that TEAMMATE's everolimus-conversion framework could shape treatment decisions for non-enrolled adult patients like Dov Fischman.

37.  Plaintiff alleges BCH failed to implement safeguards adequate to keep trial-related frameworks from displacing individualized clinical judgment or exposing non-enrolled patients to study risks without protection. The allegations below describe BCH's alleged oversight failures.

**B. The Scope of BCH's Institutional Role Extended Well Beyond Data Coordination**

38.  Plaintiff alleges that BCH's responsibilities extended beyond serving as TEAMMATE's Data Coordinating Center and Statistical Principal Investigator. Plaintiff further alleges that BCH played an active role in developing, communicating, and implementing the TEAMMATE treatment framework across participating sites, creating foreseeable channels through which that framework could influence physicians practicing within the same institutional environment as TEAMMATE investigators, including those who treated Dov Fischman.

39.  The precise scope of BCH's institutional responsibilities for TEAMMATE is known primarily to BCH. Plaintiff alleges, on information and belief, that those responsibilities extended beyond statistical analysis to the trial's governance, administration, and institutional oversight.

40.  TEAMMATE's publicly stated objective was to generate evidence to inform future clinical practice. BCH described the trial publicly through publications and trial materials, but Plaintiff alleges those descriptions do not reflect its internal governance and administration, the details of which remain in BCH's possession.

41.  UTSW's counsel informed the Texas Attorney General that BCH's IRB held primary regulatory oversight of TEAMMATE and that responsive records came from that IRB. Plaintiff alleges that this confirms BCH's institutional oversight role and supports a reasonable inference that BCH's responsibilities were not limited to data coordination or statistical analysis. The scope of BCH's governance, administration, and oversight responsibilities remains a matter for discovery.

**C. Everolimus: Commercial Development, Off-Label Status, and Known Risks**

42.  Everolimus is an mTOR inhibitor FDA-approved for limited transplant and oncology indications. Unlike calcineurin inhibitors, the longstanding standard of transplant immunosuppression that target rejection-specific immune pathways, everolimus broadly suppresses immune function through mTOR inhibition, raising infection and malignancy risk. mTOR inhibition also impairs cellular repair across tissue types, associated with delayed wound healing. At the time of TEAMMATE, everolimus was not approved for heart transplantation in any population.

43.  Everolimus carries FDA Black Box Warnings, its highest safety designation, for serious infection, malignancy including lymphoma, and increased mortality in heart transplantation. See Exhibit D. These risks were well documented at the time of TEAMMATE. Plaintiff alleges BCH had a duty to ensure they were evaluated, disclosed, and managed both within the trial and in the clinical environments where its investigators worked.

Page 12

44. Novartis developed and commercially positioned everolimus as part of a calcineurin-inhibitor-reduction strategy. Any claimed kidney-sparing benefit came from reducing CNI-associated nephrotoxicity, not from any independent kidney-protective property of everolimus itself. Trials involving everolimus in transplant populations, including TEAMMATE, used renal preservation as a central endpoint, aligning with Novartis's interest in data supporting broader adoption. The Department of Defense primarily funded TEAMMATE, and Plaintiff seeks discovery into why that funding was provided, what objectives it served, and how those objectives shaped the trial's design. Although Novartis did not publicly fund the trial, Plaintiff alleges, on information and belief, that Novartis's involvement through investigator relationships, drug supply, or informational materials extended beyond what is publicly documented.

45. Plaintiff alleges, on information and belief, that Novartis generated and disseminated promotional or educational materials on everolimus within transplant research communities, and that BCH approved TEAMMATE consent materials and investigator communications without adequate independent evaluation for accuracy, balance, or commercial bias.

46. TEAMMATE materials described the tacrolimus/MMF arm as a regimen "used in several thousand children already," while stating that the tacrolimus/everolimus arm's benefits "may include fewer transplant complications" and "may reduce rejection, coronary artery disease, and kidney disease." See Exhibit C. The materials also stated that everolimus was "approved for adult heart transplantation in Europe," which Plaintiff alleges blurred the distinction between foreign approval and the absence of FDA approval for heart transplantation in the United States.

47. Plaintiff alleges that BCH approved a protocol and materials that emphasized endpoints favoring everolimus conversion over the established tacrolimus-based standard of care while giving insufficient weight to the drug's boxed-warning risks of serious infection,

Page 13

malignancy, and death. BCH was responsible for overseeing TEAMMATE's design, materials, and communications, and Plaintiff alleges that BCH failed to implement safeguards preventing that investigational framework from influencing non-enrolled patients treated in the same clinical environment.

48.    BCH cannot avoid Plaintiff's allegations by calling TEAMMATE a pediatric trial. FDA guidance generally defines the pediatric population for drug development as patients from birth to younger than 17 years of age. TEAMMATE extended eligibility through age 21, meaning it included adults ages 18 to 21. More importantly, TEAMMATE studied the same treatment framework later used on Dov Fischman: taking stable transplant recipients off established calcineurin-inhibitor therapy and transitioning them to everolimus. Dov Fischman was a stable heart-transplant patient who was transitioned from his established regimen to everolimus outside the trial. Plaintiff's allegations do not depend on his enrollment eligibility; they depend on BCH's alleged failure to keep TEAMMATE's everolimus-conversion framework from reaching non-enrolled patients in the same transplant environment where that framework was created, studied, and communicated.

49.    TEAMMATE enrolled more than two hundred pediatric, adolescent, and adult transplant recipients. It compared everolimus, which had no FDA-approved role in heart transplantation in the United States, against tacrolimus, an established calcineurin inhibitor approved for use in adult heart-transplant care. Plaintiff acknowledges that no immunosuppressive regimen is specifically FDA-approved for pediatric heart transplantation. TEAMMATE's stated objective was to help achieve the first FDA approval of anti-rejection medicines for pediatric heart transplantation. See Exhibit C. BCH selected an everolimus-based strategy even though other immunosuppressive drugs already had FDA approval for adult heart transplantation. Plaintiff

Page 14

App. 070

alleges that this design and messaging foreseeably encouraged broader acceptance of everolimus conversion beyond the enrolled population.

**D. UTSW's Admission of BCH's Primary Oversight Role**

50. Plaintiff's investigation originally focused on UTSW, but Texas Attorney General proceedings identified BCH as the institution exercising primary regulatory oversight of TEAMMATE, redirecting the investigation.

51. Plaintiff requested TEAMMATE-related records from UTSW under the Texas Public Information Act. In response, UT System's Office of General Counsel represented to the Texas Attorney General, reflected in Exhibit A, that: (1) records were prepared by, or at the direction of, BCH's Institutional Review Board ("IRB") and provided to the University's IRB; (2) BCH's IRB had primary regulatory oversight of the trial; (3) UTSW relied on BCH's IRB under the SMART IRB Master Reliance Agreement; and (4) University employees acted as investigators or support staff in TEAMMATE.

52. On October 22, 2025, the Texas Attorney General issued an Open Records Letter Ruling confirming that the requested materials were prepared by, or at the direction of, BCH's IRB and that "BCH's IRB has primary regulatory oversight of the trial at issue." A true and correct copy of that ruling is attached as Exhibit B.

53. These representations establish, before discovery, that BCH exercised primary regulatory oversight of TEAMMATE under a formalized reliance agreement, and that UTSW personnel served as investigators or support staff under that oversight. The record also shows BCH controlled access to trial records: responsive materials came through its IRB, and BCH functioned as the responding authority on the trial's oversight, including withheld records. Plaintiff relies on this documented record, not inference, to establish BCH's primary regulatory authority. Which

Page 15

specific UTSW individuals served in what roles, and the extent of overlap with clinical care, remain within BCH's possession and require discovery.

54.  Plaintiff has pursued TEAMMATE-related records through TPIA requests to UTSW and FOIA requests to the Department of Defense and the National Institutes of Health. These efforts did not yield enough information to evaluate the trial's oversight, structure, or safety monitoring.

55.  Plaintiff previously sued UTSW in Dallas County District Court, Case No. DC-25-18350, but that case closed before discovery opened. Plaintiff therefore never obtained the records needed to determine the scope of BCH's oversight of TEAMMATE or its connection to Dov Fischman's treatment. Those records remain in BCH's possession and are the subject of this action.

56.  Plaintiff alleges that BCH held the central institutional knowledge of TEAMMATE's design, governance, oversight, and communications to participating sites. Those facts are necessary to determine how TEAMMATE's everolimus-conversion framework reached the clinical environment in which Dov Fischman was treated.

57.  Plaintiff alleges BCH cannot claim the institutional responsibility it represented to the Texas Attorney General while disclaiming the foreseeable consequences of that same role. Having admitted TEAMMATE operated under its primary regulatory authority, BCH cannot now call that authority too attenuated to support the duties alleged here.

**E. BCH's Institutional Oversight Failures**

58.  Plaintiff alleges that BCH approved the consent materials used in TEAMMATE, including at UTSW, and that those materials failed to adequately disclose everolimus's lack of FDA approval for adult heart transplantation, its known risk profile, its oncology use at different doses, and available alternatives.

**App. 072**

59.    Plaintiff alleges that BCH breached its duty of reasonable care in overseeing TEAMMATE in the following respects:

• BCH failed to ensure consent materials disclosed everolimus's lack of approval for heart transplantation and its known risk profile.

• BCH failed to ensure the trial met applicable risk-benefit standards or required a balanced evaluation of known risks.

• BCH failed to safeguard against foreseeable conflicts where physicians served as both investigators and treating clinicians.

• BCH failed to conduct adequate continuing review or take corrective action as safety concerns emerged.

• BCH failed to require structural separation between trial activities and routine clinical care.

60.    These failures let TEAMMATE's data and frameworks shape treatment, including Dov Fischman's, without the individualized reassessment the trial's own protections required.

**F. Dov Fischman's Treatment and the Decision to Transition to Everolimus**

61.    Dov Fischman remained clinically stable for nine years after his heart transplant on an established immunosuppressive regimen. He had no documented progressive renal failure, cardiac allograft vasculopathy, therapeutic failure, or documented evaluation of alternatives before he was switched to everolimus. Plaintiff alleges, on information and belief, that before TEAMMATE reached UTSW, everolimus conversion was not part of his adult heart-transplant clinic's ordinary practice and was never presented to him as a treatment option. Plaintiff further alleges that after TEAMMATE introduced and studied an everolimus-conversion framework within UTSW's transplant environment, that framework displaced the clinic's long-standing reliance on his stable

Page 17

**App. 073**

regimen and led to his transition to everolimus outside the trial, without enrollment, trial consent, or trial-level safeguards.

62. Plaintiff alleges, on information and belief, that the prescribing physician had research experience in heart-transplant immunosuppression, was familiar with mTOR inhibitors, had prior everolimus experience at another TEAMMATE site, and held privileges in the UTSW transplant program where TEAMMATE-related data and protocols were developed and used.

63. Plaintiff alleges, on information and belief, that the prescribing physician told Plaintiff's family she had converted patients to everolimus at her prior institution, itself a TEAMMATE site, and intended to do the same at UTSW. Plaintiff alleges that this reflected a broader institutional shift toward everolimus conversion, driven by the investigational framework BCH approved and oversaw through TEAMMATE. Everolimus was therefore presented to Dov Fischman's family not as a major departure from a stable nine-year regimen, but as a routine, low-risk substitution. Plaintiff alleges that the recommendation reflected the same everolimus-conversion framework TEAMMATE was created to evaluate and that BCH allowed to extend beyond enrolled participants through inadequate institutional safeguards and oversight.

64. Plaintiff alleges that TEAMMATE's safety-and-benefit narrative portrayed everolimus conversion as a routine, low-risk treatment change rather than a significant departure from established therapy requiring heightened disclosure. Plaintiff alleges that Dov Fischman never signed an informed-consent form for everolimus and was never told the drug was unapproved for heart transplantation, represented a departure from his established regimen, or carried boxed-warning risks of infection, malignancy, and death. Had those facts been disclosed, he would not have agreed to the conversion.

App. 074

65. Plaintiff alleges, on information and belief, that one or more of Dov Fischman's treating physicians served as TEAMMATE investigators or had access to its data or protocols. The extent of that overlap, and whether those physicians treated him during the relevant period, remain within BCH's control and are matters for discovery.

66. The everolimus provided to Dov Fischman was selected and supplied through institutional pharmacy processes over which he had no control. Plaintiff alleges, on information and belief, that the drug may have been procured, selected, or supplied through institutional pathways influenced by TEAMMATE's everolimus-conversion framework rather than through individualized clinical judgment alone. The procurement, selection, and supply pathways for everolimus used in TEAMMATE and in Dov Fischman's treatment remain matters within BCH's knowledge for discovery.

67. Dov Fischman was never enrolled in TEAMMATE, signed no trial consent form, and received none of the trial's required safeguards or protocol monitoring. Plaintiff alleges that, despite receiving none of those protections, he was transitioned to the same everolimus-conversion strategy the trial was evaluating.

68. With no regulatory guidance for off-label everolimus use in heart transplantation, treatment decisions were left to physician discretion without standardized safeguards. Plaintiff alleges that this discretion was influenced by TEAMMATE's everolimus-conversion framework. Plaintiff does not allege a general duty by BCH to supervise every UTSW physician. Plaintiff alleges the narrower claim that BCH's institutional role in TEAMMATE created a research framework that foreseeably shaped the prescribing environment in which Dov Fischman was later treated.

**G. Adverse Events and Death**

Page 19

**App. 075**

69. After transitioning to everolimus, Dov Fischman developed PTLD presenting as Hodgkin-type lymphoma and a serious infection his physicians could not identify. His family reported concerning symptoms beforehand, but those reports went unaddressed.

70. PTLD and opportunistic infection are recognized everolimus risks that TEAMMATE monitored under BCH's oversight. Plaintiff alleges that TEAMMATE's safety-and-benefit narrative normalized everolimus conversion and obscured the seriousness of its known risks, contributing to a clinical environment in which warning signs in non-enrolled patients like Dov Fischman were more likely to be missed, minimized, or disconnected from everolimus exposure.

71. No comparable trial safeguards, adverse-event monitoring, or discontinuation criteria applied to Dov Fischman. As a result, warning signs consistent with everolimus toxicity were not treated as drug-related signals, and his condition worsened.

72. Dov Fischman also developed precancerous skin lesions consistent with everolimus's known risk profile. Despite those adverse effects, everolimus was not discontinued; dosing was maintained and, on information and belief, may have been increased.

73. Dov Fischman died in January 2025. Plaintiff alleges that his death was proximately caused by the use of everolimus in a clinical setting shaped by TEAMMATE's everolimus-conversion framework, but without the safeguards TEAMMATE used to evaluate, monitor, and respond to those same risks.

## VII. PRESERVATION OF EVIDENCE

74. The records needed to determine the full relationship between TEAMMATE and Dov Fischman's treatment are within BCH's and related entities' possession, custody, or control. These include the trial's protocols, consent materials, investigator rosters, financial and compensation records, communications among BCH, participating sites, and sponsors including Novartis,

App. 076

adverse-event and safety records, and any record of Dov Fischman's clinical information reaching the trial. All are subject to discovery under the applicable rules of civil procedure.

75.  Plaintiff seeks non-privileged factual and operational records concerning TEAMMATE's structure, implementation, oversight, safety data, funding rationale, and interaction with clinical practice at participating sites, including records showing what safeguards existed to prevent trial results from supporting everolimus conversion beyond the enrolled population. Plaintiff does not seek privileged peer-review or IRB deliberation materials.

76.  Plaintiff places BCH on formal notice to preserve all such records, including electronic communications, metadata, and drafts, in complete and unaltered form pending resolution. Given their central relevance and the risk of loss absent an order, Plaintiff seeks an order requiring BCH to preserve them.

### VIII. NATURE OF CLAIMS: THE THEORY OF LIABILITY

**A. Discovery Is the Proper Vehicle for Resolving BCH's Institutional Role**

77.  Whether TEAMMATE allegedly influenced Dov Fischman's treatment depends on facts within BCH's exclusive possession: how the trial was governed, how information moved among participating institutions, and whether TEAMMATE's institutional knowledge shaped his clinical environment. Those issues cannot be resolved on the pleadings. BCH's governance and oversight records, the only records that could actually establish how TEAMMATE operated, remain in its possession and are exactly what Plaintiff seeks through discovery.

**B. Plaintiff's Causation Allegations Are Plausible at the Pleading Stage**

78.  Plaintiff has alleged more than a speculative connection. For nine years, everolimus was never part of Dov Fischman's stable post-transplant care. Then, while TEAMMATE was underway within the same transplant environment under BCH's primary regulatory oversight, the

**App. 077**

same everolimus-conversion strategy being evaluated in the trial was presented to him as a safe alternative outside the trial. Plaintiff further alleges that the prescribing physician had prior TEAMMATE ties and recommended that same conversion approach. These facts plausibly allege that TEAMMATE's framework reached Dov Fischman's care, and the full extent of that connection is a matter for discovery, not dismissal at the pleading stage.

**C. Off-Label Prescribing Required Independent Clinical Judgment**

79.  Plaintiff does not allege that off-label prescribing is unlawful. Plaintiff alleges that, in the absence of FDA approval or established regulatory guidance for everolimus in heart transplantation, any decision to prescribe it off label required heightened independent clinical judgment and careful evaluation of its known risks, available alternatives, and the patient's individual circumstances. Plaintiff alleges that TEAMMATE's everolimus-conversion framework displaced that individualized assessment by presenting the conversion as a routine, low-risk treatment strategy, allowing an investigational approach to become part of ordinary clinical practice before its safety had been established.

**IX. FACTUAL ISSUES REQUIRING DISCOVERY**

80.  Plaintiff expects discovery to address facts including, but not limited to, the following:

• Whether the physicians involved in Dov Fischman's care were recruited to UTSW based on their experience with TEAMMATE, everolimus, or immunosuppressive-conversion research.

•    Whether any physician involved in Dov Fischman's care also participated in TEAMMATE in any capacity.

**App. 078**

• Whether TEAMMATE utilized the same Epic electronic health record system as the clinical environment, and whether treating physicians could access information generated through the trial.

• Whether the physicians responsible for Dov Fischman's care received any data, guidance, or education generated by TEAMMATE.

• Whether TEAMMATE-related education or information was provided to the broader heart-transplant clinic or clinical staff at UTSW.

• What TEAMMATE's criteria and guidance were for converting patients to everolimus, including monitoring, adverse-event management, and discontinuation criteria.

• Whether TEAMMATE's switching and safety guidance was shared with, adopted by, or withheld from the clinical heart-transplant program.

• Whether physicians involved in Dov Fischman's care used, published, received, or relied on TEAMMATE data, Novartis promotional materials, or other everolimus-related information derived from or connected to TEAMMATE.

• Whether any UTSW physicians authored publications or materials based on TEAMMATE data, including any that discussed trial data without identifying its source.

• Whether TEAMMATE's final results and complete safety and outcome data have been finalized, reported, published, withheld, or selectively disclosed.

• Whether TEAMMATE's final results include comprehensive safety data beyond selected efficacy endpoints, including all adverse events, deaths, and complications.

• Whether adverse events, deaths, infections, malignancies, PTLD, or other safety concerns associated with everolimus were reported to BCH during TEAMMATE, and what actions, if any, BCH took to investigate, communicate, mitigate, or respond to those events.

Page 23

App. 079

• Whether the patient assistance program and prescription pathway through which Dov Fischman received everolimus was the same pathway used by TEAMMATE, or was otherwise influenced by the trial.

• The process by which TEAMMATE was presented to and approved by the institutional review board, including the role of the sponsor in that process.

• The amount of funding provided for TEAMMATE overall and the amount provided specifically to UTSW.

• What participant-facing materials and communications were used before and during TEAMMATE, including materials directed to parents or guardians, how those materials described everolimus's risks, benefits, alternatives, and treatment purpose, and whether they were revised during the trial.

• The nature of the relationships among TEAMMATE, Novartis, BCH, and all other entities involved in the trial.

• What safeguards kept TEAMMATE's data, interim results, and safety findings contained within the research setting.

• What confidentiality or data-use agreements and institutional policies governed access to TEAMMATE information.

• How TEAMMATE data was stored, accessed, and shared, including who had access and under what authority.

• Whether any of Dov Fischman's clinical information or medical data was shared with, used by, or incorporated into TEAMMATE.

## X. CAUSES OF ACTION

Page 24

**COUNT I: INSTITUTIONAL NEGLIGENCE AND NEGLIGENT UNDERTAKING**

*(Restatement (Second) of Torts §§ 323 and 324A)*

81.  Plaintiff incorporates all preceding paragraphs. BCH, through its IRB and the SMART IRB Master Reliance Agreement, voluntarily undertook primary regulatory oversight of TEAMMATE, including oversight of the protocol, consent materials, continuing review, adverse-event monitoring, investigator communications, and safeguards governing participating sites, including UTSW.

82.  The institutional responsibilities BCH voluntarily undertook are independent of any physician-patient relationship and arise from BCH's own conduct in creating, approving, governing, and supervising TEAMMATE.

83.  BCH owed a duty to exercise reasonable care in performing that undertaking, including reasonable care to ensure that TEAMMATE's investigational everolimus-conversion framework remained confined to enrolled participants, was communicated with appropriate risk safeguards, and did not foreseeably spill over into routine care for non-enrolled patients without the protections required in the research setting. The Common Rule, 45 C.F.R. Part 46, and FDA regulations governing informed consent and IRB oversight, 21 C.F.R. Parts 50 and 56, provide evidence of the standard of care applicable to that undertaking, but are not asserted as independent causes of action.

84.  UTSW trial personnel operated in both research and clinical environments, making it foreseeable that TEAMMATE's structure, data, education, and treatment philosophy could affect patients those same physicians treated outside the trial. This foreseeable pathway satisfies Restatement (Second) of Torts §§ 323 and 324A and did not depend on any physician-patient relationship between BCH and Dov Fischman.

85. BCH breached its institutional duties by approving and overseeing TEAMMATE without adequate safeguards separating research activity from routine clinical care, without adequate controls over dual-role conflicts at UTSW, without adequate safeguards preventing trial-derived practices from reaching non-enrolled patients, and without requiring independent reassessment before the everolimus-conversion framework was used outside the trial.

86. Those breaches created a foreseeable and unreasonable risk that TEAMMATE's investigational framework would extend beyond enrolled participants and influence routine clinical care without trial consent, trial monitoring, trial discontinuation criteria, or trial-level safety protections.

87. Plaintiff alleges that BCH's negligent institutional undertaking was a factual and proximate cause of the TEAMMATE-derived everolimus-conversion approach reaching Dov Fischman's clinical environment. These allegations state an independent negligence and negligent-undertaking claim arising from BCH's own institutional conduct.

**COUNT II: NEGLIGENT FAILURE TO WARN AND COMMUNICATE RISK**

88. Plaintiff incorporates all preceding paragraphs. BCH assumed institutional responsibility for TEAMMATE's risk communications, consent framework, investigator communications, trial materials, and the manner in which the everolimus-conversion strategy was presented and communicated within participating institutions.

89. BCH knew or should have known that everolimus was not FDA-approved for heart transplantation and carried FDA Boxed Warnings for serious infection, malignancy, and increased mortality in heart transplantation. See Exhibit D. BCH also knew or should have known that those risks required careful disclosure, monitoring, and containment when everolimus was studied in transplant recipients.

App. 082

90.  BCH breached its duty to communicate risk with reasonable care by approving, permitting, or failing to correct an incomplete risk framework that emphasized selected benefits of everolimus conversion while failing to communicate, with comparable weight, the drug's lack of FDA approval for heart transplantation, its boxed-warning risks, the limitations of the pediatric-trial setting, and the need to prevent trial-derived treatment approaches from reaching non-enrolled patients without appropriate safeguards.

91.  Plaintiff alleges that BCH's failure to warn and communicate risk allowed an incomplete and misleading safety framework to extend beyond TEAMMATE and into the surrounding clinical environment at UTSW. That failure constituted an independent breach of BCH's institutional duties arising from its oversight of TEAMMATE.

92.  Plaintiff alleges that adequate institutional warnings and risk communications would have required rejecting, modifying, containing, or discontinuing the everolimus-conversion approach before it reached non-enrolled patients such as Dov Fischman.

**COUNT III: GROSS NEGLIGENCE**

93.  Plaintiff incorporates all preceding paragraphs. BCH accepted primary regulatory oversight of a multi-site clinical trial involving a high-risk immunosuppressive drug that lacked FDA approval for heart transplantation and carried known risks of serious infection, malignancy, lymphoma, PTLD, impaired wound healing, and death.

94.  Plaintiff alleges, on information and belief, that BCH's senior managerial agents and institutional decisionmakers knew of those risks, knew that TEAMMATE involved physician-investigators operating in clinical transplant environments, and knew or should have known that trial-derived information and treatment frameworks could foreseeably affect non-enrolled patients if not properly contained.

App. 083

95.  Despite that knowledge, BCH authorized, approved, or permitted an oversight structure that made no meaningful effort to separate research from clinical care, control dual-role conflicts, prevent trial-derived practices from reaching non-enrolled patients, or ensure that known everolimus risks were communicated and managed with reasonable care.

96.  Plaintiff alleges that this conduct involved an extreme degree of risk to vulnerable transplant recipients and reflected conscious indifference to the rights, welfare, and safety of persons foreseeably affected by TEAMMATE's institutional framework, including non-enrolled patients in the same transplant environment.

97.  These allegations independently support a claim for gross negligence under the law determined applicable by the Court.

**COUNT IV: WRONGFUL DEATH**

*(Tex. Civ. Prac. & Rem. Code §§ 71.001–71.012)*

98.  Plaintiff incorporates all preceding paragraphs, including Counts I through III. Plaintiff brings this count as Dov Fischman's surviving child and statutory wrongful-death beneficiary under Tex. Civ. Prac. & Rem. Code § 71.004(a).

99.  Dov Fischman was domiciled in Texas, received the treatment at issue in Texas, was injured in Texas, and died in Texas in January 2025. The prescribing decisions, clinical implementation, injury, death, witnesses, treating physicians, medical records, and resulting damages are centered in Texas. Plaintiff therefore alleges that the Texas Wrongful Death Act governs the wrongful-death claim.

100.  For the reasons alleged in Counts I through III, BCH's institutional negligence, negligent undertaking, negligent failure to warn and communicate risk, and gross negligence allowed the TEAMMATE-derived everolimus-conversion framework to reach Dov Fischman's

**App. 084**

clinical care without enrollment, consent, trial monitoring, discontinuation criteria, or trial-level safeguards.

101.  Plaintiff alleges that BCH's conduct was a factual and proximate cause of the chain of events that led to Dov Fischman's exposure to everolimus, immune dysfunction, PTLD, serious infection, and death.

102.  Plaintiff seeks all damages recoverable under the Texas Wrongful Death Act, including loss of parental companionship, mental anguish, loss of support, medical expenses, funeral expenses, costs, interest, and all other damages permitted by law.

## XI. REQUEST FOR RELIEF

103. WHEREFORE, Plaintiff Gallit Fischman respectfully requests that this Court:

A. Enter judgment in favor of Plaintiff on all Counts;

B. Award compensatory damages for Dov Fischman's wrongful death under the Texas Wrongful Death Act;

C. Award compensatory damages for Plaintiff's individual damages, including emotional distress and loss of parental companionship;

D. Enter a preservation order requiring BCH to retain all TEAMMATE-related records in complete, unaltered form pending resolution of this litigation;

E. Award costs of suit;

F. Award prejudgment interest as permitted by law; and

G. Grant such other relief as the Court deems just and proper within the scope of the claims asserted herein.

## JURY DEMAND

**App. 085**

104. Plaintiff demands a trial by jury on all issues so triable pursuant to Federal Rule of

Civil Procedure 38(b).

Respectfully submitted,

Date: July 8, 2026

/s/ _____

**GALLIT FISCHMAN, Pro Se**
10114 Deermont Trail
Dallas, TX 75243
(214) 893-6720
gallitfischman@yahoo.com

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing instrument was served on all
counsel of record through the Court's CM/ECF system, or by other means authorized by the
Federal Rules of Civil Procedure, on July 8, 2026.

/s/ _____

**GALLIT FISCHMAN, Pro Se**

Exhibit A — University of Texas System Letter Brief to Texas Attorney General
(August 20, 2025)

THE UNIVERSITY *of* TEXAS SYSTEM

**THIRTEEN INSTITUTIONS. UNLIMITED POSSIBILITIES.**

**Office of General Counsel**
210 West 7th Street
Austin, Texas 78701-2903
512-499-4462
WWW.UTSYSTEM.EDU

**Jennifer Burnett**
*Associate General Counsel & Public Information Coordinator*

August 20, 2025

Open Records Division
William B. Clements, Jr. State Office Building
300 W. 15th Street, 11th Floor
Austin, Texas 78701

**Re:      Public Information Request from Gallit Fischman to The University of Texas Southwestern Medical Center -- OGC# 222101**

On June 30, 2025, The University of Texas Southwestern Medical Center ("University") received a request for information from Gallit Fischman ("Requestor"). On July 15, 2025,[1] the University sought, in good faith, clarification of the request. *See* TEX. GOV'T CODE § 552.222(b) (governmental body may communicate with requestor to clarify or narrow request). The University received the Requestor's written response on July 16, 2025. The University sought a second clarification on July 30, 2025. The University received two written clarifications from the Requestor on August 1, 2025, and a final clarified written response on August 6, 2025.[2] The University subsequently sent the request to The University of Texas System ("UT System") for handling with your office.

In accordance with section 552.301 of the Texas Government Code, we now send this request for decision within ten business days from the date the final clarified request was received. *See City of Dallas v. Abbott*, 304 S.W. 3d. 380, 384 (Tex. 2010) (holding that when a governmental entity requests a clarification or narrowing of a request for public information in good faith, the ten-day period to request an attorney general opinion as to an exception to disclosure is measured from the date the request is clarified). The University has copied the Requestor on this letter brief in accordance with section 552.301(d).

The Requestor seeks access to the following information:

> ### FINAL CLARIFIED REQUEST
>
> *A full list of all UTSW-affiliated doctors who were involved in the TEAMMATE clinical trial, including their specific roles, as well as any UTSW doctors or*

---

[1] We note that the University was closed on July 4, 2025, for the Independence Day holiday.
[2] The final clarified response was sent after business hours via email on Tuesday, August 5, 2025, and is therefore, considered received on Wednesday, August 6, 2025, the next business day.

The University of Texas at Arlington · The University of Texas at Austin · The University of Texas at Dallas · The University of Texas at El Paso

The University of Texas of the Permian Basin · The University of Texas Rio Grande Valley · The University of Texas at San Antonio

The University of Texas at Tyler · The University of Texas Southwestern Medical Center · The University of Texas Medical Branch at Galveston

The University of Texas Health Science Center at Houston · The University of Texas Health Science Center at San Antonio

The University of Texas MD Anderson Cancer Center

*supporting staff who were included on distribution lists that received trial status updates or performance metrics. All materials that were shared with the parents or guardians of children participating in the trial. This includes recruitment materials, informational packets, documentation on the drugs involved, ongoing communications, consent forms, and any PAP (Patient Assistance Program) forms used throughout the duration of the study.*

The University asserts the requested information, a representative sample of which is submitted herein, is protected from disclosure under sections 552.101 and 552.103 of the Texas Public Information Act ("Act").

**Section 552.101 of the Texas Government Code
in conjunction with Section 161.032 of the Health and Safety Code**

Under section 552.101 of the Texas Government Code, information is excepted from disclosure if it is "information considered to be confidential by law, either constitutionally, statutorily or by judicial decision." TEX. GOV'T CODE § 552.101. Specifically, the requested information is protected from disclosure under section 161.032 of the Health & Safety Code, which provides in pertinent part:

(a) The records and proceedings of a medical committee are confidential and are not subject to court subpoena.
. . .

(c) Records, information, or reports of a medical committee, medical peer review committee, or compliance officer and records, information, or reports provided by a medical committee, medical peer review committee, or compliance officer to the governing body of a public hospital, hospital district, or hospital authority are not subject to disclosure under Chapter 552, Government Code.

TEX. HEALTH & SAFETY CODE § 161.032(a), (c). Section 161.031(b) of the Texas Health & Safety Code provides that a medical committee "includes a committee appointed ad hoc to conduct a specific investigation *or established under state or federal law* or rule or under the bylaws or rules of the organization or institution." *Id.* § 161.031(b) (emphasis added).

The information at issue consists of records prepared by, or at the direction of, Boston Children's Hospital's ("BCH") Institutional Review Board ("IRB") and provided to the University's IRB. Both IRBs are medical committees established under federal law.[3] Federal regulations define an IRB as:

---

[3] 42 U.S.C. § 289 requires the establishment of IRBs to review biomedical and behavioral research involving human subjects conducted at or supported by an entity which applies for a grant, contract, or cooperative agreement for any project or program which involves conduct of biomedical or behavioral research involving human subjects. *See* 42 U.S.C. § 289 *et seq.*

2

any board, committee, or other group formally designated by an institution to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects. The primary purpose of such review is to assure the protection of the rights and welfare of the human subjects….

*See* 21 C.F.R. Sec. 56.102(g). The University's IRB is comprised of University faculty and staff and is charged with reviewing and approving research involving human subjects at the University. While BCH's IRB has primary regulatory oversight of the trial at issue,[4] the University IRB maintains these records to ensure compliance with the University IRB's own oversight responsibilities. Given the definition of IRBs under the federal regulations and the fact that IRBs are committees created pursuant to federal law, your office has routinely ruled that an IRB is a medical committee, and its records are protected from disclosure pursuant to section 161.032. *See* OR2011-05012; OR2005-00935; OR2004-3384; and OR2004-3250.

The medical committee privilege "extends to documents…prepared by or at the direction of the committee for committee purposes . . ." *Jordan v. Ct. of App. For 4th Sup. Jud. Dist.*, 701 S.W.2d 644 (Tex. 1985). The information at issue was prepared by or at the direction of the BCH's IRB and maintained by the University's IRB. Your office has previously found, on multiple occasions, UT System institutions' IRBs are medical committees for purposes of section 161.032. *See* OR2023-20276; OR2022-05656. Accordingly, the information at issue is confidential by law under section 161.032 of the Texas Health & Safety Code and is thus excepted from disclosure in conjunction with section 552.101 of the Texas Government Code.

### Section 552.103 of the Texas Government Code

In addition, the University asserts the submitted information is protected from disclosure under section 552.103 of the Texas Government Code.[5] The test for demonstrating an exception under section 552.103 requires a showing that, as of the date the request for the information was received by the governmental body: (1) litigation involving the governmental body is pending or reasonably anticipated, and (2) the information relates to the litigation. *Univ. of Tex. Law Sch. v. Tex. Legal*

---

[4] The University is relying upon BCH's IRB for the study protocol at issue pursuant to the SMART IRB Master Reliance Agreement in which both are participatory institutions.

[5] § 552.103 of the Texas Government Code provides an exception for litigation or settlement negotiations involving the state or a public subdivision and provides that:
(a) Information is excepted from the requirements of Section 552.021 if it is information relating to litigation of a civil or criminal nature to which the state or a political subdivision is or may be a party or to which an office or employee of the state or a political subdivision as a consequence of the person's office or employment, is or may be a party.
(b) For the purposes of this section, the state or political subdivision is considered to be a party to litigation of a criminal nature until the applicable statue of imitation has expired or until the defendants had exhausted all appellate and post conviction remedies in state and federal courts.
(c) Information relating to litigation involving a governmental body or an officer or employee of governmental body is excepted from disclosure under Subsection (a) only if the litigation is pending or reasonably anticipated on the date that the requestor applies to the officer for public information for access to or duplication of the information.

*Found.*, 958 S.W.2d 479, 481 (Tex. App—Austin 1997, no pet.); *Heard v. Houston Post Co.*, 684 S.W.2d 210, 212 (Tex. App.—Houston [1st Dist] 1984, writ ref'd n.r.e.); Open Records Decision No. 551 at 4 (1990).

The first prong of the test is satisfied. On June 30, 2025, the University received a notice letter from the Requestor alleging healthcare liability claims against the University and named employees. Such notice is required by the Texas Civil Practice and Remedies Code § 74.051 before litigation can be filed concerning a healthcare liability claim. The University received the letter prior to the date the present final clarified request was received. Based on the totality of circumstances, including the specific demand for damages and threat to file suit, the University reasonably anticipated litigation on the date of the present request. As such, the first requirement of section 552.103 is satisfied.

The second requirement of section 552.103 of the Act is also met. In the notice letter, the Requestor asserts, in part, claims arising from the administration of the prescription medication, Everolimus. This medication was studied as part of the TEAMMATE clinical trial in which University employees acted as investigators or support staff. The Requestor seeks information concerning the TEAMMATE clinical trial, including the identities of the involved University employees. The requested information is directly tied to the claims alleged against the University and the anticipated litigation. *See e.g.*, OR2003-4593. We believe that release of the responsive information at issue, in the face of the aforementioned claims to which this material is clearly relevant, could be used by the potential opposing party seeking to bolster or expand her claims against the University and interfere with the University's defense of such claims. The University has, therefore, also satisfied the second part of the test required by section 552.103 of the Act.

In short, we have shown that the University anticipated litigation in this matter by virtue of the notice of claim and demand letter, which preceded the University's receipt of the final clarified request. Additionally, the University has shown that the claims are related to the information sought by the Requestor. The University has, therefore, also satisfied the second prong of this test. The University has met its burden pursuant to section 552.103(a) and (c) of the Act. In light of these facts, the University asserts that section 552.103 excepts the responsive information at issue from disclosure.

## Conclusion

The University respectfully requests that the Attorney General review the arguments presented in this brief and issue a ruling that the information at issue is protected from disclosure as described herein.

All interested parties are listed below. If you need additional information, please do not hesitate to contact me at 512-579-5187.

Sincerely,

4

**App. 091**

Jennifer Burnett

cc: Requestor: (w/o Enclosures)

     Gallit Fischman
     gallitfischman@yahoo.com

App. 092

Exhibit B — Texas Attorney General Open Records Letter Ruling
(October 22, 2025)



**KEN PAXTON**
ATTORNEY GENERAL OF TEXAS

October 22, 2025

Ms. Jennifer Burnett
Assistant General Counsel and Public Information Coordinator
The University of Texas System
210 West Seventh Street
Austin, Texas 78701

RECEIVED
October 22, 2025
Office of General Counsel
Fischman

OR2025-038170

Dear Ms. Burnett:

You ask whether certain information is subject to required public disclosure under the Public Information Act (the "Act"), chapter 552 of the Government Code. Your request was assigned ID# 25-037259 (OGC# 222101).

The University of Texas Southwestern Medical Center (the "university") received a request for information pertaining to a specified clinical trial.[1] You claim the submitted information is excepted from disclosure under sections 552.101 and 552.103 of the Government Code. We have considered the exceptions you claim and reviewed the submitted representative sample of information.[2] We have also received and considered comments from the requestor. *See* Gov't Code § 552.304 (interested party may submit comments stating why information should or should not be released).

---

[1] The university states it sought and received clarifications of the information requested. *See* Gov't Code § 552.222 (providing if request for information is unclear, governmental body may ask requestor to clarify request); *see also City of Dallas v. Abbott*, 304 S.W.3d 380, 387 (Tex. 2010) (holding that when a governmental entity, acting in good faith, requests clarification or narrowing of an unclear or overbroad request for information, the ten-day period to request an attorney general ruling is measured from the date the request is clarified or narrowed).

[2] We assume the "representative sample" of records submitted to this office is truly representative of the requested records as a whole. *See* Open Records Decision Nos. 499 (1988), 497 (1988). This open records letter does not reach, and therefore does not authorize the withholding of, any other requested records to the extent those records contain substantially different types of information than that submitted to this office.

Post Office Box 12548, Austin, Texas 78711-2548 • (512) 463-2100 • www.texasattorneygeneral.gov

Ms. Jennifer Burnett - Page 2

Section 552.101 of the Government Code excepts from disclosure "information considered to be confidential by law, either constitutional, statutory, or by judicial decision." *Id.* § 552.101. Section 552.101 encompasses information protected by other statutes, such as section 161.032 of the Health and Safety Code, which provides in part:

> (a) The records and proceedings of a medical committee are confidential and are not subject to court subpoena.
>
> . . .
>
> (c) Records, information, or reports of a medical committee . . . and records, information, or reports provided by a medical committee . . . to the governing body of a public hospital . . . are not subject to disclosure under Chapter 552, Government Code.
>
> . . .
>
> (f) This section and Subchapter A, Chapter 160, Occupations Code, do not apply to records made or maintained in the regular course of business by a hospital, health maintenance organization, medical organization, university medical center or health science center, hospital district, hospital authority, or extended care facility.

Health & Safety Code § 161.032(a), (c), (f). A "medical committee" is any committee, including a joint committee of a hospital, medical organization, university medical school or health science center, health maintenance organization, extended care facility, a hospital district, or a hospital authority. *See id.* § 161.031(a). The term also encompasses "a committee appointed *ad hoc* to conduct a specific investigation or established under state or federal law or rule or under the bylaws or rules of the organization or institution." *Id.* § 161.031(b) (emphasis added).

The precise scope of the "medical committee" provision has been the subject of a number of judicial decisions. *See, e.g.*, *Mem'l Hosp.—The Woodlands v. McCown*, 927 S.W.2d 1 (Tex. 1996); *Barnes v. Whittington*, 751 S.W.2d 493 (Tex. 1988); *Jordan v. Fourth Supreme Judicial Dist.*, 701 S.W.2d 644 (Tex. 1986). These cases establish "documents generated by the committee in order to conduct open and thorough review" are confidential. *Mem'l Hosp.*, 927 S.W.2d at 10; *Jordan*, 701 S.W.2d at 647-48; *Doctor's Hosp. v. West*, 765 S.W.2d 812, 814 (Tex. App.—Houston [1st Dist.] 1988, no writ). This protection extends "to documents that have been prepared by or at the direction of the committee for committee purposes." *Jordan*, 701 S.W.2d at 647-48. Protection does not extend to documents "gratuitously submitted to a committee" or "created without committee impetus and purpose." *Id.*; *see also* Open Records Decision No. 591 (1991) (construing statutory predecessor to Health & Safety Code § 161.032). Additionally, we note section 161.032 does not make confidential "records made or maintained in the regular course of business by a hospital[.]" Health & Safety Code § 161.032(f); *see also Mem'l Hosp.*, 927 S.W.2d at 10 (stating reference to statutory predecessor to section 160.007 of the Occupations Code

**App. 095**

Ms. Jennifer Burnett - Page 3

in section 161.032 is clear signal records should be accorded same treatment under both statutes in determining if they were made in ordinary course of business). The phrase "records made or maintained in the regular course of business" has been construed to mean records that are neither created nor obtained in connection with a medical committee's deliberative proceedings. *See Mem'l Hosp.*, 927 S.W.2d at 10 (discussing *Barnes*, 751 S.W.2d 493, and *Jordan*, 701 S.W.2d 644).

You assert the submitted information "consists of records prepared by, or at the direction of, Boston Children's Hospital's ("BCH") Institutional Review Board ("IRB") and provided to the [u]niversity's IRB." The university states that the IRBs are medical committees established pursuant to federal law in order "to review, to approve the initiation of, and to conduct periodic review of, biomedical research involving human subjects."[3] 21 C.F.R. § 56.102(g). The university explains that, while "BCH's IRB has primary regulatory oversight of the trial at issue, the [u]niversity IRB maintains these records to ensure compliance with the [u]niversity IRB's own oversight responsibilities." We have previously found on multiple occasions that the university's IRB is a medical committee for purposes of section 161.032. Further, based on your arguments, we find BCH's IRD is a medical committee for purposes of subchapter D of chapter 161 of the Health and Safety Code. *See* Health & Safety Code § 161.031(c); *see also Humana Hosp. Corp. v. Spears Petersen*, 867 S.W.2d 858 (Tex. App.—San Antonio 1993, no pet.) (finding Joint Commission on Accreditation of Healthcare Organizations is medical committee under section 161.031(a)(2) and its accreditation report of hospital is confidential under section 161.032). In this instance, based on your representations and our review, we agree the submitted information consists of confidential records of a medical committee under section 161.032. Therefore, we conclude the university must withhold the submitted information under section 552.101 of the Government Code in conjunction with section 161.032 of the Health and Safety Code.[4]

This letter ruling is limited to the particular information at issue in this request and limited to the facts as presented to us; therefore, this ruling must not be relied upon as a previous determination regarding any other information or any other circumstances.

This ruling triggers important deadlines regarding the rights and responsibilities of the governmental body and of the requestor. For more information concerning those rights and responsibilities, please visit our website at https://www.texasattorneygeneral.gov/open-government/members-public/what-expect-after-ruling-issued or call the OAG's Open

---

[3] *See* 42 U.S.C. § 289(a) (providing that Secretary of Health and Human Services shall by regulation require that each entity which applies for grant, contract, or cooperative agreement for any project or program which involves conduct of biomedical or behavioral research involving human subjects submit in or with its application for such grant, contract, or cooperative agreement assurances satisfactory to Secretary that it has established "Institutional Review Board" to review biomedical and behavioral research involving human subjects conducted at or supported by such entity).

[4] As our ruling is dispositive, we need not address your remaining argument against disclosure of this information.

Ms. Jennifer Burnett - Page 4

Government Hotline, toll free, at (877) 673-6839.  Questions concerning the allowable charges for providing public information under the Public Information Act may be directed to the Cost Rules Administrator of the OAG, toll free, at (888) 672-6787.

Sincerely,

Anna Obek
Assistant Attorney General
Open Records Division

AO/mo

Ref:    ID# 25-037259

c:    Requestor

Exhibit C – Stanford Medicine TEAMMATE Clinical Trial Homepage

Case 1:26-cv-11504-WGY    Document 17    Filed 07/08/26    Page 43 of 55

Case 3:26-cv-00770-D    Document 33-1    Filed 07/09/26    Page 101 of 184    PageID 377

TEAMMATE Clinical Trial
*A Multicenter Study*

   

 Home Page



Introduction

The TEAMMATE trial is a clinical research study led by Stanford Children's Hospital and Boston Children's Hospital, and funded by the US Department of Defense. Over 200 children and young adults at 25 hospitals around the United States will enroll in the TEAMMATE trial.

**Why are we doing the TEAMMATE trial?**

The goal of the study is to figure out which medicines to prevent heart rejection work best and have the fewest side effects. Today, the average survival after pediatric heart transplant is about 15 years, and is limited to 15 years by several common problems.

Rejection (two different types, cellular and antibody)

Infection

Coronary artery disease

Kidney disease

A form of cancer called post-transplant lymphoproliferative disease (PTLD)

App. 099

7/7/26, 9:34 PM
TEAMMATE Clinical Trial Home / TEAMMATE Clinical Trial | Stanford Medicine

Case 1:26-cv-11504-WGY   Document 17   Filed 07/08/26   Page 44 of 55
Case 3:26-cv-00770-D   Document 33-1   Filed 07/09/26   Page 102 of 184   PageID 378

Transplant Cardiologists prescribe anti-rejection medicines to children after heart transplant to keep the body's immune system from attacking the new heart and to also help minimize these common problems.  Anti-rejection medicines are used all the time after heart transplants, but no anti-rejection medication has been approved by the Food and Drug Administration (FDA) for use in children after heart transplant.

TEAMMATE will compare the effects of two combinations of anti-rejection medicines in children and young adults who have had a heart transplant. The first combination of medicines is everolimus (or Zortess®) and low-dose tacrolimus (or Prograf®).  The second combination of medicines is standard-dose tacrolimus (or Prograf®) and mycophenolate mofetil (or Cellcept®).

The primary goal of the TEAMMATE trial is to figure out which combination of medicines is better at preventing long-term problems after heart transplant.  The problems we are most concerned about are rejection, kidney problems, coronary artery disease, infection, and PTLD.

We hope that data from the TEAMMATE trial help researchers figure out which anti-rejection medicines prevent transplant complications, and lead to the first FDA approval of anti-rejection medicines in pediatric heart transplantation.

Introduction Video

To hear Dr. Rossano explain more about the TEAMMATE Trial please visit this link: TEAMMATE Trial - Introduction Video

TEAMMATE Trial - Introduction Video (Spanish)

Study Population

Children eligible for this study must be less than 21 years of age at the time of heart transplant. Children may enroll when they reach 4-7 months after heart transplantation.  Eligible children must not have any active or ongoing serious problems like rejection or infection.  More specific details about criteria for participation is available on the clinicaltrials.gov website, which you can find by clicking here.

Trial Stages

If you or your child is eligible, the study will be explained to you or your child in detail by one of the study investigators. Once your questions have been answered, you or your child will be asked to sign an informed consent form to enter the study. The study has four major parts:

7/7/26, 9:34 PM                    TEAMMATE Clinical Trial Home / TEAMMATE Clinical Trial | Stanford Medicine

Case 1:26-cv-11504-WGY    Document 17    Filed 07/08/26    Page 45 of 55
Case 3:26-cv-00770-D    Document 33-1    Filed 07/09/26    Page 103 of 184    PageID 379

**Screening**: Children eligible for this study must be less than 21 years of age at the time of heart transplant. Children may enroll when they reach 4-7 months after heart transplantation.  Eligible children must not have any active or ongoing serious problems like rejection or infection.  More specific details about criteria for participation is available on the clinicaltrials.gov website, which you or your child can find by clicking here.

**Randomization**: If eligible after screening, you or your child will be randomly assigned to receive tacrolimus and Cellcept (MMF) or tacrolimus and everolimus. The assignment is done by chance, like flipping a coin. About half of the children in this study will be assigned to receive tacrolimus and MMF; the other half will be assigned to receive tacrolimus and everolimus.

**Conversion to Tacrolimus and Everolimus**: Children who are already on tacrolimus and MMF who are assigned to tacrolimus and MMF, will continue to take the same medications.  Children who are assigned to tacrolimus and everolimus will be converted from MMF to everolimus using a standard protocol. This transition will take approximately one week.  Regardless of which drug combination you or your child is assigned, testing for several additional drug levels will be required during the first week.

**Follow up**:  You or your child will be closely monitored while on either drug regimen. During this time, the study team will assess how well you or your child is doing through physical exams, laboratory tests, medical support, questionnaires, and other tests, up until right before through the end of the study.  In general, all the study visits take place at the same time as routine post-transplant care, so additional study visits are not required.

Study Duration

You or your child's participation is 30 months, when the final study visit (of 8) will occur.

Benefits of Trial

You or your child may not receive any benefits from being in this study.

You or your child may have relatively few transplant adverse events regardless of the drug regimen you or your child is assigned to.

If you or your child is assigned to receive tacrolimus and MMF, the benefits include having you or your child receive a medical regimen that has been used in several thousand children already.  Although this regimen is not FDA-approved for heart transplant in children, it is FDA-approved for pediatric liver and kidney transplant, and adult heart transplantation.

If you or your child is assigned to tacrolimus and everolimus, the benefits may include fewer transplant complications,

and specifically it may reduce rejection, coronary artery disease, and kidney disease.  These complications are linked to reduced graft survival.  This drug regimen is also not FDA-approved for pediatric heart transplantation, but is approved for pediatric liver and kidney transplant, and is approved for adult heart transplantation in Europe.

Possible Risks

Taking part in a research study involves risks, or side effects. You or your child should discuss these risks with you or your child's study doctor. Children eligible for this study all have a serious heart condition (heart transplant) whether or not they choose to participate in this study.

The risks of the transplant medications include infection, kidney problems, infection, diabetes, high blood pressure, and abdominal symptoms like belly pain and nausea. A complete list of the risks is provided in the informed consent form and will be explained in full by the study doctor. There may be additional risks that are not yet known. If any new risks are identified, the study doctor will share those with you.

Patient Safety

Throughout the study, you or your child's health and safety will be monitored by the study doctor. Additionally, an independent board of scientists and medical professionals with expertise in areas such as adult and pediatric hear transplantation will regularly review study data and make recommendations to the Department of Defense regarding patient safety in this trial. Stringent safety reporting to the FDA is also required for this trial.

Why should you be part of the TEAMMATE Trial?

TEAMMATE is the first randomized study comparing anti-rejection medications in children who have received a heart transplant.

The results of this trial will help doctors learn what drugs are the safest and best at preventing rejection in kids who have had a heart transplant.

The results from the study may lead to the **first** FDA approval of anti-rejection medications for use in kids who have had a heart transplant, which will make these medications easier to prescribe.

Participants will receive a small payment of $50 per visit to help cover out of pocket expenses (travel, meals, etc.).

**App. 102**

Exhibit D - Relevant Excerpts from the FDA-Approved Prescribing Information for
Everolimus (Zortress®), Including the Boxed Warning and Approved Indications.

App. 103

**HIGHLIGHTS OF PRESCRIBING INFORMATION**
**These highlights do not include all the information needed to use ZORTRESS safely and effectively. See full prescribing information for ZORTRESS.**

**ZORTRESS® (everolimus) tablets, for oral use**
**Initial U.S. Approval: 2010**

---

> **WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**
> *See full prescribing information for complete boxed warning.*
>
> - **Only physicians experienced in immunosuppressive therapy and management of transplant patients should use Zortress (5.1)**
> - **Increased susceptibility to infection and the possible development of malignancies may result from immunosuppression (5.2, 5.3)**
> - **Increased incidence of kidney graft thrombosis (5.4)**
> - **Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce nephrotoxicity (2.4, 2.5, 5.6, 12.7, 12.8)**
> - **Increased mortality in a heart transplant clinical trial. Use in heart transplantation is not recommended (5.7)**

---------------------------RECENT MAJOR CHANGES----------------------------
Warnings and Precautions, Cannabidiol Drug Interactions (5.22)    9/2023

--------------------------INDICATIONS AND USAGE----------------------------
Zortress is an mTOR inhibitor immunosuppressant indicated for the prophylaxis of organ rejection in adult patients:
- Kidney Transplant: at low-moderate immunologic risk. Use in combination with basiliximab, cyclosporine (reduced doses) and corticosteroids (1.1)
- Liver Transplant: Administer no earlier than 30 days posttransplant. Use in combination with tacrolimus (reduced doses) and corticosteroids (1.2, 5.5)

Limitations of Use: Safety and efficacy have not been established in the following:
- Kidney transplant patients at high immunologic risk (1.3)
- Recipients of transplanted organs other than kidney or liver (1.3, 5.7)
- Pediatric patients (less than 18 years) (1.3)

-------------------------DOSAGE AND ADMINISTRATION-------------------------
- Kidney Transplantation: starting oral dose of 0.75 mg twice daily as soon as possible after transplantation (2.1)
- Liver Transplantation: starting oral dose of 1 mg twice daily starting 30 days after transplantation (2.2)
- Monitor Everolimus Concentrations: Adjust maintenance dose to achieve trough concentrations within the 3 to 8 ng/mL target range using LC/MS/MS assay method (2.1, 2.2, 2.3)
- Administer consistently with or without food at the same time as cyclosporine or tacrolimus (2.6, 12.3)
- Mild Hepatic Impairment: Reduce initial daily dose by one-third (2.7)
- Moderate or Severe Hepatic Impairment: Reduce initial daily dose by one-half (2.7, 12.6)

----------------------DOSAGE FORMS AND STRENGTHS---------------------
Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets (3)

-------------------------------CONTRAINDICATIONS----------------------------
- Hypersensitivity to everolimus, sirolimus, or to components of the drug product (4)

---------------------------WARNINGS AND PRECAUTIONS-------------------
- Angioedema [increased risk with concomitant angiotensin converting enzyme (ACE inhibitors)]: Monitor for symptoms and treat promptly (5.8)
- Delayed Wound Healing/Fluid Accumulation: Monitor symptoms; treat promptly to minimize complications (5.9)
- Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis: Monitor for symptoms or radiologic changes; manage by dose reduction or discontinuation until symptoms resolve; consider use of corticosteroids (5.10)
- Hyperlipidemia (elevations of serum cholesterol and triglycerides): Monitor and consider anti-lipid therapy (5.11)
- Proteinuria (increased risk with higher trough concentrations): Monitor urine protein (5.12)
- Polyoma Virus Infections (activation of latent viral infections; BK virus associated nephropathy): Consider reducing immunosuppression (5.13)
- TMA/TTP/HUS (concomitant use with cyclosporine may increase risk): Monitor for hematologic changes or symptoms (5.15)
- New Onset Diabetes After Transplantation: Monitor serum glucose (5.16)
- Male Infertility: Azoospermia or oligospermia may occur (5.18, 13.1)
- Immunizations: Avoid live vaccines (5.19)
- Embryo-Fetal Toxicity: Advise females of reproductive potential of the potential risk to a fetus and to use effective contraception during treatment with Zortress and for 8 weeks after final dose (5.17, 8.1, 8.3)

--------------------------------ADVERSE REACTIONS---------------------------
Most common adverse reactions were as follows:
- Kidney Transplantation (incidence greater than or equal to 20%): peripheral edema, constipation, hypertension, nausea, anemia, urinary tract infection (UTI), and hyperlipidemia (6.1)
- Liver Transplantation (incidence greater than 10%): diarrhea, headache, peripheral edema, hypertension, nausea, pyrexia, abdominal pain, leukopenia, and hypercholesterolemia (6.1)

**To report SUSPECTED ADVERSE REACTIONS, contact Novartis Pharmaceuticals Corporation at 1-888-669-6682 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

--------------------------------DRUG INTERACTIONS---------------------------
Strong-moderate CYP3A4 inhibitors (e.g., cyclosporine, ketoconazole, erythromycin, verapamil) and CYP3A4 inducers (e.g., rifampin) may affect everolimus concentrations (7.1). Consider Zortress dose adjustment (5.14)

Therapeutic drug monitoring and dose reduction for Zortress should be considered when Zortress is coadministered with cannabidiol (5.22, 7.13)

--------------------------USE IN SPECIFIC POPULATIONS-------------------
- Pregnancy: Based on animal data, may cause maternal and fetal harm (8.1)
- Lactation: Breastfeeding not recommended (8.2)
- Females and Males of Reproductive Potential: May impair fertility (8.1, 8.3, 13.1)

**See 17 for PATIENT COUNSELING INFORMATION and Medication Guide.**

**Revised: 2/2024**

**FULL PRESCRIBING INFORMATION**

---

**WARNING: MALIGNANCIES and SERIOUS INFECTIONS; KIDNEY GRAFT THROMBOSIS; NEPHROTOXICITY; and MORTALITY IN HEART TRANSPLANTATION**

**Malignancies and Serious Infections**

- **Only physicians experienced in immunosuppressive therapy and management of transplant patients should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for maintenance therapy should have complete information requisite for the follow-up of the patient** *[see Warnings and Precautions (5.1)]*.
- **Increased susceptibility to infection and the possible development of malignancies, such as lymphoma and skin cancer, may result from immunosuppression** *[see Warnings and Precautions (5.2, 5.3)]*.

**Kidney Graft Thrombosis**

- **An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, was reported, mostly within the first 30 days posttransplantation** *[see Warnings and Precautions (5.4)]*.

**Nephrotoxicity**

- **Increased nephrotoxicity can occur with use of standard doses of cyclosporine in combination with Zortress. Therefore, reduced doses of cyclosporine should be used in combination with Zortress in order to reduce renal dysfunction. It is important to monitor the cyclosporine and everolimus whole blood trough concentrations** *[see Dosage and Administration (2.4, 2.5), Warnings and Precautions (5.6), Clinical Pharmacology (12.7, 12.8)]*.

**Mortality in Heart Transplantation**

- **Increased mortality, often associated with serious infections, within the first three months posttransplantation was observed in a clinical trial of** *de novo* **heart transplant patients receiving immunosuppressive regimens with or without induction therapy. Use in heart transplantation is not recommended** *[see Warnings and Precautions (5.7)]*.

---

**1    INDICATIONS AND USAGE**

**1.1    Prophylaxis of Organ Rejection in Kidney Transplantation**

Zortress is indicated for the prophylaxis of organ rejection in adult patients at low to moderate immunologic risk receiving a kidney transplant *[see Clinical Studies (14.1)]*. Zortress is to be administered in combination with basiliximab induction and concurrently with reduced doses of cyclosporine and with corticosteroids. Therapeutic drug monitoring (TDM) of everolimus and cyclosporine is recommended for all patients receiving these products *[see Dosage and Administration (2.2, 2.3)]*.

**1.2    Prophylaxis of Organ Rejection in Liver Transplantation**

Zortress is indicated for the prophylaxis of allograft rejection in adult patients receiving a liver transplant. Zortress is to be administered no earlier than 30 days posttransplant concurrently in combination with reduced doses of tacrolimus and with corticosteroids *[see Warnings and Precautions (5.5), Clinical Studies (14.2)]*. TDM of everolimus and tacrolimus is recommended for all patients receiving these products *[see Dosage and Administration (2.3, 2.5)]*.

**1.3    Limitations of Use**

The safety and efficacy of Zortress has not been established in the following populations:

- Kidney transplant patients at high immunologic risk.
- Recipients of transplanted organs other than kidney and liver *[see Warnings and Precautions (5.7)]*.
- Pediatric patients (less than 18 years).

**2    DOSAGE AND ADMINISTRATION**

Patients receiving Zortress may require dose adjustments based on everolimus blood concentrations achieved, tolerability, individual response, change in concomitant medications and the clinical situation. Optimally, dose adjustments of Zortress should be based on trough concentrations obtained 4 or 5 days after a previous dosing change. Dose adjustment is required if the trough concentration is below 3 ng/mL. The total daily dose of Zortress should be doubled using the available tablet strengths (0.25 mg, 0.5 mg, 0.75 mg, or 1 mg). Dose adjustment is also required if the trough

**App. 105**

concentration is greater than 8 ng/mL on 2 consecutive measures; the dose of Zortress should be decreased by 0.25 mg twice daily *[see Dosage and Administration (2.3), Clinical Pharmacology (12.3)]*.

## 2.1    Dosage in Adult Kidney Transplant Patients

An initial Zortress dose of 0.75 mg orally twice daily (1.5 mg per day) is recommended for adult kidney transplant patients in combination with reduced-dose cyclosporine, administered as soon as possible after transplantation *[see Dosage and Administration (2.3, 2.4), Clinical Studies (14.1)]*.

Oral prednisone should be initiated once oral medication is tolerated. Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

## 2.2    Dosage in Adult Liver Transplant Patients

Start Zortress at least 30 days posttransplant. An initial dose of 1 mg orally twice daily (2 mg per day) is recommended for adult liver transplant patients in combination with reduced-dose tacrolimus *[see Dosage and Administration (2.3, 2.5), Clinical Studies (14.2)]*.

Steroid doses may be further tapered on an individualized basis depending on the clinical status of patient and function of graft.

## 2.3    Therapeutic Drug Monitoring (TDM) - Everolimus

Routine everolimus whole blood therapeutic drug concentration monitoring is recommended for all patients. The recommended everolimus therapeutic range is 3 to 8 ng/mL *[see Clinical Pharmacology (12.7)]*. Careful attention should be made to clinical signs and symptoms, tissue biopsies, and laboratory parameters. It is important to monitor everolimus blood concentrations, in patients with hepatic impairment, during concomitant administration of CYP3A4 inducers or inhibitors or cannabidiol, when switching cyclosporine formulations and/or when cyclosporine dosing is reduced according to recommended target concentrations *[see Drug Interactions (7), Clinical Pharmacology (12.7, 12.8)]*.

There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced. There is little to no pharmacokinetic interaction of tacrolimus on everolimus, and thus, everolimus concentrations do not decrease if the tacrolimus exposure is reduced *[see Drug Interactions (7.2)]*.

The everolimus recommended therapeutic range of 3 to 8 ng/mL is based on an LC/MS/MS assay method. Currently in clinical practice, everolimus whole blood trough concentrations may be measured by chromatographic or immunoassay methodologies. Because the measured everolimus whole blood trough concentrations depend on the assay used, individual patient sample concentration values from different assays may not be interchangeable. Consideration of assay results must be made with knowledge of the specific assay used. Therefore, communication should be maintained with the laboratory performing the assay.

## 2.4    Therapeutic Drug Monitoring (TDM) - Cyclosporine in Kidney Transplant Patients

Both cyclosporine doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the risk of nephrotoxicity *[see Warnings and Precautions (5.6), Drug Interactions (7.2), Clinical Pharmacology (12.8)]*.

The recommended cyclosporine therapeutic ranges when administered with Zortress are 100 to 200 ng/mL through Month 1 posttransplant, 75 to 150 ng/mL at Months 2 and 3 posttransplant, 50 to 100 ng/mL at Month 4 posttransplant, and 25 to 50 ng/mL from Month 6 through Month 12 posttransplant. The median trough concentrations observed in the clinical trial ranged between 161 to 185 ng/mL through Month 1 posttransplant and between 111 to 140 ng/mL at Months 2 and 3 posttransplant. The median trough concentration was 99 ng/mL at Month 4 posttransplant and ranged between 46 to 75 ng/mL from Months 6 through Month 12 posttransplant *[see Clinical Pharmacology (12.8), Clinical Studies (14.1)]*.

Cyclosporine, USP Modified is to be administered as oral capsules twice daily unless cyclosporine oral solution or intravenous administration of cyclosporine cannot be avoided. Cyclosporine, USP Modified should be initiated as soon as possible, and no later than 48 hours after reperfusion of the graft and dose adjusted to target concentrations from Day 5 onwards.

If impairment of renal function is progressive, the treatment regimen should be adjusted. In renal transplant patients, the cyclosporine dose should be based on cyclosporine whole blood trough concentrations *[see Clinical Pharmacology (12.8)]*.

**App. 106**

In renal transplantation, there are limited data regarding dosing Zortress with reduced cyclosporine trough concentrations of 25 to 50 ng/mL after 12 months. Zortress has not been evaluated in clinical trials with other formulations of cyclosporine. Prior to dose reduction of cyclosporine, it should be ascertained that steady-state everolimus whole blood trough concentration is at least 3 ng/mL. There is an interaction of cyclosporine on everolimus, and consequently, everolimus concentrations may decrease if cyclosporine exposure is reduced *[see Drug Interactions (7.2)]*.

## 2.5    Therapeutic Drug Monitoring (TDM) – Tacrolimus in Liver Transplant Patients

Both tacrolimus doses and the target range for whole blood trough concentrations should be reduced, when given in a regimen with Zortress, in order to minimize the potential risk of nephrotoxicity *[see Warnings and Precautions (5.6), Clinical Pharmacology (12.9)]*.

The recommended tacrolimus therapeutic range when administered with Zortress are whole blood trough ($C_{0h}$) concentrations of 3 to 5 ng/mL by three weeks after the first dose of Zortress (approximately Month 2) and through Month 12 posttransplant.

The median tacrolimus trough concentrations observed in the clinical trial ranged between 8.6 to 9.5 ng/mL at Weeks 2 and 4 posttransplant (prior to initiation of everolimus). The median tacrolimus trough concentrations ranged between 7 to 8.1 ng/mL at Weeks 5 and 6 posttransplant, between 5.2 to 5.6 ng/mL at Months 2 and 3 posttransplant, and between 4.3 to 4.9 ng/mL between Months 4 and 12 posttransplant *[see Clinical Pharmacology (12.9), Clinical Studies (14.2)]*.

Tacrolimus is to be administered as oral capsules twice daily unless intravenous administration of tacrolimus cannot be avoided.

In liver transplant patients, the tacrolimus dose should be based on tacrolimus whole blood trough concentrations *[see Clinical Pharmacology (12.9)]*.

In liver transplantation, there are limited data regarding dosing Zortress with reduced tacrolimus trough concentrations of 3 to 5 ng/mL after 12 months. Prior to dose reduction of tacrolimus, it should be ascertained that the steady-state everolimus whole blood trough concentration is at least 3 ng/mL. Unlike the interaction between cyclosporine and everolimus, tacrolimus does not affect everolimus trough concentrations, and consequently, everolimus concentrations do not decrease if the tacrolimus exposure is reduced.

## 2.6    Administration

Zortress tablets should be swallowed whole with a glass of water and not crushed before use.

Administer Zortress consistently approximately 12 hours apart with or without food to minimize variability in absorption and at the same time as cyclosporine or tacrolimus *[see Clinical Pharmacology (12.3)]*.

## 2.7    Hepatic Impairment

Whole blood trough concentrations of everolimus should be closely monitored in patients with impaired hepatic function. For patients with mild hepatic impairment (Child-Pugh Class A), the initial daily dose should be reduced by approximately one-third of the normally recommended daily dose. For patients with moderate or severe hepatic impairment (Child-Pugh Class B or C), the initial daily dose should be reduced to approximately one-half of the normally recommended daily dose. Further dose adjustment and/or dose titration should be made if a patient's whole blood trough concentration of everolimus, as measured by an LC/MS/MS assay, is not within the target trough concentration range of 3 to 8 ng/mL *[see Clinical Pharmacology (12.6)]*.

## 3    DOSAGE FORMS AND STRENGTHS

Zortress is available as 0.25 mg, 0.5 mg, 0.75 mg, and 1 mg tablets.

**Table 1. Description of Zortress (everolimus) Tablets**

| Dosage strength | 0.25 mg | 0.5 mg | 0.75 mg | 1 mg |
|---|---|---|---|---|
| Appearance | White to yellowish, marbled, round, flat tablets with beveled edge | | | |
| Imprint | "C" on one side and "NVR" on the other | "CH" on one side and "NVR" on the other | "CL" on one side and "NVR" on the other | "CU" on one side and "NVR" on the other |

## 4    CONTRAINDICATIONS

### 4.1    Hypersensitivity Reactions

Zortress is contraindicated in patients with known hypersensitivity to everolimus, sirolimus, or to components of the drug product.

## 5    WARNINGS AND PRECAUTIONS

### 5.1    Management of Immunosuppression

Only physicians experienced in management of systemic immunosuppressant therapy in transplantation should prescribe Zortress. Patients receiving the drug should be managed in facilities equipped and staffed with adequate laboratory and supportive medical resources. The physician responsible for the maintenance therapy should have complete information requisite for the follow-up of the patient. In limited data with the complete elimination of calcineurin inhibition (CNI), there was an increased risk of acute rejection.

### 5.2    Lymphomas and Other Malignancies

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing lymphomas and other malignancies, particularly of the skin. The risk appears to be related to the intensity and duration of immunosuppression rather than to the use of any specific agent.

As usual for patients with increased risk for skin cancer, exposure to sunlight and ultraviolet light should be limited by wearing protective clothing and using a sunscreen with a high protection factor.

### 5.3    Serious Infections

Patients receiving immunosuppressants, including Zortress, are at increased risk of developing bacterial, viral, fungal, and protozoal infections, including opportunistic infections *[see Warnings and Precautions (5.13), Adverse Reactions (6.1, 6.2)]*. These infections may lead to serious, including fatal, outcomes. Because of the danger of over-immunosuppression, which can cause increased susceptibility to infection, combination immunosuppressant therapy should be used with caution.

Antimicrobial prophylaxis for *Pneumocystis jiroveci* (*carinii*) pneumonia and prophylaxis for cytomegalovirus (CMV) is recommended in transplant recipients.

### 5.4    Kidney Graft Thrombosis

An increased risk of kidney arterial and venous thrombosis, resulting in graft loss, has been reported, usually within the first 30 days posttransplantation *[see Boxed Warning]*.

### 5.5    Hepatic Artery Thrombosis

Mammalian target of rapamycin (mTOR) inhibitors are associated with an increase in hepatic artery thrombosis (HAT). Reported cases mostly have occurred within the first 30 days posttransplant and most also lead to graft loss or death. Therefore, Zortress should not be administered earlier than 30 days after liver transplant.

### 5.6    Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity

In kidney transplant recipients, Zortress with standard dose cyclosporine increases the risk of nephrotoxicity resulting in a lower glomerular filtration rate. Reduced doses of cyclosporine are required for use in combination with Zortress in order to reduce renal dysfunction *[see Boxed Warning, Indications and Usage (1.1), Clinical Pharmacology (12.8)]*.

In liver transplant recipients, Zortress has not been studied with standard dose tacrolimus. Reduced doses of tacrolimus should be used in combination with Zortress in order to minimize the potential risk of nephrotoxicity *[see Indications and Usage (1.2), Clinical Pharmacology (12.9)]*.

Renal function should be monitored during the administration of Zortress. Consider switching to other immunosuppressive therapies if renal function does not improve after dose adjustments or if the dysfunction is thought to be drug related. Caution should be exercised when using other drugs which are known to impair renal function.

**5.7     Heart Transplantation**

In a clinical trial of *de novo* heart transplant patients, Zortress in an immunosuppressive regimen, with or without induction therapy, resulted in an increased mortality often associated with serious infections within the first three months posttransplantation compared to the control regimen. Use of Zortress in heart transplantation is not recommended.

**5.8     Angioedema**

Zortress has been associated with the development of angioedema. The concomitant use of Zortress with other drugs known to cause angioedema, such as angiotensin converting enzyme (ACE) inhibitors may increase the risk of developing angioedema.

**5.9     Wound Healing and Fluid Accumulation**

Zortress increases the risk of delayed wound healing and increases the occurrence of wound-related complications like wound dehiscence, wound infection, incisional hernia, lymphocele and seroma. These wound-related complications may require more surgical intervention. Generalized fluid accumulation, including peripheral edema (e.g., lymphoedema) and other types of localized fluid collection, such as pericardial and pleural effusions and ascites have also been reported.

**5.10    Interstitial Lung Disease (ILD)/Non-Infectious Pneumonitis**

A diagnosis of interstitial lung disease (ILD) should be considered in patients presenting with symptoms consistent with infectious pneumonia but not responding to antibiotic therapy and in whom infectious, neoplastic and other non-drug causes have been ruled out through appropriate investigations. Cases of ILD, implying lung intraparenchymal inflammation (pneumonitis) and/or fibrosis of non-infectious etiology, some reported with pulmonary hypertension [including pulmonary arterial hypertension (PAH)] as a secondary event, have occurred in patients receiving rapamycins and their derivatives, including Zortress. Most cases generally resolve on drug interruption with or without glucocorticoid therapy. However, fatal cases have also occurred.

**5.11    Hyperlipidemia**

Increased serum cholesterol and triglycerides, requiring the need for anti-lipid therapy, have been reported to occur following initiation of Zortress and the risk of hyperlipidemia is increased with higher everolimus whole blood trough concentrations *[see Adverse Reactions (6.2)]*. Use of anti-lipid therapy may not normalize lipid levels in patients receiving Zortress.

Any patient who is administered Zortress should be monitored for hyperlipidemia. If detected, interventions, such as diet, exercise, and lipid-lowering agents should be initiated as outlined by the National Cholesterol Education Program guidelines. The risk/benefit should be considered in patients with established hyperlipidemia before initiating an immunosuppressive regimen containing Zortress. Similarly, the risk/benefit of continued Zortress therapy should be reevaluated in patients with severe refractory hyperlipidemia. Zortress has not been studied in patients with baseline cholesterol levels greater than 350 mg/dL.

Due to an interaction with cyclosporine, clinical trials of Zortress and cyclosporine in kidney transplant patients strongly discouraged patients from receiving the HMG-CoA reductase inhibitors simvastatin and lovastatin. During Zortress therapy with cyclosporine, patients administered an HMG-CoA reductase inhibitor and/or fibrate should be monitored for the possible development of rhabdomyolysis and other adverse effects, as described in the respective labeling for these agents *[see Drug Interactions (7.7)]*.

**5.12    Proteinuria**

The use of Zortress in transplant patients has been associated with increased proteinuria. The risk of proteinuria increased with higher everolimus whole blood trough concentrations. Patients receiving Zortress should be monitored for proteinuria *[see Adverse Reactions (6.2)]*.

**App. 109**

**5.13    Polyoma Virus Infections**

Patients receiving immunosuppressants, including Zortress, are at increased risk for opportunistic infections, including polyoma virus infections. Polyoma virus infections in transplant patients may have serious, and sometimes fatal, outcomes. These include polyoma virus-associated nephropathy (PVAN), mostly due to BK virus infection, and JC virus associated progressive multiple leukoencephalopathy (PML). PVAN has been observed in patients receiving immunosuppressants, including Zortress. PVAN is associated with serious outcomes; including deteriorating renal function and kidney graft loss *[see Adverse Reactions (6.2)]*. Patient monitoring may help detect patients at risk for PVAN. Reductions in immunosuppression should be considered for patients who develop evidence of PVAN or PML. Physicians should also consider the risk that reduced immunosuppression represents to the functioning allograft.

**5.14    Interaction With Strong Inhibitors and Inducers of CYP3A4**

Coadministration of Zortress with strong CYP3A4 inhibitors (e.g., ketoconazole, itraconazole, voriconazole, clarithromycin, telithromycin, ritonavir, boceprevir, telaprevir) or strong CYP3A4 inducers (e.g., rifampin, rifabutin) is not recommended without close monitoring of everolimus whole blood trough concentrations *[see Drug Interactions (7)]*.

**5.15    Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome**

The concomitant use of Zortress with cyclosporine may increase the risk of thrombotic microangiopathy (TMA)/thrombotic thrombocytopenic purpura (TTP)/hemolytic uremic syndrome (HUS). Monitor hematologic parameters *[see Adverse Reactions (6.2)]*.

**5.16    New Onset Diabetes After Transplant**

Zortress has been shown to increase the risk of new onset diabetes mellitus after transplant. Blood glucose concentrations should be monitored closely in patients using Zortress.

**5.17    Embryo-Fetal Toxicity**

Based on animal studies and the mechanism of action *[see Clinical Pharmacology (12.1)]*, Zortress may cause fetal harm when administered to a pregnant woman. In animal studies, everolimus caused embryo-fetal toxicity when administered during the period of organogenesis at maternal exposures that were equal to or less than human exposures at the recommended lowest starting dose. Advise pregnant women of the potential risk to a fetus. Advise female patients of reproductive potential to avoid becoming pregnant and to use effective contraception while using Zortress and for 8 weeks after ending treatment *[see Use in Specific Populations (8.1, 8.3)]*.

**5.18    Male Infertility**

Azoospermia or oligospermia may be observed *[see Adverse Reactions (6.2), Nonclinical Toxicology (13.1)]*. Zortress is an anti-proliferative drug and affects rapidly dividing cells like the germ cells.

**5.19    Immunizations**

The use of live vaccines should be avoided during treatment with Zortress; examples include (not limited to) the following: intranasal influenza, measles, mumps, rubella, oral polio, BCG, yellow fever, varicella, and TY21a typhoid vaccines.

**5.20    Interaction With Grapefruit Juice**

Grapefruit and grapefruit juice inhibit cytochrome P450 3A4 and P-gp activity and should therefore be avoided with concomitant use of Zortress and cyclosporine or tacrolimus.

**5.21    Patients With Hereditary Disorders/Other**

Patients with rare hereditary problems of galactose intolerance, the Lapp lactase deficiency or glucose-galactose malabsorption should not take Zortress as this may result in diarrhea and malabsorption.

**5.22    Cannabidiol Drug Interactions**

When cannabidiol and Zortress are coadministered, closely monitor for an increase in everolimus blood levels and for adverse reactions suggestive of everolimus toxicity. A dose reduction of Zortress should be considered as needed when Zortress is coadministered with cannabidiol *[see Dosage and Administration (2.3), Drug Interactions (7.13)]*.

## 6    ADVERSE REACTIONS

### 6.1    Serious and Otherwise Important Adverse Reactions

The following adverse reactions are discussed in greater detail in other sections of the label.
- Hypersensitivity Reactions *[see Contraindications (4.1)]*
- Lymphomas and Other Malignancies *[see Boxed Warning, Warnings and Precautions (5.2)]*
- Serious Infections *[see Warnings and Precautions (5.3)]*
- Kidney Graft Thrombosis *[see Warnings and Precautions (5.4)]*
- Hepatic Artery Thrombosis *[see Warnings and Precautions (5.5)]*
- Zortress and Calcineurin Inhibitor-Induced Nephrotoxicity *[see Warnings and Precautions (5.6)]*
- Heart Transplantation *[see Warnings and Precautions (5.7)]*
- Angioedema *[see Warnings and Precautions (5.8)]*
- Wound Healing and Fluid Accumulation *[see Warnings and Precautions (5.9)]*
- Interstitial Lung Disease/Non-Infectious Pneumonitis *[see Warnings and Precautions (5.10)]*
- Hyperlipidemia *[see Warnings and Precautions (5.11)]*
- Proteinuria *[see Warnings and Precautions (5.12)]*
- Polyoma Virus Infections *[see Warnings and Precautions (5.13)]*
- Thrombotic Microangiopathy/Thrombotic Thrombocytopenic Purpura/Hemolytic Uremic Syndrome (TMA/TTP/HUS) *[see Warnings and Precautions (5.15)]*
- New Onset Diabetes After Transplant *[see Warnings and Precautions (5.16)]*
- Male Infertility *[see Warnings and Precautions (5.18)]*

### 6.2    Clinical Trials Experience

Because clinical trials are conducted under widely varying conditions, the adverse reaction rates observed cannot be directly compared to rates in other trials and may not reflect the rates observed in clinical practice.

Kidney Transplantation

The data described below reflect exposure to Zortress in an open-label, randomized trial of *de novo* kidney transplant patients of concentration-controlled everolimus at an initial Zortress starting dose of 1.5 mg per day [target trough concentrations 3 to 8 ng/mL with reduced exposure cyclosporine (N = 274) compared to mycophenolic acid (N = 273) with standard exposure cyclosporine]. All patients received basiliximab induction therapy and corticosteroids. The population was between 18 and 70 years, more than 43% were 50 years of age or older (mean age was 46 years in the Zortress group, 47 years control group); a majority of recipients were male (64% in the Zortress group, 69% control group); and a majority of patients were Caucasian (70% in the Zortress group, 69% control group). Demographic characteristics were comparable between treatment groups. The most frequent diseases leading to transplantation were balanced between groups and included hypertension/nephrosclerosis, glomerulonephritis/glomerular disease and diabetes mellitus. Significantly more patients discontinued Zortress 1.5 mg per day treatment (83/277, 30%) than discontinued the control regimen (60/277, 22%). Of those patients who prematurely discontinued treatment, most discontinuations were due to adverse reactions: 18% in the Zortress group compared to 9% in the control group (p-value = 0.004). This difference was more prominent between treatment groups among female patients. In those patients discontinuing study medication, adverse reactions were collected up to 7 days after study medication discontinuation and serious adverse reactions up to 30 days after study medication discontinuation.

Discontinuation of Zortress at a higher dose (3 mg per day) was 95/279, 34%, including 20% due to adverse reactions, and this regimen is not recommended (see below).

The overall incidences of serious adverse reactions were 57% (159/278) in the Zortress group and 52% (141/273) in the mycophenolic acid group. Infections and infestations reported as serious adverse reactions had the highest incidence in both groups [20% (54/274) in the Zortress group and 25% (69/273) in the control group]. The difference was mainly due to the higher incidence of viral infections in the mycophenolic acid group, mainly CMV and BK virus infections. Injury, poisoning and procedural complications reported as serious adverse reactions had the second highest incidence in both groups [14% (39/274) in the Zortress group and 12% (32/273) in the control group] followed by renal and urinary disorders [10% (28/274) in the Zortress group and 13% (36/273) in the control group] and vascular disorders [10% (26/274) in the Zortress group and 7% (20/273) in the control group].

# EXHIBIT C

FILED
2/9/2026 5:40 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Marissa Gomez DEPUTY

CAUSE NO. DC-25-18350

| | | |
|---|---|---|
| GALLIT FISCHMAN, Individually and and ILANA FISCHMAN, individually | § § § | IN THE DISTRICT COURT |
| *Plaintiffs,* v. | § § § | 101ST JUDICIAL DISTRICT |
| THE UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER, *Defendant.* | § § § § § | DALLAS COUNTY, TEXAS |

**PLAINTIFFS' SIXTH AMENDED PETITION**

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW GALLIT FISCHMAN and ILANA FISCHMAN, individually ("Plaintiffs"), and file this Sixth Amended Petition against THE UNIVERSITY OF TEXAS SOUTHWESTERN MEDICAL CENTER ("Defendant" or "UT Southwestern"), pursuant to Texas Rules of Civil Procedure 62 and 65. This Petition supersedes all prior petitions.

**INSTITUTIONAL NEGLIGENCE CLAIMS: THRESHOLD CLASSIFICATIONS REQUESTED**

Defendant has centered its defense on threshold issues concerning sovereign immunity, Chapter 74 classification, and Standing/Capacity.

**Controlling Construction for Threshold Issues**

This section is intended to clarify Plaintiffs' positions as to TTCA waiver, Chapter 74 classification, and standing/capacity. To the extent any ambiguity appears elsewhere regarding these threshold issues, Plaintiffs respectfully submit that the statements in this section reflect the controlling articulation of Plaintiffs' theory.

---

**Threshold Determinations Requested**

Accordingly, Plaintiffs request that the Court determine the following threshold issues based on the four corners of this live pleading:

- **Sovereign Immunity Is Waived Under Texas Tort Claims Act § 101.021(2).** Dov Fischman's injuries and death were caused by Defendant's affirmative authorization, custody, dispensing pathway, and physical deployment of tangible personal property through Defendant's institutional system.

- **Claims are Outside Chapter 74.** The gravamen of this action is Defendant's institutional and operational negligence, including failures in the governance of authorization controls, monitoring, oversight, and record integrity. Plaintiffs' injuries bear a direct and substantial nexus to these institutional systems and arose from Defendant's administrative design and enforcement failures. The claims sound in general liability and ordinary negligence and fall outside Chapter 74.

- **Plaintiffs Have Standing and Capacity**. Plaintiffs sue solely in their individual capacities under CPRC Chapter 71. No survival claims are asserted. No estate has been opened or exists for Dov Fischman, and Plaintiffs seek no estate damages.

**Causes of Action Pleaded**

This Petition pleads only two causes of action:

(1) Wrongful Death under CPRC Chapter 71, asserted by both Plaintiffs in their individual capacities; and

(2) Institutional Negligence and Unauthorized Administration of Tangible Personal Property, asserted solely by Plaintiff Gallit Fischman.

---

**Relief Requested as to Threshold Issues**

Plaintiffs respectfully request that the Court classify these claims outside Chapter 74 for all purposes and recognize waiver of immunity under the Texas Tort Claims Act as pleaded. Plaintiffs further request that the Court decide these threshold issues on the pleadings or, if necessary, permit limited jurisdictional discovery of institutional policies and governance materials uniquely within Defendant's possession and control:

## I. DISCOVERY CONTROL PLAN

Plaintiffs intend that discovery be conducted under Discovery Level 2 pursuant to Texas Rule of Civil Procedure 190.3. Plaintiffs allege claims arising from institutional nondisclosure, unauthorized institutional use, and administrative system failures.

## II. PARTIES

Plaintiffs bring this action in their individual capacities pursuant to Texas Civil Practice and Remedies Code Chapter 71.

**Plaintiff Gallit Fischman** is an individual and resident of Dallas County, Texas, asserting claims for wrongful death and related institutional liability theories.

**Plaintiff Ilana Fischman** is an individual and resident of Dallas County, Texas, asserting wrongful-death damages only under Chapter 71.

**Marc Fischman** resides outside the United States, has been notified of this action, and is not joined as a plaintiff.

**Defendant The University of Texas Southwestern Medical Center** is a state institution and public hospital system with its principal place of business in Dallas County, Texas, and is liable

for its institutional acts and omissions and, under respondeat superior, for acts and omissions of its employees and agents acting within the scope of their institutional roles.

Plaintiffs reserve the right to join additional responsible persons or entities identified through discovery.

## III. SERVICE OF CITATION

Service of citation may be made upon Defendant in accordance with the Texas Rules of Civil Procedure.

## IV. JURISDICTION AND VENUE

### 4.1 Jurisdiction

Plaintiffs' claims arise from Defendant's institutional and administrative conduct, including governance, authorization systems, records control, monitoring and escalation frameworks, medication-control systems, and oversight structures. The alleged negligence originates from institutional disclosure, authorization, and administrative system failures. See Jared Bush, Jr. v. Columbia Med. Ctr. of Arlington Subsidiary, L.P., No. 23-0460, 2025 WL 230460 (Tex. May 23, 2025).

Sovereign immunity is waived under Texas Civil Practice and Remedies Code § 101.021(2) because Mr. Fischman's injuries and death were caused by Defendant's affirmative authorization, custody, dispensing pathway, and physical administration of tangible personal property through Defendant's institutional medication systems.

### 4.2 Venue

---

Cause No. DC-25-18350; *Gallit Fischman and Ilana Fischman v. UTSW*
Plaintiffs' Sixth Amended Petition                                    Page 4 of 17

Venue is proper in Dallas County, Texas under Texas Civil Practice and Remedies Code § 15.002, since the acts and omissions giving rise to this claim occurred in Dallas County.

## V. PROCEDURAL BACKGROUND AND SCOPE OF LIABILITY

### 5.1 Controlling Institutional Liability Framework

For purposes of this Section, "institutional negligence," "institutional failures," and "institutional conduct" refer to Defendant's acts and omissions in the design, implementation, enforcement, and governance of its administrative systems, including authorization controls, disclosure mechanisms, monitoring and escalation frameworks, records integrity, and oversight structures, all of which arise from Defendant's institutional control and non-delegable administrative duties.

All subsequent factual allegations, causation allegations, and causes of action are pleaded and shall be construed consistently with this institutional liability framework.

### 5.2 Gravamen and Substantive Nexus of Liability

The gravamen of Plaintiffs' claims arises from Defendant's institutional system failures. Plaintiffs' injuries bear a direct and substantial nexus to those failures because the harm flowed from how Defendant's administrative systems were designed, implemented, and enforced. Liability turns on the functioning of Defendant's institutional processes and controls.

### 5.3 Institutional Governance and Administrative Control

UT Southwestern exercised institutional control over the authorization, disclosure, monitoring, recordkeeping, and oversight systems at issue through centralized administrative and governance functions, including transplant program administration, research administration, institutional review processes, quality and safety functions, risk management, and records and information

---

Cause No. DC-25-18350; *Gallit Fischman and Ilana Fischman v. UTSW*
Plaintiffs' Sixth Amended Petition                                    Page 5 of 17

governance. These functions operated as components of a single institutional system responsible for authorization routing, disclosure enforcement, monitoring compliance, escalation, and record integrity.

## 5.4 Centralized Institutional Control and Non-Delegable Duties

Defendant exercised centralized control over these functions, which carried non-delegable responsibilities for authorization, documentation, continuity, oversight, accountability routing, and monitoring enforcement for high-risk institutional deployments. The failures alleged, including nondisclosure, lack of authorization, and breakdowns in record integrity and escalation controls, occurred at the institutional level before deployment and resulted from failures in Defendant's systems, policies, and enforcement mechanisms.

## 5.5 Failure of Institutional Review and Escalation

This action was filed after repeated efforts to obtain institutional review, coordinated intervention, and transparency failed. During Mr. Fischman's life, Defendant's systems reflected abnormal findings following the institutional deployment at issue, yet no centralized escalation, institutional review, or corrective response occurred. After his death, requests for explanation, review outcomes, and institutional materials were denied or unanswered. Subsequent production revealed material gaps in authorization routing, monitoring safeguards, and system enforcement.

## 5.6 Pre-Suit Institutional and Governmental Review Efforts

Prior to filing this action, Plaintiffs sought institutional review, escalation, and explanation through Defendant's administrative and risk-management channels regarding the deployment at issue, the resulting harm, and the absence of documented safeguards. Defendant failed to provide any institutional findings, corrective action, or explanation.

Plaintiffs further pursued non-judicial oversight through complaints and inquiries to appropriate governmental and regulatory bodies and sought institutional policies, authorization records, and governance materials through formal open-records requests. These efforts likewise failed to produce meaningful findings, corrective action, or complete records sufficient to explain Defendant's systems, controls, or decisions.

Litigation was initiated only after these institutional, regulatory, and public-records mechanisms failed to produce accountability, transparency, or a documented explanation.

**5.7 Universal Organizational Duty to Maintain Functional Systems**

The administrative processes at issue, including authorization controls, monitoring frameworks, escalation pathways, records integrity, and risk dissemination, constitute baseline operational requirements imposed on any organization that centrally authorizes and deploys high-risk, off-label tangible products.

Defendant operated a fragmented, multi-unit institutional structure that distributed these functions across multiple systems, thereby requiring defined processes, data controls, and institutional safeguards capable of identifying causation when deterioration followed deployment.

Defendant failed to implement or enforce these universal mechanisms. Warning indicators were fragmented across systems, not escalated for institutional review, and addressed only as isolated manifestations rather than through required causation analysis.

These baseline duties apply equally to public institutions, and governmental status does not diminish responsibility for maintaining systems necessary to prevent foreseeable injury or death.

## VI. FACTUAL BASIS FOR CLAIMS

This action arises, as defined and governed by the institutional liability framework set forth in Section V, from the failure of Defendant's institutional authorization, documentation, monitoring, and oversight systems governing the deployment of a high-risk, off-label tangible product. After years of stability under Defendant's institutional safeguards, a material administrative change authorized deployment of the product through Defendant's institutional systems without enforceable authorization controls or system-level gating, resulting in injury and death. Plaintiffs' claims sound in ordinary negligence and wrongful death based on institutional system failure and the affirmative use of tangible personal property under the Texas Tort Claims Act, as further detailed below.

### 6.1 Institutional Control and Governance

At all relevant times, UT Southwestern operated as a centralized administrative entity exercising exclusive control over authorization systems, records governance, procurement and custody of tangible personal property, dispensing pathways, monitoring frameworks, escalation infrastructure, and institutional reporting. Defendant controlled the systems necessary to identify risk, assess deterioration, determine causation, and intervene.

Defendant's administrative oversight units, including research administration, records and information governance, risk management, quality and safety functions, and program administration, owed institutional duties to ensure enforceable authorization, complete documentation, monitoring, and escalation. Their collective failure reflects breakdowns in institutional governance.

### 6.2 Established Baseline and Institutional Deviation

For nearly a decade, Mr. Fischman remained stable under Defendant's enforced institutional safeguards, including consistent documentation, monitoring protocols, escalation pathways, and continuity of critical information. This stability demonstrates Defendant's ability to operate effective institutional controls when enforced.

Before the medication transition, Defendant weakened or ceased enforcing these safeguards across its systems. Authorization, documentation, monitoring, and accountability controls were no longer consistently applied, materially altering how risk was governed at the institutional level.

**6.3 Collapse of Authorization, Records, and Oversight**

Defendant authorized, procured, and deployed a high-risk, off-label tangible product through its systems without enforceable approvals, standardized authorization routing, auditable records, or a defined monitoring infrastructure. Institutional records were incomplete, non-linear, and internally inconsistent, preventing determination of active regimens, timing of changes, or compliance with safeguards.

By controlling procurement, custody, and dispensing pathway of tangible personal property, including through a Patient Assistance Program without documented authorization, Defendant assumed responsibility for safety governance while lacking records sufficient to verify compliance, traceability, or risk status.

**6.4 Failure to Monitor, Escalate, and Intervene**

Defendant implemented no institutional monitoring cadence or escalation framework before authorizing deployment of the product. As adverse effects accumulated, warning signals were

fragmented across systems and addressed in isolation rather than integrated and escalated for institutional review.

Defendant failed to restore safeguards or initiate coordinated intervention. The product was discontinued only after irreversible injury occurred.

**6.5 Research-Driven Administrative Failures**

At the time of the transition, Defendant was engaged in institutional research activity involving the same off-label product. Defendant failed to maintain operational separation between research administration and patient-specific authorization, documentation, monitoring, and safety governance.

Institutional systems deferred to research-oriented priorities without mechanisms requiring patient-specific safeguards to control authorization, monitoring, or escalation.

**6.6 Institutional Causation and Failure to Determine Root Cause**

Defendant operated a fragmented, multi-unit institutional care structure in which authorization, monitoring, documentation, escalation, and review functions were distributed across multiple systems. Under such a model, Defendant was required to maintain defined institutional processes, data controls, education, and escalation pathways capable of identifying causation when deterioration occurred.

Defendant failed to do so. No integrated causation analysis or corrective care plan was implemented. Instead, abnormal findings were addressed as isolated symptoms while continued exposure to the underlying source of harm was permitted.

Mr. Fischman was stable prior to the transition. His deterioration began only after the product was authorized and deployed through Defendant's institutional systems and progressed during continued exposure. The adverse effects that developed were consistent with known risks associated with the product, including risks identified in its Black Box Warning.

Defendant failed to operationalize those known risks across its institutional systems. Warning indicators were fragmented, not integrated, and not escalated for institutional causation analysis. Defendant's failure to preserve record integrity, enforce monitoring, integrate warning signals, and determine causation resulted from institutional design and enforcement failures.

Where an identifiable agent of change is introduced into a previously stable system and adverse effects consistent with known risks follow within weeks, the agent of change is the most probable cause. Defendant cannot exclude the product as the cause of harm because it failed to maintain systems capable of evaluating causation.

But for Defendant's failures in institutional authorization, documentation, monitoring, escalation, and oversight, Mr. Fischman would not have suffered the injuries that led to his death.

**6.7 Proximate Cause**

The harm was a foreseeable result of authorizing and continuing a high-risk, off-label tangible product without institutional safeguards, monitoring requirements, or escalation pathways. No independent or superseding cause intervened. Defendant's failures operated continuously from authorization through death, resulting in an unbroken chain of harm.

**VII. CAUSES OF ACTION**

---

This action arises from UT Southwestern's institutional nondisclosure, lack of institutional authorization, and administrative failures in implementing a high-risk, off-label medication transition. Plaintiffs challenge the creation and execution of an institution-wide administrative practice that displaced established safeguards without legally sufficient institutional disclosure, authorization, oversight, or enforcement. The gravamen of these claims is institutional conduct.

**7.1 Wrongful Death (CPRC Chapter 71)**

Plaintiffs Gallit Fischman and Ilana Fischman bring this wrongful-death action in their individual capacities pursuant to Texas Civil Practice and Remedies Code Chapter 71.

Mr. Fischman's death was caused by UT Southwestern's wrongful acts and omissions, including institutional nondisclosure, uninformed institutional authorization of a medication transition, failure to enforce required administrative safeguards, and the affirmative use of tangible personal property through Defendant's institutional systems. As a direct and proximate result, Plaintiffs suffered damages recoverable under Chapter 71, including pecuniary loss, loss of companionship and society, and mental anguish.

**7.2 Uninformed and Unauthorized Institutional Administration**

UT Southwestern created and controlled the institutional disclosure and authorization framework governing high-risk, off-label medication transitions, including standardized forms, required disclosure procedures, and the data systems used to authorize and execute medication deployment. As the institutional owner of that framework, UT Southwestern was responsible for defining required disclosures, ensuring written and verbal disclosures were provided, obtaining executed authorizations, monitoring compliance, and enforcing consequences for noncompliance.

UT Southwestern further controlled the electronic and administrative systems through which medication orders were authorized and executed. Those systems should not have permitted the medication to be authorized, released, or deployed unless a completed disclosure and authorization document was uploaded, validated, and linked within the system. Defendant failed to implement or enforce such controls.

UT Southwestern breached these duties by authorizing and executing a medication transition without informed institutional disclosure, without legally sufficient institutional authorization, and without meaningful monitoring, enforcement, or system-level gating. As a result, the medication was deployed through Defendant's institutional systems in an uninformed and unauthorized manner.

These failures were a proximate cause of Mr. Fischman's injuries and death and establish liability for uninformed and unauthorized institutional administration of tangible personal property.

**7.3 Waiver of Immunity Under the Texas Tort Claims Act**

UT Southwestern is a governmental unit within the meaning of the Texas Tort Claims Act. Mr. Fischman's injuries and death were proximately caused by UT Southwestern's affirmative authorization, custody, dispensing pathway, and physical administration of tangible personal property through Defendant's institutional medication systems.

UT Southwestern exercised exclusive physical control over the acquisition, custody, dispensing pathway, and institutional deployment of the medication, including distribution through a Patient Assistance Program. The medication was authorized, procured, dispensed, and physically introduced into Mr. Fischman's body through UT Southwestern's institutional systems. This

---

Cause No. DC-25-18350; *Gallit Fischman and Ilana Fischman v. UTSW*
Plaintiffs' Sixth Amended Petition                                    Page 13 of 17

conduct constitutes affirmative use and institutional administration of tangible personal property under Texas Civil Practice and Remedies Code § 101.021(2). Sovereign immunity is therefore waived.

**7.4 Fair Notice**

Taken as a whole, these allegations provide UT Southwestern with fair notice of the factual basis of Plaintiffs' claims and the institutional acts and omissions at issue. Plaintiffs assert two causes of action only: wrongful death under CPRC Chapter 71 and Institutional Negligence and Unauthorized Administration of Tangible Personal Property.

**VIII. DAMAGES**

As a direct and proximate result of Defendant's acts and omissions, Plaintiff Gallit Fischman seeks all damages recoverable under Texas law for the claims asserted herein, and Plaintiffs Gallit Fischman and Ilana Fischman seek wrongful death damages as set forth below. All damages are sought solely based on UT Southwestern's institutional governance, administrative systems, and corporate program oversight.

## 8.1 Rule 47(c) Damages Range

Pursuant to Texas Rule of Civil Procedure 47(c), Plaintiffs seek monetary relief of more than $1,000,000 but not more than $5,000,000.

## 8.2 Wrongful Death Damages

Plaintiffs Gallit Fischman and Ilana Fischman seek wrongful death damages under Texas Civil Practice and Remedies Code Chapter 71, including:

- pecuniary losses, including loss of financial support, services, care, assistance, and contributions Dov Fischman would have provided to Plaintiffs;

- loss of companionship and society, including love, affection, comfort, guidance, and support;

- mental anguish suffered as a result of Dov Fischman's death; and

- loss of financial benefits and contributions Plaintiffs would reasonably have received.

## IX. REQUEST FOR DISCLOSURE

Pursuant to Texas Rule of Civil Procedure 194, Plaintiff requests that Defendant disclose, within the time prescribed by the Texas Rules of Civil Procedure, the information and materials described in Rule 194.2.

## X. JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable and tender the required jury fee.

## XI. PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that Defendant be cited to appear and answer herein, and that upon final trial, Plaintiffs recover judgment against Defendant for:

- **Threshold Relief.** An order determining, based on the four corners of this live Petition (and any permitted limited jurisdictional discovery), that:

  o sovereign immunity is waived under Texas Civil Practice and Remedies Code § 101.021(2);

- o   the claims pleaded herein are not health care liability claims under Chapter 74; and

- o   Plaintiffs have standing and capacity to assert the claims pleaded herein.

- all damages described in this Petition to the maximum extent permitted by law, including wrongful death damages;

- pre-judgment and post-judgment interest at the maximum rate allowed by law;

- costs of court;

- denying Defendant any attorney's fees, sanctions, or fee-shifting relief to the extent permitted by law;

- prospective declaratory and injunctive relief ancillary to Plaintiffs' Texas Tort Claims Act claims, limited to requiring Defendant to comply with existing statutory, regulatory, and internal administrative requirements governing institutional disclosure, authorization, record integrity, and monitoring and escalation systems for high-risk, off-label medication administration;

- such equitable relief as necessary to remedy and prevent continued institutional nondisclosure and administrative process failures alleged herein; and

- such other and further relief, at law or in equity, to which Plaintiffs may be justly entitled.

Respectfully submitted,

Date: February 9, 2026

/s/ _Gallit Fischman_____

GALLIT FISCHMAN, Pro Se

---

Individually and as a Plaintiff
10114 Deermont Trail
Dallas, TX 75243
Phone: (214) 893-6720
Email: gallitfischman@yahoo.com



/s/ _____

ILANA FISCHMAN, Pro Se

Individually and as a Plaintiff
10114 Deermont Trail
Dallas, TX 75243
Phone: (972) 679-3606
Email: designsetc1@yahoo.com

**CERTIFICATE OF SERVICE**

I certify that on February 9, 2026, a true and correct copy of the foregoing instrument was served on all counsel of record in accordance with Texas Rules of Civil Procedure 21 and 21a by electronic service through the electronic filing manager at the electronic mail address on file.

Via e-Service

**Jason Warner**
Special Litigation Counsel
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
jason.warner@oag.texas.gov
Counsel for Defendant



/s/ _____

**GALLIT FISCHMAN**

Pro Se Plaintiff

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 111044404
Filing Code Description: Amended Petition
Filing Description: 6TH
Status as of 2/10/2026 8:15 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Matthew JasonWarner | | jason.warner@oag.texas.gov | 2/9/2026 5:40:39 PM | SENT |
| Gallit Fischman | | gallitfischman@yahoo.com | 2/9/2026 5:40:39 PM | SENT |
| Ilana Fischman | | designsetc1@yahoo.com | 2/9/2026 5:40:39 PM | SENT |

**App. 130**

# EXHIBIT C-1

FILED
11/17/2025 12:00 AM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Marissa Gomez DEPUTY

CAUSE NO. DC-25-18350

| | | |
|---|---|---|
| GALLIT FISCHMAN, Individually and | § | IN THE DISTRICT COURT |
| as Surviving Adult Daughter | § | |
| of DOV FISCHMAN, Deceased, | § | |
| *Plaintiff,* | § | |
| v. | § | 101ST JUDICIAL DISTRICT |
| | § | |
| THE UNIVERSITY OF TEXAS | § | |
| SOUTHWESTERN MEDICAL CENTER, | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

**PLAINTIFF GALLIT FISCHMAN'S RESPONSE TO DEFENDANT'S ANSWER AND**

**MOTION TO STRIKE AFFIRMATIVE DEFENSES**

TO THE HONORABLE JUDGE WILLIAMS OF SAID COURT:

Comes now, Gallit Fischman, plaintiff in the above-styled and numbered cause, and files this, her plaintiff's motion to strike defendant's affirmative defenses, and would respectfully show the court as follows:

---

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses

# I. INTRODUCTION

Defendant's Answer asserts defenses under Chapter 74 of the Medical Liability Act and sovereign immunity but fails to satisfy Texas procedural and substantive law requirements. Defendant offers no apparent factual basis, legal analysis, or controlling authority to support these defenses, which Plaintiff contends are conclusory assertions likely violating Texas Rule of Civil Procedure 91's fair notice requirement. Rule 91 mandates that affirmative defenses provide fair notice of the facts and legal grounds supporting the defense so Plaintiff can adequately prepare a response. Defendant's failure to identify the challenged clinical judgments, specify the legal authorities relied upon, or provide any supporting evidence deprives Plaintiff of this fair notice (see *Crosstex Energy Services, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014); *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984)). Such legally insufficient pleading should be stricken as a matter of law.

Plaintiff's Original Petition comprehensively argues that Chapter 74 does not apply to claims of institutional administrative negligence, as supported by controlling decisions including *Diversicare General Partner, Inc. v. Rubio*, *Ross v. St. Luke's Episcopal Hospital*, *Texas West Oaks Hospital, LP v. Williams*, and *Marks v. St. Luke's Episcopal Hospital*. Plaintiff also identifies three independent statutory waivers of sovereign immunity recognized in *Salcedo v. El Paso Hospital District*, *Lowe v. Texas Tech University*, *City of El Paso v. Heinrich*, and *City of Watauga v. Gordon*. Despite this thorough legal framework, Plaintiff asserts that Defendant has largely failed to engage with these controlling authorities and legal arguments. Instead, Defendant offers bare, boilerplate defenses lacking factual support or legal

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                              Page 2 of 20

App. 133

analysis as required by Rule 91. These vague defenses fail to provide fair notice to Plaintiff and prejudice Plaintiff's ability to prepare a meaningful response.

Further, the recent Texas Supreme Court decision in *Bush v. Columbia Medical Center of Arlington Subsidiary, L.P., No. 23-0460 (Tex. May 23, 2025),* confirms that institutional administrative policy failures are categorically distinct from clinical medical judgment and accordingly fall outside Chapter 74's ambit. Defendant's Chapter 74 defense thus lacks any lawful foundation.

Plaintiff's allegations and arguments in this motion are based on currently available evidence and information. While Plaintiff believes such evidence supports these positions, further discovery is anticipated that may provide additional factual detail. Accordingly, statements made herein are Plaintiff's good faith positions, supported by Plaintiff's knowledge and records to date, and subject to supplementation as discovery progresses.

Accordingly, Plaintiff respectfully requests that Defendant's affirmative defenses be stricken as legally insufficient and improper.

## II. DEFENDANT'S CHAPTER 74 DEFENSE FAILS AS MATTER OF LAW

### A. *Bush v. Columbia Medical Center of Arlington* Confirms Chapter 74 Does Not Apply

*Bush v. Columbia Medical Center of Arlington Subsidiary, L.P., No. 23-0460 (Tex. May 23, 2025)* is directly controlling and dispositive on the issue of Chapter 74 applicability. The Texas Supreme Court held that hospital duties arising from institutional administration—such as the development, implementation, or enforcement of policies, procedures, or oversight—are distinct from patient-specific medical judgment and fall outside Chapter 74's scope. The Court drew a

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 3 of 20

App. 134

clear line between individual clinical care (which Chapter 74 governs) and institutional administrative negligence (which it does not require expert reports for).

*Bush v. Columbia Medical Center of Arlington* expressly rejected the defense that hospitals could invoke Chapter 74 because their conduct touched on patient care. The Court explained that "institutional negligence based on a hospital's policies, systems, or failure to supervise is not a health care liability claim," emphasizing that systemic administrative functions are legally separate from medical treatment decisions. Consequently, Bush forecloses Defendant's Chapter 74 defense here since Plaintiff's allegations concern hospital-wide administrative policy failures, not individualized medical judgment.

Plaintiff alleges administrative negligence in UTSW's institutional structure, including failures in Clinical Research Administration, Institutional Review Board oversight, Quality Assurance, Risk Management, Medical Staff Offices, Patient Safety Committee, Transplant Program Administration, and the Medical Records Department (which the Texas Medical Board found so deficient it prevented creating a medication timeline). These failures constitute institutional administrative negligence, distinct from clinical judgment and outside Chapter 74's ambit under *Bush*. Policies may guide or suggest treatment paths without supplanting physician judgment—precisely the conduct alleged here.

No expert testimony on clinical decisions is required to prove the absence of oversight systems, safety protocols, and proper documentation standards across these organizational units. Based on Plaintiff's professional experience in healthcare IT and development of Epic-integrated systems, Plaintiff has relevant factual knowledge to identify systemic operational deficiencies. This

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 4 of 20

App. 135

factual knowledge supports the conclusion that Defendant's Chapter 74 defense is legally inapplicable.

**B. No Physician-Patient Relationship Established—Chapter 74 Categorically Inapplicable**

Chapter 74 requires a physician-patient relationship for liability to attach, as established by *Brown v. Memorial Hermann Hospital System and Memorial Hospital System v. Figgs*. Plaintiff's allegations, presumed true for this motion, show Dr. MaryJane Farr acted as Section Chief with policy-making authority rather than as a treating physician. She implemented institutional immunosuppression protocols, held authority for clinic-wide changes, and participated in a single meeting with Decedent solely to announce a shift in standard therapy, not to provide individualized care. Dr. Farr conducted no chart review, inquired nothing about medical history, made no patient-specific risk analysis, discussed no treatment alternatives, and did not form any ongoing treatment relationship. Her purpose was entirely policy-driven, instituting a protocol change for all clinic patients, untouched by clinical discretion for Decedent's unique circumstances.

Dr. Farr explicitly told Ilana and Dov Fischman she was replicating a clinic-wide protocol from Columbia University Irving Medical Center confirming the meeting's goal was announcement of administrative policy, not provision of care. Additionally, she has since disclaimed any treating physician status. As such, all evidence shows her actions fell decisively within the administrative domain addressed in *Bush v. Columbia Medical Center of Arlington*.

This case requires discovery because Defendant alone possesses evidence such as Dr. Farr's job description, meeting documentation, medical records, communications regarding institutional policy changes, and records of whether patient-specific review occurred. In summary, absent a

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                      Page 5 of 20

App. 136

physician-patient relationship, the claim cannot lie under Chapter 74: it challenges only institutional administrative conduct, not clinical judgment.

## C. Documentary Evidence Establishes Institutional Failures

UTSW's response to public information requests confirms that, at the relevant time, it lacked an institutional policy governing off-label prescribing—an omission that, under *Bush v. Columbia Medical Center of Arlington*, constitutes actionable administrative negligence. Plaintiff's MyChart records demonstrate the absence of requisite follow-up appointments despite FDA black box warnings, reflecting a failure to establish and configure automated safety monitoring systems within UTSW's institutional infrastructure rather than any deficiency in individual clinical judgment. The Texas Medical Board found the medical records so inadequate as to prevent even the establishment of a medication timeline, underscoring profound institutional documentation failures and the fundamental impossibility of expert clinical review as mandated by Chapter 74. Where basic medical facts cannot be ascertained by the Medical Board, no expert witness could reasonably be expected to render the individualized clinical assessments presumed under Chapter 74.

UT System's designated medical expert further compounded institutional error by inaccurately asserting that deaths associated with Everolimus 'only occurred in de novo patients.' This misrepresents the FDA black box warning, which was based solely on safety data from de novo (new) transplant recipients and explicitly highlights the absence of sufficient safety data supporting Everolimus use for conversion therapy in established patients—the exact circumstance at issue in this case. Everolimus, serving dual functions as both an immunosuppressant and a cancer-fighting agent, demands rigorous institutional protocols to

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                   Page 6 of 20

App. 137

manage its complex risks. UTSW implemented the conversion protocol lacking adequate safety data and FDA approval specific to cardiac transplant patients, even while conducting research intended to address these gaps, all the while disregarding the Decedent's documented contraindicated exposure to cardiotoxic cancer therapies that precipitated the cardiac injury necessitating transplant. These decisions and implementations reflect institutional policy choices extending beyond established clinical evidence.

Despite the patient receiving dermatologic care for skin cancer management, Everolimus was prescribed under UTSW's institutional authority notwithstanding an off-label black box warning for increased malignancy risk and the absence of any protocols to screen for such contraindications. This represents a clear institutional failure in patient selection and risk management. Furthermore, UTSW failed to configure Epic EHR's automated scheduling and monitoring capabilities for Everolimus use as part of its standard patient safety infrastructure. Plaintiff's professional experience in developing Epic-integrated systems corroborates that these deficiencies are systemic institutional failures, which can be substantiated through documentary evidence including Epic system settings, administrative policies, and documentation procedures subject to discovery.

**D. Defendant's Procedural Defense Constitutes Implicit Admission**

By asserting defenses under Chapter 74 rather than disputing the underlying facts or applicable law, Plaintiff reasonably infers that Defendant may be implicitly conceding a claim exists, that UTSW caused cognizable harm, and that the defense is primarily procedural. If the Chapter 74 defense were meritorious, Defendant would have been obligated to specify which clinical judgments are challenged, identify the physician who established a treatment relationship,

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 7 of 20

App. 138

explain how the allegations amount to clinical judgment, and cite where in the record such facts appear. Defendant has failed to do so. This procedural defense appears designed to impose an expert report requirement, exploit known deficiencies in the record, seek dismissal on technical grounds, and obstruct discovery into institutional failures rather than address the substantive merits of Plaintiff's claims.

**E. Defendant's Failure to Meet Burden of Proof**

Defendant's Answer appears limited to conclusory assertions that Plaintiff's claims are capped under the Medical Liability Act, without citing any case law supporting the Chapter 74 defense for administrative negligence or attempting to distinguish key controlling authorities including *Bush v. Columbia Medical Center of Arlington Subsidiary, L.P.*, *Diversicare General Partner, Inc. v. Rubio*, *Ross v. St. Luke's Episcopal Hospital*, *Texas West Oaks Hospital, LP v. Williams*, and *Marks v. St. Luke's Episcopal Hospital*. Defendant fails to identify any physician-patient relationship, clarify the policy-announcement nature of the meeting, or address Dr. Farr's confirmation that she was merely implementing a Columbia University Irving Medical Center protocol. Critically, Defendant offers no explanation why systemic deficiencies in scheduling, documentation, and oversight—areas in which Plaintiff has professional domain expertise—should be deemed clinical medical judgment under Chapter 74.

This total absence of factual and legal articulation not only fails Defendant's burden of proof but also violates Texas Rule of Civil Procedure 91's fundamental fair notice requirement. Defendant has not specified which clinical judgments are challenged, which treating physicians are implicated, or provided any legal or evidentiary support. Such deficient pleading deprives Plaintiff of a meaningful opportunity to respond and properly prepare, as emphasized by

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                    Page 8 of 20

App. 139

controlling precedent including *Crosstex Energy Services, L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014) and *Brownlee v. Brownlee*, 665 S.W.2d 111, 112 (Tex. 1984). This procedural and substantive failure alone warrants striking Defendant's Chapter 74 defense.

## III. DEFENDANT'S SOVEREIGN IMMUNITY DEFENSE FAILS AS MATTER OF LAW

### A. Plaintiff Established Three Independent Statutory Waivers of Sovereign Immunity

First waiver: Texas Civil Practice and Remedies Code § 101.021(2) provides for sovereign immunity waiver where injury results from governmental use of tangible personal property. Controlling authorities such as *Salcedo v. El Paso Hospital District*, *Lowe v. Texas Tech University*, and *Jones* confirm that governmental prescription and administration of medication without required monitoring trigger this waiver. Here, UTSW enacted a clinic-wide administrative policy to prescribe and dispense Everolimus without monitoring protocols, which constitutes "affirmative governmental use" of tangible property. Moreover, the absence of an individualized physician-patient relationship underscores the administrative nature of these actions, making sovereign immunity inapplicable.

Defendant's failure to engage with or distinguish these precedents is a concession of this waiver's applicability.

Second waiver: Ultra Vires Liability. UTSW exceeded its lawful authority by prioritizing research objectives in the TEAMMATE trial over patient safety, violating multiple federal regulations. *City of El Paso v. Heinrich* and *Houston Belt & Terminal Railway Company* establish that sovereign immunity does not shield ultra vires actions—acts beyond statutory authority. Defendant offers no response to this argument.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 9 of 20

App. 140

Third waiver: Negligence Claims Are Not Intentional Torts. Under § 101.057(2), intentional torts are barred, but institutional negligence and administrative oversight claims, central to Plaintiff's allegations, are not.

**B. Defendant's Failure to Meet the Burden of Proof**

Defendant's conclusory claim of full sovereign immunity, save for partial waiver under the Texas Tort Claims Act, fails to meet the standards under *Texas Department of Parks & Wildlife v. Miranda* and *Crosstex Energy Services v. Pro Plus, Inc.* Plaintiff has demonstrated statutory waivers supported by case law and facts, shifting the burden to Defendant to specifically justify immunity. Defendant's failure to do so mandates rejection of their sovereign immunity defense.

## IV. SYSTEMATIC NON-ENGAGEMENT DEMONSTRATES RULE 91 VIOLATION AND DEFENSE INSUFFICIENCY

Pre-litigation, Defendant responded to Plaintiff's Texas Public Information Act requests with generalized denials lacking statutory citation or factual specificity, violating Government Code § 552.301. This institutional pattern of non-engagement is mirrored in Defendant's Answer to this lawsuit, which relies heavily on conclusory assertions devoid of analysis or legal support.

Such barebones affirmative defenses violate Texas Rule of Civil Procedure 91, which requires fair notice of the factual and legal bases for defenses. This rule serves to prevent precisely this type of evasive pleading that obstructs Plaintiff's ability to respond effectively and causes needless delay and expense. Courts regularly strike defenses failing Rule 91's fair notice standard to maintain procedural integrity.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 10 of 20

App. 141

Defendant's refusal to meaningfully address Plaintiff's detailed legal framework, controlling case law, or factual allegations constitutes a blatant violation of Rule 91 and renders the defenses insufficient as a matter of law.

## V. PRELIMINARY DISCOVERY IS MANDATORY BEFORE CLASSIFICATION

Texas law requires discovery when jurisdictional or classification facts are disputed and are solely within the Defendant's possession. Cases such as *Axelson* and *Diversicare* establish that discovery should be liberally granted when critical information about the issues and facts is uniquely accessible to one party. This principle is especially important when the classification of a claim—such as whether it constitutes general liability or medical malpractice—depends on facts exclusively held by the Defendant.

Given Defendant's inadequate and conclusory affirmative defenses and failure to satisfy Texas Rule of Civil Procedure 91's fair notice requirements, Plaintiff respectfully requests that, if the Court does not strike such defenses outright, it permits the case to proceed to full discovery without limitation to preliminary expert reports or classification issues. Liberal discovery is warranted because critical facts and classification determinations regarding whether the claims constitute health care liability or general liability are uniquely within Defendant's control, and discovery is essential for Plaintiff to properly develop and present her case. Restricting discovery solely to Chapter 74 issues at this preliminary stage would be premature and prejudicial.

Plaintiff further requests that the Court enter a discovery order setting a schedule consistent with the Texas Rules of Civil Procedure Discovery Control Plan, allowing necessary depositions, requests for production, and other discovery proceedings that will facilitate a thorough examination of the factual and legal issues in dispute.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                          Page 11 of 20

App. 142

Needed discovery includes:

- Evidence regarding the physician-patient relationship and administrative authority, including:
  - Dr. Farr's Section Chief status and authority;
  - Purpose and nature of the patient meeting;
  - Whether she reviewed patient records or conducted risk analysis;
  - Communications affirming institutional policy decisions;
  - Statements about using the Columbia University Irving Medical Center protocol;
  - Documentation about policy transfer, disclaimers of treatment status, and identification or absence of treating physicians;
  - Organizational charts and job descriptions.
- Institutional policies including:
  - Off-label prescribing policies (or records of absence);
  - Medication approval processes;
  - Risk screening protocols;
  - Physician-patient guideline changes;
  - Protocol imports from Columbia University Irving Medical Center;
  - Relevant implementation timelines.
- Electronic health records, including:
  - Full Dov Fischman Epic records with functioning links;
  - Monitoring and system configuration details;
  - Audit trails, timestamps, access logs;
  - Explanations for broken medical record links.
- Research protocol documentation, such as:
  - TEAMMATE trial rules;
  - Lists of participating physicians and IRB approvals;
  - Details of data sharing and communications influencing policies;
  - Blank Patient Consent Forms;
  - Everolimus and trial-related materials shared with patients and guardians;

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 12 of  20

**App. 143**

- • Withheld final trial results.
- • Drug safety information/promotional material, including:
  - • FDA-approved labeling and black box warnings shared with patients;
  - • "Novartis marketing materials and any other supporting material used to foster adoption for Everolimus provided to UT Southwestern, related to both the drug and the TEAMMATE clinical trials;
  - • Monitoring requirements;
  - • Patient information and consent documents;
  - • Institutional guidelines for off-label drug use.
- • Clinical evidence base, including:
  - • Data supporting protocol conversion for cardiac transplant patients;
  - • Comparative evidence for de novo vs. conversion protocols;
  - • Risk analyses and evidence reviews;
  - • Acknowledged limitations or gaps by the manufacturer or medical community regarding the sufficiency and completeness of safety information for Everolimus in the cardiac transplant setting, signaling caution in its clinical use.
- • Multidisciplinary review related to Dov Fischman, including:
  - • Minutes and rosters for transplant and oversight committees;
  - • Their review of the case or relevant policies;
  - • Institutional policies requiring committee review.
- • Documentation standards, including:
  - • Internal quality assurance policies;
  - • Explanation of Medical Board adverse findings;
  - • Standards for documenting clinical decisions and relationships.

This discovery will determine whether a physician-patient relationship existed, whether the conduct in question was clinical or administrative, the extent to which the trial influenced Dov Fischman's care, and whether the use of tangible property constitutes a waiver of sovereign immunity; it will also evaluate compliance with applicable institutional policies and regulatory

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                          Page 13 of 20

**App. 144**

requirements, examine the roles and responsibilities of the parties involved, and assess any potential deviations or breaches that could impact liability. Ruling prior to the completion of discovery would be premature and improper.

## A. Peer Review Privilege Does Not Shield Requested Discovery

Defendant may invoke peer review privilege under Occupations Code § 160.007, but this does not apply: the privilege covers competence evaluations, not institutional structure or whether review occurred (see *Irving Healthcare System v. Brooks*); it does not cover challenges to administrative, as opposed to peer quality, decisions (see *Columbia Medical Center of Las Colinas Subsidiary, L.P. v. Hogue*); and non-privileged material in mixed documents must still be produced, with in camera inspection where there is no alternative. Plaintiff seeks only non-privileged information about institutional structure, committee composition, and whether any review of this incident or protocol occurred.

## VI. ADDITIONAL DEFENSES FAIL

## A. Blanket Incorporation Violates Rule 91 Fair Notice Requirements

Defendant's incorporation by reference of broad statutory chapters, including "Chapter 41 et seq., Chapter 74 et seq., and Chapter 101 et seq.," without specifying which provisions apply or underlying facts, violates the fair notice requirements of Texas Rule of Civil Procedure 91. Such boilerplate incorporation fails to identify the factual predicate or legal theory of the defenses, leaving Plaintiff unable to prepare an adequate response.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                   Page 14 of 20

App. 145

Texas courts have repeatedly held that meaningful affirmative defenses require specificity in facts and legal grounds. Blanket incorporation is a paradigmatic example of pleading that Rule 91 commands courts to strike.

## B. General Denial Insufficient Without Proper Affirmative Defenses

A general denial, while proper, does not cure the legal failures of Defendant's affirmative defenses. Where no facts or law are asserted, the denial lacks fair notice of what is contested, the legal basis, or how Plaintiff should respond—leaving litigation aimless when affirmative defenses are stricken.

## C. Derivative Defenses Depend on Insufficient Primary Defenses

Medical expense caps, exemplary damages limitations, and prejudgment interest restrictions are all derivative, depending on either Chapter 74 or sovereign immunity defenses—each of which has been inadequately and improperly asserted. Medical expense caps are premature, as damages are not yet at issue, and would only be relevant if Chapter 74 were to apply (which Defendant has not shown). The exemplary damages bar (Answer § V) depends wholly on unresolved immunity questions. If immunity is waived due to ultra vires conduct, then injunctive relief may also apply. Prejudgment interest restrictions are standard and not genuinely a defense to liability, and thus premature and non-responsive.

## D. Attorney's Fees—Statutory Citation Error

Defendant incorrectly cites Tex. Civ. Prac. & Rem. Code §§101.023 & 101.025 as authority for denying attorney's fees, when these actually address exemplary damages and intentional torts— not attorney's fees. This mis-citation demonstrates Defendant's failure to properly review

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 15 of 20

App. 146

Plaintiff's petition or relevant law. Proper authority (*Gulf Coast Center v. Curry, Manbeck v. Austin Independent School District*) bars fees for TTCA tort claims, but Texas Government Code §552.323(a) allows fees for TPIA violations, which Defendant wrongly omits and to which Plaintiff is entitled for TPIA claims.

## VII. INSTITUTIONAL ACCOUNTABILITY AND PROPER CLASSIFICATION

Chapter 74's purpose is to prevent frivolous lawsuits, not to shield institutional failures. Defendant's purely procedural defenses highlight the substantive merit of Plaintiff's claims. Only upon proper classification as institutional administrative negligence can real accountability, oversight, and patient safety improvement occur.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays the Court to:

- Strike Defendant's Chapter 74 defenses (Answer § III), sovereign immunity defenses (Answer § II), blanket incorporation language (Answer § III), derivative defenses (Answer §§ IV, V, VI), and affirmative defenses for failure to comply with Texas Rule of Civil Procedure 91;

- Find that Defendant failed to meet its burden of proving Chapter 74 applies and that immunity is not waived;

- Order preliminary discovery on all issues relating to whether a physician-patient relationship existed; Dr. Farr's administrative versus treating role; meeting documentation; protocol evidence; administrative authority; policies; Epic records; research protocol; Everolimus product, trial, and consent materials; FDA and monitoring documentation; clinical evidence base; committee structure; documentation standards; and any additional facts relevant to the applicability or waiver of sovereign immunity;

- Order production of committee records specifically related to Dov Fischman, notwithstanding any claims of medical peer review privilege, as Texas law excludes administrative functions from such privilege and requires disclosure. This request does not include any personally identifiable information (PII) of individuals other than Dov Fischman;

- Order preservation of all relevant records, system logs, and data;

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                         Page 16 of 20

**App. 147**

- Reset the November 26, 2025 dismissal hearing to allow for completion of discovery;

- Deny dismissal before discovery is finished;

- Take judicial notice that UTSW is a public entity subject to transparency requirements;

- Require verification and detailed factual basis for any amended defenses;

- Order compliance with Texas Public Information Act (TPIA);

- Award costs and fees for TPIA violations under Government Code § 552.323(a);

- Award attorney's fees and costs for Defendant's violation of Texas Rule of Civil Procedure 91 fair notice requirements;

- Grant all other relief to which Plaintiff is entitled.

Plaintiff respectfully requests that the Court decide this response based on the written submissions filed herein and that a hearing be held only if the Court deems it necessary.

Respectfully submitted,

Date: November 16, 2025

/s/ *Gallit Fischman*

GALLIT FISCHMAN, Pro Se

Individually and as surviving daughter of Dov Fischman, deceased
10114 Deermont Trail
Dallas, TX 75243
Phone: (214) 893-6720
Email: gallitfischman@yahoo.com

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 17 of 20

App. 148

VERIFICATION

STATE OF TEXAS §

COUNTY OF DALLAS §

BEFORE ME, the undersigned authority, personally appeared Gallit Fischman, who being duly sworn, states:

I am over 18 years of age, of sound mind, and competent to make this verification. I have personal knowledge of the following facts, which are true and correct:

I worked as Solution Architect at Accenture for approximately 2.5 years on healthcare IT projects for Geisinger Health System, Bon Secours Mercy Health, and Pfizer, where I developed Epic-integrated systems, created automated scheduling campaigns, and implemented data governance protocols for Protected Health Information.

I possess MyChart documentation from UTSW's system showing no monitoring appointments were scheduled for Dov Fischman following his Everolimus prescription.

I have personally reviewed Dov Fischman's medical records and identified specific documentation inadequacies.

Texas Medical Board personnel communicated verbally to me that the medical records were so inadequate they could not establish a medication timeline for Dov Fischman's treatment.

UTSW responded to my detailed public information requests with the statement: "After conducting a diligent search, UT Southwestern did not locate any public information under the Act," without addressing each category of requested information separately, without identifying any specific exemptions, and without citing any statutory authority for withholding information.

Dr. Farr met with Dov Fischman once. According to Ilana Fischman, Dr. Farr's Physician Assistant briefly reviewed medical charts, but Dr. Farr did not participate. There was no inquiry into medication status, medical history, or individualized clinical assessment. The meeting seemed focused on justifying the switch to Everolimus. Dr. Farr reportedly announced a clinic-wide transition to Everolimus as the standard immunosuppression therapy during the meeting, citing her prior implementation of a similar protocol at Columbia University Irving Medical Center.

All facts stated in this Motion regarding documentary evidence, my professional background, Medical Board communications, UTSW's public information responses, Dr. Farr's meeting with Ilana and Dov Fischman, and the specific administrative failures alleged are true and correct to the best of my knowledge and belief.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 18 of 20

App. 149



GALLIT FISCHMAN

SWORN TO AND SUBSCRIBED before me on this 16th day of November, 2025.

Notary Public, State of Texas
My Commission Expires: 10 / 02 / 2028

BRANDON EDWARDS
Notary ID # 13511522-0
My Commission Expires
October 02, 2028

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 19 of 20

App. 150

**CERTIFICATE OF SERVICE**

I do hereby certify compliance with Tex. R. Civ. P. 21 and 21a. A true and correct copy of the foregoing instrument has been served on all counsel, by electronic transmission to the electronic mail address on file with the electronic filing manager. *See* Tex. R. Civ. P. 21a(a)(1). If a party has not designated an electronic mail address with the electronic filing manager, the party was served a true and correct copy of the foregoing instrument in person, by certified/regular mail, by commercial delivery service by fax or by email, or by such other manner as the Court in its discretion may direct. *See* Tex. R. Civ. P. 21a(a)(2).

On November 16, 2025, service was made on the attorney of record listed below.

Via e-Service

**Jason Warner**
Special Litigation Counsel
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
jason.warner@oag.texas.gov
Counsel for Defendant

/s/ _Gallit Fischman_____

**GALLIT FISCHMAN**

Pro Se Plaintiff

---

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Plaintiff Gallit Fischman's Response to Defendant's Answer
and Motion to Strike Affirmative Defenses                                    Page 20 of 20

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 108100164
Filing Code Description: Response
Filing Description:
Status as of 11/17/2025 9:34 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Matthew JasonWarner | | jason.warner@oag.texas.gov | 11/16/2025 3:44:24 PM | SENT |
| Gallit Fischman | | gallitfischman@yahoo.com | 11/16/2025 3:44:24 PM | SENT |

**App. 152**

# EXHIBIT C-2

FILED
12/12/2025 5:23 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Martin Reyes DEPUTY

CAUSE NO. DC-25-18350

| | | |
|---|---|---|
| GALLIT FISCHMAN, Individually and | § | IN THE DISTRICT COURT |
| as Surviving Adult Daughter | § | |
| of DOV FISCHMAN, Deceased, | § | |
| *Plaintiff,* | § | |
| v. | § | 101ST JUDICIAL DISTRICT |
| | § | |
| THE UNIVERSITY OF TEXAS | § | |
| SOUTHWESTERN MEDICAL CENTER, | § | |
| *Defendant.* | § | DALLAS COUNTY, TEXAS |

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR ADVANCE RULING UNDER §74.353 AND IN OPPOSITION TO DEFENDANT'S PLEA IN ABATEMENT

PRELIMINARY STATEMENT

This Brief addresses the threshold Chapter 74 issue raised by both Plaintiff's Motion for Advance Ruling under Texas Civil Practice & Remedies Code §74.353 (filed November 24, 2025) and Defendant's Plea in Abatement (filed November 24, 2025). Both motions present the same core legal question: whether Plaintiff's claims constitute Health Care Liability Claims subject to Chapter 74.

Plaintiff filed a Response to Defendant's Plea in Abatement on December 1, 2025, addressing Defendant's specific procedural arguments. This Brief provides comprehensive legal analysis of

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 1 of 25

**App. 154**

the institutional governance framework establishing why Plaintiff's claims fall outside Chapter 74's scope, supporting both Plaintiff's affirmative Motion for Advance Ruling and Plaintiff's opposition to Defendant's Plea in Abatement.

## I. Introduction

Plaintiff does not challenge an individual physician's isolated treatment decision. Plaintiff challenges how UT Southwestern Medical Center, acting through its governing structures, programmed and operated its hospital—its policies, monitoring rules, staffing patterns, research priorities, documentation systems, and electronic safety architecture. UT Southwestern designed this institutional environment and then allowed its physicians to function as interchangeable cogs inside that machine, without guardrails, transparency, or meaningful oversight. These are governance-level obligations that arise before any individual doctor ever makes a bedside judgment and fall outside the core treatment-focused category of claims Chapter 74 was designed to regulate.

This framing is critical under §74.353: when the gravamen of the claim is institutional programming, not individual clinical negligence, the claim falls outside Chapter 74.

## II. Legal Standard: Section 74.353 Advance Ruling

Section 74.353 allows the Court to issue an advance ruling on whether claims constitute Health Care Liability Claims (HCLCs). Courts applying §74.353 analyze:

- What duty forms the basis of the claim — if it is a governance, administrative, research-compliance, or institutional-policy duty, the claim is not an HCLC;

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 2 of 25

App. 155

- Whether the conduct challenged is "treatment, lack of treatment, or departure from accepted standards of medical care" — if not, Chapter 74 does not apply;

- Whether evaluating the claim requires expert testimony on medical judgment — if the claim instead concerns policies, monitoring systems, documentation standards, or administrative oversight, it is not an HCLC.

Every allegation in Plaintiff's petition targets duties that Texas statutes assign to a hospital's governing body, not to front-line clinicians. Therefore, each falls outside Chapter 74. Texas courts determine whether a claim is a Health Care Liability Claim based on the underlying facts and duties alleged, not the labels used in the pleadings, and here those duties arise from institutional governance and regulatory obligations rather than bedside medical judgment.

Decisions such as *Ross v. St. Luke's Episcopal Hospital, Reddic v. East Texas Medical Center, and Loaisiga v. Cerda* confirm that courts look to the underlying duties and whether medical judgment and expert testimony are required; where the claims concern institutional operations and general safety or administrative obligations, they are not health care liability claims under Chapter 74.

### III. Statement of Facts

Mr. Fischman received a heart transplant at UT Southwestern in April 2015 and remained stable for ~nine years on Cyclosporine, Imuran, and continuous Valcyte prophylaxis for his permanent high-risk CMV mismatch (donor CMV-positive, recipient CMV-negative). His chart from this period shows detailed, protocol-driven documentation.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 3 of 25

App. 156

On December 12, 2023, Section Chief Dr. MaryJane Farr saw Mr. Fischman once. Per information from Plaintiff's mother present at the encounter, Dr. Farr stated she had converted heart transplant patients to Everolimus at Columbia and was replicating this systematic conversion at UT Southwestern. She had no prior relationship with him, did not review his decade-long history, relied on a physician assistant to drive the encounter, approved discontinuing Valcyte despite the unchanged CMV mismatch, and documented no individualized risk assessment, patient-specific justification, discussion of alternatives, or black-box warnings contraindicating heart transplant use. UT Southwestern was completing the TEAMMATE study of Everolimus in heart transplant patients during this period.

After Everolimus initiation, UT Southwestern scheduled no follow-up appointments or laboratory monitoring despite FDA requirements and its own research protocols mandating surveillance for this high-risk drug. One month later, Mr. Fischman returned with abdominal pain that proved to be post-transplant lymphoproliferative disorder, a known risk of Everolimus and intensified immunosuppression.

In response to Plaintiff's Public Information Act request seeking policies governing off-label prescribing of high-risk immunosuppressants including Everolimus, UT Southwestern certified it had "no documents" responsive to the request.

**IV. Argument**

Plaintiff's claims challenge five institutional failures outside Chapter 74:

1.  Policy Design (*Bush v. Columbia*): No documents for off-label Everolimus program.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 4 of 25

**App. 157**

2. System Architecture (*Bush*, Ch. 241): Epic lacked alerts/safety flags.

3. Staffing (*Ollie*): Rotation model, no accountability.

4. Monitoring (*Easley*, Ch. 241): No required follow-up/labs.

5. Research (45 C.F.R. §46): Trial protections not extended to patients.

Texas courts apply a "substantive nexus" test that looks to whether the alleged duty and conduct are rooted in medical judgment or in general safety and administrative obligations that can be understood through common experience. Determining whether a hospital adopted any policies, configured EHR alerts, or scheduled follow-up labs for a high-risk drug falls squarely within common experience and does not require a medical expert to define a physician's standard of care.

**A. The Design-Build-Operate Framework: Institutional Governance Duties Fall Outside Chapter 74**

Healthcare operations management recognizes three distinct institutional responsibilities:

- Design (creating policies, protocols, system architecture),

- Build (implementing those systems through training, technology configuration, resource allocation), and

- Operate (executing clinical care within the designed system).

Under Texas law, Design and Build are governance functions assigned by statute to the hospital's governing body. The Texas Education Code, Chapter 65 (including §65.11 "Board of Regents"), vests "the government of the university system" in a Board of Regents appointed by the

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                      Page 5 of 25

App. 158

Governor with Senate consent and authorizes that Board to "govern, operate, support, and maintain" each UT component, including UT Southwestern and its hospitals. University of Texas System Board of Regents Rule 20201 ("Presidents") designates the UT Southwestern President—who reports to the Chancellor and the Regents—as the "Health Care Governing Body" for the institution's hospitals and clinics, with legal responsibility to oversee, manage, and govern them in accordance with health care regulations and applicable law. The Texas Health and Safety Code, Chapter 241, and implementing regulations such as 26 Tex. Admin. Code §505.41 require a hospital's governing body to organize, manage, and control the hospital and to adopt, implement, and enforce policies and procedures for safe operation, including medication practices and monitoring protocols.

Operate is where individual clinicians function. This distinction maps directly onto Chapter 74's scope: Chapter 74 addresses Operate-level treatment decisions; it does not address Design and Build failures, which *Bush v. Columbia Medical Center* recognizes as institutional duties independent of individual provider conduct.

Every allegation in Plaintiff's petition targets Design and Build failures:

- Category 1 - Policy Design Failure: Failure to design policies for off-label immunosuppressants

- Category 2 - System Architecture Failure: Failure to build Epic safety systems

- Category 3 - Staffing and Accountability Failure: Failure to design accountability structures

- Category 4 - Monitoring Protocol Failure: Failure to build monitoring protocols

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                          Page 6 of 25

- Category 5 - Research Compliance Failure: Failure to apply research protections to clinical patients

Individual physicians were left to Operate without institutional infrastructure—which is itself the institutional failure under the governance statutes, placing these claims outside Chapter 74. Because these Design and Build duties belong solely to the governing body, not physicians, allegations of violating these duties necessarily fall outside Chapter 74's definition of a health care liability claim.

**B. Institutional Program Implementation, Not Individualized Treatment**

The December 12, 2023 encounter that initiated Mr. Fischman's Everolimus conversion exemplifies why these claims fall outside Chapter 74. The physician involved was not acting as Mr. Fischman's treating cardiologist but as a physician-administrator implementing an institutional program.

Dr. MaryJane Farr, Section Chief of Advanced Heart Failure and Transplant Cardiology at UT Southwestern, previously held a leadership position at Columbia University Irving Medical Center—both institutions serving as TEAMMATE clinical trial sites. Plaintiff's mother, who attended the December 12, 2023 encounter with Mr. Fischman, reports that Dr. Farr stated Everolimus was a superior drug, that she had converted her patient population at Columbia Irving to this immunosuppressant, and was implementing the same conversion program at UT Southwestern. This was not an individualized clinical assessment of Mr. Fischman's specific needs—it was enrollment in an undisclosed institutional drug conversion program. The encounter record confirms this programmatic nature:

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 7 of 25

App. 160

- Dr. Farr had not established a longitudinal doctor-patient relationship with Mr. Fischman

- She met with him only once

- She did not meaningfully review his decade-long transplant history

- The physician assistant drove the discussion at the computer

- The PA first raised discontinuing Valcyte despite Mr. Fischman's permanent CMV mismatch

- Dr. Farr approved the removal

- No individualized risk assessment appears in the record

- No patient-specific justification for converting a stable transplant patient after ~nine years on successful immunosuppression

- No discussion of safer alternatives or black box warnings

When a Section Chief describes systematically converting her patient population to a high-risk immunosuppressant as part of an institutional program she implemented at a prior institution and seeks to replicate at her current institution, this constitutes institutional policy implementation, not "treatment, lack of treatment, or departure from accepted standards of medical care" under Chapter 74.

The conversion program itself required governing-body-level decisions that were never made:

1. Category 1 - Policy Design Failure: Adoption of institutional policies for off-label high-risk drug use

2. Category 2 - System Architecture Failure: Configuration of Epic systems to support safe program execution

3. Category 3 - Staffing and Accountability Failure: Staffing structures to ensure continuity and accountability

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 8 of 25

App. 161

4.  Category 4 - Monitoring Protocol Failure: Establishment of monitoring protocols to protect patients enrolled in the program

These are governance obligations under Education Code Chapter 65, UT System Rule 20201, and Health & Safety Code Chapter 241 that precede any individual physician's treatment decision. This is a Design-phase failure under *Bush v. Columbia Medical Center*, placing it outside Chapter 74's scope.

**C. Process Design Failures: The Shouldice Hospital Model and Institutional Causation**

The principles of institutional process design and their impact on patient outcomes are well-established in healthcare operations literature. *Shouldice Hospital Limited*, a Harvard Business School case study (Case No. 9-683-068), demonstrates that clinical excellence results from comprehensive institutional process engineering, not from relying on individual clinician competence to overcome systemic deficiencies.

Shouldice Hospital in Ontario, Canada performs exclusively external hernia repairs and achieves a recurrence rate below 1%—compared to the 10% industry standard. This ten-fold improvement does not result from superior individual surgeon skill but from deliberate institutional process design. The core business principle: "you cannot inspect quality into a product—you must build it into the process." Superior outcomes are engineered through institutional design decisions made before any individual clinician encounters a patient.

This business principle maps directly onto *Bush v. Columbia Medical Center's* legal framework: when hospitals design comprehensive processes with built-in safeguards, monitoring, and accountability, excellent outcomes follow predictably (institutional Design and Build). When

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 9 of 25

**App. 162**

hospitals fail to design such processes, foreseeable harm results (institutional negligence outside Chapter 74). UT Southwestern's Everolimus program demonstrates the opposite of *Shouldice's* approach: no policies, no safeguards, no monitoring.

This demonstrates the distinction *Bush v. Columbia Medical Center* draws: institutional process design (outside Chapter 74) versus individual clinical execution (inside Chapter 74). UTSW's failures occurred at the Design and Build levels—governance obligations under Education Code Chapter 65, UT System Rule 20201, and Health & Safety Code Chapter 241—not at the Operate level where individual physicians function within a designed system.

UT Southwestern operated as a premier academic medical center with extensive experience in clinical research protocol design, sophisticated Epic systems capable of enforcing clinical workflows, active quality improvement committees, and IRB oversight. The institution's TEAMMATE trial protocols for Everolimus prove UTSW knew exactly how to design comprehensive monitoring, safety assessments, and quality controls for this high-risk immunosuppressant in heart transplant patients. Yet UTSW applied none of these principles to clinical patients, creating a two-tier system (Category 5 - Research Compliance Failure under 45 C.F.R. Part 46).

The *Shouldice* comparison proves causation at the institutional level:

- *Shouldice* designed comprehensive institutional process → Predictably achieved <1% recurrence (10x better than standard)

- UTSW designed comprehensive research process (TEAMMATE) → Safely monitored trial subjects on Everolimus

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 10 of 25

App. 163

- UTSW designed no clinical process for same drug → Predictably, Mr. Fischman developed PTLD and died without institutional monitoring detecting toxicity

This is institutional programming failure under *Bush* and the governance statutes, not individual treatment failure under Chapter 74.

Federal human-subjects regulations (45 C.F.R. part 46) define research as systematic investigation designed to develop generalizable knowledge and require institutional review board oversight and enhanced informed consent for activities exposing subjects to experimental risks. When organizations formally study a drug in a defined population, they must apply robust safeguards and clearly distinguish research from routine care.

UT Southwestern's decision to impose comprehensive monitoring on TEAMMATE trial Everolimus participants while maintaining "no documents" and no protections for non-trial heart transplant patients on the same drug reflects institutional governance and research compliance failure, not bedside clinical judgment disagreement. These federal duties sound in institutional governance, transparency, and research ethics rather than Chapter 74's "treatment, lack of treatment, or departure from accepted standards of medical care."

The *Shouldice* model demonstrates that when hospitals design comprehensive processes, they apply them consistently. UT Southwestern created institutional inequity: research subjects received formal protections while clinical patients like Mr. Fischman received none despite both receiving identical high-risk drug. This two-tier system violates Common Rule principles (45 C.F.R. § 46.111) requiring research not place non-participants at disadvantage—a governance-level resource allocation decision under federal regulations, not a treatment decision under Chapter 74.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 11 of 25

App. 164

Federal compliance duties lie with the institution—not physicians—placing these Category 5 claims outside Chapter 74.

**D. Institutional Policy Failures: UT Southwestern's "No Documents" Admission**

In response to Public Information Act Request No. 2025-036 seeking documented guidelines, policies, and physician training records on off-label prescribing of high-risk immunosuppressants including Everolimus, UT Southwestern's custodian of records certified under penalty of perjury: "After conducting a diligent search, UT Southwestern did not locate any public information under the Act."

This response to a request specifically seeking policies, procedures, protocols, and guidelines governing off-label prescribing of high-risk immunosuppressants including Everolimus is dispositive under *Bush v. Columbia Medical Center*. *Bush* holds that a hospital's failure to adopt required protocols constitutes institutional negligence, not a health care liability claim. UTSW cannot convert its institutional failure into a Chapter 74 claim by pointing to physician conduct that occurred in the absence of institutional policies the governing body was statutorily required to adopt under Chapter 241 and 26 TAC §505.41.

    1. **Program Implementation Without Policies**

Dr. Farr implemented an institutional Everolimus conversion program—per information from Plaintiff's mother present at the encounter, explicitly describing converting heart transplant patients at Columbia and replicating this at UTSW—in complete absence of institutional policies governing that program. This is precisely the governance failure *Bush* identifies as institutional negligence: hospitals cannot permit physician-administrators to implement

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 12 of 25

App. 165

systematic drug conversion programs while simultaneously failing to adopt policies, monitoring protocols, and safety systems required to support those programs. The institutional Design failure precedes and causes any individual physician conduct.

## 2. Two-Tier System: Research Protections vs. Clinical Abandonment

At the same time, UT Southwestern was completing Everolimus in heart transplant patients under the TEAMMATE trial with formal research protocols including defined monitoring and safety rules, while using the same high-risk drug in Mr. Fischman's case without placing him under any comparable protections.

This two-tier system represents Category 5 (Research Compliance Failure) and reinforces that UTSW possessed the institutional knowledge to design appropriate safeguards but consciously chose not to apply them to clinical patients.

## 3. Institutional Policy Failure Under *Davis*

*Texas Health Harris Methodist Hospital Southwest Fort Worth v. Davis* reinforces this framework: the jury in *Davis* assigned 65% fault to the hospital for failing to implement written medication policies even though independent physicians committed the immediate error. *Davis* treats policy omissions as direct institutional liability, not vicarious liability. UTSW's "no documents" for off-label dangerous immunosuppressants matches this pattern of institutional policy failure under *Davis* and is pleaded as such, not as a Chapter 74 treatment claim.

## 4. Documentation System Failures

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                           Page 13 of 25

App. 166

The evolution of Mr. Fischman's chart demonstrates institutional documentation system failures. In early years after transplant, UT Southwestern documented immunosuppression and prophylaxis with extraordinary precision: detailed steroid taper, specific Imuran dosing, cyclosporine titration with target levels, structured CMV prophylaxis schedule. When UT Southwestern transitioned him to Everolimus—a high-risk immunosuppressant with serious known complications—his chart contained little indicating this drug was added or that any systematic monitoring plan existed.

UT Southwestern failed to disclose to Mr. Fischman or Plaintiff:

- off-label status;
- FDA black box warnings contraindicating heart transplant use;
- increased cancer risk contradicting the switch's purported justification;
- Valcyte discontinuation despite CMV mismatch;
- safer alternatives;
- chemotherapy-induced transplant vulnerability;
- TEAMMATE trial overlap;
- physicians' trial roles;
- wound healing impairment;
- required monitoring;
- mortality risks.

This is not a dispute over whether a single doctor wrote a perfect note. It is evidence that UT Southwestern's institutional documentation standards deteriorated to the point that a major immunosuppression change could occur without clear documentation or documented monitoring protocol. *Omaha Healthcare Center v. Johnson* treats such systemic record-keeping failures as institutional negligence independent of any provider's clinical judgment. Plaintiff's documentation allegations challenge institutional transparency and compliance

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 14 of 25

App. 167

systems grounded in governance statutes, PIA requirements, and *Omaha*—not treatment-level negligence within Chapter 74.

**E. System Architecture, Staffing, and Monitoring: Institutional Build Failures**

UT Southwestern's Epic electronic health record system failures demonstrate institutional Build-phase omissions outside Chapter 74. As a Solution Architect who designed and built Salesforce Health Cloud systems integrated with Epic at major health systems, Plaintiff possesses direct professional knowledge of how hospitals configure EHR systems to enforce institutional quality and safety protocols.

**1. Epic System Architecture Failure (Category 2)**

In a properly configured Epic implementation for high-risk medication management:

- Order sets include linked orders for follow-up appointments and labs that automatically populate when high-risk medications are prescribed

- Best Practice Advisories (BPAs) fire alerts when required monitoring is not scheduled within defined timeframes

- Health Maintenance modules track overdue labs and generate provider notifications

- Clinical decision support rules prevent encounter closure until required follow-up is scheduled

- Care Team configurations ensure accountability is assigned for monitoring high-risk medications

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                      Page 15 of 25

App. 168

- Problem List hard-coding makes permanent risk factors like CMV mismatch non-removable without override documentation requiring justification

UTSW configured none of these institutional safeguards into its Epic system for Everolimus or CMV mismatch despite the institution's Epic infrastructure being fully capable of supporting such safety measures.

Mr. Fischman's permanent CMV mismatch (donor CMV-positive, recipient CMV-negative) exemplifies this system architecture failure. The mismatch was documented for ~nine years and warranted continuous Valcyte prophylaxis, which UTSW maintained for nearly ~nine years. Yet at the encounter where Everolimus was initiated, Valcyte was also discontinued—despite the unchanged high-risk mismatch. UTSW's Epic configuration permitted a physician to discontinue Valcyte in a permanent CMV mismatch patient without any system alert, challenge, or documentation requirement.

This is an institutional configuration failure—a governance decision about how to program the hospital's safety architecture under Chapter 241 and 26 TAC §505.41. These are Build-phase decisions made by Epic analysts, clinical informaticists, and governance committees during system implementation and ongoing optimization—not Operate-phase treatment decisions made by bedside clinicians. *Bush* places such institutional design decisions outside Chapter 74's treatment-focused scope.

Similarly, UT Southwestern's MyChart system proves no follow-up appointments or labs were scheduled post-Everolimus despite FDA monitoring requirements. In hospital-configured Epic systems, order sets for high-risk medication initiation include mandatory linked appointments and labs; scheduling modules require booking before encounter closure;

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                    Page 16 of 25

App. 169

BPAs alert when monitoring is overdue. The absence of any scheduled follow-up reveals UTSW failed to configure mandatory workflows for high-risk drug monitoring.

**2. Swiss Cheese Model: No Defensive Layers**

*The Swiss Cheese Model* holds that adverse events result from aligned holes in multiple defensive layers. UT Southwestern created a system with no defensive layers:

- No policies (Category 1)

- No Epic safeguards (Category 2)

- Rotating physicians without assignment (Category 3)

- No mandatory monitoring or outcome tracking (Category 4)

When every institutional layer is absent, harm becomes predictable system outcome under Chapter 241, not unpredictable treatment complication under Chapter 74.

This is a Category 2 System Architecture Failure—institutional Build decisions outside Chapter 74.

**3. Staffing and Monitoring Failures (Categories 3 & 4)**

UT Southwestern's administrative system rotated multiple physicians through Mr. Fischman's care with no single provider responsible for monitoring Everolimus toxicity, coordinating labs, or responding to early warning signs. No hospital-driven protocol mandated scheduled labs, phone check-ins, or visits during the first month after initiating this high-risk drug, despite UT Southwestern's own research protocols showing close monitoring is standard and necessary.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                                Page 17 of 25

App. 170

As a result, Mr. Fischman went essentially unmonitored until he returned a month later with abdominal pain that proved to be post-transplant lymphoproliferative disorder—a catastrophic complication consistent with the known risk profile of aggressive immunosuppression.

Teaching hospitals face inherent continuity challenges from rotating personnel. Healthcare operations literature recognizes fragmented staffing models require stronger institutional compensatory mechanisms—robust handoff protocols, clear accountability assignments, better EHR-based tracking. The *Shouldice* model demonstrates that when operational models create inherent risks, institutional process design must compensate by building stronger continuity mechanisms.

UTSW did the opposite: combined maximum staffing fragmentation with no institutional continuity mechanisms for its Everolimus conversion program. Epic offers care coordination tools designed to mitigate such fragmentation (In Basket routing, care team assignments, handoff modules, longitudinal care plans), but UTSW failed to configure these tools for transplant patients on high-risk immunosuppression changes. No institutional protocol required continuous oversight when stable patients undergo systematic drug conversions. These allegations focus on how UT Southwestern's governing body structured staffing, supervision, and monitoring—system-level Design and Build choices under Chapter 241 and 26 TAC §505.41—not on whether any doctor misread a lab or chose wrong medication. *Ollie* holds hospitals are directly responsible for operational and staffing decisions, including supervision, allocation, and accountability assignment. UTSW's failure to design a staffing and accountability structure for its Everolimus conversion program created a system where,

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 18 of 25

App. 171

predictably, no individual physician felt responsible for monitoring Mr. Fischman during the critical first month post-conversion.

This represents Category 3 (Staffing and Accountability Failure under *Ollie*) and Category 4 (Monitoring Protocol Failure under *Easley* and Chapter 241)—institutional Build failures outside Chapter 74, not Operate-phase treatment decisions.

**F. Texas Precedent Confirms Claims Outside Chapter 74**

Texas decisions confirm hospitals have non-delegable institutional duties in precisely the areas Plaintiff challenges.

- *Bush v. Columbia Medical Center:* Hospital's failure to adopt and enforce appropriate protocols created foreseeable risk and supported direct institutional liability even though independent physicians delivered care. Claims turned on institutional protocol design omissions, not bedside choices. UTSW's failure to adopt protocols for off-label high-risk immunosuppressants despite running formal Everolimus studies falls in the same institutional duty category *Bush* recognizes—outside Chapter 74.

- *Davis v. Texas Health Harris Methodist*: Jury assigned 65% fault to hospital for failing to implement written medication policies even though independent physicians committed immediate error. Policy omissions are direct institutional liability, not vicarious liability. UTSW's "no documents" matches this pattern (Category 1 Policy Design Failure).

- *Omaha Healthcare Center v. Johnson:* Non-clinical, administrative, systemic failures— inadequate documentation, missing policies, monitoring breakdowns—support direct institutional claims independent of provider judgment. UTSW's rotating physicians,

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 19 of 25

**App. 172**

sparse documentation, and absent monitoring plans challenge institutional systems, not individual competence.

- ***Ollie v. Harris Methodist Fort Worth:*** Hospitals are directly responsible for operational and staffing decisions including supervision and allocation. Inadequate staffing is hospital-level negligence. UTSW's physician rotation without accountability represents systemic staffing failure (Category 3).

- ***Easley v. Christus St. Catherine:*** Ongoing monitoring and protocol enforcement are central hospital responsibilities when safety depends on detecting deterioration. Hospital's duty to enforce its own rules is institutional obligation. UTSW's intensive monitoring for trial cohort while leaving Mr. Fischman unmonitored is Category 4 institutional monitoring failure.

Chapter 74 was drafted to regulate claims challenging provision of medical care but not to immunize hospitals from accountability for defective institutional processes— especially those that appear to be driven by research, financial, and transparency choices rather than patient-centered clinical decision making.

Chapter 74 covers claims "for treatment, lack of treatment, or other claimed departure from accepted standards of medical care." Plaintiff alleges Design and Build failures:

- Category 1: Failures to adopt required Everolimus policies (Design failure under *Bush, Davis*)

- Category 2: EHR design and safety-flag failures (Build failure—system architecture under *Bush,* Chapter 241)

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                      Page 20 of 25

App. 173

- Category 3: Failures in physician-rotation staffing design (Build failure under *Ollie*)

- Category 4: Failures to implement mandatory monitoring (Build failure under *Easley,* Chapter 241)

- Category 5: Research-compliance failures creating two-tier protection system (Design failure under 45 C.F.R. Part 46)

UT Southwestern's conduct centers on how it programmed and monitored its system: creating detailed monitoring for Everolimus trial subjects while maintaining "no documents" for clinical patients; rotating physicians without accountable oversight; failing to require basic monitoring; maintaining documentation and PIA practices obscuring what was done and why. Texas law does not require these institutional omissions to be the sole cause of injury; it is enough that they were a substantial factor in bringing about a foreseeable system outcome, which Plaintiff alleges was made "almost inevitable" by UTSW's failure to adopt policies, configure monitoring, and assign accountability for Everolimus use.

Under *Bush, Davis, Omaha, Ollie, Easley,* the governance statutes, federal research standards, and healthcare operations principles exemplified by *Shouldice Hospital* (Harvard Business School Case No. 9-683-068), these are institutional Design and Build process failures in governance, monitoring, staffing, documentation, and transparency.

Evaluating these failures turns on statutes, written (or absent) policies, EHR configuration, monitoring schedules, and research protocols—matters that do not require expert testimony on what a reasonably prudent transplant physician would have done for Mr. Fischman at the bedside, which is the type of medical-judgment evidence Chapter 74 is concerned with.

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 21 of 25

App. 174

These are not Operate-phase treatment decisions, and evaluating them does not require medical-expert testimony on standard of care. These are governance, administrative, institutional, and regulatory failures—exactly the claims Texas courts have held fall outside Chapter 74.

These claims fall outside Chapter 74:

- No policies *(Bush/Davis)*

- No EHR safeguards *(Bush*/Ch. 241)

- No staffing continuity *(Ollie)*

- No monitoring (*Easley*/Ch. 241)

- Research inequity (45 C.F.R. §46)

Plaintiff contends they fall outside Chapter 74's core category of health care liability claims directed at individual treatment decisions, or at minimum constitute distinct institutional claims not subject to Chapter 74's expert report framework.

## V. Conclusion

The distinction is clear: Chapter 74 regulates individual physicians' Operate-phase treatment decisions made within a system. It does not immunize hospitals from liability for failing to Design and Build the system itself.

UT Southwestern implemented a systematic Everolimus conversion program with:

- No institutional policies (admitted under oath in PIA response - Category 1)

- No Epic safety configurations (despite institutional capability - Category 2)

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                   Page 22 of 25

**App. 175**

- No monitoring protocols (despite FDA requirements and UTSW's research showing necessity - Category 4)

- No accountability structures (rotating physicians, no assignment - Category 3)

- No protections for clinical patients (despite comprehensive TEAMMATE trial safeguards for research subjects - Category 5)

These are Design and Build failures—institutional programming decisions made by the governing body before any individual physician encountered Mr. Fischman. Under *Bush v. Columbia Medical Center, Texas Health Harris Methodist Hospital Southwest Fort Worth v. Davis, Omaha Healthcare Center v. Johnson, Harris Methodist Fort Worth v. Ollie, Christus St. Catherine v. Easley,* Education Code Chapter 65, UT System Rule 20201, Health & Safety Code Chapter 241, 26 TAC §505.41, and 45 C.F.R. Part 46, these institutional governance duties fall outside Chapter 74's treatment-focused definition.

The *Shouldice Hospital* case (Harvard Business School Case No. 9-683-068) demonstrates that when hospitals engineer comprehensive institutional processes, excellent outcomes follow predictably. UT Southwestern chose the opposite: systematic program implementation with no institutional engineering, creating a system where bad outcomes were inevitable.

Accordingly, the Court should grant Plaintiff's Motion for Advance Ruling under Texas Civil Practice & Remedies Code §74.353 and hold that Plaintiff's institutional governance claims are not Health Care Liability Claims subject to Chapter 74's requirements.

Further, the Court should:

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                              Page 23 of 25

**App. 176**

1. Exempt Plaintiff from Chapter 74 expert report requirements for these institutional governance claims

2. Permit discovery to proceed on institutional governance, policy adoption, Epic configuration, staffing design, monitoring protocols, and research compliance issues

3. Allow Plaintiff to develop evidence of these Design and Build institutional failures without Chapter 74 procedural constraints that apply only to Operate-phase treatment decisions

Respectfully submitted,

Date: December 12, 2025

/s/ _Gallit Fischman_____

GALLIT FISCHMAN, Pro Se

Individually and as surviving daughter of Dov Fischman, deceased
10114 Deermont Trail
Dallas, TX 75243
Phone: (214) 893-6720
Email: gallitfischman@yahoo.com

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 24 of 25

App. 177

**CERTIFICATE OF SERVICE**

I certify that on December 12, 2025, a true and correct copy of the foregoing instrument was

served on all counsel of record via electronic service through the Court's e-filing system as

follows:

Via e-Service

**Jason Warner**
Special Litigation Counsel
Office of the Attorney General of Texas
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
jason.warner@oag.texas.gov
Counsel for Defendant

/s/ _Gallit Fischman_____

**GALLIT FISCHMAN**

Pro Se Plaintiff

Cause No. DC-25-18350; *Gallit Fischman v. UTSW*
Brief to Support Motion for Advance Ruling Chapter 74
& Opposition to Plea in Abatement                                    Page 25 of 25

App. 178

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 109062195
Filing Code Description: Brief Filed
Filing Description: IN SUPPORT OF MOTION FOR ADVANCE RUILING UNDER §74.353 & IN OPPOSITION TO DEFENDANT'S PLEA IN ABATEMENT
Status as of 12/15/2025 7:57 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Matthew JasonWarner | | jason.warner@oag.texas.gov | 12/12/2025 5:23:49 PM | SENT |
| Gallit Fischman | | gallitfischman@yahoo.com | 12/12/2025 5:23:49 PM | SENT |

App. 179

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JUN - 5 2026

CLERK, U.S. DISTRICT COURT

By _JTF_

Deputy

GALLIT FISCHMAN,
Individually,

    Plaintiff,

v.

NOVARTIS PHARMACEUTICALS
CORPORATION,

    Defendant.

§
§
§
§
§
§
§
§
§
§
§
§
§

**3-26Cv1882-K**

Civil Action No. _____

---

## NOTICE OF RELATED CASE

---

Pursuant to Local Civil Rule 3.3, Plaintiff files this Notice of Related Case and states as follows:

This action may be related to the following case currently pending in the United States District Court for the Northern District of Texas before the Honorable Sidney A. Fitzwater:

*Fischman v. Epic Systems Corporation,* Civil Action No. 3:26-cv-00770-D.

The cases may involve a common nucleus of operative fact, including overlapping factual allegations concerning Dov Fischman, Everolimus treatment, transplant-related care, clinical information management, medical-record information, chronology, causation, and related events.

Plaintiff files this notice solely to comply with Local Civil Rule 3.3 and takes no position at this time regarding consolidation, reassignment, coordination, or any other administrative action.

Respectfully submitted,


/s/ Gallit Fischman
Gallit Fischman
Plaintiff Pro Se